# EX. B

**FRANCHISE DISCLOSURE DOCUMENT**
**CRAVE Franchising, LLC**
A Wyoming limited liability company
Herschler Building East, Suite 101
122 West 25th Street
Cheyenne, Wyoming 82002-0020
Tel: (516)316-7420
www.iwantcrave.com
email: samantha@iwantcrave.com



The franchise offered is for a quick serve "Crave" restaurant or food truck offering hot dogs, other cased meats, barbeque items, beverages, appetizers, and side dishes.  Your restaurant will also offer beer and may serve wine.  Your food truck will not offer beer or wine.  A Crave franchised business operates using the franchisor's proprietary recipes, formulae, techniques, trade dress, trademarks, and logos.

The total investment necessary to begin operation of a Crave restaurant franchise is $220,400 to $582,000.  This includes $45,000 that must be paid to the franchisor and/or its affiliate.  The total investment necessary to begin operation of a Crave food truck franchise is $190,800 to $270,300.  This includes $30,000 that must be paid to the franchisor and/or its affiliate.

The total investment necessary to begin the operation of a Crave multi-unit development business ranges from $217,800 to $619,500.  This includes $55,000 to $80,000 that must be paid to the franchisor and/or its affiliate.

This disclosure document summarizes certain provisions of your franchise agreement and other information in plain English.  Read this disclosure document and all accompanying agreements carefully. You must receive the disclosure document at least 14 calendar days before you sign a binding agreement with, or make any payment to the franchisor or an affiliate in connection with the proposed franchise sale. **Note, however, that no government agency has verified the information contained in this document.**

You may wish to receive your disclosure document in another format that is more convenient for you.  To discuss the availability of disclosures in different formats, contact Samantha Rincione at 122 West 25th Street, Suite 101, Cheyenne, Wyoming, 82002, and (516)316-7420.

The terms of your contract will govern your franchise relationship.  Don't rely on the disclosure document alone to understand your contract.  Read all of your contract carefully.  Show your contract and this disclosure document to an advisor, like a lawyer or an accountant.

Buying a franchise is a complex investment.  The information in this disclosure document can help you make up your mind.  More information on franchising, such as "*A Consumer's Guide to Buying a*

CRAVE FDD 2020 A6

*Franchise*," which can help you understand how to use this disclosure document, is available from the Federal Trade Commission.  You can contact the FTC at 1-877-FTC-HELP or by writing to the FTC at 600 Pennsylvania Avenue, NW, Washington, DC, 20580.  You can also visit the FTC's home page at *www.ftc.gov* for additional information.  Call your state agency or visit your public library for other sources of information on franchising.

There may also be laws on franchising in your state.  Ask your state agencies about them.

**Issuance Date: April 6, 2020**

**How to Use this Franchise Disclosure Document**

Here are some questions you may be asking about buying a franchise and tips on how to find more information.

| QUESTION | WHERE TO FIND INFORMATION |
|---|---|
| **How much can I earn?** | Item 19 may give you information about outlet sales, costs, profits, or losses.  You should also try to obtain this information from others, like current and former franchisees.  You can find their names and contact information in Item 20 or Exhibit D. |
| **How much will I need to invest?** | Items 5 and 6 list fees you will be paying to the franchisor or at the franchisor's direction.  Item 7 lists the initial investment to open.  Item 8 describes the suppliers you must use. |
| **Does the franchisor have the financial ability to provide support to my business?** | Item 21 or Exhibit A includes financial statements.  Review these statements carefully. |
| **Is the franchise system stable, growing or shrinking?** | Item 20 summarizes the recent history of the number of company-owned and franchised outlets. |
| **Will my business be the only CRAVE business in my area?** | Item 12 and the "territory" provisions in the franchise agreement and multi-unit development agreement describe whether the franchisor and other franchisees can compete with you. |
| **Does the franchisor have a troubled legal history?** | Items 3 and 4 tell you whether the franchisor or its management have been involved in material litigation or bankruptcy proceedings. |
| **What's it like to be a CRAVE franchisee?** | Item 20 or Exhibit D lists current and former franchisees.  You can contact them to ask about their experiences. |
| **What else should I know?** | These questions are only a few things you should look for.  Review all 23 Items and all Exhibits in this disclosure document to better understand this franchise opportunity.  See the table of contents. |

## What You Need to Know About Franchising *Generally*

**<u>Continuing responsibility to pay fees</u>.**  You may have to pay royalties and other fees even if you are losing money.

**<u>Business model can change.</u>**  The franchise agreement may allow the franchisor to change its manuals and business model without your consent.  These changes may require you to make additional investments in your franchise business or may harm your franchise business.

**<u>Supplier restrictions.</u>**  You may have to buy or lease items from the franchisor or a limited group of suppliers the franchisor designates.  These items may be more expensive than similar items you could buy on your own.

**<u>Operating restrictions.</u>**  The franchise agreement may prohibit you from operating a similar business during the term of the franchise.  There are usually other restrictions.  Some examples may include controlling your location, your access to customers, what you sell, how you market, and your hours of operation.

**<u>Competition from franchisor.</u>**  Even if the franchise agreement grants you a territory, the franchisor may have the right to compete with you in your territory.

**<u>Renewal.</u>**  Your franchise agreement may not permit you to renew.  Even if it does, you may have to sign a new agreement with different terms and conditions in order to continue to operate your franchise business.

**<u>When your franchise ends.</u>**  The franchise agreement may prohibit you from operating a similar business after your franchise ends even if you still have obligations to your landlord or other creditors.

## Some States Require Registration

Your state may have a franchise law, or other law, that requires franchisors to register before offering or selling franchises in the state.  Registration does not mean that the state recommends the franchise or has verified the information in this document.  To find out if your state has a registration requirement, or to contact your state, use the agency information in Exhibit G.

Your state also may have laws that require special disclosures or amendments be made to your franchise agreement.  If so, you should check the State Specific Addendum.  See the Table of Contents for the location of the State Specific Addendum.

## Special Risks to Consider About *This* Franchise

Certain states require that the following risk(s) be highlighted:

1) **<u>Out-of-State Dispute Resolution.</u>**  The franchise agreement and multi-unit development agreement require you to resolve disputes with the franchisor by mediation, arbitration and/or litigation only in Delaware.  Out-of-state arbitration or litigation may force you to accept a less favorable settlement for disputes.  It may also cost more to mediate, arbitrate, or litigate with the franchisor in Delaware than in your own state.

Certain states may require other risks to be highlighted. If so, check the "State Specific Addendum" (if any) to see whether your state requires other risks to be highlighted.

CRAVE FDD 2020 A6

## TABLE OF CONTENTS

**ITEM 1** ................................................................................................................... **1**

THE FRANCHISOR, AND ANY PARENTS, PREDECESSORS AND AFFILIATES ......................... 1

**ITEM 2** ................................................................................................................... **4**

BUSINESS EXPERIENCE ................................................................................................ 4

**ITEM 3** ................................................................................................................... **5**

LITIGATION ................................................................................................................ 5

**ITEM 4** ................................................................................................................... **5**

BANKRUPTCY ............................................................................................................. 5

**ITEM 5** ................................................................................................................... **5**

INITIAL FEES .............................................................................................................. 5

**ITEM 6** ................................................................................................................... **6**

OTHER FEES ............................................................................................................... 6

**ITEM 7** ................................................................................................................. **13**

ESTIMATED INITIAL INVESTMENT ............................................................................. 13

**ITEM 8** ................................................................................................................. **18**

RESTRICTIONS ON SOURCES OF PRODUCTS AND SERVICES ......................................... 18

**ITEM 9** ................................................................................................................. **24**

FRANCHISEE'S OBLIGATIONS .................................................................................... 24

**ITEM 10** ............................................................................................................... **25**

FINANCING ............................................................................................................... 25

**ITEM 11** ............................................................................................................... **25**

FRANCHISOR'S ASSISTANCE, ADVERTISING, COMPUTER SYSTEMS AND TRAINING ...... 25

**ITEM 12** ............................................................................................................... **35**

TERRITORY .............................................................................................................. 35

**ITEM 13** ............................................................................................................... **38**

TRADEMARKS ........................................................................................................... 38

**ITEM 14** ............................................................................................................... **40**

PATENTS, COPYRIGHTS AND PROPRIETARY INFORMATION ................................. 40

**ITEM 15** ............................................................................................................... **41**

OBLIGATION TO PARTICIPATE IN THE ACTUAL OPERATION OF THE FRANCHISE
BUSINESS .................................................................................................................. 41

**ITEM 16** ............................................................................................................... **42**

RESTRICTIONS ON WHAT THE FRANCHISEE MAY SELL ............................................... 42

**ITEM 17** ................................................................................................................ **42**

RENEWAL, TERMINATION, TRANSFER AND DISPUTE RESOLUTION ................................... 42

**ITEM 18** ................................................................................................................ **49**

PUBLIC FIGURES ............................................................................................... 49

**ITEM 19** ................................................................................................................ **49**

FINANCIAL PERFORMANCE REPRESENTATIONS .................................................. 49

**ITEM 20** ................................................................................................................ **50**

OUTLETS AND FRANCHISEE INFORMATION ............................................... 50

**ITEM 21** ................................................................................................................ **52**

FINANCIAL STATEMENTS .......................................................................... 52

**ITEM 22** ................................................................................................................ **53**

CONTRACTS ................................................................................................. 53

**ITEM 23** ................................................................................................................ **53**

RECEIPTS ..................................................................................................... 53

<u>EXHIBITS</u>

A – Financial Statements
B-1 – Franchise Agreement
B-2 – Food Truck Addendum
C – Multi-Unit Development Agreement
D – List of Franchisees and Franchisees Who Have Left the System
E – Table of Contents of Confidential Operations Manual
F – State Specific Addendum
G – List of State Administrators/Agents for Service of Process
H – Form of General Release
I – Receipt

**ITEM 1**
**THE FRANCHISOR, AND ANY PARENTS, PREDECESSORS AND AFFILIATES**

**The Franchisor**

CRAVE Franchising, LLC (referred to in this Disclosure Document as "Crave," "we," "us," or "our" and where the context requires also includes our affiliates) was formed as a Wyoming limited liability company on February 24, 2018.  Our headquarters is at Herschler Building East, Suite 101, 122 West 25th Street, Cheyenne, Wyoming, 82002-0020, and we do business under our corporate name and the Marks as described below.  In this Disclosure Document, we refer to the person or entity that will be signing the Franchise Agreement (defined below) as "you," "your," or "Franchisee," which includes all franchise owners and partners, if you are a corporation, partnership or other entity.

We do not own or operate any businesses of the type being franchised.  We have not offered franchises in any other line of business and we do not engage in any other business activity.  We began offering franchises in February 2018.

Our agents for service of process are listed in Exhibit G.

**Our Parents, Predecessors and Affiliates**

We have no predecessor or affiliate.  Our parent is Rincione Investments LLC, a Wyoming limited liability company formed on February 14, 2018, and headquartered at our address ("Parent").  Our Parent does not own or operate a business of the type being franchised and will not guarantee our performance under either the Franchise Agreement or Multi-Unit Development Agreement.  Our Parent is not an approved supplier of any product or service you must purchase or lease.  Our Parent owns the proprietary marks, as described in Item 13.

**Description of Franchise**

We offer franchises for the right to establish and operate a quick serve "Crave" restaurant or food truck offering hot dogs, other cased meats, barbeque items, beverages, appetizers, and side dishes ("Restaurant", "Food Truck" or "Franchised Business").  If you choose to, and if permitted by your local ordinances, you may also offer beer and wine from your Restaurant.  Food Trucks will not offer beer and wine.  The Franchised Businesses operate under the trade name and mark "Crave" and the additional principal service marks, trademarks, trade names, logos, emblems, and indicia of origin identified in Item 13.  These principal marks and all other marks which may be designated by us in the future in writing for use with the System (defined below) are referred to in this Disclosure Document as the "Marks" or "Proprietary Marks".

Crave Franchised Businesses are operated under the Marks and the System in accordance with the terms of the Franchise Agreement.  Crave Restaurants are typically located in shopping malls, in strip centers or as free-standing locations with easy access and ample parking and will need approximately 2,500 to 3,500 square feet of space.  Each Restaurant will offer dine-in, take out, delivery and catering services and may have a drive-through.  Crave Food Trucks typically operate in densely populated towns and cities and near parks and other large public outdoor spaces.

The Franchised Businesses are established and operated under a comprehensive and unique system (the "System").  The System includes distinctive signage, interior and exterior design, décor and color scheme; special recipes and menu items, including proprietary products and ingredients; uniform standards, specifications, and procedures for operations; quality and uniformity of products and services offered;

inventory, management and financial control procedures (including point of sales and tracking systems); training and assistance; and advertising and promotional programs; all of which we may change, improve, and further develop, in our discretion. Certain aspects of the System are more fully described in this Disclosure Document and the confidential operations manual (the "Manual"), which you should expect to evolve over time, that are provided to you as a Franchisee.

**Franchise Agreement**

We offer the right to establish and operate a Restaurant or Food Truck under the terms of a single unit franchise agreement within a designated territory (the "Franchise Agreement"). Our current form of Franchise Agreement and Food Truck Addendum are Exhibits B-1 and B-2 of this Disclosure Document. You may be an individual, corporation, partnership, or other form of legal entity. If you are an entity, then under the Franchise Agreement, each of your owners would be characterized as Franchisee's Principals (referred to in this Disclosure Document as "your Principals"). The Franchise Agreement is signed by us, by you, and individually by each of your Principals. By signing the Franchise Agreement, your Principals agree to be individually bound by the obligations contained in the Franchise Agreement. Depending on the type of business activities in which you or your Principals may be involved, we may require you or your Principals to sign additional confidentiality and non-competition agreements.

You must designate a general manager who will be the main individual responsible for your business ("General Manager"). We recommend, but do not require, that you be the General Manager. Your General Manager does not have to own an equity interest in you or the franchise. The General Manager must sign covenants to maintain the confidentiality of information he/she learns while employed as your General Manager, and your General Manager must sign non-competition covenants.

**Multi-Unit Development Agreement**

In certain circumstances, we will offer the right to enter into a multi-unit development agreement in the form attached as Exhibit C to this Disclosure Document (the "Multi-Unit Development Agreement") to develop any combination of multiple franchised Restaurants or Food Trucks to be located within a specifically described geographic area (the "Development Area"). We will determine the Development Area before you sign the Multi-Unit Development Agreement and it will be included in the Multi-Unit Development Agreement. You must establish at least three Franchised Businesses within the Development Area according to a minimum performance schedule, and you must sign a separate Franchise Agreement for each Franchised Business established under the Multi-Unit Development Agreement.

You will sign the Franchise Agreement for the first Franchised Business to be developed under the Multi-Unit Development Agreement at the same time you sign the Multi-Unit Development Agreement. For each additional Crave franchise developed under the Multi-Unit Development Agreement, you must sign the form of Franchise Agreement that we are then offering to new franchisees. The size of the Development Area will vary depending upon local market conditions and the number of Franchised Businesses to be developed.

**Market and Competition**

The market for restaurants and food trucks in general is well developed and intensely competitive. You will serve the general public and will compete with a variety of businesses, including locally owned to regional, national and chain restaurants, some of which may be franchise systems. We may establish other restaurants or food trucks in your area (if permitted under the Franchise Agreement) and/or sell or license others to sell products in your area. Also, we may sell products through the internet, toll-free telephone numbers, catalogs, or other similar means of distribution to customers at any location, which may

be located in your area.  See Items 12 and 16 for a description of your permitted activities and your rights, and our permitted and restricted activities and rights.

**Industry Regulations**

The restaurant industry is heavily regulated.  A wide variety of Federal, state and local laws, rules and regulations have been enacted that may impact the operation of your Restaurant, and may include those which:  (a) establish general standards, zoning, permitting restrictions and requirements and other specifications and requirements for the location, construction, design, maintenance and operation of the Restaurant's premises; (b) set standards pertaining to employee health and safety; (c) regulate matters affecting the health, safety and welfare of your customers, such as general health and sanitation requirements for restaurants and laws and regulations relating to access by persons with disabilities; employee practices concerning the storage, handling, cooking and preparation of food; restrictions on smoking; availability of and requirements for public accommodations and requirements for fire safety and general emergency preparedness; (d) regulate food and liquor service operations including establishing requirements for food identification and labeling; and (e) regulate advertisements.  State and local agencies inspect restaurants to ensure that they comply with these laws and regulations.  You should investigate whether there are regulations and requirements that may apply in the geographic area in which you are interested in locating your Restaurant and you should consider both their effect and costs of compliance.

Many of the regulations that apply to restaurants, as detailed in the paragraph above, also apply to the operation of food trucks.  The following are additional regulations that may apply to food trucks: (a) special health and food service licensing requirements and special accommodations for restrooms; (b) restrictions and requirements governing the use of vending machines; and (c) regulations regarding the proper use, storage and disposal of waste, insecticides, and other hazardous materials.  You must investigate the state and local laws that relate to zoning and permitting in the area where you will operate your Food Truck, and in the area where you will park and store your Food Truck when not in use.  You must comply with all local, state, and federal laws that apply to your Food Truck relating to driver's licensing, commercial food vehicle registration, permitting and licensing, automobile insurance requirements, health laws, sanitation requirements, and no-smoking laws.  In some states, a physical examination may be required to obtain a license to drive a commercial vehicle.  Most states require liability insurance coverage for both the driver and the vehicle.

Many of the laws, rules and regulations that apply to business generally, such as the Americans With Disabilities Act, Federal Wage and Hour Laws and the Occupational Safety and Health Act, also apply to restaurants.  The U.S. Food and Drug Administration, the U.S. Department of Agriculture and state and local health departments administer and enforce laws and regulations that govern food preparation and service and restaurant sanitary conditions.  The federal Clean Air Act and various implementing state laws require certain state and local areas to meet national air quality standards limiting emissions of ozone, carbon monoxide and particulate matters, including caps on emissions from commercial food preparation.  Some areas have also adopted or are considering proposals that would regulate indoor air quality.

The Nutrition Labeling and Education Act (NLEA) sets regulations for food labeling, including nutritional label standards, nutrient content claims, and health claims.  NLEA applies to virtually all foods in the food supply, including food served and sold in restaurants.  While NLEA specifies a number of exemptions for restaurants, there are many instances where a nutritional label is required.  The Food and Drug Administration's *Nutritional Labeling Guide for Restaurants and Other Retail Establishments* provides answers to commonly asked questions regarding the application of NLEA.

You must identify, investigate, satisfy and comply with all laws, ordinances and/or regulations applicable to your Franchised Business, including employment, workers' compensation, insurance,

corporate, tax, public health and similar laws and regulations, because they vary from place to place, can change over time and may affect the operation of your franchise. You should independently research and review the legal requirements of the food services industry with your own attorney before you sign any binding documents or make any investments.

You will offer beer and may offer wine for sale at your Restaurant, unless it is prohibited by applicable law. You must comply with any federal, state, county, municipal, or other local laws and regulations relating to beer and/or wine that may apply to your Restaurant. You should consult with your attorney concerning those and other local laws and ordinances that may affect the operation of your Restaurant. You must obtain any applicable real estate permits (such as zoning), real estate licenses, liquor licenses and operational licenses.

You must have your license to offer beer and wine before you open the Restaurant. The difficulty and cost of obtaining a liquor license and the procedures for securing the license vary greatly from area to area. There is also wide variation in state and local laws and regulations that govern the sale of beverage alcohol. In addition, state "dram shop" laws give rise to potential liability for injuries that are directly or indirectly related to the sale and consumption of alcohol.

Each of your managers and other employees we designate must be ServSafe (or similar) certified. Certain managers and other employees we designate (including cashiers) must also complete alcohol awareness or TIPS training.

## ITEM 2
## BUSINESS EXPERIENCE

### Chief Executive Officer (CEO) and Chief Operations Officer (COO) – Samantha Rincione

Mrs. Rincione has been our CEO and COO since our inception in February 2018 and has been CEO and COO of our Parent since its inception in February 2018. From June 2017 to the present, she has been a principal of Emerging Franchises, a consulting firm based in St. James, New York. From February 2015 to June 2017, she was Vice President of Franchise Development of UFood Grill in Burlington, Massachusetts. From February 2015 to June 2017, she was an independent franchise development consultant based in Burlington. Massachusetts. Mrs. Rincione was CEO/President of restaurant operator SG Mango, LLC in Westhampton Beach, New York, from February 2010 to February 2015.

### Chief Development Officer (CDO) – Salvatore Rincione

Mr. Rincione has been our CDO since our inception in February 2018 and has been CDO of our Parent since its inception in February 2018. From June 2017 to the present, he has been a principal of SR Consulting, a restaurant consulting firm based in St. James, New York. From February 2015 to June 2017, he was Chief Executive Officer of UFood Grill in Burlington, Massachusetts. From February 2015 to June 2017, he was Vice President of Healthy Acquisitions Corp. in Burlington, Massachusetts. From September 2007 to January 2015, he was Vice President of BRIX Holdings in Holbrook, New York.

### Director of Operations and Training – Jake Moran

Mr. Moran has been our Director of Operations and Training since our inception in February 2018. From June 2017 to the present, Mr. Moran has been Franchise Director for Emerging Franchises, a consulting firm based in St. James, New York. From February 2015 to June 2017, he was Training Manager for BRIX Holdings in Deer Park, New York. Mr. Moran was Training Manager for SG Mango North Babylon LLC in Deer Park, New York, from September 2012 to February 2015.

## ITEM 3
## LITIGATION

No litigation is required to be disclosed in this Item.

## ITEM 4
## BANKRUPTCY

No bankruptcy information is required to be disclosed in this Item.

## ITEM 5
## INITIAL FEES

**Franchise Agreement**:  You must pay us an initial franchise fee of $40,000 for the right to establish a single Crave Restaurant under a Franchise Agreement.  If you are purchasing your second or third Restaurant, the initial franchise fee will be reduced to $35,000.  If you are purchasing your fourth or later Restaurant, the initial franchise fee will be reduced to $30,000.

You must pay us an initial franchise fee of $25,000 for the right to establish a single Crave Food Truck business under a Franchise Agreement.  If you already own and operate a Crave Restaurant and desire to own and operate a Food Truck business, the initial franchise fee for the Food Truck will be reduced to $20,000.

From time to time we may offer special incentive programs as part of our franchise development activities.  We currently offer an incentive program where we will discount the initial franchise fee by $5,000 to veterans and active-duty military personnel for the first Franchised Business purchased.  We have the right to offer, modify or withdraw any incentive program without notice to you.  The initial franchise fee is imposed uniformly on all franchisees and is not refundable under any circumstances.

In the last fiscal year, the initial franchise fees for four franchisees were discounted between $5,000 and $10,000.

**Grand Opening Marketing**:  You must pay us $5,000 for a grand opening marketing campaign for your Franchised Business that we will conduct on your behalf.  This money is not refundable.

**Multi-Unit Development Agreement**:  If you qualify to develop and operate multiple Crave Franchised Businesses, then you will pay to us a development fee equal to 100% of the initial franchise fee for the first Franchised Business you commit to develop under the Multi-Unit Development Agreement plus 50% of the initial franchise fee for each additional Franchised Business you commit to develop under the Multi-Unit Development Agreement.  You may commit to develop any combination of Restaurants and Food Trucks under a Multi-Unit Development Agreement.  For example, if you commit to develop three Food Trucks, the development fee is calculated as $25,000 + (2 x $12,500 = $25,000) = $50,000.  If you commit to develop three Restaurants, the development fee is calculated as $40,000 + (2 x $17,500 = $35,000) = $75,000.  If you commit to develop a minimum of three units in some other combination of Food Trucks and Restaurants, the development fee will be an amount between $50,000 and $75,000.  The development fee is fully earned by us when received and is not refundable or credited against any future fees payable by you under any Franchise Agreement or otherwise.

You will sign the Franchise Agreement for the first Franchised Business at the same time you sign the Multi-Unit Development Agreement, and we will apply a portion of the development fee to pay the

initial franchise fee for the first Franchised Business in full.  For each additional Franchised Business you will develop under the Multi-Unit Development Agreement, we will apply a credit of 50% of the amount of the initial franchise fee for that Franchised Business, and the balance of the initial franchise fee due for that Franchised Business is payable in a lump sum when you sign the Franchise Agreement for that Franchised Business.  The development fee is imposed uniformly on all multi-unit developers and is not refundable under any circumstances.

There are no other purchases from or payments to us or any affiliate of ours that you must make before your Franchised Business opens for business.

## ITEM 6
## OTHER FEES

| (1)<br>Fees [1] | (2)<br>Amount | (3)<br>Due Date | (4)<br>Remarks |
|---|---|---|---|
| Royalty Fee [2] | 7% of Gross Sales | Payable weekly on Wednesday (unless Wednesday is not a business day, then it is due on the next business day) | Royalty Fees are calculated based on Gross Sales for the previous week ending Sunday.  Amounts due will be withdrawn by EFT from your designated bank account. |
| Brand Development Fee [3] | 1% of Gross Sales | Payable together with the Royalty Fee | The Brand Development Fund is described in Item 11.  Food Truck businesses are not required to pay the brand development fee. |
| Local Marketing | 1% of Gross Sales for Restaurants<br><br>2% of Gross Sales for Food Trucks | Must be spent on a quarterly basis | Payable to your local marketing suppliers.  Any marketing you wish to use must first be approved by us. |
| Cooperative Marketing [4] | As determined by the members | As determined by the members | If a marketing cooperative is formed for the geographic area where your Franchised Business is located, you must join the cooperative.  Any money you contribute to a cooperative will count toward your local marketing requirement. |

| (1)<br>Fees [1] | (2)<br>Amount | (3)<br>Due Date | (4)<br>Remarks |
|---|---|---|---|
| Initial Training (For New or Replacement Employees) | Our then-current per diem training fee, plus trainees' expenses<br><br>Current per diem fee, per trainee = $500 | Before training | The cost to train two people is included in the initial franchise fee.  If you request that we provide our initial training program to any additional employees, or to new or replacement employees during the term of your Franchise Agreement, you must pay our training fee as well as the trainees' expenses, including travel, lodging, meals and wages. |
| Additional On-Site Training / Remedial Training | Our then-current per diem rate per trainer, plus expenses<br><br>Current per diem rate = $500 | When billed | If you request that we provide additional training at your Franchised Business, or if as the result of an inspection or quality assurance audit we believe that remedial training is necessary, you must pay our daily fee for each trainer we send to your Franchised Business, and you must reimburse each trainer's expenses, including travel, lodging and meals. |
| Interest | 18% per annum or the highest interest rate allowed by applicable law, whichever is greater | On demand | Interest may be charged on all overdue amounts.  Interest accrues from the original due date until payment is received in full. |
| Audit Fee | Cost of audit (estimated to be between $1,000 and $5,000) | When billed | Payable only if we find, after an audit, that you have understated Gross Sales by 2% or more or you have understated any amount you owe to us.  You must also pay the understated amount plus interest. |

| (1)<br>Fees [1] | (2)<br>Amount | (3)<br>Due Date | (4)<br>Remarks |
|---|---|---|---|
| Insufficient Funds Fee | $100 per occurrence | On demand, if incurred | Payable if there are insufficient funds in your account to pay fees due to us. If you incur three insufficient funds fees in any 12-month period, we have the right to terminate your Franchise Agreement. |
| Transfer Fee – Transfer Between Owners | $5,000 | With request for approval of transfer | For any transfer of ownership interests or shares between the owners of the franchise, or if you are adding a new owner (as long as majority ownership does not change). |
| Transfer Fee – Franchise Agreement | $5,000 | With request for approval of transfer | No fee charged for a one-time transfer from individual(s) to a corporate entity formed for convenience of ownership of the franchise. |
| Transfer Fee – Multi-Unit Development Agreement | $5,000 | With request for approval of transfer | No fee charged for a one-time transfer from individual(s) to a corporate entity formed for convenience of ownership of the franchise. |
| Renewal Fee | $5,000 | Upon renewal of the Franchise Agreement | |
| Relocation Fee | $5,000 | With request for approval of relocation | If you wish to relocate your Restaurant or operate your Food Truck in a different municipality |
| Inspection / Product and Supplier Evaluation | $250 per product or supplier to be evaluated, plus reimbursement of our expenses | On demand | Payable if you request that we evaluate a product or supplier that we have not previously approved and that you want to use for your Franchised Business. Payable also if we determine that your Franchised Business is offering items that do not conform to our specifications. |
| Liquidated Damages | See footnote 5 | | |

| (1)<br>Fees [1] | (2)<br>Amount | (3)<br>Due Date | (4)<br>Remarks |
|---|---|---|---|
| Costs and Attorneys' Fees | Will vary under circumstances | On demand | If you default under your agreement, you must reimburse us for the expenses we incur (such as attorneys' fees) in enforcing or terminating the agreement. |
| Indemnification | Will vary under circumstances | On demand | You must reimburse us for the costs we incur if we are sued or held liable for claims that arise from your operation of the Franchised Business or for costs associated with defending claims that you used the trademarks in an unauthorized manner. |
| Repair, Maintenance, and Remodeling/ Redecorating | Will vary under circumstances | As incurred | Payable to approved suppliers.  You must regularly clean and maintain your Franchised Business and its equipment.  We may require you to remodel or redecorate your Franchised Business to meet our then-current image for all Crave businesses.  We will not require you to remodel or redecorate your Franchised Business more frequently than every five years. |
| Charges for "mystery shopper" quality control evaluation | Up to $150 | Monthly | See Note 6.  The mystery shopper program will be separate from our programs for customer surveys and customer satisfaction audits (which may require you to accept coupons from participating customers for discounted or complimentary items). |
| ServSafe / TIPS (or similar) Certification | $150 per person or the then-current market rate | As needed | Each of your managers and other employees we designate must be ServSafe and TIPS or similarly certified.  Payable to an approved supplier |

| (1)<br>Fees [1] | (2)<br>Amount | (3)<br>Due Date | (4)<br>Remarks |
|---|---|---|---|
| Insurance Premiums | Reimbursement of our costs, plus 10% administrative fee | On demand | If you do not maintain the required insurance coverages, we have the right (but not the obligation) to obtain insurance on your behalf. |
| Management Fee | 10% of Gross Sales, plus expenses | If incurred | We may step in and manage your Franchised Business in certain circumstances, such as death, disability, or prolonged absence.  We will charge a management fee if we manage your Franchised Business, and you must reimburse our expenses. |
| Co2 Equipment Fee | $100 to 300 | Monthly | Payable to approved supplier |
| Point of Sale Software Fee-Clover POS System | $135 to $175 for Restaurant<br><br>$50 to $75 for Food Truck | Monthly | Payable to Clover Network, Inc., our designated supplier for the point of sale system. |
| Point of Sale Reporting App-Abreeze | $5 to $48 | Monthly | See Note 7.  Payable to Clover Network, Inc., for use of the Abreeze Reporting App that is required for weekly Gross Sales reporting. |
| Untappd App Subscription | $500 per year or $20-$50 per month | Annually or Monthly | Payable to Untappd for use of the app used for updating the tap beers on the beer wall and for communication with the local beer community.  Subscriptions may be purchased annually or monthly but use of this app is mandatory.  This subscription is not required for Food Truck businesses. |
| Gift Card Program | Will vary, depending on number of gift cards sold and/or processed | As incurred | Payable to approved supplier. You must participate in our gift card program.  Gift cards will be available for sale and redemption at any Restaurant or Food Truck in the System. |

| (1)<br>Fees [1] | (2)<br>Amount | (3)<br>Due Date | (4)<br>Remarks |
|---|---|---|---|
| Crave Loyalty Program and Digital Ordering Mobile Solution—Appetizer App | $90 to $105 | Monthly | Payable to Clover Network, Inc., our designated supplier of loyalty, mobile application, digital ordering, and self-order kiosk services. |
| Prohibited Product or Service Fee | $500 per day for each day the infraction continues | As incurred | If you offer any product or service at your Franchised Business that we have not approved |
| Menu Board and Music | $139 to $150 | Monthly | Payable to approved supplier. Food Truck businesses are not required to pay the Menu Board and Music fees. |
| PourMyBeer Support Fee | $250 | Monthly | Payable to PourMyBeer for the support and maintenance services related to the beer wall in your Restaurant. Food Truck businesses are not required to pay this fee. |

**Notes**:

1.      All fees described in this Item 6 are non-refundable.  Except as otherwise indicated in the preceding chart, we impose all fees and expenses listed and you must pay them to us.  Except as specifically stated above, the amounts given may be due to changes in market conditions, our cost of providing services and future policy changes.  At the present time we have no plans to increase payments over which we have control, but as noted in the chart above and in these notes, we have the right to increase certain fees upon notice to you.

2.      For the purposes of determining the royalties to be paid under the Franchise Agreement, "Gross Sales" means the total selling price of all services and products and all income of every other kind and nature related to the Franchised Business, whether for cash or credit and regardless of collection in the case of credit.  If a cash shortage occurs, the amount of Gross Sales will be determined based on the records of the point of sale system and any cash shortage will not be considered in the determination.  Gross Sales expressly excludes taxes collected from your customers and paid to the appropriate taxing authority and customer refunds or adjustments.

You must report your Gross Sales to us by Tuesday each week for the previous week ending Sunday.  The Royalty Fee and brand development fee (for Restaurants only) will be withdrawn from your designated bank account by electronic funds transfer ("EFT") weekly on Wednesday based on the Franchised Business' Gross Sales for the preceding week ending Sunday.  If you do not report the Franchised Business' Gross Sales, we may debit your account for 120% of the last Royalty Fee and brand development fee (for Restaurants only) that we debited.  If the fees we debit are less than the fees you actually owe us, once we have been able to determine the true and correct Gross Sales, we will debit your account for the balance on a day we specify.  If the fees we debit are greater than the fees you actually owe

us, we will credit the excess against the amount we otherwise would debit from your account during the following week.

If any state imposes a sales or other tax on the Royalty Fees, then we have the right to collect this tax from you.

If a state or local law applicable to your Restaurant prohibits or restricts in any way your ability to pay Royalty Fees or other amounts based on Gross Sales derived from the sale of beverage alcohol at the Restaurant, then the percentage rate for calculating Royalty Fees shall be increased, and the definition of Gross Sales shall be changed to exclude sales of beverage alcohol, so that the Royalty Fees to be paid by you shall be equal to the amounts you would have had to pay if sales from beverage alcohol were included in Gross Sales.  For example, if you generated $1,000 in Gross Sales, of which $200 is from the sale of beverage alcohol, then your weekly Royalty Fee is $60 (6% x $1,000).  If you are not permitted by law to pay Royalty Fees on the sale of beverage alcohol, then we must recalculate your royalty percentage so that you still pay the full Royalty Fee.  In our example, we must deduct $200 from the Gross Sales and raise your royalty percentage to 7.5% so that we may collect the same $60 Royalty Fee ($1,000 - $200 = $800 x 7.5% = $60).

3.      We will establish and administer a Brand Development Fund on behalf of the System to provide national or regional creative materials for the benefit of the System.

4.      Cooperatives will include all Franchised Businesses in a designated geographic area and may include Crave businesses owned by us and our affiliates.  Each Crave business has one vote in the cooperative, but no one Crave business or commonly controlled group of businesses will have more than 25% of the total vote.  No cooperatives have been established as of the date of this Disclosure Document.

5.      If we terminate your Franchise Agreement for cause, you must pay us within 15 days after the effective date of termination liquidated damages equal to the average monthly Royalty Fees you paid or owed to us during the 12 months of operation preceding the effective date of termination multiplied by (a) 24 (being the number of months in two full years), or (b) the number of months remaining in the Agreement had it not been terminated, whichever is lower.

6.      We may use an independent service to conduct a "mystery shopper" quality control and evaluation program.  You must participate in this program, and we may require that you pay the then-current charges imposed by the evaluation service (as we direct, either directly to the evaluation service provider or to us as a reimbursement).

7.      Although the computer system is designed to enable us to have independent access to the information monitored by the system, this does not diminish your responsibility to report your Gross Sales to us weekly as described in Note 2 above.  Gross Sales will be reported to us through the Abreeze Reporting App available through the Clover point of sale system.  You are required to use the app to calculate and report your Gross Sales to us each week.

**ITEM 7**
**ESTIMATED INITIAL INVESTMENT**

**YOUR ESTIMATED INITIAL INVESTMENT - RESTAURANT**

| (1)<br>Type of<br>Expenditure | (2)<br>Amount | (3)<br>Method of<br>Payment | (4)<br>When Due | (5)<br>To Whom<br>Payment is to<br>be Made |
|---|---|---|---|---|
| Initial Franchise Fee [1] | $40,000 | Lump Sum | When Franchise Agreement Signed | Us |
| Rent – 3 Months [2] | $9,000 to $30,000 | As arranged | As arranged | Landlord |
| Lease & Utility Security Deposit [3] | $4,000 to $15,500 | As arranged | As arranged | Landlord, Utility Companies |
| Design & Architect Fees [4] | $1,000 to $12,500 | As arranged | As arranged | Designer or Architect |
| Leasehold Improvements [5] | $50,000 to $275,000 | As arranged | As arranged | Contractor |
| Signage [6] | $3,000 to $18,000 | As arranged | As arranged | Suppliers |
| Equipment, Furniture and Fixtures [7] | $75,000 to $120,000 | As arranged | As arranged | Suppliers |
| Point of Sale & Computer Equipment [8] | $2,400 to $5,500 | As arranged | As arranged | Suppliers |
| Business Licenses & Permits (Not Including Beer/Wine License) [9] | $500 to $1,500 | As arranged | As arranged | Government Agencies |
| Professional Fees [10] | $1,000 to $2,500 | As arranged | As arranged | Attorney, Accountant |
| Insurance – 3 Months [11] | $1,000 to $2,000 | As arranged | As arranged | Insurance Companies |
| Initial Inventory- Food & Other Items [12] | $8,000 to $10,000 | As arranged | As arranged | Suppliers |
| Initial Inventory- Alcohol [12] | $5,000 to $13,000 | As arranged | As arranged | Suppliers |

| (1) Type of Expenditure | (2) Amount | (3) Method of Payment | (4) When Due | (5) To Whom Payment is to be Made |
|---|---|---|---|---|
| Training Expenses [13] | $500 to $1,500 | As arranged | As arranged | Airline, Hotel, Restaurant, etc. |
| Grand Opening Marketing [14] | $5,000 | As arranged | As arranged | Us |
| Additional Funds – 3 Months [16] | $15,000 to $30,000 | As arranged | As arranged | You Determine |
| **Total [17]** | **$220,400 to $582,000** | | | |

**YOUR ESTIMATED INITIAL INVESTMENT – FOOD TRUCK**

| (1) Type of Expenditure | (2) Amount | (3) Method of Payment | (4) When Due | (5) To Whom Payment is to be Made |
|---|---|---|---|---|
| Initial Franchise Fee [1] | $25,000 | Lump Sum | When Franchise Agreement Signed | Us |
| Truck with Equipment [15] | $150,000 to $210,000 | As arranged | As arranged | Designated Supplier |
| Signage [6] | $500 to $1,000 | As arranged | As arranged | Suppliers |
| Point of Sale & Computer Equipment [8] | $2,500 to $6,500 | As arranged | As arranged | Suppliers |
| Business Licenses & Permits [9] | $200 to $1,000 | As arranged | As arranged | Government Agencies |
| Insurance – 3 Months [11] | $100 to $300 | As arranged | As arranged | Insurance Companies |
| Initial Inventory- Food & Other Items [12] | $2,000 to $5,500 | As arranged | As arranged | Suppliers |
| Training Expenses [13] | $500 to $1,000 | As arranged | As arranged | Airline, Hotel, Restaurant, etc. |
| Grand Opening Marketing [14] | $5,000 | As arranged | As arranged | Us |
| Additional Funds – 3 Months [16] | $5,000 to $15,000 | As arranged | As arranged | You Determine |

| (1)<br>Type of<br>Expenditure | (2)<br>Amount | (3)<br>Method of<br>Payment | (4)<br>When Due | (5)<br>To Whom<br>Payment is to<br>be Made |
|---|---|---|---|---|
| **Total** [17] | **$190,800 to $270,300** | | | |

In general, none of the expenses listed in the above chart are refundable, except any security deposits you must make may be refundable.  We do not finance any portion of your initial investment.  All of our estimates assume that you will purchase the required items.  Your costs may be lower if you choose to lease some items.

**Notes:**

1. ***Initial Franchise Fee***.  The initial franchise fees are discussed in Item 5.

2. ***Rent***.  Our estimates assume that you will lease space for your Restaurant.  Your Restaurant must be in a shopping mall, in strip centers or a free-standing location with easy access and ample parking, and you will need approximately 2,500 to 3,500 square feet.  Landlords may vary the base rental rate and charge rent based on a percentage of gross sales.  In addition to base rent, your lease may require you to pay common area maintenance charges ("CAM Charges") for your pro rata share of the real estate taxes and insurance, and your pro rata share of other charges.  The actual amount you pay under the lease will vary depending on the size of the Restaurant, the types of charges that are allocated to tenants under the lease, your ability to negotiate with landlords and the prevailing rental rates in the geographic region.

If you choose to purchase real property on which to build your Restaurant, your initial investment will probably be higher than what we estimate above.  If you purchase real property, we cannot estimate how this purchase will affect your total initial investment.

3. ***Lease & Utility Security Deposit***.  Our estimate assumes you will need to provide one month of rent as a security deposit to your landlord, and you may need to provide security deposits for your utilities (such as gas, water and/or electric).

4. ***Design & Architect Fees***.  You must obtain construction plans for the build-out of your Restaurant according to our specifications.  We have the right to designate and/or approve of the designer and/or architect you use.

5. ***Leasehold Improvements***.  The cost of leasehold improvements will vary depending on many factors, including: (a) the size and configuration of the premises; (b) pre-construction costs (including demolition of existing walls and removal of existing improvements and fixtures); and (c) cost of materials and labor, which may vary based on geography and location or whether you must use union labor for the build-out of your Restaurant.  These amounts may vary substantially based on local conditions, including the availability and prices of labor and materials.  These costs may also vary depending on whether certain of these costs will be incurred by the landlord or through landlord tenant improvement contributions, and the condition of the space before you take possession of the premises.  The low end of our estimate assumes that you have leased space that previously operated as a restaurant and that you will convert to a Crave Restaurant.  The high end of our estimate assumes that you have leased a "vanilla box" space and that more improvements are required.  Our estimate does not include any tenant improvement allowance that you may negotiate.  We must approve of the contractor you wish to use in the build-out of your Restaurant.

6.      *Signage*.  The amounts on the Restaurant table represent your cost for interior and exterior signage.  Your landlord or your local ordinances may have different restrictions it places on interior and exterior signage which may affect your costs.  The amounts on the Food Truck table represent the costs for the exterior free-standing signage we require according to the Manual.

7.      *Equipment, Furniture and Fixtures*.  The equipment you will need includes freezer, refrigerators, prep tables, cooking ovens, sound system, small wares, and other typical items necessary to outfit and operate a restaurant.  The furniture you will need for your Restaurant includes chairs, counters, tables, and barstools.  The fixtures you will need include artwork, décor items, and lighting.  Our estimate includes the equipment and services necessary for installation of a self-serve beer tap wall, which must be purchased from PourMyBeer.  PourMyBeer is the sole approved supplier of self-serve beer tap wall equipment and installation services.  The self-serve beer tap wall in your Restaurant must have at least a 24 to 32 tap system but may have more than 32 taps.

8.      *Point of Sale & Computer Equipment*.  You must purchase or lease the point of sale and computer system that we designate for your Franchised Business.  Additional information regarding the required point of sale and computer system is included in Item 11.

9.      *Business Licenses and Permits*.  These are estimates of the costs for obtaining local business licenses which typically remain in effect for one year.  These figures do not include occupancy and construction permits for your Restaurant which are included in the leasehold improvements estimate.  The cost of these permits and licenses will vary substantially depending on whether you operate a Restaurant or a Food Truck and on the location of the Franchised Business.  We strongly recommend that you verify the cost for all licenses and permits required in your jurisdiction before signing the Franchise Agreement.

You will offer beer and may offer wine from your Restaurant, unless local law prohibits you from offering beverage alcohol.  Since the availability and expenses of acquiring a beer and wine license vary substantially from jurisdiction to jurisdiction, you should consult the appropriate governmental authority concerning the availability of the required license and the associated expenses for your Restaurant before you sign a Franchise Agreement.  We have not included the cost of a beer and wine license in our estimate.  The cost of a beer and wine license can range from under $2,000 to over $100,000 depending on the location and jurisdiction but can be even higher in some states.  We strongly recommend that you verify the cost and availability of a beer and wine license in your jurisdiction before signing the Franchise Agreement, if your Restaurant will offer beer and wine.

10.     *Professional Fees*.  We strongly recommend that you engage an accountant and a franchise attorney to advise you in your evaluation of the franchise we are offering.

11.     *Insurance*.  These figures are estimates of the cost of the quarterly premiums for the insurance you must obtain and maintain for your Franchised Business, as described in Item 8.  Insurance premiums may be payable monthly, quarterly, semi-annually, or annually, based on the insurance company's practices and your creditworthiness.

12.     *Initial Inventory-Food & Other Items/Initial Inventory-Alcohol*.  These amounts represent your initial inventory of food, beer, wine and other beverage supplies, paper products, and cleaning materials and supplies.  Food Truck businesses will not offer beer and alcohol and will not incur expenses related to alcohol inventory.

13.     ***Training Expenses***.  These estimates include only your out-of-pocket costs associated with attending our initial training program, including travel, lodging, meals, and applicable wages for two trainees.  These amounts do not include any fees or expenses for training any other personnel.  Your costs may vary depending on your selection of lodging and dining facilities and mode and distance of transportation.  Our training program lasts for approximately three weeks.

14.     ***Grand Opening Marketing***.  You must pay to us $5,000 to conduct a grand opening marketing campaign for your Restaurant or Food Truck on your behalf.  The grand opening marketing campaign will be conducted during your first 90 days of operation or we may choose a different time period to conduct the grand opening marketing campaign for you.

15.     ***Truck with Equipment***.  You will purchase or finance your Food Truck through our designated supplier.  A 10% down payment must be paid to the designated supplier before the build-out will commence on your Food Truck.  These estimates include the cost of the Food Truck, the vehicle wrap, all the food service equipment required by us (refrigerator, ovens, etc.) to operate the Food Truck and the labor costs to build-out the truck.

16.     ***Additional Funds***.  You will need capital to support ongoing expenses, such as payroll, utilities, rent, Royalty Fees, and brand development fees or other advertising fees, if these costs are not covered by sales revenue for your first three months of operation.  Our estimate does not include any sales revenue you may generate.  New businesses often generate a negative cash flow.  We estimate that the amount given will be sufficient to cover ongoing expenses for the start-up phase of the business, which we calculate to be three months.  This is only an estimate and there is no guarantee that additional working capital will not be necessary during this start-up phase or after.

17.     ***Total***.  We relied upon our principals' experience in operating restaurants and food trucks when preparing these figures.  Your actual costs may vary greatly and will depend on factors such as the size and condition of the space and cost to convert to a Restaurant, your management skill, experience and business acumen; local economic conditions; the local market for the Franchised Business' products; the prevailing wage rate; competition; and the sales level reached during the start-up phase.  These amounts do not include any estimates for debt service.  These are only estimates.  Your costs may vary based on actual rental prices in your area, and other site-specific requirements or regulations.  The costs outlined in this Item 7 are not intended to be a forecast of the actual cost to you or to any particular franchisee.

\*       \*       \*       \*       \*

**YOUR ESTIMATED INITIAL INVESTMENT**
**MULTI-UNIT DEVELOPER – DEVELOPMENT OF THREE FRANCHISED BUSINESSES**

| (1) Type of Expenditure | (2) Amount | (3) Method of Payment | (4) When Due | (5) To Whom Payment is to be Made |
|---|---|---|---|---|
| Development Fee [(1)] | $50,000 to $75,000 | Lump Sum | On signing Multi-Unit Development Agreement | Us |
| Vehicle – 3 Months [(2)] | $2,000 to $2,500 | As Arranged | As Incurred | Suppliers |

CRAVE FDD 2020 A6

| (1) Type of Expenditure | (2) Amount | (3) Method of Payment | (4) When Due | (5) To Whom Payment is to be Made |
|---|---|---|---|---|
| Other Expenditures for First Franchised Business [3] | $165,800 to $542,000 | See First Table | See First Table | See First Table |
| **Total** | **$217,800 to $619,500** | | | |

In general, none of the expenses listed in the above chart are refundable.  We do not finance any portion of your initial investment.

**Notes:**

1.      *Development Fee; Initial Franchise Fee*.  These fees are discussed in Item 5.  Our estimate assumes you will develop the minimum of three Franchised Businesses, with the low end representing the development fee if you commit to develop three Food Trucks and the high end representing the development fee if you commit to develop three Restaurants.  If you choose to develop additional Franchised Businesses, your development fee will increase by 50% of the initial franchise fee for each additional Food Truck or Restaurant you commit to develop.

2.      *Vehicle*.  We anticipate that you will need a vehicle to view potential sites and to oversee the build-out of the Restaurant or the customization of the Food Truck.  Our estimate includes three months of expenses for gas, maintenance, and vehicle payments.

3.      *Other Expenditures for First Franchised Business*.  These are the estimates to establish your first Franchised Business.  Because you may commit to any combination of Restaurants or Food Trucks under a Multi-Unit Development Agreement, the low end of this estimate represents the costs associated with establishing a Food Truck as your first unit.  The high end of this estimate represents the costs associated with establishing a Restaurant for your first unit.  Costs associated with establishing additional Franchised Businesses are subject to factors that we cannot estimate or control, such as inflation, increased labor costs or increased materials costs.

### ITEM 8
### RESTRICTIONS ON SOURCES OF PRODUCTS AND SERVICES

You must purchase or lease and install all fixtures, furnishings, equipment (including point of sales system), décor items, signs and related items we require, all of which must conform to the standards and specifications stated in our Confidential Operations Manual (the "Manual") or otherwise in writing, unless you have first obtained our written consent to do otherwise.  You may not install or permit to be installed on the Restaurant premises, or on or in the Food Truck, any fixtures, furnishings, equipment, décor items, signs, games, vending machines or other items without our written consent or that do not comply with our specifications.

To make sure that the highest degree of quality and service is maintained, you must operate the Franchised Business in strict conformity with the methods, standards, and specifications that we prescribe in the Manual or otherwise in writing.  You must maintain in sufficient supply and use and sell at all times only those food and beverage items, ingredients, products, materials, supplies and paper goods that meet our standards and specifications.  All menu items must be prepared in accordance with the recipes and

procedures specified in the Manual or other written materials.  You must not deviate from these standards and specifications by the use or offer of non-conforming items, or differing amounts of any items, without obtaining our written consent first.  We can, and expect to, modify our standards and specifications as we deem necessary.  We will provide you notice in the Manual or otherwise in writing (such as via email) of any changes in our standards and/or specifications.

You must permit us or our agents, during normal business hours, to remove a reasonable number of samples of food or non-food items from your inventory or from the Franchised Business free of charge for testing by us or by an independent laboratory to determine whether the samples meet our then-current standards and specifications.  In addition to any other remedies we may have, we may require you to reimburse our costs for the testing if we have not previously approved the supplier of the item or if the sample fails to conform to our specifications.

You must obtain all food and beverage items, ingredients, supplies, materials, fixtures, furnishings, equipment (including point of sale system and communication systems), and other products used or offered for sale at the Franchised Business solely from suppliers who demonstrate, to our continuing reasonable satisfaction, the ability to meet our then-current standards or in accordance with our standards and specifications.  A complete list of our approved products and suppliers will be included in the Manual and is subject to change over time.  We will provide you notice in the Manual or otherwise in writing (such as via email) of any changes to the lists of approved products and approved suppliers.

Our sole approved supplier for the required self-serve beer tap wall equipment and installation services and for the support and maintenance of the beer wall in your Restaurant is PourMyBeer based in Chicago, Illinois.  You must purchase all non-beer tap wall equipment, and all furniture and small wares from our designated supplier for these products, Burkett Restaurant Equipment & Supplies in Perrysburg, Ohio.  You must also purchase or lease the eight-valve legacy system (bag-in-box) soda dispensing machine from The Coca-Cola Company, and it must include the dispenser for Gold Peak Tea.  Food Truck businesses are not required to have the soda dispensing machine.  You must use the Untappd App in operating your Restaurant in order to update the tap beers on the beer wall and to communicate with the local beer community.  The designated supplier for this app is Untappd (www.untappd.com).  Use of this app is not required for Food Truck businesses.

You must use the Clover point of sale system, and Clover Network, Inc. in Sunnyvale, California, is our designated supplier for this system and for the Abreeze Reporting App.  You must also participate in our Crave Loyalty Program and offer digital ordering and mobile services through our mobile application and self-order kiosks (kiosks in Restaurants only), and you must use our designated Appetizer App.  The fees for this program and these services are also paid to Clover Network, Inc.

You must purchase or lease your Food Truck from our designated supplier, Premier Food Trucks located in Palm Coast, Florida (phone: 386-597-7580).  None of our officers has an ownership interest in any of the above and below-named suppliers.

*Additional Mandatory Approved Suppliers:*  You must purchase from or use the services of the following mandatory approved suppliers in the following designated categories.

Architect:
LUMEN Architectural Engineering, P.C.
154 West 14th Street, 4th Floor
New York, New York 10011
Phone: 201-255-2802
Web: www.lumen.us

All Food Items:
Sysco Corporation
1032 Baugh Road
Selma, North Carolina 27576
Phone: 866-755-5060
Web: www.sysco.com

All Non-Alcoholic Beverage Items:
The Coca-Cola Company
1 Coca-Cola Plaza NW
Atlanta, Georgia 30313
Phone: 404-676-2121
Email: echeyne@coca-cola.com

or

Sysco Corporation
1032 Baugh Road
Selma, North Carolina 27576
Phone: 866-755-5060
Web: www.sysco.com

Exterior Signage:
Universal Signs & Service
435 Brook Avenue
Deer Park, New York 11729
Contact: Rick Lackner
Phone: 631-446-1121
Web: www.universalsignsny.com

Window Signage/Uniforms/Advertising Materials:
Boston Creative Design
520 Main Street, Building 3
Wilmington, Massachusetts 01887
Contact: Bil Gallagher
Phone: 978-988-1000 or 978-566-9743
Web: www.bostoncreative.com

     If you wish to purchase, lease or use any products that we have not previously approved, or purchase or lease from a supplier we have not previously approved, you must submit a written request for approval or you must request the supplier to do so. You must pay our then-current evaluation fee for each product or supplier you request to have approved, and you must reimburse our reasonable costs related to our testing and inspection. We must approve any product or supplier in writing before you make any purchases of that product or from that supplier. We can require that our representatives be permitted to

inspect the supplier's facilities and that samples from the supplier be delivered, either to us or to an independent laboratory, for testing. We have the right to re-inspect the facilities and products of any approved supplier and to revoke our approval if the supplier fails to continue to meet any of our then-current standards. Our supplier approval procedure does not obligate us to approve any particular supplier. We will notify you in writing within 30 days after you have requested our approval whether the proposed product or supplier is, in fact, approved or disapproved. We are not required to make available to you or to any supplier our criteria for product or supplier approval. We are not obligated to approve any specific product or supplier if we believe that approval of that product or supplier is not in the best interests of the System. We may revoke our prior approval of any product or supplier at any time, and after your receipt of written notice from us regarding our revocation you must stop using that product or stop purchasing from that supplier.

We and/or our affiliates may develop for use in the System certain products which are prepared from confidential proprietary recipes and other proprietary products which bear the Marks. Because of the importance of quality and uniformity of production and the significance of those products in the System, it is to your and our benefit that we closely control the production and distribution of those products. Therefore, you will use only our proprietary recipes and other proprietary products and will purchase those items solely from us or from a source designated by us all of your inventory of those products.

Currently neither we nor our Parent are an approved supplier of any product or service. None of our officers has an ownership interest in any approved supplier.

We may, when appropriate, negotiate purchase arrangements, including price terms, with designated and approved suppliers on behalf of the System. As of the date of this Disclosure Document, there are no purchasing or distribution cooperatives in which you must participate. When determining whether to grant new, additional or renewal franchises, we consider many factors, including your compliance with the requirements described in this Item 8, but your compliance with these requirements does not automatically give you the right to an additional or renewal franchise.

We may establish strategic alliances or preferred vendor programs with suppliers that are willing to supply some products, equipment, or services to some or all of the restaurants and food trucks in our System. We and/or our affiliates may negotiate supply contracts with our suppliers under which we are able to purchase products, equipment, supplies, services, and other items at a price that will benefit us and our franchisees. If we do establish those types of alliances or programs, we may limit the number of approved suppliers with whom you may deal, we may designate sources that you must use for some or all products, equipment and services, and we may refuse to approve proposals from franchisees to add new suppliers if we believe that approval would not be in the best interests of the System or the franchised network of restaurants and food trucks.

We have the right to collect and retain any and all allowances, rebates, credits, incentives, or benefits (collectively, "Allowances") offered by manufacturers, suppliers, and distributors to you, to us, or to our affiliates based upon your purchases of products and services from manufacturers, suppliers, and distributors. We or our affiliates will have all of your right, title, and interest in and to any and all of these Allowances. We or our affiliates may collect and retain any or all of these Allowances without restriction (unless otherwise instructed by the manufacturer, supplier, or distributor). We may also choose to contribute these Allowances to the Brand Development Fund, but if we do so it does not reduce or eliminate your obligation to pay the brand development fee. For the fiscal year ended December 31, 2019, neither we nor our affiliates earned revenue from Allowances.

For the catering or delivery services your Restaurant will provide, we anticipate that your employees will use their personal vehicles to provide these services from your Restaurant. We have the

right to require you to have temporary signage placed on each delivery vehicle. We expect that all delivery vehicles will be kept clean, in good working order and be properly insured. You must have each person providing those services to comply with all laws, regulations, and rules of the road and to use due care and caution operating and maintaining the motor vehicles. Except as described in this paragraph, we do not have any standards or exercise control over any motor vehicle that you use. You must also offer delivery through third-party delivery services like Grubhub and Uber Eats.

Food Trucks may also provide catering and delivery services in the designated territory. We expect that all Food Trucks will be kept clean, in good working order and be properly insured according to our System requirements. Each person who will drive the Food Truck must comply with all laws, regulations and rules of the road and must use due care and caution in operating the Food Truck. Food Trucks must be professionally washed at least once each week

All advertising and promotional materials, signs, decorations, paper goods (including menus and all forms and stationery used in the Franchised Business) and other items we designate must bear the Marks in the form, color, location, and manner we prescribe. In addition, all your advertising and promotion in any medium must be conducted in a dignified manner and must conform to the standards and requirements in the Manual or otherwise. You must obtain our approval before you use any advertising and promotional materials and plans if we have not prepared or approved them during the 12 months before their proposed use. Any advertising and promotional materials you submit to us for our review will become our property.

You must obtain our acceptance of the site for the Restaurant before you acquire the site. You must also obtain our acceptance of any contract of sale or lease for the Restaurant before you sign the contract or lease. You must provide us with a copy of the fully signed lease for the Restaurant premises. We may require you and your landlord to sign a Collateral Assignment of Lease which permits us to assume your lease in certain circumstances, including the termination or expiration of your Franchise Agreement (Attachment 2 to the Franchise Agreement).

You must obtain our acceptance of the municipality in which your Food Truck will operate before you may begin operating the Food Truck. You must purchase or finance your Food Truck from our designated supplier, and it will come fully outfitted with all the equipment and signage we require and have approved for use with your Food Truck. If you choose to finance your Food Truck through our designated supplier, we will not review or approve the purchase contract, however we do require you to provide a down payment of at least 10% to the designated supplier before they will begin the build-out of your Food Truck.

Your Restaurant must be constructed according to plans that we have accepted. We will provide you with sample plans and/or our specifications for a Crave Restaurant. We have the right to designate or approve the architect/designer that you use, and we must approve the contractor you select before you contract with them. You must arrange for construction plans to be created that incorporate our requirements into the size and shape of the approved site for your Restaurant. You may not use the plans or begin building out your Restaurant until we have approved the construction plans, and any changes to the construction plans must also be approved by us before the change may be implemented. Our review is not meant to assess compliance with any applicable laws, regulations or building codes. Our review is only to verify that the construction plans accurately present our trade dress, the Marks and meet our specifications. We have the right to inspect your Restaurant while it is being constructed. You may not open your Restaurant for business without our approval. You must certify to us that your Restaurant has been constructed in compliance with the Americans with Disabilities Act.

Before you begin construction of the Restaurant, or before you take delivery of your Food Truck, you must obtain the insurance coverages we require. Our current insurance requirements are described

below.  We may modify our insurance requirements during the term of your Franchise Agreement, and any modifications will be communicated to you in our Manual or otherwise in writing.  The insurance coverage must be maintained during the term of the Franchise Agreement and must be obtained from a responsible, duly licensed carrier or carriers acceptable to us.  All insurance must be on an "occurrence" basis.  You must provide us with certificates of insurance showing that you have obtained the required insurance coverages at least ten days before construction of your Restaurant begins or before you take delivery of Food Truck, and then 30 days before expiration of each policy.

Your coverage must include CRAVE Franchising, LLC as additional insureds on a primary non-contributory basis to the general liability policy and the auto liability policy. The additional insureds should be listed on the certificate as follows: CRAVE Franchising, LLC and their members, officers, directors, partners, shareholders, regional directors, subsidiaries and affiliates, agents and employees; and it must be provided on an Additional Insured Grantor of Franchise Endorsement form CG2029 (or an endorsement form with comparable wording acceptable to us).

The insurance must be underwritten by insurers licensed and permitted to write coverage in the state in which the Restaurant is located or the Food Truck will be operating and with a rating of "A-" or better with A.M. Best Company.  These policies must include the coverage that we require, which currently includes: (a) "all risk" or "special" property insurance covering all real and personal property and equipment on a replacement costs basis, including business interruption and extra expense insurance on an actual loss sustained basis; (b) comprehensive general liability insurance, including products and completed operations in an amount no less than the following combined single limits: $2,000,000 per occurrence, $2,000,000 personal and advertising injury, $2,000,000 completed operations/products aggregate, $2,000,000 aggregate per location; (c) employment practices liability coverage with a limit of $100,000 per occurrence and in the aggregate; (d) commercial automobile liability coverage, including coverage of owned, non-owned, rented or hired vehicles with coverage in amounts no less than $1,000,000 combined single limit; (e) workers' compensation insurance for statutory limits and employer's liability insurance in amounts no less than $1,000,000 per accident, $1,000,000 each employee by disease, and $1,000,000 policy limit by disease; (f) if you operate a Restaurant, liquor liability insurance with limits of no less than $1,000,000 per occurrence; (g) umbrella or excess liability insurance with limits of $2,000,000 per occurrence and $2,000,000 general aggregate; and (h) any insurance required by the terms of your lease or required by applicable law.

You and your insurers must agree to waive rights of subrogation against CRAVE Franchising, LLC, and you must deliver evidence of the waiver to us.  Each year we may modify the insurance minimum coverage requirements which may include an increase to the minimum coverage requirements to reflect changes in inflation or as market conditions warrant.  We have the right to change our insurance requirements during the term of your Franchise Agreement, including the types of coverage and the amounts of coverage, and you must comply with those changes.

In addition, related to any construction, renovation, or remodeling of the Restaurant, you must maintain builders' risks insurance and performance and completion bonds in forms and amounts, and written by a carrier or carriers, satisfactory to us.  All of the policies must name us and those of our affiliates that we specify, and the respective officers, directors, shareholders, partners, agents, representatives, independent contractors, servants and employees of each of them, as additional named insureds and must include a waiver of subrogation in favor of all those parties.

We have the right to require that you obtain from your insurance company a report of claims made and reserves set against your insurance.  All insurance policies must provide that no less than 30 days' prior written notice will be given to us in the event of a material alteration to or cancellation of the policies.  If

you do not obtain any insurance as required, we have the right (but not the obligation) to purchase insurance for you and you must reimburse our costs related to this purchase plus a 10% administrative fee.

We estimate that your purchases from us or approved suppliers, or that must conform to our specifications, will represent approximately 68% to 78% of your total purchases in establishing the Franchised Business, and approximately 50% of your total purchases in the continuing operation of the Franchised Business.

**ITEM 9**
**FRANCHISEE'S OBLIGATIONS**

**This table lists your principal obligations under the franchise and other agreements. It will help you find more detailed information about your obligations in these agreements and in other items of this disclosure document.**

In the table below, the following abbreviations have these meanings: FA means the Franchise Agreement and MUDA means the Multi-Unit Development Agreement.

| | Obligation | Article or Section in Agreement | Disclosure Document Item |
|---|---|---|---|
| a. | Site selection and acquisition/ lease | FA – Article 2<br>MUDA – Section 3 | Items 8 and 11 |
| b. | Pre-opening purchases/leases | FA – Articles 6, 7 and 8 | Items 6, 7, 8 and 11 |
| c. | Site development and other pre-opening requirements | FA – Article 2 | Items 8 and 11 |
| d. | Initial and ongoing training | FA – Article 6 | Items 6, 7 and 11 |
| e. | Opening | FA – Articles 2 and 6 | Item 11 |
| f. | Fees | FA – Articles 3, 4, 6, 7, 8, 11, 14 and 18<br>MUDA – Sections 2 and 3 | Items 5, 6, 7 and 11 |
| g. | Compliance with standards and policies/ operating manual | FA – Articles 2, 3, 6, 8, 9, 10, 11 and 12 | Items 8, 11 and 14 |
| h. | Trademarks and proprietary information | FA – Articles 9 and 10 and Attachment 4<br>MUDA – Section 7 | Items 13 and 14 |
| i. | Restrictions on products/services offered | FA – Article 7<br>MUDA – Section 7 | Item 16 |
| j. | Warranty and customer service requirements | FA – Article 7 | Not applicable |
| k. | Territorial development and sales quotas | MUDA – Section 3 | Item 12 |
| l. | Ongoing product/service purchases | FA – Article 7 | Items 6 and 8 |

| Obligation | Article or Section in Agreement | Disclosure Document Item |
|---|---|---|
| m.  Maintenance, appearance, and remodeling requirements | FA – Articles 2, 7 and 14 | Items 6 and 11 |
| n.  Insurance | FA – Article 12 | Items 6, 7 and 8 |
| o.  Advertising | FA – Article 8 | Items 6, 8 and 11 |
| p.  Indemnification | FA – Article 15<br>MUDA – Section 14 | Item 6 |
| q.  Owner's participation/ management/staffing | FA – Articles 6, 14, 15 and 16<br>MUDA – Section 7 | Items 1, 11 and 15 |
| r.  Records and reports | FA – Articles 4, 7 and 11 | Item 6 |
| s.  Inspections and audits | FA – Articles 2, 7 and 11<br>MUDA – Section 12 | Items 6, 8 and 11 |
| t.  Transfer | FA – Article 14<br>MUDA – Section 11 | Items 6 and 17 |
| u.  Renewal | FA – Article 3<br>MUDA – Section 5 | Items 6 and 17 |
| v.  Post-termination obligations | FA – Article 18<br>MUDA – Section 10 | Items 6 and 17 |
| w.  Non-competition covenants | FA – Article 10 and Attachment 4<br>MUDA – Section 12 | Item 17 |
| x.  Dispute resolution | FA – Article 19<br>MUDA – Section 19 | Items 6 and 17 |
| y.  Liquidated damages | FA –Article 18 | Item 6 |

## ITEM 10
## FINANCING

We do not offer direct or indirect financing.  We do not guarantee your note, lease, or obligation.

## ITEM 11
## FRANCHISOR'S ASSISTANCE, ADVERTISING, COMPUTER SYSTEMS AND TRAINING

**Except as listed below, CRAVE Franchising, LLC is not required to provide you with any assistance**.

**Pre-Opening Obligations**

**Multi-Unit Development Agreement**:  Under the Multi-Unit Development Agreement, we will grant to you rights to a Development Area within which you will establish and operate an agreed-upon number of Franchised Businesses under separate Franchise Agreements.  (Multi-Unit Development Agreement, Section 1.1.)

**Franchise Agreement**:  Before the opening of a Franchised Business we will provide the following assistance and services:

1.      If you will establish a Restaurant, our written site selection guidelines, and the site selection assistance we deem advisable.  (Franchise Agreement, Section 5.1.)  We will also describe your designated territory when we have accepted a proposed location for your Restaurant or when we have accepted a municipality for operation of your Food Truck.

2.      On-site evaluation of the proposed site for your Restaurant, if we determine an on-site evaluation is necessary.  (Franchise Agreement, Section 5.2.)

3.      Standard specifications and layouts for building and furnishing the Restaurant, which you will use to have site plans and build-out plans prepared, at your expense.  (Franchise Agreement, Section 5.3.)  We have the right to require you to use the architect/designer we designate and to inspect your Restaurant during its construction.  We must approve of the contractor you wish to use for the Restaurant's construction.

4.      On loan, our Manual, which we may revise during the term of your Franchise Agreement.  (Franchise Agreement, Sections 5.4 and 10.1.)  We may provide all or a portion of the Manual to you electronically, such as via a password-protected website.

5.      A list of approved products and suppliers, which we may revise during the term of your Franchise Agreement and which may include us and/or our affiliates as approved suppliers.  (Franchise Agreement, Sections 5.9 and 7.4.)

6.      An initial training program at our headquarters for two people.  (Franchise Agreement, Sections 5.10 and 6.4.)

7.      One of our representatives to provide up to two days of opening assistance and training around the opening of your Franchised Business.  We will provide this opening assistance and training at our expense, but if you request additional days of on-site assistance you must reimburse our costs for the additional days, including our per diem fee for our representative and the additional out-of-pocket expenses our representative incurs.  (Franchise Agreement, Section 6.4.)  If you are opening your second or later Franchised Business, we have the right to reduce the duration of our representative's visit or to not provide opening assistance.

**Continuing Obligations**

**Multi-Unit Development Agreement**:  Under the Multi-Unit Development Agreement:

1.      We will review the information regarding potential sites or municipalities that you provide to us to determine whether the sites or municipalities meet our standards and criteria for a Crave Restaurant or Crave Food Truck and, if the site or municipality meets our criteria, accept the site for the Restaurant or the municipality for the Food Truck.  (Multi-Unit Development Agreement, Section 8.1.)

2.      We will provide you with standard specifications and layouts for building and furnishing Restaurants.  (Multi-Unit Development Agreement, Section 8.2.)

3.      We will review your site plan and final build-out plans and specifications for conformity to our standards and specifications for a Restaurant.  (Multi-Unit Development Agreement, Section 8.3.)

4.      We will provide other resources and assistance as may be developed and offered to our multi-unit developers.  (Multi-Unit Development Agreement, Section 8.4.)

**Franchise Agreement**:  During the operation of a Franchised Business we will provide the following assistance and services:

1.      As we reasonably determine necessary, visits to and evaluations of the Franchised Business and the products and services provided to make sure that our high standards of quality, appearance and service of the System are maintained.  (Franchise Agreement, Sections 5.5 and 7.5.6.)

2.      Advice and written materials (including updates to the Manual) concerning techniques of managing and operating the Franchised Business, including new developments and improvements in equipment, food products, packaging, and preparation.  (Franchise Agreement, Section 5.7.)

3.      Training programs and seminars and other related activities regarding the operation of the Franchised Business as we may conduct for you or your business' personnel generally, which may be mandatory for you, your General Manager, and/or other Franchised Business personnel.  (Franchise Agreement, Section 6.4.)

4.      At your request or if we determine it is necessary, additional on-site training or assistance at your Franchised Business.  You must pay our per diem fee for each trainer providing the training and you must reimburse our expenses.  (Franchise Agreement, Section 6.4.)

5.      Administration of the Brand Development Fund.  (Franchise Agreement, Section 8.3.)

6.      Indemnification against and reimbursement for all damages for which you are held liable in any proceeding arising out of your use of any of the Marks (including settlement amounts), if you and your Principals have fully complied with the terms of the Franchise Agreement.  (Franchise Agreement, Section 9.4.)

7.      Designate the maximum prices you may charge, as permitted by applicable law.  (Franchise Agreement, Section 7.13.)  Our designation of the maximum pricing is not a guarantee that you will achieve a specific level of sales or profitability.

8.      At our option, hold a meeting of our franchisees to discuss new menu offerings, new standards of operation, provide training, and other matters pertaining to the franchise.  We may designate that attendance at a franchisee meeting is mandatory for you, your General Manager, and/or other Franchised Business personnel.  (Franchise Agreement, Section 6.5.)

**Site Selection**:  You must assume all costs, liabilities, expenses, and responsibility for locating, obtaining, and developing a site for the Restaurant and for constructing and equipping the Restaurant at the accepted site.  You will select the site for the Restaurant subject to our acceptance and using our site selection criteria.  Before you lease or purchase the site for the Restaurant, you must locate a site that satisfies our site selection guidelines.  If we deem it necessary we will conduct one on-site evaluation, but before we conduct the evaluation you must submit to us in the form we specify a description of the site, including evidence that the site satisfies our site selection guidelines, together with other information and materials that we may reasonably require, including a letter of intent or other evidence that confirms your favorable prospects for obtaining the site.  We have the right to approve deviations from our site selection standards based on the individual factors and components of a particular site.

You must have located and submitted to us, for our review, all information we require regarding the site you propose for your Restaurant no later than 90 days after you have signed the Franchise Agreement.  We will have 30 days after we receive all required information and materials from you to accept or decline the proposed site as the location for your Crave Restaurant.  If we do not provide our specific acceptance of a proposed site, the site is deemed not accepted.  We do not warrant or guarantee that your Restaurant will be successful at any site that we accept.  Our acceptance only means that the site meets our minimum requirements for a Restaurant, subject to any deviation from our standards as we may permit.

We will provide you with our current written site selection guidelines and any other site selection counseling and assistance we think is advisable.  Our criteria for site selection include:  location of the site and its setting (free-standing building, shopping center, shopping mall, downtown location, etc.); availability of parking; visibility from main roads; availability, size and placement of signage; co-tenants in the shopping center or immediate area; other businesses in the immediate area; accessibility to the site; condition of the premises and how much build-out or construction it will need; proximity to competitive businesses; availability of utilities; and base population and median income in the immediate area.  We will use these and other factors in determining the suitability of your proposed site for a Crave Restaurant.  Once the location for your Restaurant has been determined, your Restaurant may not be relocated without our prior written consent.  You must provide us with a copy of the signed lease for your Restaurant location.

If you are not able to locate a suitable site for your Restaurant within 90 days after you sign the Franchise Agreement, we may provide you with an extension of this timeframe or we may terminate your Franchise Agreement.

You must obtain our acceptance of the municipality in which your Food Truck will operate before you may begin operations.  Our criteria for accepting municipalities includes: the number and size of shopping centers, malls, business parks or business districts, parks and open public spaces; availability of parking or standing on main roads; other food truck businesses in the immediate area; and population base and median income of the population.  We will use these and other factors in determining the suitability of your proposed municipality for a Crave Food Truck.  Once the municipality for your Food Truck has been determined, your Food Truck may not relocate to another municipality or operate outside that municipality without our prior written consent.

If you are not able to locate a suitable municipality in which to operate your Food Truck within 90 days after you sign the Franchise Agreement, we may provide you with an extension of this timeframe or we may terminate your Franchise Agreement.

**Opening**:  We estimate that the time from the signing of the Franchise Agreement to the opening of the Restaurant will be approximately four to eight months.  Your total timeframe may be shorter or longer depending on the time necessary to obtain an accepted site, to obtain financing, to obtain the permits and licenses for the construction and operation of the Restaurant, to complete construction or remodeling as it may be affected by weather conditions, shortages, delivery schedules and other similar factors, to complete the interior and exterior of the Restaurant, including decorating, purchasing and installing fixtures, equipment and signs, and to complete preparation for operating the Restaurant, including purchasing inventory and supplies.  You must open the Restaurant and begin business within 12 months after you sign the Franchise Agreement.  If you are not able to open your Restaurant within this period, we have the right to terminate your Franchise Agreement or we may extend the period of time for you to open.  You may not open your Restaurant for business until we have approved you to do so.

We estimate that the time from the signing of the Franchise Agreement to the opening of the Food Truck business will be three to six months.  It will take 12 weeks to equip, including vehicle wrap, and

deliver the Food Truck and upon delivery it will be fully ready to begin operations. Your total timeframe to open may be shorter or longer depending on the time necessary to obtain an accepted municipality in which to operate, to obtain financing (if necessary) for the Food Truck, to obtain the permits and licenses for the operation of the Food Truck, and to complete preparation for operating the Food Truck, including purchasing inventory and supplies. You must open the Food Truck business within six months after you sign the Franchise Agreement. If you are not able to open your Food Truck business within this period, we have the right to terminate your Franchise Agreement or we may extend the period of time for you to open. You may not open your Food Truck for business until we have approved you to do so.

If you are a Multi-Unit Developer, you must sign your first Franchise Agreement at the same time you sign the Multi-Unit Development Agreement. The typical length of time between the signing of the Franchise Agreement and the opening of your first Franchised Business is the same as for an individual franchisee. Each additional Restaurant or Food Truck you develop must be opened according to the terms of your Minimum Performance Schedule.

**Grand Opening Marketing**: You must pay to us $5,000 so that we may conduct a marketing campaign on your behalf to announce the grand opening of your Franchised Business. The grand opening marketing campaign will be conducted in the initial 90 days of operation unless we designate a different time period to conduct the grand opening marketing. The grand opening marketing campaign will include giveaways of food samples and other promotions as we designate.

**Brand Development Fund**: We have the right to establish a Brand Development Fund ("Fund") to promote the System, Crave Restaurants and the products and services offered by Crave Restaurants. (Franchise Agreement, Section 8.3.) You must pay a non-refundable brand development fee to the Fund in an amount equal to 1% of Gross Sales for each Restaurant business you own and operate. Crave Food Truck businesses are not required to contribute to the Fund. In the calendar year ending December 31, 2019, 88% of the contributions to the Fund went toward advertising and promotion and 12% toward website maintenance and design.

The Fund will be used for national and regional advertising, marketing, publicity, and promotional activity relating to our business. We will determine, in our fully unrestricted discretion, the manner in which the Fund will be spent. Some portion of the Fund may be used for creative concept production, marketing surveys, test marketing and related purposes. As stated in Item 8, we may contribute Allowances we receive from approved suppliers to the Fund. If we choose to do this, it does not reduce or eliminate your obligation to pay the brand development fee.

We have the right to direct all advertising activities with sole discretion over creative concepts, materials and media used, as well as their placement and allocation. We also have the right to determine, in our sole discretion, the composition of all geographic and market areas for the implementation of these advertising and promotional activities. The Fund may be used to meet any and all costs of maintaining, administering, directing and preparing national and/or regional advertising materials, programs and public relations activities (including, without limitation, the cost of preparing and conducting television, radio, magazine, billboard, newspaper, direct mail and other media programs and activities, for conducting marketing surveys, test marketing, employing advertising agencies to assist therewith, and providing promotional brochures, coupons and other marketing materials to all franchisees of the System). The Fund is intended to maximize general public recognition in all media of the Proprietary Marks and patronage of Crave Restaurants and we have no obligation to ensure that expenditures of the Fund in or affecting any geographic area are proportionate or equivalent to payments of the brand development fee by franchisees operating in that geographic area, or that any Restaurant will benefit directly or in proportion to the brand development fees paid for the development of advertising and marketing materials or the placement of

advertising.  We are not obligated to spend any amount on advertising in your area or territory.  We may use up to 5% of the Fund for advertising that is principally a solicitation for the sale of franchises.

We have the right to reimburse ourselves out of the Fund for the total costs (including indirect costs such as salaries for our employees who devote time and effort to Fund related activities and overhead expenses) of developing, producing and distributing any advertising materials and collecting the brand development fee (including attorneys', auditors' and accountants' fees and other expenses incurred in connection with collecting any brand development fee).  We also have the right to use a portion of the Fund to subsidize the cost of presenting refresher training and/or a franchisee meeting.

Restaurants owned by us or our affiliates may, but are not required to, contribute to the Fund on the same basis as you.  Funds from the brand development fees paid will be kept in a non-interest bearing account separate from our other funds.  These funds will not be used to defray any of our general operating expenses, except as described in the paragraph above.  Any sums paid to the Fund that are not spent in the year they are collected will carry over to the following year.  We will prepare, and furnish to you upon written request, an annual statement of funds collected and costs incurred.  We are not required to have any Fund statement audited, but if we choose to have the Fund audited it will be at the Fund's expense.

Although the Fund is intended to be perpetual, we may terminate the Fund at any time.  The Fund will not be terminated until all monies in the Fund have been spent for advertising or promotional purposes or returned to contributors on a pro rata basis.  If we terminate the Fund, we have the right to reinstate it at any time and you must again contribute to the Fund.  Any reinstated Fund will be maintained as described above.

Money in the Fund can be used to produce commercials and ad layout templates that you must adapt for your Restaurant and use in local marketing, at your expense.  The Fund may also develop new menus and table tents for use by all Crave Restaurants in the System, and we may designate that our approved supplier will automatically ship these items to you, at your expense, when they are to be used.

**Local Marketing**:  You must conduct local marketing in your designated territory, and you must spend at least 1% of Gross Sales each quarter on local marketing for your Restaurant or 2% of Gross Sales each quarter on local marketing for your Food Truck.  Within 30 days of our request, you must provide us with proof of your local marketing expenditures, including verification copies of the advertisements.

We must approve all marketing materials before you use them.  You must not advertise or use our Marks in any fashion on the internet, world wide web or via other means of advertising through telecommunication, including social media, without our express written consent.

Any marketing that you propose to use that has either not been prepared by us or has not been approved by us in the immediately preceding 12-month period must be submitted to us for our review not later than 15 days before you intend to use it.  Unless we provide our specific disapproval of the proposed materials, the materials are deemed approved.  Any materials you submit to us for our review will become our property, and there will be no restriction on our use or distribution of these materials.

We have the right to require you to include certain language in your local marketing, such as "Franchises Available" and our website address and phone number.

**Cooperative Marketing**:  We may designate any geographic area in which two or more Restaurants are located, or in which two or more Food Trucks operate, as a region for purposes of establishing a marketing cooperative ("Cooperative"), or we may approve of the formation of a Cooperative by our franchisees.  The members of the Cooperative for any area will consist of all franchised Restaurants

and Food Trucks; Restaurants and Food Trucks owned and operated by us or our affiliates may, but are not required to, participate in a Cooperative.  We have the right to dissolve, merge or change the structure of the Cooperatives.  Each Cooperative will be organized for the exclusive purposes of administering marketing programs and developing promotional materials for use by the members in local marketing, subject to our approval as described above.  If a Cooperative has been established for the geographic area where your Restaurant is located, or where your Food Truck operates, when the Franchise Agreement is signed, or if any Cooperative is established during the term of the Franchise Agreement, you must become a member of the Cooperative.  If the Cooperative will operate according to written documents, we must approve of these documents, and a copy of the Cooperative documents applicable to the geographic area in which your Restaurant will be located, or in which your Food Truck will operate, will be provided to you if you request it.  You will not have to participate in more than one Cooperative.

The payments you make to a Cooperative may be applied by you toward satisfaction of your local marketing requirement.  If the amount you contribute to a Cooperative is less than your local marketing requirement, you must still spend the difference locally.  By vote of the members, the members will determine the amount that each member must contribute to the Cooperative.  All Crave businesses in the Cooperative, including those owned by us and/or our affiliates, will have the same voting rights as franchisees, but no one Crave business (or commonly controlled group of Crave businesses) will have more than 25% of the total vote.

All contributions to the Cooperative will be maintained and administered in accordance with the documents governing the Cooperative, if any.  The Cooperative will be operated solely as a conduit for the collection and expenditure of the Cooperative fees for the purposes outlined above.  No advertising or promotional plans or materials may be used by the Cooperative or furnished to its members without first obtaining our approval.  Currently there are no Cooperatives in the System.  The Cooperative is not required to prepare an annual financial statement.

**Website / Intranet**:  We alone may establish, maintain, modify, or discontinue all internet, world wide web and electronic commerce activities pertaining to the System.  We have established one or more websites accessible through one or more uniform resource locators ("URLs").  We will provide your Franchised Business with a listing on our website and we may, but are not required to, design and provide for the benefit of your Franchised Business a "click through" subpage at our website for the promotion of your Franchised Business.  If we establish one or more websites or other modes of electronic commerce and if we provide a "click through" subpage at the website(s) for the promotion of your Franchised Business, you must routinely provide us with updated copy, photographs and news stories about your Franchised Business suitable for posting on your "click through" subpage.  We have the right to specify the content, frequency, and procedure you must follow for updating your "click through" subpage.

Any websites or other modes of electronic commerce that we establish or maintain, including but not limited to any mobile applications ("apps") that we may introduce, may – in addition to advertising and promoting the products, programs or services available at Crave Restaurants and Food Trucks – also be devoted in part to offering Crave franchises for sale and be used by us to exploit the electronic commerce rights which we alone have.

In addition to these activities, we may also establish an intranet through which downloads of operations and marketing materials, exchanges of franchisee email, System discussion forums and System-wide communications (among other activities) can be done.  You may not maintain your own website; otherwise maintain a presence or advertise on the internet or any other mode of electronic commerce in connection with your Franchised Business; establish a link to any website we establish at or from any other website or page; or at any time establish any other website, electronic commerce presence or URL which

in whole or in part incorporates the "Crave" name or any names confusingly similar to the Proprietary Marks.

You are not permitted to promote your Franchised Business or use any of the Proprietary Marks in any manner on any social or networking websites, such as Facebook, Foursquare, Instagram, LinkedIn, or Twitter, without our prior written consent. We will control all social media initiatives. You must comply with our System standards regarding the use of social media in your Franchised Business' operation, including prohibitions on your and the Franchised Business' employees posting or blogging comments about the Franchised Business or the System, other than on a website established or authorized by us ("social media" includes personal blogs, common social networks like Facebook, Foursquare, Instagram and MySpace, professional networks like LinkedIn, live-blogging tools like Twitter, virtual worlds, file, audio and video-sharing sites, and other similar social networking or media sites or tools). We will provide access to branded social media pages/handles/assets, and you must update these regularly. We have the right to conduct collective/national campaigns via local social media on your behalf.

We alone will be, and at all times will remain, the sole owner of the copyrights to all material which appears on any website we establish and maintain, including any and all material you may furnish to us for your "click through" subpage.

**Advisory Council**: We may, in our discretion, form an advisory council to work with us to improve the System, the products offered by Crave businesses, advertising conducted by the Fund, and any other matters that we deem appropriate. If an advisory council is formed, it will act solely in an advisory capacity, and will not have decision making authority. We will have the right to form, change, merge or dissolve any advisory council. We may develop by-laws for any advisory council.

If formed, an advisory council will be comprised of our representatives and franchisee representatives. Franchisee representatives may be selected by us or by a vote of other franchisees in the System. If you participate on an advisory council, you will pay any expenses you incur related to your participation, such as travel and living expenses to attend council meetings.

**Training**: No later than 30 days before the date the Restaurant or Food Trucks is scheduled to begin operation, two trainees must have completed, to our satisfaction, our mandatory initial training program. We will conduct this training at our corporate headquarters, at an affiliate's Crave business, or at another location we designate. Your trainees must include you or your General Manager. Our initial training program lasts for approximately three weeks. Initial training programs will be offered at various times during the year depending on the number of new franchisees entering the System, replacement general managers and other personnel needing training, the number of new Restaurants and Food Trucks being opened and the timing of the scheduled openings of Restaurants and Food Trucks.

We will provide instructors and training materials for two trainees (the cost of which is included in the initial franchise fee). You may also have additional personnel trained by us for the Franchised Business, at your expense. We will determine whether your trainees have satisfactorily completed initial training. If you or your General Manager do not satisfactorily complete the initial training program or if we determine that these persons cannot satisfactorily complete the training program, you must designate a replacement to satisfactorily complete the training before you will be permitted to open your Franchised Business. If the replacement General Manager cannot complete the initial training program to our satisfaction, we have the right to terminate your Franchise Agreement.

Any manager subsequently designated by you must also receive and complete the initial training program to our satisfaction, even if this requires sending that manager to our headquarters training program, at your expense. We have the right to charge a reasonable fee for the initial training we provide to a

replacement or successor employee if we have not approved you to provide the training. You must also pay for all expenses your trainees incur for any training program, including costs of travel, lodging, meals, and applicable wages. We may approve you to train replacement managers under our training program before permitting you to train your entire staff for a third or later Franchised Business opening. You may not train any personnel until we have approved you as a trainer.

For the opening of the Franchised Business, we will provide you with one of our representatives. The trained representative will provide on-site pre-opening and opening training, supervision, and assistance to you for up to two days around your Franchised Business' opening. If you request that our representative provide additional days of on-site assistance, you must reimburse the expenses our representative incurs while providing the additional assistance, including travel, lodging and meals and you must pay our then-current per diem fee. If you are opening your second (or later) Franchised Business, we have the right to reduce the duration of our representative's visit or to not provide opening assistance.

If, during the term of your Franchise Agreement, you request that we provide additional training or assistance on-site at your Franchised Business or if we determine that additional training or assistance is necessary, you must pay our then-current per diem fee for each trainer we provide, and you must reimburse us for any expenses our trainers incur, such as costs of travel, lodging, and meals.

The instructional materials used in the initial training include our Manual, marketing and promotion materials, materials related to the operation of the point of sale system, and any other materials that we believe will be beneficial to our franchisees in the training process.

The training schedule and activities of the initial training program are described below:

**TRAINING PROGRAM**

| Subject | Hours of Classroom Training | Hours of On-the-Job Training | Location |
|---|---|---|---|
| Orientation | 5 | 0 | A training facility we designate or at an operating Crave business |
| Restaurant Operations | 10 | 15 | A training facility we designate or at an operating Crave business |
| Food Prep Station | 5 | 15 | A training facility we designate or at an operating Crave business |
| Line Cook/Food Assembly | 0 | 15 | A training facility we designate or at an operating Crave business |
| Food Expediter & Delivery | 0 | 15 | A training facility we designate or at an operating Crave business |
| General Manager | 5 | 20 | A training facility we designate or at an operating Crave business |
| **Totals** | **25** | **80** | |
| | **105 total hours** | | |

The instructor primarily conducting our initial training program is Jake Moran. Each of our instructors has at least five years of experience relevant to the subjects they are teaching and one year of experience with us and/or our affiliates.

The entire training program is subject to change due to updates in materials, methods, manuals, and personnel without notice to you.  The subjects and time periods allocated to the subjects actually taught to a specific franchisee and its personnel may vary based on the individual needs and/or experience of those persons being trained.

We may choose to hold refresher training courses, and we may designate that attendance at refresher training is mandatory for you, your General Manager, and/or other Franchised Business personnel. We do not anticipate charging a fee for refresher training, but you will pay for all of the expenses incurred by your trainees, including travel, lodging, meals, and wages.

We may also choose to hold an annual meeting of our franchisees to provide additional training, introduce new products or changes to the System, or for other reasons.  We may designate that attendance at an annual meeting is mandatory for you, your General Manager, and/or other Franchised Business personnel. We do not anticipate charging a fee to attend the meeting, but you will pay for all of the expenses incurred by your attendees at the meeting, including travel, lodging, meals, and wages.  We will designate the location of any franchisee meeting, such as a resort hotel, but we will not designate an unreasonably expensive site.

In addition to our initial training program, you, your managers, and any other personnel we designate must be ServSafe/TIPS (alcohol awareness), or similarly, certified.  The cost of these certifications is not included in the initial franchise fee and we do not provide certification.  You may need to receive periodic additional training and/or certification.

**Confidential Operations Manual**:  The Table of Contents for our Manual is attached to this Disclosure Document as Exhibit E.  Our Manual contains approximately 60 pages.

**Computer and Point of Sale Systems**:  You must purchase or lease and use certain point of sale systems, computer hardware and software that meet our specifications and that are capable of electronically interfacing with our computer system.  We currently require you to purchase and use the Clover point of sale system with back office systems.  The estimated cost of these systems is between $2,400 and $5,500 for a Restaurant and between $2,500 and $6,500 for a Food Truck.  The point of sale and computer systems will provide order processing, business reports, credit card processing, inventory control and other functions.  You will pay a monthly fee for the use of the Clover POS software and this fee ranges between $135 and $175 for a Restaurant and $50 to $75 for a Food Truck.  You are required to use the Abreeze Reporting App available through the Clover point of sale system to calculate and report your Gross Sales to us each week.  Merchant fees for use of this app range from $5 to $48 per month based on transactions.

The computer system is designed to enable us to have immediate access to the information monitored by the system, and there is no contractual limitation or restriction on our access to or use of the information we obtain.  The information we may access and/or download from your computer system includes Gross Sales.  You must install and maintain equipment and a high-speed internet connection in accordance with our specifications to permit us to access the computer system (or other computer hardware and software) either electronically or at the Franchised Business' premises.  This will permit us to electronically inspect and monitor information concerning your Franchised Business' Gross Sales and any other information that may be contained or stored in the equipment and software.  You must make sure that we have access at all times and in the manner we specify, at your cost.  It will be a material default under the Franchise Agreement if you do not maintain the equipment, lines, and communication methods in operation and accessible to us at all times throughout the term of the Franchise Agreement.

The approved supplier for the computer system, if we designate one, will be included in the Manual. You must purchase a maintenance contract for your computer system, which we anticipate will cost $75

per month for the computer hardware and $35 to $50 per month for the software. You must obtain any upgrades and/or updates to the software used with the computer system, at your expense. In addition, we may require you to update and/or upgrade all or a portion of your point of sale and/or computer system during the term of your Franchise Agreement, at your expense. The Franchise Agreement does not limit our ability to require you to update and/or upgrade your point of sale and/or computer system or the cost of any update and/or upgrade. Neither we nor any affiliate of ours is responsible for providing you with any upgrades, updates, or maintenance for your point of sale or computer system.

You must participate in our Crave Loyalty Program and offer digital ordering and mobile services through our mobile application and self-order kiosks (kiosks in Restaurants only), and you must pay our designated supplier, Clover Network, Inc., for this program and these services. This program and the services will cost between $90 and $105 per month.

## ITEM 12
## TERRITORY

**Franchise Agreement**: Your Franchise Agreement will specify the site that will be the "Accepted Location" for your Restaurant. Your Franchise Agreement will also specify a designated territory for the Restaurant. The "Designated Territory" will be a five-mile radius around the Accepted Location, except that if your Accepted Location is a Non-Traditional Site (as described below), you will not receive a Designated Territory. In addition, because we have the right to establish Restaurants at Non-Traditional Sites, or to operate Food Trucks at Non-Traditional Sites (which may be within your Designated Territory), your Designated Territory is not exclusive to you. If you operate a Food Truck, your Franchise Agreement will specify a Designated Territory that will be defined by a mileage radius based on the municipality in which you wish to operate and the general population density in that municipality. If the municipality you select is in a rural area, your Designated Territory could be a mileage radius around a central point of up to 50 miles. If you select a municipality that is considered suburban or urban, your Designated Territory could be limited to a mileage radius around a central point of up to five miles or up to ten city blocks.

You will not receive an exclusive territory. You may face competition from other franchisees, from outlets that we own, or from other channels of distribution or competitive brands that we control.

During the term of the Franchise Agreement, we will not establish or operate, nor license any other person to establish or operate, a Restaurant or Food Truck in the Designated Territory, except as may be permitted under the Franchise Agreement and those exceptions are described below. There are no circumstances under which the Designated Territory may be altered before your Franchise Agreement expires or is terminated. Your territorial protection does not depend on your achieving a certain sales volume, market penetration, or other factor, other than compliance with the Franchise Agreement.

If, during the term of the Franchise Agreement, you wish to relocate your Restaurant or operate your Food Truck in a different municipality, or if the Restaurant is damaged or destroyed and cannot be repaired within 60 days, you must submit to us in writing the materials we require to consider your request, including information concerning the proposed new location for the Restaurant or new municipality for the Food Truck. You must also meet certain other requirements, such as being in compliance with the Franchise Agreement, the new location meets our then-current requirements for a Crave Restaurant or the new municipality meets our then-current requirements for a Crave Food Truck, and the new location (for a Restaurant) is located within your Designated Territory, and you must sign our then-current form of Franchise Agreement. If we permit you to relocate, you will not pay a new initial franchise fee when you sign the new Franchise Agreement, but you must pay our relocation fee.

Nothing in the Franchise Agreement will prohibit us from: (1) operating and/or franchising others to operate restaurants or food trucks identified in whole or in part by the Proprietary Marks and/or utilizing the System in the Designated Territory that are located in gas stations or convenience stores; transportation facilities, including airports, train stations, subways and rail and bus stations; military bases and government offices; sports facilities, including stadiums and arenas; amusement parks, zoos and convention centers; car and truck rest stops and travel centers; educational facilities; recreational theme parks; hospitals; hotels; business or industrial foodservice venues; venues in which foodservice is or may be provided by a master concessionaire or contract foodservice provider; Indian reservations; casinos; or any similar captive market location not reasonably available to you (a "Non-Traditional Site"); (2) awarding national, regional or local licenses to third parties to sell products under the Proprietary Marks in foodservice facilities primarily identified by the third party's trademark; (3) merchandising and distributing products identified by the Proprietary Marks in the Designated Territory through any method or channel of distribution other than through the operation of a restaurant or food truck, including distribution of products (including any proprietary products) through grocery stores, club stores and similar stores; (4) selling and distributing products identified by the Proprietary Marks in the Designated Territory to restaurants other than Restaurants identified by the Proprietary Marks, regardless of whether the restaurants are licensed to use the Proprietary Marks in connection with their retail sales or not; (5) selling products and services through other channels of distribution, including the internet, wholesale, mail order and catalog; (6) developing and/or owning other franchise systems for the same or similar products and services using trade names and trademarks other than the Proprietary Marks; and (7) purchasing, being purchased by, merging or combining with businesses that we deem to offer direct competition to Crave businesses. We are not required to pay you any consideration if we exercise any right specified above in the Designated Territory.

If any Non-Traditional Site (as described above) is located within the physical boundaries of your Designated Territory, then the premises of this Non-Traditional Site will not be included in your Designated Territory and you will have no rights to this Non-Traditional Site.

We and our affiliates are not prohibited from: (1) operating and franchising others to operate, during the term of the Franchise Agreement, Crave Restaurants or Food Trucks at any location outside of the Designated Territory; (2) operating and franchising others to operate, after the Franchise Agreement terminates or expires, Crave Restaurants or Food Trucks at any location, including locations inside the Designated Territory; and (3) operating and franchising others to operate at any location, during or after the term of the Franchise Agreement, any type of restaurant or food truck other than a Crave Restaurant or Food Truck.

The restrictions above do not apply to Crave Restaurants or Food Trucks in operation, under lease or construction or other commitment to open in the Designated Territory as of the effective date of the Franchise Agreement.

Except as expressly limited above, we and our affiliates have the right to conduct any business activities, under any name, in any geographic area and at any location, regardless of the proximity to your Restaurant or Food Truck or the economic effect on your Restaurant or Food Truck or your activities under the Franchise Agreement.

You may sell our menu items to customers who live anywhere but who choose to dine at or from your Restaurant or Food Truck. You may not engage in any promotional activities or sell products or services, whether directly or indirectly, through or on the internet, the world wide web, or any other similar proprietary or common carrier electronic delivery system; through catalogs or other mail order devices sent or directed to customers or prospective customers located anywhere; or by telecopy or other telephonic or electronic communications, including toll-free numbers, directed to or received from customers or prospective customers located anywhere. While you may place advertisements in printed media and on

television and radio that are targeted to customers and prospective customers located within your Designated Territory, you will not be deemed to be in violation of the Franchise Agreement if those advertisements, because of the natural circulation of the printed media or reach of television and radio, are viewed by prospective customers outside of your Designated Territory. You may not directly solicit customers outside of your Designated Territory. You have no options, rights of first refusal, or similar rights to acquire additional franchises. You may not sell any products to any business or other customer at wholesale.

We and our affiliates may sell products under the Marks within and outside your Designated Territory through any method of distribution other than a Crave Restaurant or Food Truck, including sales through channels of distribution such as the internet, catalog sales, grocery stores, club stores, specialty food stores, telemarketing or other direct marketing sales (together, "alternative distribution channels"). You may not use alternative distribution channels to make sales outside or inside your Designated Territory and you will not receive any compensation for our sales through alternative distribution channels.

We or our affiliate will fulfill all orders placed through the retail portion of our website and you will not be entitled to any portion of the profits received from this, even if the customer's order is generated from or delivered to an address in your Designated Territory.

Neither we nor any parent or affiliate has established, or presently intends to establish, other franchised or company-owned Restaurants or Food Trucks which sell our proprietary products or services under a different trade name or trademark, but we have the right to do so in the future, without first obtaining your consent. We describe earlier in this Item 12 what we may do anywhere and at any time.

**Multi-Unit Development Agreement**: Under the Multi-Unit Development Agreement we grant you the right to develop and operate (under separate Franchise Agreements) the number of Crave Restaurants or Food Trucks in the Development Area that is specified in the Minimum Performance Schedule, which is an attachment to the Multi-Unit Development Agreement. The Development Area is typically described in terms of municipal or county boundaries but may be defined as a specified trade area in a municipality. The actual size of the Development Area will vary depending upon the availability of contiguous markets, our long-range development plans, your financial and operational resources, the number and mix of Restaurants and Food Trucks you commit to develop, population, and market conditions. Our designation of a particular Development Area is not an assurance or warranty that there are a sufficient number of suitable sites for Restaurants or suitable municipalities for Food Trucks in the Development Area for you to meet your Minimum Performance Schedule. The responsibility to locate and prepare a sufficient number of suitable sites/municipalities is solely yours and we have no obligation to accept sites or municipalities which do not meet our criteria for you to meet the Minimum Performance Schedule.

Except as described below, during the term of the Multi-Unit Development Agreement, we and our affiliates will not operate or grant a franchise for the operation of Restaurants or Food Trucks to be located or to operate within the Development Area. However, we have the right to terminate this provision if you are not in full compliance with all of the terms and conditions of the Multi-Unit Development Agreement and all of the Franchise Agreements signed under it. Your territorial rights to the Development Area may or may not, in our discretion, include the right to develop Restaurants or operate Food Trucks at any Non-Traditional Sites. Because we have the right to develop Restaurants or operate Food Trucks at Non-Traditional Sites, as described above, your Development Area is not exclusive to you.

You will not receive an exclusive territory. You may face competition from other franchisees, from outlets that we own, or from other channels of distribution or competitive brands that we control.

Except as expressly limited by the Multi-Unit Development Agreement, we and our affiliates retain all rights with respect to Restaurants, Food Trucks, the Marks, and any products and services anywhere in the world including the right:  (a) to produce, offer and sell and to grant others the right to produce, offer and sell the products offered at Restaurants and any other goods displaying the Marks or other trade and service marks through alternative distribution channels, as described above, both within and outside your Development Area, and under any terms and conditions we deem appropriate; (b) to operate and to grant others the right to operate Restaurants or Food Trucks located outside the Development Area under any terms and conditions we deem appropriate and regardless of proximity to your Restaurants or Food Trucks; (c) to operate and to grant others the right to operate Restaurants or Food Trucks at Non-Traditional Sites within and outside the Development Area under any terms and conditions we deem appropriate; and (d) the right to acquire and operate a business operating one or more restaurants, food trucks or food service businesses located or operating in your Development Area, except that these businesses will not operate using the Proprietary Marks.  If a Non-Traditional Site becomes available within the Development Area during the term of the Multi-Unit Development Agreement, we may, in our sole discretion, offer you the opportunity to develop a Restaurant or Food Truck at the Non-Traditional Site.  You will have 30 days after we notify you that the site is available to accept this right of first refusal.

After the final Franchised Business under your Minimum Performance Schedule has opened, if we believe that it is desirable to establish additional Franchised Businesses within the Development Area, and if you complied with the terms of your Multi-Unit Development Agreement and are in compliance with your Franchise Agreements, we will offer you the right to develop these additional Franchised Businesses. You must exercise this option, in full, within 60 days after our notice to you.  If you do not exercise or you decline this right of first refusal, we will have the right to sell these development rights to another multi-unit developer or to develop the Restaurants or Food Trucks ourselves.

To maintain your rights under the Multi-Unit Development Agreement you must have open and in operation the cumulative number of Franchised Businesses stated on the Minimum Performance Schedule by the dates agreed upon in the Minimum Performance Schedule.  Failure to do so will be grounds for either a loss of territorial exclusivity or a termination of the Multi-Unit Development Agreement.

In addition, when the last Franchised Business to be developed within the Development Area opens for business, your rights under the Multi-Unit Development Agreement with respect to the Development Area will have expired and we and our affiliates will have the right to operate and to grant to others development rights and franchises to develop and operate Restaurants and Food Trucks within the Development Area.  This right will be subject only to the territorial rights under your franchise agreements for Restaurants and Food Trucks in the Development Area and the right of first refusal to develop additional Franchised Businesses described above.  The Development Area may not be altered unless we and you mutually agree to do so.  It will not be affected by your sales volume.  You are not granted any other option, right of first refusal or similar right to acquire additional Franchised Businesses in your Development Area under the Multi-Unit Development Agreement, except as described above.

## ITEM 13
## TRADEMARKS

The Franchise Agreement grants you the right to use certain trademarks, trade names, service marks, symbols, emblems, logos, and indicia of origin designated by us.  These Marks may be used only in the manner we authorize and only for the operation of your Franchised Business.  The Multi-Unit Development Agreement does not grant to you any right to use the Marks.

You may not use the Marks as a part of your corporate or other legal name, and you must comply with our instructions in filing and maintaining trade name or fictitious name registrations.  You must sign

any documents we require to protect the Marks or to maintain their continued validity and enforceability. In addition, you may not directly or indirectly contest the validity of our ownership of or our rights in and to the Marks.

Our Parent owns the following principal Marks which have been registered or applied for registration with the U.S. Patent and Trademark Office ("USPTO") on the Principal Register:

| Mark | Registration Date | Registration Number | Register |
|---|---|---|---|
|  | July 30, 2019 | 5,822,628 | Principal |
| #BEATTHECRAVING | March 10, 2020 | 6,005,320 | Principal |

There are no currently effective determinations of the USPTO, the Trademark Trial and Appeal Board, the trademark administrator of any state or any court, no pending infringement, opposition or cancellation proceedings and no pending litigation involving any of the Marks that may significantly affect the ownership or use of any Mark listed above.  There are no agreements currently in effect which limit our right to use or to license others to use the Marks, except for the perpetual trademark license agreement between us and our Parent dated February 24, 2018.  Our Parent intends to file all affidavits and other documents required to maintain its interests in and to the Marks.

You must immediately notify us of any apparent infringement of the Marks or challenge to your use of any of the Marks or claim by any person of any rights in any of the Marks.  You and your Principals are not permitted to communicate with any person other than us, or any designated affiliate, our counsel and your counsel involving any infringement, challenge, or claim.  We can take action and have the right to exclusively control any litigation or USPTO or other administrative or agency proceeding caused by any infringement, challenge or claim or otherwise relating to any of the Marks.  You must sign any and all documents, and do what may, in our counsel's opinion, be necessary or advisable to protect our interests in any litigation or USPTO or other administrative or agency proceeding or to otherwise protect and maintain our interests and the interests of any other person or entity (including any affiliate) having an interest in the Marks.

We will indemnify you against and reimburse you for all damages for which you are held liable for your use of any of the Marks, provided that the conduct of you and your Principals in the proceeding and use of the Marks is in full compliance with the terms of the Franchise Agreement.

Except as provided above, we are not obligated by the Franchise Agreement to protect any rights granted to you to use the Marks or to protect you against claims of infringement or unfair competition with respect to them.  Although we are not contractually obligated to protect the Marks or your right to use them, as a matter of corporate policy we intend to defend the Marks vigorously.

We may require you, at your expense, to discontinue or modify your use of any of the Marks or to use one or more additional or substitute trade names, service marks, trademarks, symbols, logos, emblems and indicia of origin if we determine that an addition or substitution will benefit the System.

The license to use the Marks granted in the Franchise Agreement is non-exclusive to you. We have and retain certain rights in the Marks including the following:

      1.      To grant other licenses for the use of the Marks in addition to those licenses already granted or to be granted to franchisees;

      2.      To develop and establish other systems using the Marks or other names or marks, and to grant licenses or franchises in those systems without providing any rights to you; and

      3.      To engage, directly or indirectly, at wholesale, retail or otherwise, in (a) the production, distribution, license and sale of products and services and (b) the use of the Marks and any and all trademarks, trade names, service marks, logos, insignia, slogans, emblems, symbols, designs and other identifying characteristics we may develop for that purpose.

### ITEM 14
### PATENTS, COPYRIGHTS AND PROPRIETARY INFORMATION

**Patents and Copyrights**:  We do not have an ownership interest in any pending or registered patents or copyrights that are material to the franchise.

**Confidential Operations Manual**:  You must operate the Franchised Business in accordance with the standards and procedures specified in the Manual.  One copy of the Manual will be loaned to you by us for the term of the Franchise Agreement.  We may, instead of providing you with a hard copy of the Manual, make our Manual available electronically via a password protected website.

You must treat the Manual and any other manuals we create or approve for use in your operation of the Franchised Business, and the information contained in them, as confidential.  You must also use all reasonable efforts to maintain this information as secret and confidential and you must not duplicate, copy, record or otherwise reproduce these materials, in whole or in part, or make them available to any unauthorized person.  The Manual remains our sole property and must be kept in a secure place on the Franchised Business' premises.

We may revise the contents of the Manual and you must comply with each new or changed standard.  You must also insure that the Manual is kept current at all times.  If there is a dispute regarding the contents of the Manual, the terms of the master copy maintained by us at our home office will be controlling.

**Confidential Information**:  We claim proprietary rights in certain of our recipes which are included in the Manual and which are our trade secrets.  Any and all information, knowledge, know-how and techniques related to the System that we communicate to you, including the Manual, plans and specifications, marketing information and strategies and site evaluation, selection guidelines and techniques, recipes, and the terms of your agreement with us, are considered confidential.  You and each of your Principals are prohibited, during and after the term of your Agreement, from communicating, or using for the benefit of any other person or entity, and, after the term of your Agreement, from using for your or their own benefit, any confidential information, knowledge or know-how concerning the methods of operation of the Franchised Business that may be communicated to you or any of your Principals or that you may learn about.  You and each of your Principals may divulge this confidential information only to

your employees who must have access to it to operate the Franchised Business.  Neither you nor your Principals are permitted at any time, without first obtaining our written consent, to copy, record or otherwise reproduce the materials or information nor make them available to any unauthorized person.  If we ask, you must have your General Manager and any of your personnel who have received or will have access to confidential information sign similar confidentiality covenants.

If you, your Principals, General Manager, or employees develop any new concept, process or improvement in the operation or promotion of the Franchised Business, you must promptly notify us and give us all necessary information, free of charge.  You, your Principals, General Manager, and employees must acknowledge that any of these concepts, processes or improvements will become our property and we may give the information to other franchisees.

## ITEM 15
## OBLIGATION TO PARTICIPATE IN THE ACTUAL
## OPERATION OF THE FRANCHISE BUSINESS

You must designate and retain at all times an individual to serve as the General Manager who will be a full-time employee responsible for the daily operation of the Franchised Business.  The General Manager must have relevant food service experience, must satisfy our educational and business criteria as provided to you in the Manual or other written instructions, must satisfy the applicable training requirements in the Franchise Agreement, and must be individually acceptable to us and approved by us to act as a General Manager.  We recommend, but do not require, that you or one of the Principals acts as the General Manager.  We do not require you to be actively involved in the daily operation of your Franchised Business, but you must still make sure that your Franchised Business is being operated according to the terms of your Franchise Agreement and the Manual.  If you are not actively involved in the daily operation of your Franchised Business, then we may communicate with and rely on the decisions made by your General Manager.  The General Manager does not have to own an equity interest in you or the franchise.  The General Manager must be responsible for the supervision and management of the Franchised Business and must devote full time and best efforts to this activity.  If the General Manager cannot serve in the position or does not meet the requirements, he or she must be replaced within 30 days after the General Manager stops serving or no longer meets the requirements.

In addition to the General Manager, you must have any assistant managers necessary for the efficient operation of the Franchised Business.  All of your managers must have successfully completed our training program and be certified by us to operate your Franchised Business.  We do not require that any of your managers have an ownership interest in you.  While your Franchised Business is open, you must have at least one certified manager on-site.  You must also retain other personnel as are needed to operate the Franchised Business.

Your General Manager and all other personnel who will have access to our proprietary and confidential information and training must sign our Confidentiality and Non-Competition Agreement which is attached to our Franchise Agreement as Attachment 4.  We will be a third-party beneficiary of each agreement with the independent right to enforce the agreement's terms.  We have the right, in our discretion, to decrease the period of time or geographic scope of the non-competition covenants contained in the attachments or eliminate the non-competition covenants altogether for any party that must sign an agreement as described in this paragraph.

If your Franchised Business is owned by an entity, all owners of the entity must personally sign the Franchise Agreement as a Principal.  If you are a married individual, your spouse must sign our Spousal Guaranty which is attached to our Franchise Agreement as Attachment 9.

**ITEM 16**
**RESTRICTIONS ON WHAT THE FRANCHISEE MAY SELL**

You must sell or offer for sale all menu items, food products, merchandise, and other products and services we require, in the manner and style we require, including dine-in and carry-out, as expressly authorized by us in writing.  You must sell and offer for sale only the menu items, products, and services that we have expressly approved in writing.  You must not deviate from our standards and specifications without first obtaining our written consent.  You must discontinue selling and offering for sale any menu items, products, or services that we may disapprove in writing at any time.  We have the right to change the types of menu items, products and services offered by you at the Franchised Business at any time, and there are no limits on our right to make those changes.

You must maintain in sufficient supply and use and sell only the food and beverage items, ingredients, proprietary products, merchandise, other products, materials, supplies, and paper goods that conform to our standards and specifications.  You must prepare all menu items according to our recipes and procedures for preparation contained in the Manual or other written instructions, including the measurements of ingredients.  You must not deviate from our standards and specifications by the use or offer of nonconforming items or differing amounts of any items, without first obtaining our written consent.

We have the right to vary the menu items offered at certain Crave Franchised Businesses based on regional or local tastes or ingredients.  If we allow a Crave Restaurant or Food Truck to modify its menu to accommodate regional or local tastes or ingredients, we are not required to grant to you a similar variance or modification.

You must keep the Franchised Business very clean and maintain it in good repair and condition.  You must make any additions, alterations, repairs, and replacements, including repainting or replacement of obsolete signs, furnishings, equipment, and décor as we may reasonably direct.  You must not make any changes to the premises without obtaining our written consent before you make the changes.  You must obtain and pay for any new or additional equipment, including point of sale, computer hardware and software, fixtures, supplies and other products and materials that you must have to offer and sell new menu items from the Franchised Business.

We have the right to determine the maximum prices for the goods, products and services offered from your Franchised Business, as permitted by applicable law.  You must comply with the prices required by us, but we make no guarantees or warranties that offering the products or merchandise at the required price will enhance your sales or profits.

We do not impose any other restrictions in the Franchise Agreement or otherwise, as to the goods or services that you may offer or sell or as to the customers to whom you may offer or sell, except as described in Item 12.  You may not directly solicit customers outside of your Designated Territory.

**ITEM 17**
**RENEWAL, TERMINATION, TRANSFER AND DISPUTE RESOLUTION**

**THE FRANCHISE RELATIONSHIP**

**This table lists certain important provisions of the franchise and related agreements.  You should read these provisions in the agreements attached to this disclosure document.**

| Provision | Section in Franchise Agreement | Summary |
|---|---|---|
| a.  Length of the franchise term | Section 3.1 | 10 years |
| b.  Renewal or extension of the term | Section 3.2 | One renewal term of 10 years |
| c.  Requirements for franchisee to renew or extend | Section 3.2 | Renewal is automatic.  Within the last six months of the term of your Franchise Agreement, we will send you a bill for the renewal fee as well as any documents that you must sign for the renewal, which may include a renewal Franchise Agreement and a release. If you do not wish to renew your agreement, you must provide us with notice of this election no later than 60 days before your agreement expires.  If you do not pay the renewal fee and sign the documents we require, your agreement will not be renewed.<br><br>You may be asked to sign a contract with materially different terms and conditions than your original contract, but the boundaries of your territory will remain the same, and the fees on renewal will not be greater than the fees that we then impose on similarly situated renewing franchisees. |
| d.  Termination by franchisee | Not applicable | You may terminate the Franchise Agreement on any grounds available by law. |
| e.  Termination by franchisor without cause | Not applicable | Not applicable |
| f.  Termination by franchisor with cause | Section 17.1.1 | Each of your obligations under the Franchise Agreement is a material and essential obligation, the breach of which may result in termination. |

| | Provision | Section in Franchise Agreement | Summary |
|---|---|---|---|
| g. | "Cause" defined – curable defaults | Sections 17.1.3 and 17.2 | We may terminate you for cause if you fail to cure certain defaults, including:  suspension of your beer and wine license; if you or any of your affiliates fail to pay any monies owed to us, or our affiliates or vendors, and do not cure within five days after notice (or longer period required); fail to obtain signed copies of the confidentiality and non-competition covenants contained in the Franchise Agreement within five days after a request; fail to obtain and maintain required insurance within seven days after notice; fail to cure a failed quality assurance audit within 15 days after notice; suspension of required license or permit; use the Marks in an unauthorized manner and fail to cure within 24 hours after notice; fail to maintain quality standards; fail to cure any other default that is susceptible of cure within 30 days after notice |
| h. | "Cause" defined – non-curable defaults | Sections 17.1.2 and 17.1.3 | We may terminate you for cause if you fail to cure certain defaults, including: loss of your beer and wine license, if you become insolvent, make a general assignment for benefit of creditors, file a petition or have a petition initiated against you under federal bankruptcy laws, have outstanding judgments against you for over 30 days, sell unauthorized products or services, fail to find an accepted location within time required, fail to remodel when required, fail to open Franchised Business when required, fail to comply with any term and condition of any sublease or related agreement and have not cured the default within the given cure period, abandon or lose right to the Franchised Business' premises, are convicted of a felony or other crime that may have an adverse effect on the System or Marks, transfer any interest without our consent, required license permit is revoked, repeated defaults, or maintain false books or records.  In addition, a default under one agreement with us may result in a termination of all of your other agreements with us.  This is known as a cross-default provision. |

| Provision | Section in Franchise Agreement | Summary |
|---|---|---|
| i. Franchisee's obligations on termination/non-renewal | Section 18 | Obligations include:  You must stop operating the Franchised Business and using the Marks and System and completely de-identify the business, pay all amounts due to us or our affiliates, return the Manual and all other proprietary materials, comply with confidentiality requirements, pay liquidated damages (if applicable), and at our option, sell or assign to us your rights in the Franchised Business' premises and the equipment and fixtures used in the business |
| j. Assignment of contract by franchisor | Section 14.1 | We have the right to transfer or assign the Franchise Agreement to any person or entity without restriction.  However, no assignment will be granted except to an assignee who, in our good faith judgment, is willing and able to assume our obligations. |
| k. "Transfer" by franchisee – defined | Section 14.2.1 | Includes sale, assignment, conveyance, pledge, mortgage, or other encumbrance of any interest in the Franchise Agreement, the Franchised Business or you (if you are not a natural person) |
| l. Franchisor approval of transfer by franchisee | Section 14.2.2 | You must obtain our consent before transferring any interest.  We will not unreasonably withhold our consent. |
| m. Conditions for franchisor approval of transfer | Section 14.2.2 | Conditions include:  You must pay all amounts due us or our affiliates, not otherwise be in default, sign a general release, and pay a transfer fee.  Transferee must meet our criteria, complete training to our satisfaction and sign current Franchise Agreement |
| n. Franchisor's right of first refusal to acquire franchisee's business | Section 14.4 | Within 30 days after notice, we have the option to purchase the transferred interest on the same terms and conditions. |
| o. Franchisor's option to purchase franchisee's business | Sections 14.8 and 18.12 | We have the right to purchase the assets of the Franchised Business for fair market value (a) at any time during the term of your Franchise Agreement, or (b) on termination or non-renewal of the Franchise Agreement. |

| | Provision | Section in Franchise Agreement | Summary |
|---|---|---|---|
| p. | Death or disability of franchisee | Section 14.5 | Upon your death or permanent disability (if you are a natural person) or upon the death or permanent disability of any Principal, distributee must be approved by us, or franchise must be transferred to someone approved by us within 12 months after death or within six months after notice of permanent disability. |
| q. | Non-competition covenants during the term of the franchise | Section 10.3.1 | You are prohibited from operating or having an interest in a similar business without our prior written consent. |
| r. | Non-competition covenants after the franchise is terminated or expires | Section 10.3.2 | You and your Principals are prohibited for two years from expiration or termination of the franchise from operating or having an interest in a similar business within 20 miles of any Franchised Business in the System. |
| s. | Modification of the agreement | Sections 10.1.5 and 19.2 | The Franchise Agreement may not be modified unless mutually agreed to in writing.  You must comply with the Manual as amended. |
| t. | Integration/merger clause | Section 19.2 | Only the terms of the Franchise Agreement and other related written agreements are binding (subject to applicable federal and/or state law).  Any representations or promises outside of the Disclosure Document and Franchise Agreement may not be enforceable. |
| u. | Dispute resolution by arbitration or mediation | Section 19.7 | Arbitration in Wilmington, Delaware, subject to applicable state and federal law |
| v. | Choice of forum | Section 19.8 | Wilmington, Delaware, subject to applicable state and federal law |
| w. | Choice of law | Section 19.8 | Delaware, subject to applicable state and federal law |

**THE MULTI-UNIT DEVELOPMENT RELATIONSHIP**

| | Provision | Section in Multi-Unit Development Agreement | Summary |
|---|---|---|---|
| a. | Length of the franchise term | 6 | Length of the Minimum Performance Schedule |

| Provision | Section in Multi-Unit Development Agreement | Summary |
|---|---|---|
| b. Renewal or extension of the term | 5 | After all Franchised Businesses have been developed, we will negotiate in good faith another Multi-Unit Development Agreement. |
| c. Requirements for multi-unit developer to renew or extend | Not applicable | Not applicable |
| d. Termination by multi-unit developer | Not applicable | You may seek to terminate on any grounds available to you at law. |
| e. Termination by franchisor without cause | Not applicable | Not applicable |
| f. Termination by franchisor with cause | 9 | We can terminate if you commit any one of several listed violations. |
| g. "Cause" defined – curable defaults | 9 | If you use the Marks or System without our consent; participating in a competing business; failure to pay money to us when due; you begin developing a Franchised Business before all of your pre-development obligations are met; failure to obtain our consent when required; you open or begin operating any Franchised Business before a Franchise Agreement for that Franchised Business has been signed |
| h. "Cause" defined – non-curable defaults | 9 | Failure to meet your minimum performance schedule; failure to comply with applicable laws; if all of your Franchised Businesses stop operating; unauthorized transfer; you make a material misrepresentation to us; conviction by you or your owners of an indictable offense; bankruptcy or insolvency; if a Franchise Agreement with us is terminated according to its terms (this is a cross-default provision) |
| i. Multi-unit developer's obligations on termination/ non-renewal | 10 | You must stop selecting sites for Franchised Businesses, and you may not open any more Franchised Businesses |
| j. Assignment of contract by franchisor | 11 | No restriction on our right to assign.  However, no assignment will be made except to an assignee who, in our good faith judgment, is willing and able to assume our obligations under the Multi-Unit Development Agreement. |
| k. "Transfer" by multi-unit developer – defined | 11 | Includes transfer of any interest in the Multi-Unit Development Agreement |

| | Provision | Section in Multi-Unit Development Agreement | Summary |
|---|---|---|---|
| l. | Franchisor approval of transfer by multi-unit developer | 11 | We have the right to approve all transfers, our consent not to be unreasonably withheld |
| m. | Conditions for franchisor approval of transfer | 11 | Conditions for transfer include not being in default, at least 25% of all Franchised Businesses required to be developed are open or under construction, all debts are paid, the buyer meets our current criteria for new Multi-Unit Developers, execution of a general release, payment of transfer fee, buyer personally guarantees all obligations |
| n. | Franchisor's right of first refusal to acquire multi-unit developer's business | 11 | We have the right to match the offer. |
| o. | Franchisor's option to purchase multi-unit developer's business | Not applicable | Not applicable |
| p. | Death or disability of multi-unit developer | 11 | Upon your death or permanent disability (if you are a natural person) or upon the death or permanent disability of any Principal, distributee must be approved by us, or development rights must be transferred to someone approved by us, within 12 months after death or within six months after notice of permanent disability. |
| q. | Non-competition covenants during the term of the franchise | 12 | You are prohibited from operating or having an interest in a similar business without our prior written consent, except for Franchised Businesses operated under Franchise Agreements with us. |
| r. | Non-competition covenants after the franchise is terminated or expires | 12 | No competing business for two years and within 20 miles of any Franchised Business in the System |
| s. | Modification of the agreement | 18 | The Multi-Unit Development Agreement may not be modified unless mutually agreed to in writing. |

| | Provision | Section in Multi-Unit Development Agreement | Summary |
|---|---|---|---|
| t. | Integration/merger clause | 18 | Only the terms of the Multi-Unit Development Agreement and other related written agreements are binding (subject to applicable federal and/or state law).  Any representations or promises outside of the Disclosure Document and Multi-Unit Development Agreement may not be enforceable. |
| u. | Dispute resolution by arbitration or mediation | 19 | Arbitration in Wilmington, Delaware, subject to applicable state and federal law |
| v. | Choice of forum | 19 | Wilmington, Delaware, subject to applicable state and federal law |
| w. | Choice of law | 19 | Delaware, subject to applicable state and federal law |

## ITEM 18
## PUBLIC FIGURES

We do not use any public figure to promote our franchise.

## ITEM 19
## FINANCIAL PERFORMANCE REPRESENTATIONS

The FTC's Franchise Rule permits a franchisor to provide information about the actual or potential financial performance of its franchised and/or franchisor owned outlets, if there is a reasonable basis for the information, and if the information is included in the Franchise Disclosure Document.  Financial performance information that differs from that included in Item 19 may be given only if: (1) a franchisor provides the actual records of an existing outlet you are considering buying; or (2) a franchisor supplements the information provided in this Item 19, for example, by providing information about performance at a particular location or under particular circumstances.

We do not make any representations about a franchisee's future financial performance or the past financial performance of company-owned or franchised outlets.  We also do not authorize our employees or representatives to make any such representations either orally or in writing.  If you are purchasing an existing outlet, however, we may provide you with the actual records of that outlet.  If you receive any other financial performance information or projections of your future income, you should report it to the franchisor's management by contacting Samantha Rincione at 122 West 25th Street, Suite 101, Cheyenne, Wyoming, 82002, and (516)316-7420, the Federal Trade Commission, and the appropriate state regulatory agencies.

**ITEM 20**
**OUTLETS AND FRANCHISEE INFORMATION**

**Table No. 1**
**Systemwide Outlet Summary**
**For years 2017, 2018, 2019**

| Outlet Type | Year | Outlets at the Start of the Year | Outlets at the End of the Year | Net Change |
|---|---|---|---|---|
| Franchised | 2017 | 0 | 0 | 0 |
| | 2018 | 0 | 0 | 0 |
| | 2019 | 0 | 4 | +4 |
| Company-Owned* | 2017 | 0 | 0 | 0 |
| | 2018 | 0 | 0 | 0 |
| | 2019 | 0 | 0 | 0 |
| **Total Outlets** | **2017** | **0** | **0** | **0** |
| | **2018** | **0** | **0** | **0** |
| | **2019** | **0** | **4** | **+4** |

**Table No. 2**
**Transfers of Outlets from Franchisees to New Owners (other than the Franchisor)**
**For years 2017, 2018, 2019**

| State | Year | Number of Transfers |
|---|---|---|
| Georgia | 2017 | 0 |
| | 2018 | 0 |
| | 2019 | 1 |
| **Total** | **2017** | **0** |
| | **2018** | **0** |
| | **2019** | **1** |

**Table No. 3**
**Status of Franchised Outlets**
**For years 2017, 2018, 2019**

| State | Year | Outlets at Start of Year | Outlets Opened | Termina-tions | Non-Renewals | Reacquired by Franchisor | Ceased Operations – Other Reasons | Outlets at End of the Year |
|---|---|---|---|---|---|---|---|---|
| Georgia | 2017 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2018 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2019 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| North Carolina | 2017 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2018 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2019 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Oklahoma | 2017 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2018 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2019 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Texas | 2017 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2018 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2019 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| **Total** | **2017** | **0** | **0** | **0** | **0** | **0** | **0** | **0** |
| | **2018** | **0** | **0** | **0** | **0** | **0** | **0** | **0** |
| | **2019** | **0** | **4** | **0** | **0** | **0** | **0** | **4** |

**Table No. 4**
**Status of Company-Owned Outlets**
**For years 2017, 2018, 2019**

| State | Year | Outlets at Start of Year | Outlets Opened | Outlets Reacquired from Franchisee | Outlets Closed | Outlets Sold to Franchisee | Outlets at End of the Year |
|---|---|---|---|---|---|---|---|
| None | 2017 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2018 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2019 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total** | **2017** | **0** | **0** | **0** | **0** | **0** | **0** |
| | **2018** | **0** | **0** | **0** | **0** | **0** | **0** |
| | **2019** | **0** | **0** | **0** | **0** | **0** | **0** |

Table No. 5
Projected Openings as of December 31, 2019

| States | Franchise Agreements Signed But Outlet Not Opened | Projected New Franchised Outlets in the Next Fiscal Year | Projected New Company-Owned Outlets in the Next Fiscal Year |
|---|---|---|---|
| Colorado | 1 | 2 | 0 |
| Florida | 1 | 3 | 0 |
| Georgia | 1 | 2 | 0 |
| Iowa | 0 | 1 | 0 |
| Kansas | 0 | 1 | 0 |
| Louisiana | 2 | 2 | 0 |
| Nevada | 0 | 2 | 0 |
| New York | 0 | 2 | 1 |
| North Carolina | 0 | 3 | 0 |
| Ohio | 0 | 1 | 0 |
| South Carolina | 0 | 1 | 0 |
| Tennessee | 0 | 2 | 0 |
| Texas | 2 | 5 | 0 |
| **Total** | **7** | **27** | **1** |

A list of the names of all franchisees and multi-unit developers and the addresses and telephones numbers of their franchises will be provided in Exhibit D to this disclosure document when applicable.

The name, city, state and current business telephone number (or if unknown, the last known home telephone number) of every franchisee or multi-unit developer who had a franchise terminated, cancelled, not renewed or otherwise voluntarily or involuntarily ceased to do business under the applicable Agreement during the most recently completed fiscal year or who has not communicated with us within 10 weeks of the issuance date of this disclosure document will be listed on Exhibit D to this disclosure document when applicable. **If you buy this franchise, your contact information may be disclosed to other buyers when you leave the franchise system.**

During the last three fiscal years, we have not had any franchisees sign confidentiality provisions that would restrict their ability to speak openly about their experience with the Crave System.

There are no trademark-specific organizations formed by our franchisees that are associated with the Crave System.

## ITEM 21
## FINANCIAL STATEMENTS

Attached to this Disclosure Document as Exhibit A are our audited financial statements for the fiscal year ended December 31, 2019, and our unaudited financial statements for the fiscal year ended December 31, 2018.

We have not been in business for three years or more and cannot include all financial statements required for Item 21.

Our fiscal year end is December 31st.

**ITEM 22**
**CONTRACTS**

Attached as Exhibits to this Disclosure Document are the following contracts and their attachments:

| | | |
|---|---|---|
| 1. | Franchise Agreement | Exhibit B |
| 2. | Multi-Unit Development Agreement | Exhibit C |
| 3. | Form of General Release | Exhibit H |

**ITEM 23**
**RECEIPTS**

Two copies of an acknowledgment of your receipt of this Disclosure Document appear at the end of the Disclosure Document.  Please return one signed copy to us and retain the other for your records.

**Exhibit A to the**
**Crave Franchise Disclosure Document**

**<u>FINANCIAL STATEMENTS</u>**

# CRAVE Franchising, LLC
## Cheyenne, WY

Financial Statements
December 31, 2019 and 2018

*CRAVE FRANCHISING, LLC*
*FINANCIAL STATEMENTS*
*DECEMBER 31, 2019 AND 2018*

### *Table of Contents*

|                                   | Page |
|-----------------------------------|------|
| Independent Auditors' Report      | 1    |

### *Basic Financial Statements*

|                                   | Page |
|-----------------------------------|------|
| Balance Sheets                    | 3    |
| Statements of Income              | 4    |
| Statements of Member's Equity     | 5    |
| Statements of Cash Flows          | 6    |
| Notes to Financial Statements     | 7    |



*INDEPENDENT AUDITORS' REPORT*

To the Member of
  CRAVE Franchising, LLC
Cheyenne, WY

We have audited the accompanying financial statements of CRAVE Franchising, LLC (a Limited Liability Company), which comprise the balance sheet as of December 31, 2019, and the related statements of income, member's equity, and cash flows for the year then ended, and the related notes to the financial statements.

### Management's Responsibility for the Financial Statements

Management is responsible for the preparation and fair presentation of these financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

### Auditors' Responsibility

Our responsibility is to express an opinion on these financial statements based on our audit. We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditors' judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

### Opinion

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of CRAVE Franchising, LLC as of December 31, 2019, and the results of its operations and its cash flows for the year then ended in accordance with accounting principles generally accepted in the United States of America.

**CRAVE Franchising, LLC**
Page 2 of 2

*Other Matters*

The 2018 financial statements were compiled by other accountants and their report thereon, dated February 13, 2019, stated they did not audit or review those financial statements and, accordingly, express no opinion or other form of assurance on them. Accordingly, we do not express an opinion on the financial statements as of and for the year ended December 31, 2018 or the related notes to the financial statements for that period.

*Porterfield & Company CPA, PLLC*

**Porterfield & Company CPA, PLLC**

Harrison, Arkansas
   February 14, 2020

### CRAVE FRANCHISING, LLC
### BALANCE SHEETS
### AS OF DECEMBER 31, 2019 AND 2018

#### ASSETS

| | | 2019 | | Unaudited 2018 |
|---|---|---|---|---|
| **Current Assets** | | | | |
| Cash and Cash Equivalents | $ | 14,877 | $ | 7,603 |
| Accounts Receivable | | 3,796 | | - |
| Note Receivable - Related Parties | | 120,120 | | - |
| Prepaid Expenses | | - | | 400 |
| Deferred Sales Commissions | | 5,900 | | 4,900 |
| **Total Current Assets** | | 144,693 | | 12,903 |
| | | | | |
| **Other Assets** | | | | |
| Software, net | | 1,067 | | 1,600 |
| Intellectual Property | | 10,500 | | 8,000 |
| Deferred Sales Commissions | | 48,200 | | 44,100 |
| **Total Other Assets** | | 59,767 | | 53,700 |
| | | | | |
| **Total Assets** | $ | 204,460 | $ | 66,603 |

#### LIABILITIES AND MEMBER'S EQUITY (DEFICIT)

| | | 2019 | | 2018 |
|---|---|---|---|---|
| **Current Liabilities** | | | | |
| Accounts Payable and Accrued Liabilities | $ | 22,569 | $ | 5,816 |
| Current Portion of Deferred Revenue - Franchise Sales | | 187,621 | | 117,583 |
| **Total Current Liabilities** | | 210,190 | | 123,399 |
| | | | | |
| **Long-Term Liabilities** | | | | |
| Long-Term Deferred Revenue - Franchise Sales, net of Current Portion | | 64,337 | | 23,617 |
| **Total Long-Term Liabilities** | | 64,337 | | 23,617 |
| | | | | |
| **Total Liabilities** | | 274,527 | | 147,016 |
| | | | | |
| **Member's Equity (Deficit)** | | (70,067) | | (80,413) |
| | | | | |
| **Total Liabilities and Member's Equity (Deficit)** | $ | 204,460 | $ | 66,603 |

*CRAVE FRANCHISING, LLC*
*STATEMENTS OF INCOME*
*FOR THE YEARS ENDED DECEMBER 31, 2019 AND 2018*

|  | 2019 | *Unaudited* 2018 |
|---|---:|---:|
| **Operating Revenues** | | |
| Royalties | $ 64,447 | $ - |
| Initial Franchise Fees, net of discounts | 158,042 | - |
| Marketing Fund | 12,121 | - |
| Other Income | 2,005 | - |
| **Net Operating Revenue** | 236,615 | - |
| | | |
| **Operating Expenses** | | |
| Amortization | 533 | - |
| Franchise Brand Development | 12,437 | 27,930 |
| General and Administrative | 111,504 | 27,377 |
| Legal and Professional Services | 39,109 | 12,737 |
| Marketing and Advertising | 30,398 | 12,853 |
| Salaries and Benefits | 25,081 | - |
| Sales Commissions | 4,900 | - |
| **Total Operating Expenses** | 223,962 | 80,897 |
| | | |
| **Operating Income (Loss)** | 12,653 | (80,897) |
| | | |
| **Interest Income (Expense)** | (2,307) | (16) |
| | | |
| **Net Income (Loss)** | $ 10,346 | $ (80,913) |

### CRAVE FRANCHISING, LLC
### STATEMENTS OF MEMBER'S EQUITY
### FOR THE YEARS ENDED DECEMBER 31, 2019 AND 2018

|  | 2019 | Unaudited 2018 |
|---|---|---|
| **Member's Equity (Deficit)**, Beginning of Year | $ (80,413) | $ - |
| **Net Income (Loss)** | 10,346 | (80,913) |
| **Member Contributions** | - | 500 |
| **Member's Equity (Deficit)**, End of Year | $ (70,067) | $ (80,413) |

*CRAVE FRANCHISING, LLC*
*STATEMENTS OF CASH FLOWS*
*FOR THE YEARS ENDED DECEMBER 31, 2019 AND 2018*

|  | 2019 | *Unaudited* 2018 |
|---|---|---|
| **Cash Flows from Operating Activities** | | |
| Net Income (Loss) | $ 10,346 | $ (80,913) |
| Amortization | 533 | - |
| Amortization of Sales Commissions | 4,900 | - |
| Changes in Assets and Liabilities: | | |
| Accounts Receivable | (3,796) | - |
| Prepaid Expenses | 400 | (400) |
| Accounts Payable and Accrued Liabilities | 16,753 | 5,816 |
| Deferred Revenue - Franchise Sales | 110,758 | 141,200 |
| **Net Cash Provided by (Used in) Operating Activities** | 139,894 | 65,703 |
| **Cash Flows from Investing Activities** | | |
| Payment of Sales Commissions on Contracts | (10,000) | (49,000) |
| Purchase of Software and Intellectual Property | (2,500) | (9,600) |
| **Net Cash Provided by (Used in) Investing Activities** | (12,500) | (58,600) |
| **Cash Flows from Financing Activities** | | |
| (Increase) Decrease in Note Receivable - Related Parties | (120,120) | - |
| Contributions Received | - | 500 |
| **Net Cash Provided by (Used in) Financing Activities** | (120,120) | 500 |
| **Increase (Decrease) in Cash and Cash Equivalents** | 7,274 | 7,603 |
| **Cash and Cash Equivalents**, Beginning of Year | 7,603 | - |
| **Cash and Cash Equivalents**, End of Year | $ 14,877 | $ 7,603 |

### SUPPLEMENTARY INFORMATION

| | | |
|---|---|---|
| **Cash Paid for Interest** | $ 2,307 | $ 16 |

See notes to financial statements.

6

**CRAVE FRANCHISING, LLC**
**NOTES TO FINANCIAL STATEMENTS**
**DECEMBER 31, 2019 AND 2018**

## NOTE 1 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

**Nature of Operations**

CRAVE Franchising, LLC ("the Company" or "CRAVE") was formed in the State of Wyoming on February 24, 2018. The Company is engaged in the sale of Crave franchise restaurants, which offer hot dogs, other cased meats, barbeque items, beverages, appetizers, side dishes, and beer and may offer wine. A Crave franchise restaurant will operate using the franchisor's proprietary recipes, formulae, techniques, trade dress, trademarks, and logos. CRAVE also will provide start-up and support services to its franchisees.

**Cash and Cash Equivalents**

For purposes of the statement of cash flows, the Company considers all highly liquid investments with original maturities of three months or less to be cash equivalents.

**Fair Value of Financial Instruments**

The Company's financial instruments consist of cash and cash equivalents and prepaid expenses. The carrying amount of these financial instruments approximates fair value due either to length of maturity or interest rates that approximate prevailing market rates unless otherwise disclosed in these financial statements.

**Revenue Recognition**

The Company generates revenue from contracts with franchisees. The Company's franchise agreements offer the following benefits to the franchisee: common use and promotion of the Crave trademark; distinctive sales and promotional materials; access to technology; standardized supplies and other materials used in the restaurants; and recommended procedures for operation of the restaurants. The Company concluded that these benefits are highly related and all a part of one performance obligation, a license of symbolic intellectual property that is billed through a variety of fees including initial franchise fees, continuing franchise fees, and other fees. The following is a description of principal activities from which the Company generates its revenue.

*Initial Franchise Fees from Franchise Sales*

Franchise fees include revenue from the sale or renewal of franchises. An initial fee is charged upon a franchise sale and consists of distinct and non-distinct performance obligations. Revenue from distinct performance obligations consist of pre-opening goods and services that are recognized upon fulfillment of the performance obligation. Non-distinct performance obligations attributable to the intellectual property element of the initial franchise fee are deferred and amortized over the term of the initial franchise agreement (10 years).

*Continuing Franchise Fees (Royalties)*

Revenue from continuing franchise fees consists of royalties paid weekly by franchisees based on weekly restaurant sales. Royalty revenue is recognized in the month for which the fee is billed.

*Brand Development Fees*

Revenue from continuing franchise fees also consists of brand development fees paid weekly by franchisees based on weekly restaurant sales. Brand development revenue is recognized in the month for which the fee is billed.

*Commissions Related to Franchise Sales*

Commissions paid on franchise sales are recorded as an asset and amortized as the revenue from the related franchise sale is earned and recognized.

*CRAVE FRANCHISING, LLC*
*NOTES TO FINANCIAL STATEMENTS*
*DECEMBER 31, 2019 AND 2018*

**NOTE 1 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES, (Continued)**

**Other Intangible Assets**

The Company owns the principal trademarks, service marks and trade names that it uses in conjunction with operating its business. These intangible assets increase when the Company pays to file trademark applications in the U.S. and certain other jurisdictions globally. The Company's trademarks are amortized on a straight-line basis over their estimated useful lives.

The Company reviews its intangible assets subject to amortization for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Recoverability of assets to be held and used is assessed by a comparison of the carrying amount of an asset group to estimated undiscounted future cash flows expected to be generated from such asset. If not recoverable, the excess of the carrying amount of an asset over its estimated discounted cash flows would be charged to operations as an impairment loss. For each of the years ended December 31, 2019 and 2018, there were no material impairments indicated for such assets.

**Accounts Receivable**

Accounts receivable for royalties and brand development are recorded at the amounts the Company expects to collect on balances earned and outstanding at the end of the year. Management closely monitors outstanding balances and provides for estimates of uncollectible balances in an allowance for doubtful accounts. The accounts receivable at December 31, 2019 and 2018 were $3,796 and $0, respectively. The allowance for doubtful accounts at December 31, 2019 and 2018 was $0 and $0, respectively.

**Property and Equipment**

The Company's policy is to depreciate property and equipment using the straight-line method over the asset's estimated useful life. Asset purchases under $1,500 are expensed as incurred. There were no property and equipment or depreciation expenses recorded in the years ended December 31, 2019 and 2018.

**Advertising**

The Company expenses costs for advertising as the costs are incurred. Total advertising costs charged to expense for the years ended December 31, 2019 and 2018 were $30,398 and $12,853, respectively.

**Income Taxes**

The Company elected, under the Internal Revenue Code and similar state statutes, to be treated as a single member LLC. As such, it is not liable for corporate income taxes. The Member of the corporation is taxed individually on the Company's taxable income. Management believes there is appropriate support for any tax positions taken, and as such, does not have any uncertain tax positions that are material to the balance sheet. The Member's U.S. Income Tax Return is subject to examination by the IRS, generally for three years after it was filed.

**Recently Adopted Accounting Pronouncements**

In May 2014, the FASB issued ASU 2014-09, *Revenue from Contracts with Customers* (Topic 606), with several subsequent amendments, which requires an entity to recognize the amount of revenue to which it expects to be entitled for the transfer of promised goods or services to customers. The ASU replaced most existing revenue recognition guidance in U.S. GAAP when it became effective for the Company on January 1, 2018.

*CRAVE FRANCHISING, LLC*
*NOTES TO FINANCIAL STATEMENTS*
*DECEMBER 31, 2019 AND 2018*

### NOTE 1 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES, (Continued)

**Use of Accounting Estimates**

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect certain reported amounts and disclosures. Accordingly, actual results could differ from those estimates.

**Comparative Data**

Certain minor reclassifications of prior year data have been made in order to enhance the comparability with the current year presentation.

### NOTE 2 - RELATED PARTY TRANSACTIONS

The Company had notes receivable from a party related by common ownership. These notes are noninterest bearing and are due on demand. The notes are classified as Notes Receivable - Related Parties. The amount receivable as of December 31, 2019 and 2018 is $120,120 and $0, respectively.

### NOTE 3 - FRANCHISES IN OPERATION

The franchise activity for the year ended December 31, 2019 and 2018 were as follows:

|  | 2019 | 2018 |
|---|---|---|
| Operating at beginning of period | 0 | 0 |
| Franchises Opened | 4 | 0 |
| Franchises Closed | (0) | (0) |
| Operating at end of period | 4 | 0 |

### NOTE 4 - FINANCIAL INSTRUMENTS WITH RISK OF ACCOUNTING LOSS

The Company's cash and cash equivalents consist of deposits including both checking and money market accounts. Deposits are carried at cost. The carrying amount of deposits is displayed on the balance sheet as Cash and Cash Equivalents. The FDIC insurance covers the first $250,000 of deposits per financial institution.

### NOTE 5 - COMMITMENTS AND CONTINGENCIES

The Company neither owns nor leases any real or personal property. A related party has provided office space without charge. There is no obligation for the related party to continue this arrangement. Such costs are immaterial to the financial statements and accordingly are not reflected herein. The member is involved in other business activities and most likely will become involved in other business activities in the future.

### NOTE 6 - SUBSEQUENT EVENTS

In 2019, the Company signed contracts and received franchise fees for seven additional locations, and all are expected to open up in 2020.

Management has evaluated subsequent events through February 14, 2020, the date on which the financial statements were available to be issued.

**Exhibit B-1 to the**
**Crave Franchise Disclosure Document**

## <u>FRANCHISE AGREEMENT</u>

**CRAVE FRANCHISING, LLC**

**<u>FRANCHISE AGREEMENT</u>**

_____

**FRANCHISEE**

_____

**DATE OF AGREEMENT**

**TABLE OF CONTENTS**

**ARTICLE 1** ................................................................................................................................**2**

GRANT ....................................................................................................................................2
*1.1    Grant of Franchise* ..................................................................................................2
*1.2    Accepted Location* ...................................................................................................2
*1.3    Relocation* ...............................................................................................................2
*1.4    Designated Territory* ..............................................................................................2
*1.5    Our Reserved Rights* ..............................................................................................3
*1.6    Forms of Agreement* ...............................................................................................4

**ARTICLE 2** ................................................................................................................................**4**

SITE SELECTION, PLANS AND CONSTRUCTION ...........................................................4
*2.1    Your Responsibility to Locate a Site* .....................................................................4
*2.2    Site Selection* ..........................................................................................................4
*2.3    Zoning Clearances, Permits and Licenses* .............................................................5
*2.4    Design of Restaurant* ..............................................................................................5
*2.5    Build-Out of Restaurant* .........................................................................................5
*2.6    Opening Date; Time is of the Essence* ...................................................................6

**ARTICLE 3** ................................................................................................................................**6**

TERM AND RENEWAL ........................................................................................................6
*3.1    Term* .........................................................................................................................6
*3.2    Renewal* ...................................................................................................................6
*3.3    Refusal to Renew Franchise Agreement* .................................................................7
*3.4    Renewal Under Law* ................................................................................................7
*3.5    Your Election Not to Renew* ...................................................................................7

**ARTICLE 4** ................................................................................................................................**8**

FEES .......................................................................................................................................8
*4.1    Initial Franchise Fee* ...............................................................................................8
*4.2    Royalty Fees* ............................................................................................................8
*4.3    Brand Development Fee* ..........................................................................................8
*4.4    Payments to Us* ........................................................................................................9
*4.5    Interest on Overdue Amounts* .................................................................................9
*4.6    Definition of Gross Sales* .......................................................................................9
*4.7    Insufficient Funds Fees* ...........................................................................................9
*4.8    Payment of Additional Fees* ..................................................................................10

**ARTICLE 5** ..............................................................................................................................**10**

OUR OBLIGATIONS ..........................................................................................................10
*5.1    Site Selection Guidelines* ......................................................................................10
*5.2    On-Site Evaluation* ...............................................................................................10
*5.3    Design Plans* .........................................................................................................10
*5.4    Confidential Operations Manual* ..........................................................................10
*5.5    Visits and Evaluations* ..........................................................................................10
*5.6    Marketing and Promotional Materials* .................................................................10
*5.7    Management and Operations Advice* .....................................................................10
*5.8    Products for Resale* ...............................................................................................11
*5.9    Approved Suppliers* ...............................................................................................11

|   |   |   |
|---|---|---|
| 5.10 | Initial Training Program | 11 |
| 5.11 | Opening Assistance | 11 |
| 5.12 | Brand Development Fund; Marketing Cooperatives | 11 |

**ARTICLE 6** ........................................................................................................... **11**

YOUR AGREEMENTS, REPRESENTATIONS, WARRANTIES AND COVENANTS ................... 11

| 6.1 | Use Commercially Reasonable Efforts | 11 |
| 6.2 | Representations of Corporate Entity | 11 |
| 6.3 | Franchised Business Management | 12 |
| 6.4 | Training | 13 |
| 6.5 | Franchisee Meetings | 14 |
| 6.6 | Compliance with Laws | 15 |
| 6.7 | Compliance with All Other Obligations | 15 |
| 6.8 | Guaranty | 15 |

**ARTICLE 7** ........................................................................................................... **15**

FRANCHISE OPERATIONS .......................................................................................... 15

| 7.1 | Compliance with Standards | 15 |
| 7.2 | Maintenance of Franchised Business | 15 |
| 7.3 | Remodeling and Redecorating | 16 |
| 7.4 | Approved Suppliers | 16 |
| 7.5 | Operation of Franchised Business in Compliance with Our Standards | 17 |
| 7.6 | Proprietary Products | 18 |
| 7.7 | Advertising and Promotional Materials | 19 |
| 7.8 | Complaints | 19 |
| 7.9 | Power of Attorney for Telephone Listings, etc. | 19 |
| 7.10 | Customer Surveys | 19 |
| 7.11 | Mystery Shopper Service | 19 |
| 7.12 | Pricing | 20 |
| 7.13 | Motor Vehicles | 20 |
| 7.14 | Unapproved Products and Services | 20 |

**ARTICLE 8** ........................................................................................................... **21**

MARKETING AND PROMOTION ................................................................................... 21

| 8.1 | Participation in Marketing; Brand Development Programs | 21 |
| 8.2 | Local Marketing | 21 |
| 8.3 | Brand Development Fund | 21 |
| 8.4 | Cooperative Marketing Funds | 22 |
| 8.5 | Conduct of Marketing; Our Approval | 23 |
| 8.6 | Grand Opening Marketing | 24 |
| 8.7 | Websites | 24 |
| 8.8 | Advisory Council | 25 |

**ARTICLE 9** ........................................................................................................... **25**

MARKS ..................................................................................................................... 25

| 9.1 | Use of Marks | 25 |
| 9.2 | Ownership of Marks; Limited License | 25 |
| 9.3 | Limitation on Use of Marks | 26 |
| 9.4 | Notification of Infringement or Claim | 26 |
| 9.5 | Retention of Rights by Us | 27 |

**ARTICLE 10** ........................................................................................................................**27**

   CONFIDENTIALITY AND NON-COMPETITION COVENANTS .........................................27

     *10.1   Confidential Operations Manual* .............................................................................27

     *10.2   Confidential Information*.........................................................................................28

     *10.3   Non-Competition*....................................................................................................28

     *10.4   Failure to Comply* ..................................................................................................30

**ARTICLE 11** ........................................................................................................................**30**

   BOOKS AND RECORDS ..........................................................................................................30

     *11.1   Books and Records*.................................................................................................30

     *11.2   Reports* ...................................................................................................................30

     *11.3   Inspections; Audits* ................................................................................................31

     *11.4   Correction of Errors* .............................................................................................31

     *11.5   Authorization of Us* ...............................................................................................31

     *11.6   We are Attorney-in-Fact* ........................................................................................31

**ARTICLE 12** ........................................................................................................................**32**

   INSURANCE .............................................................................................................................32

**ARTICLE 13** ........................................................................................................................**34**

   DEBTS AND TAXES ................................................................................................................34

     *13.1   Taxes* ......................................................................................................................34

     *13.2   Payments to Us*.......................................................................................................34

     *13.3   Tax Disputes*...........................................................................................................34

     *13.4   Compliance with Laws* ..........................................................................................34

     *13.5   Notification of Action or Proceeding* ....................................................................34

**ARTICLE 14** ........................................................................................................................**35**

   TRANSFER OF INTEREST ......................................................................................................35

     *14.1   Transfer by Us*........................................................................................................35

     *14.2   Transfer by You*......................................................................................................35

     *14.3   Transfer to a Corporation or Limited Liability Company* ....................................37

     *14.4   Our Right to Purchase Business* ...........................................................................37

     *14.5   Death or Disability*................................................................................................39

     *14.6   No Waiver of Claims* ..............................................................................................40

     *14.7   Transfer Between Owners*.......................................................................................40

     *14.8   Our Right to Purchase Your Franchised Business* ................................................40

**ARTICLE 15** ........................................................................................................................**41**

   INDEMNIFICATION.................................................................................................................41

     *15.1   Indemnification by You* .........................................................................................41

     *15.2   Notification of Action or Claim* .............................................................................42

     *15.3   We May Settle*.........................................................................................................42

     *15.4   Losses and Expenses* .............................................................................................42

     *15.5   Indemnitees Do Not Assume Liability*....................................................................42

     *15.6   Recovery from Third Parties* ..................................................................................43

     *15.7   Survival of Terms* ...................................................................................................43

**ARTICLE 16** ........................................................................................................................**43**

   RELATIONSHIP OF THE PARTIES ........................................................................................43

     *16.1   No Fiduciary Relationship* .....................................................................................43

| 16.2 | Independent Contractor | 43 |
| 16.3 | Sole and Exclusive Employer of Your Employees | 44 |
| 16.4 | You are Not Authorized | 44 |

**ARTICLE 17** ......................................................................................................... **45**

TERMINATION ......................................................................................................... 45
| 17.1 | Automatic Termination – No Right to Cure | 45 |
| 17.2 | Notice of Termination – 30 Days to Cure | 47 |
| 17.3 | Cross-Defaults, Non-Exclusive Remedies, etc. | 48 |
| 17.4 | Our Right to Discontinue Services to You | 48 |
| 17.5 | Amendment Pursuant to Applicable Law | 48 |

**ARTICLE 18** ......................................................................................................... **48**

POST-TERMINATION ............................................................................................... 48
| 18.1 | Cease Operations | 48 |
| 18.2 | Stop Using the System | 49 |
| 18.3 | Cancellation of Assumed Names | 49 |
| 18.4 | No Use of Similar Marks | 49 |
| 18.5 | Payment of Sums Owed | 49 |
| 18.6 | Payment of Damages, Costs and Expenses | 49 |
| 18.7 | Delivery of Manual and Materials | 49 |
| 18.8 | Confidential Information | 49 |
| 18.9 | Marketing and Promotional Materials | 50 |
| 18.10 | Signage | 50 |
| 18.11 | Assignment of Lease | 50 |
| 18.12 | Our Right to Purchase | 50 |
| 18.13 | Franchised Business Assets | 51 |
| 18.14 | Assignment of Options by Us | 52 |
| 18.15 | Telephone Numbers, Internet Pages Listings, etc. | 52 |
| 18.16 | Liquidated Damages | 52 |

**ARTICLE 19** ......................................................................................................... **52**

MISCELLANEOUS ................................................................................................... 52
| 19.1 | Notices | 52 |
| 19.2 | Entire Agreement | 53 |
| 19.3 | No Waiver | 53 |
| 19.4 | Our Prior Approval | 53 |
| 19.5 | No Warranty or Guaranty | 53 |
| 19.6 | Continued Obligation to Pay Sums | 53 |
| 19.7 | Arbitration | 54 |
| 19.8 | Venue; Governing Law | 54 |
| 19.9 | Agreement Regarding Governing Law and Choice of Forum | 54 |
| 19.10 | Waiver of Punitive Damages; Waiver of Jury Trial | 55 |
| 19.11 | Execution in Multiple Counterparts | 55 |
| 19.12 | Captions | 55 |
| 19.13 | Survival of Terms | 55 |
| 19.14 | Severability of Provisions | 55 |
| 19.15 | Joint and Several Obligations | 55 |
| 19.16 | Rights and Remedies Cumulative | 56 |
| 19.17 | References | 56 |
| 19.18 | No Rights or Remedies Except to the Parties | 56 |

*19.19*    *Effectiveness of Agreement* ........................................................ *56*
*19.20*    *Modification of the System* ......................................................... *56*
*19.21*    *Operation in the Event of Absence or Disability* ........................ *57*
*19.22*    *Step-In Rights* ............................................................................ *57*
*19.23*    *Costs and Legal Fees* ................................................................. *58*

**ARTICLE 20** ........................................................................................... **58**

SECURITY INTERESTS ......................................................................... 58
*20.1*    *Collateral* ................................................................................... *58*
*20.2*    *Indebtedness Secured* ................................................................ *58*
*20.3*    *Additional Documents* ................................................................ *58*
*20.4*    *Possession of Collateral* ............................................................ *59*
*20.5*    *Our Remedies in Event of Default* .............................................. *59*
*20.6*    *Special Filing as Financing Statement* ....................................... *59*

**ARTICLE 21** ........................................................................................... **59**

TECHNOLOGY ....................................................................................... 59
*21.1*    *Computer Systems and Software* ................................................ *59*
*21.2*    *Data* ............................................................................................ *60*
*21.3*    *Privacy* ....................................................................................... *60*
*21.4*    *Telecommunications* ................................................................... *60*
*21.5*    *Intranet* ...................................................................................... *60*
*21.6*    *On-line Use of Proprietary Marks* .............................................. *61*
*21.7*    *No Outsourcing Without Prior Written Consent* .......................... *61*
*21.8*    *Changes to Technology* .............................................................. *61*

**ARTICLE 22** ........................................................................................... **61**

YOUR REPRESENTATIONS AND ACKNOWLEDGMENTS ...................... 61
*22.1*    *Your Representations* ................................................................. *61*
*22.2*    *Your Acknowledgments* .............................................................. *62*

<u>ATTACHMENTS</u>
1 -    Accepted Location and Designated Territory
2 -    Collateral Assignment of Lease
3 -    Statement of Ownership Interests in Franchisee/Entity
4 -    Confidentiality and Non-Competition Agreement
5 -    Electronic Funds Transfer Authorization
6 -    Internet Advertising, Social Media and Telephone Account Agreement
7 -    Franchisee Acknowledgment Statement
8 -    Americans with Disabilities Act Certification
9 -    Spousal Guaranty

# CRAVE FRANCHISING, LLC

## FRANCHISE AGREEMENT

**THIS FRANCHISE AGREEMENT (the "Agreement") ,** entered into on _____ _____ (the "Effective Date"), by and between CRAVE Franchising, LLC, a Wyoming limited liability company, with its principal address at Herschler Building East, Suite 101, 122 West 25th Street, Cheyenne, Wyoming, 82002-0020 (herein referred to as "Franchisor", "we", "us" or "our") and _____, a(n) _____, whose principal address is _____, and _____'s principal(s) _____, an individual residing at _____, and _____, an individual residing at _____ ("Principal(s)"). _____ and Principal(s) shall be collectively referred to in this Agreement as "you" or "your" or "Franchisee".

## W I T N E S S E T H:

**WHEREAS**, as the result of the expenditure of time, skill, effort and money, we and our affiliate have developed and own a unique and distinctive system (hereinafter "System") relating to the establishment and operation of a quick-serve restaurant offering hot dogs, other cased meats, barbeque items, beverages, appetizers and side dishes ("Restaurant", or "Franchised Business") on a dine-in, take-out, catering, and delivery basis. If not prohibited by applicable law, your Franchised Business must offer beer and may offer wine;

**WHEREAS**, the distinguishing characteristics of the System include, without limitation, distinctive exterior and interior design, décor, color scheme, and furnishings; proprietary products and ingredients; proprietary recipes and special menu items; uniform standards, specifications, and procedures for operations; quality and uniformity of products and services offered; procedures for inventory, management and financial control; training and assistance; and advertising and promotional programs; all of which may be changed, improved, and further developed by us from time to time;

**WHEREAS**, the System is identified by means of certain trade names, service marks, trademarks, logos, emblems and indicia of origin, including, but not limited to, the mark "Crave" and such other trade names, service marks, and trademarks as are now designated (and may hereafter be designated by us in writing) for use in connection with the System (hereinafter referred to as "Marks");

**WHEREAS**, we and our affiliates continue to develop, use and control the use of such Marks in order to identify for the public the source of services and products marketed thereunder and under the System, and to represent the System's high standards of quality, appearance and service;

**WHEREAS**, you understand and acknowledge the importance of our high standards of quality, cleanliness, appearance and service and the necessity of operating the business franchised hereunder in conformity with our standards and specifications; and

**WHEREAS**, you desire to use the System in connection with the operation of a Franchised Business at the location accepted by us as herein provided, as well as to receive the training and other assistance by us in connection therewith.

**NOW, THEREFORE**, the parties, in consideration of the mutual undertakings and commitments set forth herein, the receipt and sufficiency of which are hereby acknowledged, agree as follows:

## ARTICLE 1
## GRANT

### 1.1     Grant of Franchise

In reliance on the representations and warranties of you and your Principals hereunder, we hereby grant to you, upon the terms and conditions in this Agreement, the right and license, and you hereby accept the right and obligation, to operate a Crave business under the Marks and the System in accordance with this Agreement.  You and your Principals have represented to us that you have entered into this Agreement with the intention to comply fully with the obligations to construct the Franchised Business hereunder and not for the purpose of reselling the rights to develop the Franchised Business.  You and the Principals understand and acknowledge that we have granted such rights in reliance on the business skill, financial capacity, personal character of, and expectations of performance hereunder by, you and the Principals and that this Agreement and the rights and obligations hereunder may not be transferred until after the Franchised Business is open for business to the public in accordance with Section 2.7, and then only in accordance with Article 14 hereof.

### 1.2     Accepted Location

The specific street address of the Franchised Business location as accepted by us shall be set forth in Attachment 1 ("Location" or "Accepted Location") when such Location is determined.  You shall not relocate the Franchised Business without our express prior written consent, which consent shall not be unreasonably withheld.  This Agreement does not grant to you the right or license to operate the Franchised Business or to offer or sell any products or services described under this Agreement at or from any location other than the Accepted Location.

### 1.3     Relocation

If you are unable to continue the operation of the Franchised Business at the Accepted Location because of the occurrence of a force majeure event (as described in Section 17.1.3(e)), then you may request our approval to relocate the Franchised Business to another location in the Designated Territory, as that term is defined below, which approval shall not be unreasonably withheld.  Any other relocation outside the Designated Territory or a relocation of the Franchised Business not caused by force majeure shall also be subject to our prior approval.  If we elect to grant you the right to relocate the Franchised Business, then you shall comply with the site selection and construction procedures set forth in Article 2.  When you submit to us your relocation request, you shall pay to us a non-refundable relocation fee in an amount equal to Five Thousand Dollars ($5,000).

### 1.4     Designated Territory

Upon the execution of this Agreement or when the Accepted Location is determined, whichever occurs later, you may be assigned a territory (the "Designated Territory") that will also be described in Attachment 1.  You understand and acknowledge that if your Accepted Location is a Non-Traditional Site (as described in Section 1.5 below), you will not receive a Designated Territory.

Except as provided in this Agreement, and subject to your and Principals' material compliance with this Agreement, any other agreement among you or any of your affiliates (defined for the purposes hereof as any entity that is controlled by, controlling or under common control with such other entity) and us, we shall not establish or authorize any other person or entity, other than you, to establish a Crave business in the Designated Territory during the term of this Agreement and any extensions hereof.  You acknowledge and understand that the rights granted hereunder pertain only to the establishment of a dedicated Crave outlet.  You acknowledge and agree that our affiliates currently operate, or may in the future operate, restaurants under different marks and with operating systems that are the same as or similar to the System,

and that any such restaurants might compete with your Franchised Business.  You further agree and acknowledge that the license granted hereby is only for the operation of one (1) Franchised Business and only at a location accepted by us.

**1.5      Our Reserved Rights**

1.5.1      Nothing in this Agreement will prohibit us from:  (a) operating and/or franchising others to operate restaurants or other distribution models identified in whole or in part by the Proprietary Marks and/or utilizing the System in the Designated Territory that are located in gas stations or convenience stores; transportation facilities, including airports, train stations, subways and rail and bus stations; military bases and government offices; sports facilities, including stadiums and arenas; amusement parks, zoos and convention centers; car and truck rest stops and travel centers; educational facilities; recreational theme parks; hospitals; business or industrial foodservice venues; venues in which foodservice is or may be provided by a master concessionaire or contract foodservice provider; Indian reservations; casinos; or any similar captive market location not reasonably available to you ("Non-Traditional Site"); (b) awarding national, regional or local licenses to third parties to sell products under the Proprietary Marks in foodservice facilities primarily identified by the third party's trademark; (c) merchandising and distributing products identified by the Proprietary Marks in the Designated Territory through any method or channel of distribution other than through the operation of a dedicated restaurant, including distribution of proprietary products through grocery stores, club stores and similar stores; (d) selling and distributing products identified by the Proprietary Marks in the Designated Territory to restaurants or distribution channels other than a dedicated restaurant identified by the Proprietary Marks, provided those restaurants or distribution channels are not licensed to use the Proprietary Marks in connection with their retail sales; (e) selling products and services through other channels of distribution, including the internet, wholesale, mail order and catalogue; (f) developing and/or owning other franchise systems for the same or similar products and services using trade names and trademarks other than the Proprietary Marks; and (g) purchasing, being purchased by, merging or combining with, businesses that we deem to offer direct competition to Crave businesses.

1.5.2      You understand and acknowledge that if any Non-Traditional Site (as described above) is located within the physical boundaries of your Designated Territory, then the premises of this Non-Traditional Site will not be included in your Designated Territory and you will have no rights to this Non-Traditional Site.

1.5.3      This Section 1.5 does not prohibit us or our affiliates from:  (a) operating and franchising others to operate, during the Initial Term, Crave businesses at any location outside of the Designated Territory; (b) operating and franchising others to operate, after this Agreement terminates or expires, Crave businesses at any location, including locations inside the Designated Territory; and (c) operating and franchising others to operate at any location, during or after the Initial Term, any type of restaurant or distribution model other than a dedicated Crave Restaurant.

1.5.4      The restrictions contained in this Section do not apply to Crave businesses in operation, under lease or construction or other commitment to open in the Designated Territory as of the Effective Date.

1.5.5      Except as expressly limited by this Section 1.5, we and our affiliates have the right to conduct any business activities, under any name, in any geographic area and at any location, regardless of the proximity to the Franchised Business or the economic effect on your Franchised Business or activities under this Agreement.

**1.6     Forms of Agreement**

You acknowledge that, over time, we have entered, and will continue to enter, into agreements with other franchisees that may contain provisions, conditions and obligations that differ from those contained in this Agreement.  The existence of different forms of agreement and the fact that we and other franchisees may have different rights and obligations does not affect our or your duties to comply with the terms of this Agreement.

**ARTICLE 2**
**SITE SELECTION, PLANS AND CONSTRUCTION**

**2.1     Your Responsibility to Locate a Site**

You assume all cost, liability, expense and responsibility for locating, obtaining and developing a site for the Franchised Business within the Designated Territory, and for constructing and equipping the Restaurant at such site.  You shall not make any binding commitment to a prospective vendor or lessor of real estate with respect to a site for the Restaurant unless the site is accepted by us as set forth below.  You acknowledge that the location, selection, procurement and development of a site for the Restaurant is your responsibility; that in discharging such responsibility you shall consult with real estate and other professionals of your choosing, unless we designate a supplier for these services; and that our approval of a prospective site and the rendering of assistance in the selection of a site does not constitute a representation, promise, warranty or guarantee, express or implied, by us that the Franchised Business operated at that site will be profitable or otherwise successful.

**2.2     Site Selection**

2.2.1     If you do not already have possession of a location that we have accepted upon your execution of this Agreement, then within ninety (90) days of the date this Agreement is executed you shall locate a site for the Restaurant that satisfies the site selection guidelines provided to you by us pursuant to Section 5.1 and submit to us in the form specified by us a description of the site, including evidence reasonably satisfactory to us demonstrating that the site satisfies our site selection guidelines, together with such other information and materials as we may reasonably require, including, but not limited to, a letter of intent or other evidence satisfactory to us which confirms your favorable prospects for obtaining the site. We shall have thirty (30) days after receipt of this information and materials to accept or decline, in our sole discretion, the proposed site as the location for the Restaurant.  We may, if we determine it is necessary, conduct one (1) on-site evaluation of the proposed location for the Restaurant.  No site may be used for the location of the Restaurant unless it is first accepted in writing by us.  You acknowledge and agree that our acceptance of a location for the Franchised Business is not a warranty or guaranty, express or implied, that you will achieve any particular level of success at the location or that your Restaurant will be profitable. Our acceptance of a location for the Restaurant only signifies that the location meets our then-current minimum criteria for a Crave Restaurant.  We reserve the right to approve deviations from our site selection standards based on the individual factors and components of a particular site, but any such approvals shall be granted in our sole discretion.  If you are unable to locate a site for your Restaurant within ninety (90) days after this Agreement is executed, we may provide you with an extension of this timeframe or we may terminate this Agreement.

2.2.2     If you elect to purchase the premises for the Franchised Business, you shall submit a copy of the proposed contract of sale to us for our written approval prior to its execution and shall furnish to us a copy of the executed contract of sale within ten (10) days after execution.  If you will occupy the premises of the Franchised Business under a lease or sublease, you shall submit a copy of the lease or sublease to us for written acceptance prior to its execution and shall furnish to us a copy of the executed lease or sublease within ten (10) days after execution.  No lease or sublease for the Franchised Business

premises shall be accepted by us unless a Collateral Assignment of Lease, prepared by us and executed by us, you and the lessor or sublessor, in substantially the form attached as Attachment 2, is attached to the lease and incorporated therein.  We shall have ten (10) days after receipt of the lease, sublease or the proposed contract of sale to either accept or decline such documentation prior to its execution.  If we do not provide our specific approval of the lease, sublease or contract of sale within this ten (10) day period, then it shall be deemed not accepted.

2.2.3    After we have accepted the location for your Franchised Business and that Accepted Location is acquired by you pursuant to this Agreement, the Accepted Location and your Designated Territory shall be described in Attachment 1.

### 2.3    Zoning Clearances, Permits and Licenses

You shall be responsible for obtaining all zoning classifications and clearances which may be required by state or local laws, ordinances or regulations or which may be necessary as a result of any restrictive covenants relating to the Accepted Location.  Prior to beginning the construction and/or improvement of the Franchised Business premises, you shall (i) obtain all permits, licenses and certifications required therefor, and (ii) certify in writing to us that the insurance coverage specified in Article 12 is in full force and effect (or provide us with a certificate of insurance evidencing coverage) and that all required approvals, clearances, permits and certifications have been obtained.  Upon written request, you shall provide to us additional copies of your insurance policies or certificates of insurance and copies of all such approvals, clearances, permits and certifications.

### 2.4    Design of Restaurant

You must obtain any architectural, engineering and design services required for the construction of the Restaurant at your own expense from an architectural design firm approved or designated by us.  You shall adapt the prototypical architectural and design plans and specifications for construction of the Restaurant provided to you by us in accordance with Section 5.3 as necessary for the construction of the Restaurant and shall submit such adapted plans to us for our review.  Such plans must comply with applicable laws (including the Americans with Disabilities Act), ordinances and building codes for the city and state in which the Restaurant will be located.  If we determine, in our reasonable discretion, that any such plans are not consistent with the best interests of the System, we may prohibit the implementation of such plans, and in this event will notify you of any objection(s) within ten (10) days of receiving such plans.  If we fail to notify you of an objection to the plans within this time period, you may use such plans.  If we object to any such plans, we shall provide you with a reasonably detailed list of changes necessary to make the plans acceptable.  We shall, upon a re-submission of the plans with such changes, notify you within ten (10) days of receiving the resubmitted plans whether the plans are acceptable.  If we fail to notify you in writing of any objection within such time period, you may use the resubmitted plans.  You acknowledge that our review of such plans relates only to compliance with the System and that acceptance by us of such plans does not constitute a representation, warranty, or guarantee, express or implied, by us that such plans are accurate or free of error concerning their design or structural application, or that such plans comply with any laws, ordinances or building codes applicable to the Accepted Location.

### 2.5    Build-Out of Restaurant

You shall commence and diligently pursue construction or remodeling (as applicable) of the Restaurant.  Commencement of construction shall be defined as the time at which any site work is initiated by you or on your behalf at the location accepted for the Restaurant.  Site work includes, without limitation, paving of parking areas, installing outdoor lighting and sidewalks, extending utilities, demising of interior walls and demolishing of any existing premises.  During the time of construction or remodeling, you shall

provide us with such periodic reports regarding the progress of the construction or remodeling as may be reasonably requested by us.  In addition, we may make such on-site inspections as we may deem reasonably necessary to evaluate such progress.   You shall notify us of the scheduled date for completion of construction or remodeling no later than thirty (30) days prior to such date.  Within a reasonable time after the date of completion of construction or remodeling, we may, at our option, conduct an inspection of the completed Restaurant.  You acknowledge and agree that you will not open the Restaurant for business without our written authorization and that authorization to open shall be conditioned upon your strict compliance with this Agreement and your certification to us, in the form attached hereto as Attachment 8, that the Restaurant has been constructed in compliance with the Americans with Disabilities Act.

### 2.6    Opening Date; Time is of the Essence

You acknowledge that time is of the essence.   Subject to your compliance with the conditions stated below, you shall open the Franchised Business and commence business not later than twelve (12) months after the Effective Date.  The date the Franchised Business actually opens for business to the public is herein called the "Opening Date".  Prior to opening, you shall complete all exterior and interior preparations for the Restaurant, including installation of equipment, fixtures, furnishings and signs, pursuant to the plans and specifications reasonably approved by us, and shall comply with all of your other pre-opening obligations, including, but not limited to, those obligations described in Sections 6.2 through 6.7, to our reasonable satisfaction.  If you fail to reasonably comply with any of such obligations, except for delay caused by a force majeure event as described in Section 17.1.3(e), we shall have the right to prohibit you from commencing business.  Prior to opening the Franchised Business, and before any renovation to the Franchised Business, you shall execute an Americans with Disabilities Act Certification in the form attached to this Agreement as Attachment 8 that certifies in writing to us that the Franchised Business premises and any proposed renovations comply with the Americans with Disabilities Act.  If you are unable to open your Restaurant within the timeframe required herein, we may provide you with an extension of this timeframe or we may terminate this Agreement.

### ARTICLE 3
### TERM AND RENEWAL

### 3.1    Term

Unless sooner terminated as provided in Article 17 hereof, the term of this Agreement shall continue from the date stated on the first page hereof for a period of ten (10) years ("Initial Term").

### 3.2    Renewal

This Agreement shall automatically renew for one (1) additional term of ten (10) years, provided the conditions set forth in this Section 3.2 are met.

3.2.1    You shall have been, throughout the Initial Term of this Agreement, in substantial compliance, and at the expiration of such Initial Term are in full compliance, with this Agreement, your lease or sublease and all other agreements between you and us or companies or persons associated or affiliated with us.

3.2.2    We shall, within six (6) months before the expiration of the Initial Term, provide you with any documents that you are required to execute for the renewal term, which documents may include, but are not limited to, a general release, our then-current Franchise Agreement and all other ancillary agreements, instruments and documents then customarily used by us in the granting of business franchises (all of which will contain terms and fees substantially the same as those included in Franchise

Agreements being executed at the time of renewal, and which will not obligate you to pay a further initial franchise fee, but will require payment of a renewal fee equal to Five Thousand Dollars ($5,000)) (the "Renewal Franchise Documents").

        3.2.3    You shall execute the Renewal Franchise Documents and all other documents and instruments that we require in order to renew this Agreement.  You shall return the executed Renewal Franchise Documents to us, together with payment of our then-current renewal fee, by no later than the expiration date of the Initial Term.  If we do not receive the executed documents and renewal fee by such expiration date, then this Agreement shall expire, you shall have no further rights under this Agreement, and you shall comply with the provisions of Article 18 and any other provisions that survive termination or expiration of this Agreement.

        3.2.4    After we have received from you all executed Renewal Franchise Documents and the renewal fee, we shall inspect your Franchised Business to determine the extent of any required updating, remodeling, redecorating or other refurbishment for the Franchised Business in order to bring the Franchised Business up to our then-current image and standards for new Crave businesses.  We will provide notice to you of the modifications you shall be required to make, and you shall have six (6) months from the date of such notice to effectuate such modifications.  If you fail or refuse to make the required modifications, we shall have the right to terminate the Renewal Franchise Documents.

### 3.3      Refusal to Renew Franchise Agreement

        We can refuse to renew your franchise if your lease, sublease or other document by which you have the right to occupy the Accepted Location is not extended before your renewal term is to take effect to cover the period of the renewal or if you do not have a written commitment from your landlord to renew the lease or sublease for a period at least equal to the renewal term.  We may also refuse to renew your franchise under other circumstances, including, but not limited to, your failure to substantially comply with the terms of this Agreement, your failure to pay amounts owed to us or our affiliates when due, or your failure to cure of any defaults incurred during the Initial Term of this Agreement, if applicable.

### 3.4      Renewal Under Law

        Even though we decline the renewal of your franchise, it is possible that we can be required to renew it under a law, rule, regulation, statute, ordinance, or legal order that is applicable at the time.  If that happens, to the extent it is allowed by the concerned law, rule, regulation, statute, ordinance or order, your renewal term will be subject to the conditions of the Franchise Agreement we are using for new franchisees at the time the renewal period begins.  If we are not then offering new franchises, your renewal period will be subject to the terms in the Franchise Agreement that we indicate.  If for any reason that is not allowed, the renewal term will be governed by the terms of this Agreement.

### 3.5      Your Election Not to Renew

        For the purposes hereof, you shall be deemed to have irrevocably elected not to renew the franchise hereunder (and the option to do so shall thereupon terminate) if you fail to execute and return to us the Renewal Franchise Documents within the timeframe specified in Section 3.2, or if you provide written notice to us within the final sixty (60) days of the Initial Term indicating that you do not wish to renew this Agreement.

## ARTICLE 4
## FEES

### 4.1     Initial Franchise Fee

Upon the execution of this Agreement, you agree to pay to us an initial franchise fee in the amount of _____ Dollars ($_____) ("Initial Franchise Fee").  The Initial Franchise Fee shall be deemed fully earned in consideration of the administrative and other expenses incurred by us in granting the franchise hereunder and for our lost or deferred opportunity to grant such franchise to any other party, and the initial franchise fee shall not be refundable under any circumstances.

### 4.2     Royalty Fees

4.2.1     During the term of this Agreement, you shall pay to us, in partial consideration for the rights herein granted, a continuing weekly royalty fee of seven percent (7%) of Gross Sales ("Royalty Fee").  Such Royalty Fee shall be due and payable on Wednesday of each week based on the Gross Sales for the preceding week ending Sunday, provided that such day is a business day.  If the date on which such payments would otherwise be due is not a business day, then payment shall be due on the next business day.

4.2.2     Each such Royalty Fee shall be preceded by a royalty report itemizing the Gross Sales for the preceding week ending Sunday ("Royalty Report") and any other reports required hereunder. Notwithstanding the foregoing, you shall provide us with such Royalty Report by Tuesday of each week by modem or, if not reasonably available, by facsimile transmission or such other method of delivery as we may reasonably direct.  As stated herein, we have the right to poll your point of sale system directly to obtain such Gross Sales information, but this does not diminish your responsibility to provide us with the required Royalty Report.

4.2.3     If any state imposes a sales or other tax on the Royalty Fees, then we have the right to collect this tax from you.

4.2.4     If a state or local law in which the Franchised Business is located prohibits or restricts in any way your ability to pay and our ability to collect Royalty Fees or other amounts based on Gross Sales derived from the sale of alcoholic beverages at the Franchised Business then we and you shall increase the percentage rate for calculating Royalty Fees, and change the definition of Gross Sales to exclude sales of alcoholic beverages, in a manner such that the Royalty Fees to be paid by you, and received by us, shall be equal to such amounts as you would have been required to pay, and we would have received, if sales from alcoholic beverages were included in Gross Sales.

### 4.3     Brand Development Fee

In addition to the Royalty Fee described in Section 4.2 above, you agree to pay to us a Brand Development Fee in an amount equal to one percent (1%) of the Gross Sales of the Franchised Business once the Brand Development Fund is established.  Such amount shall be contributed to a Brand Development Fund maintained by us, as described in Section 8.3 below.  The Brand Development Fee is payable to us at the same time and in the same manner as the Royalty Fee.

We may periodically receive allowances, rebates or other payments from approved suppliers based on purchases from such suppliers by our franchisees, and we may elect to contribute such allowances, rebates or other payments to the Brand Development Fund.  You understand and acknowledge, however, that any such contribution of these amounts by us to the Brand Development Fund does not in any manner diminish or eliminate your obligation to pay the Brand Development Fee.

### 4.4     Payments to Us

By executing this Agreement, you agree that we shall have the right to withdraw funds from your designated bank account by electronic funds transfer ("EFT") in the amount of the Royalty Fee, Brand Development Fee, and any other payments due to us and/or our affiliates.  If you do not provide the Royalty Report when required, we may debit your account for one hundred twenty percent (120%) of the last Royalty Fee and Brand Development Fee (if applicable) that we debited.  If the Royalty Fee and Brand Development Fee we debit are less than the Royalty Fee and Brand Development Fee you actually owe to us, once we have been able to determine the Franchised Business' true and correct Gross Sales, we will debit your account for the balance on a day we specify.  If the Royalty Fee and Brand Development Fee we debit are greater than the Royalty Fee and Brand Development Fee you actually owe, we will credit the excess against the amount we otherwise would debit from your account during the following week.  You shall, upon execution of this Agreement or at any time thereafter at our request, execute such documents or forms as we or your bank determine are necessary for us to process EFTs from your designated bank account for the payments due hereunder.  If payments are not received when due, interest may be charged by us in accordance with Section 4.5 below.  Upon written notice to you, you may be required to pay such fees directly to us in lieu of EFT, at our sole discretion.

### 4.5     Interest on Overdue Amounts

You shall not be entitled to withhold payments due us under this Agreement on grounds of alleged non-performance by us hereunder.  Any payment or report not actually received by us on or before its due date shall be deemed overdue.  Time is of the essence with respect to all payments to be made by you to us.  All unpaid obligations under this Agreement shall bear interest from the date due until paid at the greater of (i) eighteen percent (18%) per annum; or (ii) the maximum rate allowed by applicable law.  Notwithstanding anything to the contrary contained herein, no provision of this Agreement shall require the payment or permit the collection of interest in excess of the maximum rate allowed by applicable law.  If any excess of interest is provided for herein, or shall be adjudicated to be so provided in this Agreement, the provisions of this paragraph shall govern and prevail, and neither you nor your Principals shall be obligated to pay the excess amount of such interest.  If for any reason interest in excess of the maximum rate allowed by applicable law shall be deemed charged, required or permitted, any such excess shall be applied as a payment and reduction of any other amounts which may be due and owing hereunder, and if no such amounts are due and owing hereunder then such excess shall be repaid to the party that paid such interest.

### 4.6     Definition of Gross Sales

"Gross Sales" shall mean the total selling price of all services and products and all income of every other kind and nature related to the Franchised Business, whether for cash or credit and regardless of collection in the case of credit.  If a cash shortage occurs, the amount of Gross Sales will be determined based on the records of the point of sale system and any cash shortage will not be considered in the determination.  Gross Sales expressly excludes taxes collected from your customers and paid to the appropriate taxing authority and customer refunds or adjustments.

### 4.7     Insufficient Funds Fees

If there are not sufficient funds in your account to permit us to debit the account for the payments you owe us, you will pay to us an insufficient funds fee equal to One Hundred Dollars ($100).  This fee is in addition to interest on any overdue amount, as described in Section 4.5 above, and any fees charged by your bank.  If you incur three (3) insufficient funds fees within any twelve (12) month period, we may terminate this Agreement without providing you the opportunity to cure the default.

**4.8    Payment of Additional Fees**

You shall pay such other fees or amounts described in this Agreement.

**ARTICLE 5**
**OUR OBLIGATIONS**

We agree to provide the services described below with regard to the Franchised Business:

**5.1    Site Selection Guidelines**

We will provide our written site selection guidelines and such site selection assistance as we may deem advisable.

**5.2    On-Site Evaluation**

We will, if we deem it necessary, conduct one (1) on-site evaluation of a site that you propose to us for your Franchised Business, provided that we have received all required information and materials concerning such site prepared pursuant to Article 2.

**5.3    Design Plans**

We will provide, on loan, one (1) set of prototypical architectural and design plans and specifications for your Restaurant.  You shall, at your expense, have such architectural and design plans and specifications adapted for construction and/or improvement of your Restaurant in accordance with Article 2 using an architect or design that we have approved or designated.

**5.4    Confidential Operations Manual**

We will provide, on loan, our Confidential Operations Manual and such other manuals and written materials as we shall have developed for use in the Franchised Business (as the same may be revised by us from time to time, the "Manual"), as more fully described in Section 10.1.  The Manual may, in our discretion, be provided electronically or via an intranet website for all Crave businesses in the System.

**5.5    Visits and Evaluations**

We will visit the Franchised Business and evaluate the products sold and services rendered therein from time to time as reasonably determined by us, as more fully described in Section 7.5.6.

**5.6    Marketing and Promotional Materials**

We shall have the right to review and approve or disapprove all marketing and promotional materials that you propose to use, pursuant to Article 8.

**5.7    Management and Operations Advice**

We will provide advice and written materials concerning techniques of managing and operating the Franchised Business from time to time developed by us, including new developments and improvements in technology or equipment, food products and the packaging and preparation thereof, and menu items. Notwithstanding the foregoing, you understand and acknowledge that we reserve the right, in our sole discretion, to grant to certain Crave businesses variances from our standard menu to accommodate regional or local tastes or ingredients.  Nothing in this Agreement requires us to grant to you a similar variance.

### 5.8     Products for Resale

From time to time and at our reasonable discretion, at a reasonable cost, we may make available for resale to your customers certain merchandise identifying the System, such as logoed merchandise and memorabilia, and other proprietary products in sufficient amounts to meet customer demand.  We may specify that you must purchase such merchandise from us, our affiliate, or another designated supplier.

### 5.9     Approved Suppliers

We will provide a list of approved suppliers as described in Section 7.4 from time to time as we deem appropriate.

### 5.10     Initial Training Program

We will provide an initial training program for two (2) people, as well as other training programs in accordance with the provisions of Section 6.4.

### 5.11     Opening Assistance

We will provide on-site opening assistance at the Franchised Business in accordance with the provisions of Section 6.4.

### 5.12     Brand Development Fund; Marketing Cooperatives

We will establish and administer a brand development fund and/or marketing cooperatives in accordance with Article 8.

## ARTICLE 6
## YOUR AGREEMENTS, REPRESENTATIONS, WARRANTIES AND COVENANTS

### 6.1     Use Commercially Reasonable Efforts

Each of you and the Principals covenants and agrees that they shall make all commercially reasonable efforts to operate the Franchised Business so as to achieve optimum sales.

### 6.2     Representations of Corporate Entity

If you are a corporation, limited liability company, or partnership, you and your Principals represent, warrant and covenant that:

6.2.1     You are duly organized and validly existing under the state law of your formation;

6.2.2     You are duly qualified and are authorized to do business in each jurisdiction in which your business activities or the nature of the properties owned by you require such qualification;

6.2.3     Your corporate charter, operating agreement, or written partnership agreement shall at all times provide that your activities are confined exclusively to the operation of the Franchised Business, unless otherwise consented to in writing by us;

6.2.4     The execution of this Agreement and the consummation of the transactions contemplated hereby are within your corporate power, if you are a corporation, or if you are a limited liability company, permitted under your operating agreement, or if you are a partnership, permitted under your written partnership agreement and have been duly authorized by you;

6.2.5    If you are a corporation or a limited liability company, copies of your articles of incorporation, bylaws, operating agreement, other governing documents, any amendments thereto, resolutions of the Board of Directors authorizing entry into and performance of this Agreement, and any certificates, buy-sell agreements or other documents restricting the sale or transfer of stock of the corporation, and any other documents as may be reasonably required by us shall be furnished to us prior to the execution of this Agreement; or, if you are a partnership, copies of your written partnership agreement, other governing documents and any amendments thereto shall be furnished to us prior to the execution of this Agreement, including evidence of consent or approval of the entry into and performance of this Agreement by the requisite number or percentage of partners, if such approval or consent is required by your written partnership agreement;

6.2.6    If you are a corporation, partnership or other form of legal entity other than an individual, the ownership interests in you are accurately and completely described in Attachment 3. Further, if you are a corporation, you shall maintain at all times a current list of all owners of record and all beneficial owners of any class of voting securities in you or, if you are a partnership or other form of legal entity, you shall maintain at all times a current list of all owners of an interest in the partnership or entity. You shall immediately provide a copy of the updated list of all owners to us upon the occurrence of any change of ownership and otherwise make your list of owners available to us upon reasonable written request;

6.2.7    If you are a corporation, you shall maintain stop-transfer instructions against the transfer on your records of any of equity securities and each stock certificate representing stock of the corporation shall have conspicuously endorsed upon it a statement in a form satisfactory to us that it is held subject to all restrictions imposed upon assignments by this Agreement. If you are a partnership or limited liability company, your written agreement shall provide that ownership of an interest in the entity is held subject to all restrictions imposed upon assignments by this Agreement;

6.2.8    You must have provided us with your most recent financial statements. Such financial statements present fairly your financial position, at the dates indicated therein and with respect to you, the results of your operations and your cash flow for the years then ended. You agree that you shall maintain at all times, during the term of this Agreement, sufficient working capital to fulfill your obligations under this Agreement. Each of the financial statements mentioned above shall be certified as true, complete and correct and shall have been prepared in conformity with generally accepted accounting principles applicable to the respective periods involved and, except as expressly described in the applicable notes, applied on a consistent basis. No material liabilities, adverse claims, commitments or obligations of any nature exist as of the date of this Agreement, whether accrued, unliquidated, absolute, contingent or otherwise, which are not reflected as liabilities on your financial statements.

6.2.9    You acknowledge and agree that the representations, warranties and covenants set forth above in Sections 6.2.1 through 6.2.8 are continuing obligations of you and the Principals, as applicable, and that any failure to comply with such representations, warranties and covenants shall constitute a material event of default under this Agreement. You will cooperate with us in any efforts made by us to verify compliance with such representations, warranties and covenants.

**6.3      Franchised Business Management**

You shall designate and retain at all times a general manager ("General Manager") to direct the operation and management of the Franchised Business. Your General Manager shall be a full-time employee, must have successfully completed our training program, and must have been certified by us. We reserve the right to require certain other of your managers to be certified by us. At all times while your Franchised Business is open and operating, at least one (1) certified manager shall be on-site at your

Franchised Business.  The General Manager shall be responsible for the daily operation of the Franchised Business and may be one of the Principals.  The General Manager shall, during the entire period he/she serves as General Manager, meet the following qualifications:

6.3.1    The General Manager shall satisfy our educational and business experience criteria as set forth in the Manual as defined herein or otherwise in writing by us;

6.3.2    The General Manager shall devote full time and best efforts to the supervision and management of the Franchised Business;

6.3.3    The General Manager shall be an individual acceptable to us; and

6.3.4    The General Manager shall satisfy the training requirements set forth in Section 6.4.  If, during the term of this Agreement, the General Manager is not able to continue to serve in such capacity or no longer qualifies to act as such in accordance with this Section, you shall promptly (not later than seven (7) days after the event) notify us and designate a replacement within thirty (30) days after the General Manager ceases to serve, such replacement being subject to the same qualifications listed above (including completing all training and obtaining all certifications required by us).  You shall provide for interim management of the Franchised Business until such replacement is so designated, such interim management to be conducted in accordance with the terms of this Agreement.  Any failure to materially comply with the requirements of this Section 6.3 shall be deemed a material event of default under Section 17.1.3(o) hereof.

**6.4    Training**

You agree that it is necessary to the continued operation of the System and the Franchised Business that your personnel receive such training as we may reasonably require, and accordingly agree as follows:

6.4.1    (a)    Not later than thirty (30) days prior to the scheduled opening of the Franchised Business, two (2) trainees shall have completed, to our reasonable satisfaction, our initial training program, including classroom training and training in an operating Franchised Business at such location(s) as may be designated by us.  Your trainees must include you or your General Manager.  If you request that we provide our initial training program to any additional trainees, you shall pay our then-current, per person training fee for each additional trainee.  You shall be responsible for any and all expenses incurred by your trainees in connection with any initial training program, including, without limitation, costs of travel, lodging, meals and applicable wages.

(b)    We shall determine, in our reasonable discretion, whether you and your General Manager have satisfactorily completed initial training.  If the initial training program is (i) not completed within the timeframe required by us, (ii) not satisfactorily completed by the General Manager, or (iii) if we in our reasonable business judgment, based upon the performance of the General Manager, determine that the training program cannot be satisfactorily completed by any such person, you shall designate a replacement to satisfactorily complete such training at your expense, including payment of our then-current training fee.  If the replacement General Manager cannot complete the initial training program to our satisfaction, we have the right to terminate this Agreement.  Any General Manager subsequently designated by you shall also receive and complete such initial training before you will be permitted to open your Franchised Business.

(c)    Any manager subsequently designated by you must also receive and complete the initial training program to our satisfaction, even if this requires sending that manager to our headquarters training program, at your expense.  We reserve the right to charge a reasonable fee for the

initial training we provide to a replacement or successor employee if we have not approved you to provide the training.  You must also pay for all expenses you, your managers and other personnel incur for any training program, including costs of travel, lodging, meals and applicable wages.  We may approve you to train replacement managers under our training program before permitting you to train your entire staff, if this Agreement is for your third or later Franchised Business.  You may not train any personnel until we have approved you as a trainer.

6.4.2    In connection with the opening of the Franchised Business, we shall provide you with one (1) of our representatives to provide on-site opening assistance and training for up to two (2) days around your Franchised Business' opening.  If you request that our representative provide additional days of on-site assistance, you agree to reimburse all expenses our representative incurs while providing the additional assistance, including, without limitation, our then-current per diem fee and any additional travel, lodging and meals expenses.  If this Agreement is for your second (2nd) or later Franchised Business, we reserve the right to reduce the duration of such representative's visit or to not provide pre-opening assistance and training.

6.4.3    Upon your reasonable request or if we determine that additional training or assistance is necessary, we shall, during the term hereof and subject to the availability of personnel, provide you with additional trained representatives who shall provide on-site remedial training and assistance to your Franchised Business' personnel.  For this additional training and assistance, you shall pay the per diem fee then being charged to franchisees under the System for the services of such trained representatives, plus their costs of travel, lodging, and meals.

6.4.4    We reserve the right to conduct additional or refresher training programs, seminars and other related activities regarding the operation of the Franchised Business.  Such training programs and seminars may be offered to you, your managers or other Franchised Business personnel generally, and we may designate that such training programs and seminars are mandatory for you, your General Manager and/or other Franchised Business personnel.  We do not anticipate charging a fee for any refresher training, but you will pay for all of the expenses incurred by your trainees, including travel, lodging, meals and wages.

6.4.5    <u>Industry Certifications.</u>  In addition to our training requirements, we require you, your General Manager, managers and additional employees we designate to maintain industry certifications from an approved food safety and handling program (ServSafe or a similar program) and approved alcohol service training program (TIPS or a similar program).  These training and certification programs will be at your sole expense, including program fees, travel, lodging, meals and applicable wages.  Recertification may be necessary based on the specific requirements of each industry certification program.

**6.5    Franchisee Meetings**

We reserve the right to hold meetings for all franchisees and other Crave business operators, which meetings shall not occur more frequently than annually.  We shall not be required to hold such meetings until we believe it is prudent to do so.  These meetings may be used to provide additional training, introduce new products or changes to the System, or for other reasons.  We reserve the right to designate that attendance at any franchisee meeting is mandatory for you, your General Manager and/or other Franchised Business personnel.  We do not anticipate charging a fee for the meeting, but you will pay for all of the expenses incurred by your attendees at the meeting, including travel, lodging, meals and wages.

### 6.6      Compliance with Laws

You shall comply with all requirements of federal, state and local laws, rules, regulations, and orders, including but not limited to obtaining the appropriate licenses and permits required by your local or state government.

You and your Principals agree to comply, and to assist us to the fullest extent possible in our efforts to comply, with Anti-Terrorism Laws (defined below).  In connection with that compliance, you and your Principals certify, represent, and warrant that none of your property or interests is subject to being blocked under, and that you and your Principals otherwise are not in violation of, any of the Anti-Terrorism Laws. "Anti-Terrorism Laws" mean Executive Order 13224 issued by the President of the United States, the USA PATRIOT Act, and all other present and future federal, state, and local laws, ordinances, regulations, policies, lists, and other requirements of any governmental authority addressing or in any way relating to terrorist acts and acts of war.  Any violation of the Anti-Terrorism Laws by you or your Principals, or any blocking of your or your Principals' assets under the Anti-Terrorism Laws, shall constitute good cause for immediate termination of this Agreement.

### 6.7      Compliance with All Other Obligations

You shall comply with all other requirements and perform such other obligations as provided hereunder.

### 6.8      Guaranty

If any Principal is a married individual and the Principal's spouse has not executed this Agreement, such Principal shall cause his or her spouse to personally execute and bind himself or herself to the terms of a Guaranty, in the form attached as Attachment 9.

### ARTICLE 7
### FRANCHISE OPERATIONS

### 7.1      Compliance with Standards

You understand the importance of maintaining uniformity among all of the Franchised Businesses and the importance of complying with all of our standards and specifications relating to the operation of the Franchised Business.

### 7.2      Maintenance of Franchised Business

You shall maintain the Franchised Business in a high degree of sanitation, repair and condition, and in connection therewith shall make such additions, alterations, repairs and replacements thereto (but no others without our prior written consent) as may be required for that purpose, including, without limitation, such periodic repainting or replacement of obsolete signs, furnishings, equipment (including, but not limited to, point of sale or computer hardware and software systems), and décor as we may reasonably direct in order to maintain System-wide integrity and uniformity.  You shall also obtain, at your cost and expense, any new or additional equipment (including point of sale or computer hardware and software systems), fixtures, supplies and other products and materials which may be reasonably required by us for you to offer and sell new menu items from the Franchised Business or to provide the Franchised Business' services by alternative means, such as through catering or delivery arrangements.  Except as may be expressly provided in the Manual, no material alterations or improvements or changes of any kind in design, equipment, signs, interior or exterior décor items, fixtures or furnishings shall be made in or about the Franchised Business or its premises without our prior written approval, which shall not be unreasonably withheld.

In the event we notify you of any additions, alterations, repairs and replacements required to be made to your Franchised Business or the Accepted Location and you fail to make such additions, alterations, repairs and replacements within the timeframe we require, we shall have the right, without liability for trespass or tort, to enter the Accepted Location and make the additions, alterations, repairs and replacements, and you agree to promptly reimburse us for our expenses in so acting.

### 7.3    Remodeling and Redecorating

To assure the continued success of the Franchised Business, you shall, upon our request, upgrade, remodel and/or redecorate the Franchised Business premises, equipment (including point of sale or computer hardware and software systems), signs, interior and exterior décor items, fixtures, furnishings, supplies and other products and materials required for the operation of the Franchised Business to our then-current System-wide standards and specifications.  We agree that we shall not request such upgrading, remodeling and/or redecorating more frequently than every five (5) years during the term of this Agreement, except that if the Franchised Business is transferred pursuant to Article 14, we may request that the transferee remodel and/or redecorate the Franchised Business as described herein.

### 7.4    Approved Suppliers

You shall comply with all of our standards and specifications relating to the purchase of all food and beverage items, ingredients, supplies, materials, fixtures, furnishings, equipment (including point of sale and computer hardware and software systems) and other products used or offered for sale at the Franchised Business.  Except as provided in Sections 7.6 and 7.7 with respect to certain materials bearing the Marks and proprietary products, you shall obtain such items from suppliers (including manufacturers, distributors and other sources) who continue to demonstrate the ability to meet our then-current standards and specifications for food and beverage items, ingredients, supplies, materials, fixtures, furnishings, equipment and other items used or offered for sale at Franchised Businesses and who possess adequate quality controls and capacity to supply your needs promptly and reliably; and who have been approved in writing by us prior to any purchases by you from any such supplier; and who have not thereafter been disapproved by us.  You shall obtain equipment and installation of the self-serve beer tap wall for your Franchised Business only from our sole approved supplier.  You shall obtain services for your Franchised Business' loyalty program and your digital ordering mobile solution only from our sole approved supplier.

If you desire to purchase, lease or use any unapproved products or other items, or you desire to purchase or lease from an unapproved supplier, you shall submit to us a written request for approval of such product or supplier, or shall request the supplier itself to do so.  You shall pay our then-current evaluation fee for each product or supplier you request to have approved, and you shall reimburse the reasonable expenses we incur related to our evaluation of the proposed product or supplier.  You shall not purchase or lease any product or from any supplier until and unless such product or supplier has been approved in writing by us.  We shall have the right to require that our representatives be permitted to inspect the proposed supplier's facilities, and that samples from the supplier be delivered, either to us or to an independent laboratory designated by us, for testing.  We reserve the right, at our option, to re-inspect from time to time the facilities and products of any such approved supplier and to revoke our approval upon the supplier's failure to continue to meet any of our then-current criteria.  Nothing herein shall be construed to require us to approve any particular supplier.

You understand and acknowledge that we may periodically receive payments from approved suppliers, such as in the form of rebates, based on such approved suppliers' sales of products and services to our franchisees.  We reserve the right to direct that any supplier rebates, refunds, advertising allowances or other consideration payable or paid as a result of your purchases of non-proprietary goods, services or

equipment be paid to us or any affiliate that we may designate.  If we do so, then you hereby acknowledge that you will not assert any interest in such monies.

### 7.5   Operation of Franchised Business in Compliance with Our Standards

To ensure that the highest degree of quality and service is maintained, you shall operate the Franchised Business in strict conformity with such of our methods, standards and specifications set forth in the Manual and as may from time to time otherwise be prescribed in writing.  In particular, you also agree:

7.5.1   To sell or offer for sale all menu items, products and services required by us and in the method, manner and style of distribution prescribed by us and only as expressly authorized by us in writing in the Manual or otherwise in writing.

7.5.2   To sell and offer for sale only the menu items, products and services that have been expressly approved for sale in writing by us; to refrain from deviating from our standards and specifications without our prior written consent; and to discontinue selling and offering for sale any menu items, products or services which we may, in our sole discretion, disapprove in writing at any time.  Notwithstanding the foregoing, you understand and agree that we have the right, in our sole discretion, to grant to certain Crave businesses variances from our standard menu to accommodate regional or local tastes or ingredients, and that nothing in this Agreement requires us to grant to you a similar variance.

7.5.3   To maintain in sufficient supply and to use and sell at all times only such food and beverage items, ingredients, other products, materials, merchandise, supplies and paper goods that conform to our standards and specifications; to prepare all menu items in accordance with our recipes and procedures for preparation contained in the Manual or other written directives, including, but not limited to, the prescribed measurements of ingredients; and to refrain from deviating from our standards and specifications by the use or offer of non-conforming items or differing amounts of any items, without our prior written consent.

7.5.4   To permit us or our agents, during normal business hours, to remove a reasonable number of samples of food or non-food items from your inventory or from the Franchised Business, without payment therefor, in amounts reasonably necessary for testing by us or an independent laboratory to determine whether such samples meet our then-current standards and specifications.  In addition to any other remedies we may have under this Agreement, we may require you to bear the cost of such testing if the supplier of the item has not previously been approved by us or if the sample fails to conform with our reasonable specifications.

7.5.5   To purchase or lease and install, at your expense, all fixtures, furnishings, equipment (including point of sale and computer hardware and software systems), décor items, signs, delivery vehicles, and related items as we may reasonably direct from time to time in the Manual or otherwise in writing; and to refrain from installing or permitting to be installed on or about the Franchised Business premises, without our prior written consent, any fixtures, furnishings, equipment, delivery vehicles, décor items, signs, games, vending machines or other items not previously approved as meeting our standards and specifications.  If any of the property described above is leased by you from a third party, such lease shall be approved by us, in writing, prior to execution.  Our approval shall be conditioned upon such lease containing a provision which permits any interest of yours in the lease to be assigned to us upon the termination or expiration of this Agreement and which prohibits the lessor from imposing an assignment or related fee upon us in connection with such assignment.

7.5.6   To grant us and our agents the right to enter upon the Franchised Business' premises and any delivery/catering vehicle, during normal business hours, for the purpose of conducting

inspections; to cooperate with our representatives in such inspections by rendering such assistance as they may reasonably request; and, upon notice from us or our agents and without limiting our other rights under this Agreement, to take such steps as may be necessary to correct immediately any deficiencies detected during any such inspection.  Should you, for any reason, fail to correct such deficiencies within fifteen (15) days, we shall have the right and authority (without, however, any obligation to do so) to correct such deficiencies and charge you a reasonable fee for our expenses in so acting, payable by you immediately upon demand, or in our discretion we may terminate this Agreement.  In addition, we may require you to attend remedial training at our headquarters or we may send a trainer to your Franchised Business to provide remedial training, at your expense, which may include training or per diem fees and reimbursement of travel and living expenses.

7.5.7    To maintain a competent, conscientious, trained staff and to take such steps as are necessary to ensure that your employees preserve good customer relations and comply with such dress code as we may reasonably prescribe from time to time.

7.5.8    To install and maintain equipment and a telecommunications line in accordance with our specifications to permit us to access and retrieve by telecommunication any information stored on a point of sale system (or other computer hardware and software) you are required to utilize at the Franchised Business as specified in the Manual, thereby permitting us to inspect and monitor electronically information concerning your Franchised Business, Gross Sales and such other information as may be contained or stored in such equipment and software.  You shall obtain and maintain high speed internet access and/or other means of electronic communication, as specified by us from time to time.  It shall be a material default under this Agreement if you fail to maintain such equipment, lines and communication methods in operation and accessible to us at all times throughout the term of this Agreement.  We shall have access as provided herein at such times and in such manner as we shall from time to time specify.

7.5.9    To honor all credit, charge, courtesy or cash cards or other credit devices required or approved by us.  You must obtain our written approval prior to honoring any previously unapproved credit, charge, courtesy or cash cards or other credit devices.

7.5.10   To sell or otherwise issue gift cards or certificates (together "Gift Cards") that have been prepared utilizing the standard form of Gift Card provided or designated by us, and only in the manner specified by us in the Manual or otherwise in writing.  You shall fully honor all Gift Cards that are in the form provided or approved by us regardless of whether a Gift Card was issued by you or another Crave business.  You shall sell, issue, and redeem (without any offset against any Royalty Fees) Gift Cards in accordance with procedures and policies specified by us in the Manual or otherwise in writing, including those relating to procedures by which you shall request reimbursement for Gift Cards issued by other Crave businesses and for making timely payment to us, other operators of Crave businesses, or a third-party service provider for Gift Cards issued from the Franchised Business that are honored by us or other Crave business operators.  We reserve the right to alter the terms and conditions of any gift card or loyalty programs, including reserving the right to apply changes retroactively to benefits already accrued under such programs.

7.5.11   To issue and honor any loyalty cards that we designate or approve for the System.

## 7.6    Proprietary Products

You acknowledge and agree that we and our affiliates may develop for use in the System certain products which are prepared from confidential proprietary recipes and which are trade secrets of us and our affiliates, and other proprietary products bearing the Marks.  Because of the importance of quality and uniformity of production and the significance of such proprietary products in the System, it is to the mutual

benefit of the parties that we closely control the production and distribution of such proprietary products. Accordingly, you agree that if such proprietary products become a part of the System, you shall use only our secret recipes and proprietary products and shall purchase all of your requirements for such proprietary products solely from us or from a source designated by us. You further agree to purchase from us or our designated supplier for resale to your customers proprietary products and other merchandise identifying the System as we shall require, such as logoed merchandise, memorabilia and promotional products, in amounts sufficient to satisfy your customer demand.

### 7.7    Advertising and Promotional Materials

You shall require all advertising and promotional materials, signs, decorations, paper goods (including menus and all forms and stationery used in the Franchised Business), and other items which may be designated by us to bear the Marks in the form, color, location and manner prescribed by us, including, without limitation, notations about the ownership of the Marks.

### 7.8    Complaints

You shall process and handle all consumer complaints connected with or relating to the Franchised Business, and shall promptly notify us by telephone and in writing of all of the following complaints: (i) food related illnesses, (ii) environmental, safety or health violations, (iii) claims exceeding Five Hundred Dollars ($500), and (iv) any other material claims against or losses suffered by you. You shall maintain for our inspection any governmental or trade association inspection reports affecting the Franchised Business or equipment located in the Franchised Business during the term of this Agreement and for thirty (30) days after the expiration or earlier termination of this Agreement.

### 7.9    Power of Attorney for Telephone Listings, etc.

Upon the execution of this Agreement or at any time thereafter, you shall, at our option, execute such forms and documents as we deem necessary, including the agreement attached hereto as Attachment 6, to appoint us as your true and lawful attorney-in-fact with full power and authority for the sole purpose of assigning to us only upon the termination or expiration of this Agreement, as required under Section 18.15: (i) all rights to the telephone numbers of the Franchised Business and any related and other business listings; and (ii) internet listings, domain names, internet accounts, advertising on the internet or world wide web, websites, listings with search engines, email addresses or any other similar listing or usages related to the Franchised Business. You agree that you have no authority to and shall not establish any website or listing on the internet or world wide web without our express written consent, which consent may be denied without reason.

### 7.10    Customer Surveys

You shall participate in all customer surveys and satisfaction audits, which may require that you provide discounted or complimentary products, provided that such discounted or complimentary sales shall not be included in the Gross Sales of the Franchised Business. Additionally, you shall participate in any complaint resolution and other programs as we may reasonably establish for the System, which programs may include, without limitation, providing discounts or refunds to customers.

### 7.11    Mystery Shopper Service

We may designate an independent evaluation service to conduct a "mystery shopper" quality control and evaluation program with respect to Franchised Businesses. You agree that the Franchised Business will participate in such mystery shopper program, as prescribed and required by us, provided that Crave businesses owned by us, our affiliates and our franchisees also will participate in such program to

the extent we have the right to require such participation, and you further agree to pay all fees related to such mystery shopper program.

### 7.12   Pricing

Where permitted by applicable law, we may provide you written advice regarding the maximum prices which you may charge your customers for menu items, products and services provided or sold under the System.  Any such advice, if given at all, will be binding on you and you agree to comply with our pricing guidelines.  Nothing contained herein shall be deemed a representation by us that if you follow such guidelines you will, in fact, generate a profit.  You are obligated to inform us of all prices charged for products sold by you and to inform us of any modifications of your prices.  We may exercise rights with respect to pricing programs and products to the fullest extent permitted by then-applicable law.  These rights may include (without limitation) establishing the maximum retail prices which you may charge customers for the programs or products offered and sold at your Franchised Business; recommending retail prices; advertising specific retail prices for some or all programs, products or sold by your Franchised Business, which prices you agree to observe (sometimes known as "price point advertising campaigns"); engaging in advertising, promotional and related programs which you must participate in and which may directly or indirectly impact your retail prices (such as "buy one, get one free"); and otherwise mandating, directly or indirectly, the maximum retail prices which your Franchised Business may charge the public for the programs, products and services it offers.  We may engage in any such activity at any time throughout the term of this Agreement.  Further, we may engage in such activity only in certain geographic areas (towns, cities, states, regions) and not others, or with regard to certain subsets of franchisees and not others.  You acknowledge and agree that any maximum or other prices we establish or suggest may or may not optimize the revenues or profitability of your Franchised Business.  You entirely waive any and all claims related to our establishment of prices charged at your Franchised Business.

### 7.13   Motor Vehicles

For your catering or delivery services, we anticipate that your employees will use their personal vehicles to provide such services from your Franchised Business.  We reserve the right to require you to have temporary signage placed on each delivery vehicle and to require you to offer delivery through third-party food delivery services (e.g. Grubhub or Uber Eats).  We expect that all delivery vehicles will be kept clean, in good working order and be properly insured.  You must have each person providing those services to comply with all laws, regulations and rules of the road and to use due care and caution operating and maintaining the motor vehicles.  Except as described in this paragraph, we do not have any standards or exercise control over any motor vehicle that you use for delivery services from your Franchised Business.

### 7.14   Unapproved Products and Services

In the event you sell any food, beverage, products, novelty items, clothing, souvenirs or perform any services that we have not prescribed, approved or authorized, you shall, immediately upon notice from us:  (i) cease and desist offering or providing the unauthorized or unapproved food, beverage, product, premium, novelty item, clothing, souvenir or from performing such services and (ii) pay to us, on demand, a prohibited product or service fine equal to Five Hundred Dollars ($500) per day for each day such unauthorized or unapproved food, beverage, product, premium, novelty item, clothing, souvenir or service is offered or provided by you after written notice from us.  The prohibited product or service fine shall be in addition to all other remedies available to us under this Agreement or at law.

## ARTICLE 8
## MARKETING AND PROMOTION

Recognizing the value of marketing and the importance of the standardization of marketing programs to the furtherance of the goodwill and public image of the System, the parties agree as follows:

### 8.1      Participation in Marketing; Brand Development Programs

We may from time to time develop and create advertising and sales promotion programs designed to promote and enhance the collective success of all Franchised Businesses operating under the System. You shall participate in all such advertising and sales promotion programs in accordance with the terms and conditions established by us for each program.  In all aspects of these programs, including, without limitation, the type, quantity, timing, placement and choice of media, market areas and advertising agencies, the standards and specifications established by us shall be final and binding upon you.

We may, from time to time, incorporate into the System programs, products or services which we either develop or otherwise obtain rights to, which are offered and sold under names, trademarks and/or service marks other than the Proprietary Marks and which your Franchised Business, along with other Crave businesses, will be required to offer and sell.  This activity, referred to as "cobranding", may involve changes to the Proprietary Marks and may require you to make modifications to your premises and the furniture, fixtures, equipment, signs and trade dress of your Franchised Business.  If you receive written notice that we are instituting a cobranding program, you agree promptly to implement that program at your Franchised Business at the earliest commercially reasonable time and to execute any and all instruments required to do so.  Under no circumstance will any cobranding program increase your Royalty Fees, Brand Development Fee or local marketing expenditure obligations under this Agreement.

### 8.2      Local Marketing

In addition to the ongoing marketing contributions set forth herein and, subject to any allocation of your expenditures for local marketing to a Cooperative as described in Section 8.4, you shall spend each quarter throughout the Initial Term an amount equal to one percent (1%) of Gross Sales on marketing and promotion of your Franchised Business in your Designated Territory ("Local Marketing"). Notwithstanding the foregoing, if your Franchised Business participates in a Cooperative, as described in Section 8.4 below, any amount you contribute to the Cooperative will count toward your Local Marketing requirement; provided, however, that in the event your contribution to the Cooperative is less than your Local Marketing requirement, you shall nevertheless spend the difference locally.  You shall submit to us, within thirty (30) days of our request, advertising expenditure reports accurately reflecting your Local Marketing expenditures, including verification copies of all marketing and any other information that we require.

### 8.3      Brand Development Fund

Recognizing the value of uniform marketing, advertising and promotion to the goodwill and public image of the System, you agree that we or our designee shall have the right to establish, maintain and administer a Brand Development Fund (hereinafter referred to as the "Fund") for such national and regional advertising programs as we may deem necessary or appropriate, in our sole discretion, as follows:

8.3.1    We shall direct all national and regional brand development programs with sole discretion over the creative concepts, materials, endorsements and media used therein, and the placement and allocation thereof.  You understand and acknowledge that the Fund is intended to maximize general public recognition and acceptance of the System and the Marks for the benefit of all Crave restaurants operating under the System, and that we undertake no obligation in administering the Fund to ensure that

expenditures from the Fund are proportionate or equivalent to your contributions made for your Restaurant, or that any particular Restaurant or franchisee benefits directly or pro rata from the placement of any such advertising.  You understand and acknowledge that we may use up to five percent (5%) of the Fund to prepare and place advertising that is primarily a solicitation of franchise sales.

       8.3.2   You agree that the Fund may be used to meet any and all costs of maintaining, administering, directing and preparing national and/or regional advertising materials, programs and public relations activities (including, without limitation, the cost of preparing and conducting television, radio, magazine, billboard, newspaper, direct mail and other media programs and activities, for conducting marketing surveys, test marketing, employing advertising agencies to assist therewith, and providing promotional brochures, coupons and other marketing materials to all franchisees of the System).  The Fund shall be held in a non-interest bearing account separate from our other funds, and shall not be used to defray any of our general operating expenses, except that we have the right to reimburse ourselves out of the Fund for the total costs (including indirect costs such as salaries for our employees who devote time and effort to Fund related activities and overhead expenses) of developing, producing and distributing any advertising materials and collecting the Brand Development Fee (including attorneys', auditors' and accountants' fees and other expenses incurred in connection with collecting any Brand Development Fee).  We also reserve the right to use a portion of the Fund to subsidize the cost of presenting refresher training and/or a franchisee meeting.

       8.3.3   A statement of the operations of the Fund shall be prepared annually by our accountants and shall be made available to you on written request.  The cost of the statement shall be paid by the Fund.  We are not required to have any Fund statement audited, but if we choose to have the Fund audited it will be at the Fund's expense.  Except as expressly provided in this Section 8.3, we assume no direct or indirect liability or obligation to you with respect to the maintenance, direction or administration of the Fund.  We have no obligation to spend any amount on advertising in your area or Designated Territory.

       8.3.4   Restaurants owned by us or our affiliates may, but are not required to, make contributions to the Fund on the same basis as our franchisees.

       8.3.5   Any monies remaining in the Fund at the end of any year will carry over to the next year.  Although the Fund is intended to be of perpetual duration, we may terminate the Fund.  The Fund shall not be terminated, however, until all monies in the Fund have been expended for advertising or promotional purposes or returned to contributing Restaurants or those operated by us, without interest, on the basis of their respective contributions.

       8.3.6   If we elect to terminate the Fund, we may, in our sole discretion, reinstate the Fund at any time.  If we so choose to reinstate the Fund, said reinstated Fund shall be operated as described herein.

**8.4**     **Cooperative Marketing Funds**

       We may, in our discretion, create a regional marketing cooperative ("Cooperative") in any area, or we may approve the creation of such a Cooperative by franchisees in the System, and establish the rules and regulations therefor.  Immediately upon our request, you must become a member of the Cooperative for the area in which your Franchised Business is located.  In no event may the Franchised Business be required to be a member of more than one Cooperative.  The Cooperative must be governed in the manner we prescribe.  The Cooperative may require each of its members to make contributions thereto in an amount as agreed upon by the Cooperative members.  You shall contribute such amounts at the times and in the manner as determined by majority vote of the Cooperative members.  Any funds contributed to a

Cooperative will be credited against your Local Marketing obligation; provided, however, that if your contributions to a Cooperative are less than your Local Marketing requirement, you shall nevertheless spend the difference locally.  The following provisions apply to each Cooperative:

8.4.1    the Cooperative must be organized and governed in a form and manner, and commence operation on a date, that we approve in advance in writing;

8.4.2    the Cooperative must be organized for the exclusive purpose of administering advertising programs and developing, subject to our approval, standardized promotional materials for the members' use in local advertising within the Cooperative's area;

8.4.3    the Cooperative may adopt its own rules and procedures, but such rules or procedures must be approved by us and must not restrict or expand your rights or obligations under this Agreement;

8.4.4    except as otherwise provided in this Agreement, and subject to our approval, any lawful action of the Cooperative (including, without limitation, imposing assessments for local marketing) at a meeting attended by members possessing more than fifty percent (50%) of the total voting power in the Cooperative is binding upon you if approved by members possessing more than fifty percent (50%) of the total voting power possessed by members in attendance, with each Franchised Business having one (1) vote, but no franchisee (or commonly controlled group of franchisees) may have more than twenty-five percent (25%) of the vote in the Cooperative regardless of the number of Franchised Businesses owned;

8.4.5    without our prior written approval, the Cooperative may not use, nor furnish to its members, any advertising or promotional plans or materials; all such plans and materials must be submitted to us in accordance with the procedure set forth in Section 8.5;

8.4.6    Cooperative may require its members to periodically contribute to it in such amounts as it determines.  You understand and acknowledge that if any Crave businesses owned and operated by us or our affiliates are in the Cooperative's area, such businesses may, but are not required to, participate in the Cooperative;

8.4.7    no later than the fifteenth (15th) day of each month, each member/franchisee must submit its contribution under Section 8.4.6 for the preceding calendar month to the Cooperative, together with such other statements or reports as we or the Cooperative may require, with our prior written approval; and

8.4.8    if an impasse occurs because of a Cooperative members' inability or failure, within forty-five (45) days, to resolve any issue affecting the Cooperative's establishment or effective functioning, upon request of any Cooperative member, that issue must be submitted to us for consideration, and our resolution of such issue is final and binding on all Cooperative members.

### 8.5    Conduct of Marketing; Our Approval

All marketing and promotion by you in any medium shall be conducted in a professional manner and shall conform to our standards and requirements as set forth in the Manual or otherwise.  You shall obtain our approval of all marketing and promotional plans and materials prior to use if such plans and materials have not been prepared by us or previously approved by us during the twelve (12) months prior to their proposed use.  You shall submit such unapproved plans and materials to us not later than fifteen (15) days prior to the date you intend to use them.  If we do not provide our specific disapproval of the proposed materials, the proposed materials are deemed to be approved.  Any plans and materials that you

submit to us for our review will become our property and there will be no restriction on our use or dissemination of such materials.  You shall not advertise or use the Marks in any fashion on the internet, world wide web or via other means of advertising through telecommunication without our express written consent.

We reserve the right to require you to include certain language on all marketing to be used locally by you or to be used by a Cooperative, including, but not limited to, "Franchises Available" and reference to our telephone number and/or website.

**8.6     Grand Opening Marketing**

In addition to the ongoing marketing contributions and expenditures set forth herein, you shall be required to pay to us Five Thousand Dollars ($5,000) so we may conduct a grand opening marketing campaign to promote the opening of your Franchised Business.  The grand opening marketing campaign shall be conducted generally in the initial ninety (90) days following the Franchised Business' opening, or such other period of time as we may designate.  Your grand opening marketing campaign will include the giveaways and other promotions as we require.

**8.7     Websites**

We alone may establish, maintain, modify or discontinue all internet, world wide web and electronic commerce activities pertaining to the System.  We have established one or more websites accessible through one or more uniform resource locators ("URLs").  We will provide your Franchised Business with a listing on our website and we may, but are not required to, design and provide for the benefit of your Franchised Business a "click through" subpage at our website for the promotion of your Franchised Business.  If we establish one or more websites or other modes of electronic commerce and if we provide a "click through" subpage at the website(s) for the promotion of your Franchised Business, you must routinely provide us with updated copy, photographs and news stories about your Franchised Business suitable for posting on your "click through" subpage.  We reserve the right to specify the content, frequency and procedure you must follow for updating your "click through" subpage.

Any websites or other modes of electronic commerce that we establish or maintain, including but not limited to any mobile applications ("apps") that we may introduce, may – in addition to advertising and promoting the products, programs or services available at Crave businesses – also be devoted in part to offering Crave franchises for sale and be used by us to exploit the electronic commerce rights which we alone reserve.

In addition to these activities, we may also establish an intranet through which downloads of operations and marketing materials, exchanges of franchisee email, System discussion forums and System-wide communications (among other activities) can be done.  You may not maintain your own website; otherwise maintain a presence or advertise on the internet or any other mode of electronic commerce in connection with your Franchised Business; establish a link to any website we establish at or from any other website or page; or at any time establish any other website, electronic commerce presence or URL which in whole or in part incorporates the "Crave" name or any names confusingly similar to the Proprietary Marks.

You are not permitted to promote your Franchised Business or use any of the Proprietary Marks in any manner on any social or networking websites, such as Facebook, Foursquare, Instagram, LinkedIn or Twitter, without our prior written consent.  We will control all social media initiatives.  You must comply with our System standards regarding the use of social media in your Franchised Business' operation, including prohibitions on your and the Franchised Business' employees posting or blogging comments about the Franchised Business or the System, other than on a website established or authorized by us

("social media" includes personal blogs, common social networks like Facebook, Foursquare, Instagram and MySpace, professional networks like LinkedIn, live-blogging tools like Twitter, virtual worlds, file, audio and video-sharing sites, and other similar social networking or media sites or tools).  We will provide access to branded social media pages/handles/assets, and you must update these regularly.  We reserve the right to conduct collective/national campaigns via local social media on your behalf.

We alone will be, and at all times will remain, the sole owner of the copyrights to all material which appears on any website we establish and maintain, including any and all material you may furnish to us for your "click through" subpage.

### 8.8    Advisory Council

We may, in our discretion, form an advisory council to work with us to improve the System, the products offered by Crave businesses, advertising conducted by the Brand Development Fund, and any other matters that we deem appropriate.  If an advisory council is formed, it will act solely in an advisory capacity, and will not have decision making authority.  We will have the right to form, change, merge or dissolve any advisory council.  We may develop by-laws for the governance of any advisory council.

If formed, an advisory council will be comprised of our representatives and franchisee representatives.  Franchisee representatives may be selected by us or by a vote of other franchisees in the System.  If you participate on an advisory council, you will pay any expenses you incur related to your participation, such as travel and living expenses to attend council meetings.

## ARTICLE 9
## MARKS

### 9.1    Use of Marks

We grant you the right to use the Marks during the term of this Agreement in accordance with the System and related standards and specifications.

### 9.2    Ownership of Marks; Limited License

You expressly understand and acknowledge that:

9.2.1    We are the owner or the licensee of the owner of all right, title and interest in and to the Marks and the goodwill associated with and symbolized by them.  All references herein to our right, title and interest in the Marks shall be deemed to include the owner's right, title and interest in the Marks.

9.2.2    Neither you nor any Principal shall take any action that would prejudice or interfere with the validity of our rights with respect to the Marks.  Nothing in this Agreement shall give the you any right, title, or interest in or to any of the Marks or any service marks, trademarks, trade names, trade dress, logos, copyrights or proprietary materials, except the right to use the Marks and the System in accordance with the terms and conditions of this Agreement for the operation of the Franchised Business and only at or from its accepted location or in approved advertising related to the Franchised Business.

9.2.3    You understand and agree that the limited license to use the Marks granted hereby applies only to such Marks as are designated by us, and which are not subsequently designated by us as being withdrawn from use, together with those which may hereafter be designated by us in writing.  You expressly understand and agree that you are bound not to represent in any manner that you have acquired any ownership or equitable rights in any of the Marks by virtue of the limited license granted hereunder, or by virtue of your use of any of the Marks.

9.2.4    You understand and agree that any and all goodwill arising from your use of the Marks and the System shall inure solely and exclusively to our benefit, and upon expiration or termination of this Agreement and the license herein granted, no monetary amount shall be assigned as attributable to any goodwill associated with your use of the Marks.

9.2.5    You shall not contest the validity of or our interest in the Marks or assist others to contest the validity of or our interest in the Marks.

9.2.6    You acknowledge that any unauthorized use of the Marks shall constitute an infringement of our rights in the Marks and a material event of default hereunder.  You agree that you shall provide us with all assignments, affidavits, documents, information and assistance we reasonably request to fully vest in us all such rights, title and interest in and to the Marks, including all such items as are reasonably requested by us to register, maintain and enforce such rights in the Marks.

9.2.7    If it becomes advisable at any time, in our discretion, to modify or discontinue use of any Mark and/or to adopt or use one or more additional or substitute proprietary marks, then you shall be obligated to comply with any such instruction by us.  We shall not have any obligation in such event to reimburse you for your documented expenses of compliance.  You waive any other claim arising from or relating to any Mark change, modification or substitution.  We will not be liable to you for any expenses, losses or damages sustained by you as a result of any Mark addition, modification, substitution or discontinuation.  You covenant not to commence or join in any litigation or other proceeding against us for any of these expenses, losses or damages.

### 9.3    Limitation on Use of Marks

With respect to your licensed use of the Marks pursuant to this Agreement, you further agree that:

9.3.1    Unless otherwise authorized or required by us, you shall operate and advertise the Franchised Business only under the name "Crave" without prefix or suffix.  You shall not use the Marks as part of your corporate or other legal name and shall obtain our approval of a trade name or "d/b/a" prior to filing it with the applicable state authority.

9.3.2    During the term of this Agreement and any renewal hereof, you shall identify yourself as the independent owner of the Franchised Business in conjunction with any use of the Marks, including, but not limited to, uses on invoices, order forms, receipts and contracts, as well as the display of a notice in such content and form and at such conspicuous locations on the premises of the Franchised Business, or on any delivery vehicle as we may designate in writing.

9.3.3    You shall not use the Marks to incur any obligation or indebtedness on our behalf;

9.3.4    You shall comply with our instructions in filing and maintaining the requisite trade name or fictitious name registrations and shall execute any documents deemed necessary by us or our counsel to obtain protection of the Marks or to maintain their continued validity and enforceability.

### 9.4    Notification of Infringement or Claim

You shall notify us immediately by telephone and thereafter in writing of any apparent infringement of or challenge to your use of any Mark, of any claim by any person of any rights in any Mark, and you and the Principals shall not communicate with any person other than us, our counsel and your counsel in connection with any such infringement, challenge or claim.  We shall have complete discretion to take such action as we deem appropriate in connection with the foregoing, and the right to control exclusively, any

settlement, litigation or Patent and Trademark Office or other proceeding arising out of any such alleged infringement, challenge or claim or otherwise relating to any Mark.  You agree to execute any and all instruments and documents, render such assistance, and do such acts or things as may, in our opinion, reasonably be necessary or advisable to protect and maintain our interests in any litigation or other proceeding or to otherwise protect and maintain the interests of us or any other interested party in the Marks. We will indemnify you and hold you harmless from and against any and all claims, liabilities, costs, damages and reasonable expenses for which you are held liable in any proceeding arising out of your use of any of the Marks (including settlement amounts), provided that the conduct of you and the Principals with respect to such proceeding and use of the Marks is in full compliance with the terms of this Agreement.

### 9.5     Retention of Rights by Us

The right and license of the Marks granted hereunder to you is non-exclusive and we thus have and retain the following rights, among others, subject only to the limitations of Article 1:

9.5.1    To grant other licenses for use of the Marks, in addition to those licenses already granted to existing franchisees;

9.5.2    To develop and establish other systems using the Marks or other names or marks and to grant licenses thereto without providing any rights to you; and

9.5.3    To engage, directly or indirectly, through our employees, representatives, licensees, assigns, agents and others, at wholesale, retail or otherwise, in (a) the production, distribution, license and sale of products and services, and (b) the use in connection with such production, distribution and sale, of the Marks and any and all trademarks, trade names, service marks, logos, insignia, slogans, emblems, symbols, designs and other identifying characteristics as may be developed or used from time to time by us.

### ARTICLE 10
### CONFIDENTIALITY AND NON-COMPETITION COVENANTS

### 10.1     Confidential Operations Manual

10.1.1   To protect our reputation and goodwill and to maintain high standards of operation under the Marks, you shall conduct your business in accordance with the Manual, other written directives which we may reasonably issue to you from time to time whether or not such directives are included in the Manual, and any other manuals and materials created or approved for use in the operation of the Franchised Business.

10.1.2   You and the Principals shall at all times treat the Manual, any of our written directives, and any other manuals and materials, and the information contained therein as confidential and shall maintain such information as trade secret and confidential in accordance with this Article 10.  You and the Principals shall divulge and make such materials available only to such of your employees as must have access to it in order to operate the Franchised Business.  You and the Principals shall not at any time copy, duplicate, record or otherwise reproduce these materials, in whole or in part, or otherwise make the same available to any person other than those authorized above.

10.1.3  The Manual, written directives, other manuals and materials and any other confidential communications provided or approved by us shall at all times remain our sole property, shall at all times be kept in a secure place at the Franchised Business, and shall be returned to us immediately upon request or upon termination or expiration of this Agreement.

10.1.4   The Manual, any written directives, and any other manuals and materials issued by us and any modifications to such materials shall supplement and be deemed part of this Agreement.

10.1.5   We may from time to time revise the contents of the Manual and the contents of any other manuals and materials created or approved for use in the operation of the Franchised Business. You shall remove and return to us all pages of the Manual that have been replaced or updated by us. You expressly agree to comply with each new or changed standard.

10.1.6   You shall at all times ensure that the Manual are kept current and up to date. In the event of any dispute as to the contents of the Manual, the terms of the master copy of the Manual maintained by us at our headquarters shall control.

**10.2     Confidential Information**

10.2.1   Neither you nor any Principal shall, during the term of this Agreement or thereafter, communicate, divulge or use for the benefit of any other person, persons, partnership, association or corporation and, following the expiration or termination of this Agreement, they shall not use for their own benefit any confidential information, knowledge or know-how concerning the methods of operation of the Franchised Business which may be communicated to them or of which they may be apprised in connection with the operation of the Franchised Business under the terms of this Agreement. You and the Principals shall divulge such confidential information only to such of your employees as must have access to it in order to operate the Franchised Business. Any and all information, knowledge, know-how, techniques and any materials used in or related to the System which we provide to you in connection with this Agreement, including but not limited to the Manual, plans and specifications, marketing information and strategies and site evaluation, selection guidelines and techniques, recipes, and the terms of this Agreement, shall be deemed confidential for purposes of this Agreement. Neither you nor the Principals shall at any time, without our prior written consent, copy, duplicate, record or otherwise reproduce such materials or information, in whole or in part, nor otherwise make the same available to any unauthorized person. The covenants in this Section shall survive the expiration, termination or transfer of this Agreement or any interest herein and shall be perpetually binding upon you and each of the Principals.

10.2.2   You shall require and obtain the execution of covenants similar to those set forth in Section 10.2.1 from your General Manager and all other of your personnel who have received or will have access to confidential information. Such covenants shall be substantially in the form set forth in Attachment 4.

10.2.3   If you, the Principals, the General Manager, or any of your employees develop any new concept, process, product, recipe, or improvement in the operation or promotion of the Franchised Business, you are required to promptly notify us and provide us with all necessary related information, without compensation. You and the Principals acknowledge that any such concept, process product, recipe, or improvement will become our property, and we may use or disclose such information to other franchisees as we determine to be appropriate.

**10.3     Non-Competition**

10.3.1   You and the Principals specifically acknowledge that, pursuant to this Agreement, you and the Principals will receive valuable training, trade secrets and confidential information, including, without limitation, information regarding the operational, sales, promotional and marketing methods and techniques of us and the System which are beyond the present skills and experience of you and the Principals and your managers and employees. You and the Principals acknowledge that such specialized training, trade secrets and confidential information provide a competitive advantage and will be valuable to them in the development and operation of the Franchised Business, and that gaining access to such

specialized training, trade secrets and confidential information is, therefore, a primary reason why they are entering into this Agreement. In consideration for such specialized training, trade secrets and confidential information (including, without limitation, information regarding the operational, sales, promotional and marketing methods and techniques of us and the System which are beyond the present skills and experience of you and the Principals and your managers and employees), you and Principals covenant that with respect to you, during the term of this Agreement, except as otherwise approved in writing by us, which approval may be withheld or denied in our sole and absolute discretion, neither you nor any of Principal shall, either directly or indirectly, for themselves or through, on behalf of or in conjunction with any person(s), partnership or corporation:

(a)     Divert, or attempt to divert, any business or customer of the Franchised Business to any competitor, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Marks and the System.

(b)     Own, maintain, operate, engage in, or have any financial or beneficial interest in (including any interest in corporations, partnerships, trusts, unincorporated associations or joint ventures), advise, assist or make loans to, any business located within the United States, its territories, states or commonwealths, or any other country, province, state or geographic area in which we have used, sought registration of or registered the same or similar Marks or operates or licenses others to operate a business under the same or similar Marks, which business is of a character and concept similar to the Franchised Business, including a food service business which offers and sells the same or substantially similar food products (a "Competitive Business") without our prior written consent.

10.3.2  For a continuous uninterrupted period commencing upon the expiration, termination of, or transfer of all of your interest in, this Agreement and continuing for two (2) years thereafter, except as otherwise approved in our sole and absolute discretion, neither you nor any Principal shall, directly or indirectly, for themselves, or through, on behalf of or in conjunction with any person, persons, partnership, or corporation:

(a)     Divert, or attempt to divert, any business or customer of the Franchised Business hereunder to any competitor, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Marks and the System.

(b)     Own, maintain, operate, engage in, or have any financial or beneficial interest in (including any interest in corporations, partnerships, trusts, unincorporated associations or joint ventures), advise, assist or make loans to any Competitive Business, which business is, or is intended to be, located within a twenty (20) mile radius of the location of any Franchised Business in the System.

10.3.3  The parties acknowledge and agree that each of the covenants contained herein are reasonable limitations as to time, geographical area, and scope of activity to be restrained and do not impose a greater restraint than is necessary to protect our goodwill or other business interests. The parties agree that each of the covenants herein shall be construed as independent of any other covenant or provision of this Agreement. If all or any portion of a covenant in this Section is held unreasonable or unenforceable by a court or agency having valid jurisdiction in an unappealed final decision to which we are a party, you and the Principals expressly agree to be bound by any lesser covenant subsumed within the terms of such covenant that imposes the maximum duty permitted by law, as if the resulting covenant were separately stated in and made a part of this Section.

(a)     You and the Principals understand and acknowledge that we shall have the right, in our sole and absolute discretion, to reduce the scope of any covenant set forth in this Section 10.3,

or any portion thereof, without their consent, effective immediately upon notice to you; and you and the Principals agree that they shall comply forthwith with any covenant as so modified, which shall be fully enforceable notwithstanding the provisions of Section 19.2 hereof.

(b)    You and the Principals expressly agree that the existence of any claims they may have against us, whether or not arising from this Agreement, shall not constitute a defense to our enforcement of the covenants in this Section.

(c)    Sections 10.3.1(b) and 10.3.2(b) shall not apply to ownership of less than a five percent (5%) beneficial interest in the outstanding equity securities of any publicly held company.

10.3.4  You shall require and obtain execution of covenants similar to those set forth in this Section 10.3 (including covenants applicable upon the termination of a person's employment with you) from your General Manager and all other of your personnel who have received or will have access to training from us.  Such covenants shall be substantially in the form set forth in Attachment 4. Notwithstanding the foregoing, we reserve the right, in our sole discretion, to decrease the period of time or geographic scope of the non-competition covenant set forth in Attachment 4 or eliminate such non-competition covenant altogether for any party that is required to execute such agreement under this Section 10.3.4.

### 10.4     Failure to Comply

You and the Principals acknowledge that any failure to comply with the requirements of this Section shall constitute a material event of default under Article 17 hereof.  You and the Principals acknowledge that a violation of the terms of this Section would result in irreparable injury to us for which no adequate remedy at law may be available, and you and the Principals accordingly consent to the issuance of an injunction prohibiting any conduct by you or the Principals in violation of the terms of this Section. You and the Principals agree to pay all court costs and reasonable attorneys' fees incurred by us in connection with the enforcement of this Section, including payment of all costs and expenses for obtaining specific performance of, or an injunction against violation of, the requirements of such Section.

## ARTICLE 11
## BOOKS AND RECORDS

### 11.1     Books and Records

You shall maintain during the term of this Agreement, and shall preserve for at least three (3) years from the dates of their preparation, full, complete and accurate books, records and accounts, including, but not limited to, sales slips, coupons, purchase orders, payroll records, check stubs, bank statements, sales tax records and returns, cash receipts and disbursements, journals and ledgers, records of EFT transactions, and backup or archived records of information maintained on any computer system in accordance with generally accepted accounting principles and in the form and manner prescribed by us from time to time in the Manual or otherwise in writing.

### 11.2     Reports

In addition to the Royalty Report required by Article 4 hereof, you shall comply with the following reporting obligations:

11.2.1  You shall, at your expense, submit to us, in the form prescribed by us, a report of Gross Sales and a profit and loss statement for each month (which may be unaudited) for you within ten

(10) days after the end of each month during the term hereof.  Each such statement shall be signed by your treasurer or chief financial officer or comparable officer attesting that it is true, complete and correct;

11.2.2   You shall, at your expense, provide to us a complete annual financial statement (which shall be reviewed) prepared by an independent certified public accountant by April 15th of each year during the term hereof showing the results of the Franchised Business' operations during the previous calendar year.  We reserve the right to require such financial statements to be audited by an independent certified public accountant satisfactory to us at your cost and expense if an inspection discloses an understatement of two percent (2%) or more in any report, pursuant to Section 11.3; and

11.2.3   You shall also submit to us, for review or auditing, such other forms, reports, records, information and data as we may reasonably designate, and which pertain to the Franchised Business, in the form and at the times and places reasonably required by us, upon request and as specified from time to time in writing.

**11.3     Inspections; Audits**

We or our designees shall have the right, during normal business hours, to review, audit, examine and copy any or all of your books and records as we may require at the Franchised Business.  You shall make such books and records available to us or our designees immediately upon request.  If any required Royalty Fee, Brand Development Fee, or other payments due to us are delinquent, or if an inspection should reveal that such payments have been understated in any report to us, then you shall immediately pay to us the amount overdue or understated upon demand with interest determined in accordance with the provisions of Section 4.5.  If an inspection discloses an underpayment of amounts owed to us or an understatement in any report of Gross Sales of two percent (2%) or more, you shall, in addition, reimburse us for all costs and expenses connected with the inspection (including, without limitation, reasonable accounting and attorneys' fees).  These remedies shall be in addition to any other remedies we may have at law or in equity.

**11.4     Correction of Errors**

You understand and agree that our receipt or acceptance of any of the statements furnished or royalties paid to us (or the cashing of any royalty checks or processing of any EFTs) shall not preclude us from questioning the correctness thereof at any time and, in the event that any inconsistencies or mistakes are discovered in such statements or payments, they shall immediately be rectified by you and the appropriate payment shall be made by you.

**11.5     Authorization of Us**

You hereby authorize (and agree to execute any other documents deemed necessary to effect such authorization) all banks, financial institutions, businesses, suppliers, manufacturers, contractors, vendors and other persons or entities with which you do business to disclose to us any requested financial information in their possession relating to you or the Franchised Business.  You authorize us to disclose data from your reports, if we determine, in our sole and absolute discretion, that such disclosure is necessary or advisable, which disclosure may include disclosure to prospective or existing franchisees or other third parties.

**11.6     We are Attorney-in-Fact**

You hereby appoint us as your true and lawful attorney-in-fact with full power and authority, for the sole purpose of obtaining any and all returns and reports filed by you with any state and/or federal taxing authority pertaining to the Franchised Business.  This power of attorney shall survive the expiration or termination of this Agreement.

## ARTICLE 12
## INSURANCE

12.1     You shall procure, before you begin construction and/or improvement of the Franchised Business premises, and shall maintain in full force and effect at all times during the term of this Agreement (and for such period thereafter as is necessary to provide the coverages required hereunder for events having occurred during the term of this Agreement) at your expense, an insurance policy or policies protecting you and us, our successors and assigns, our affiliates, and our respective officers, directors, shareholders, partners, agents, representatives, independent contractors and employees of each of them against any demand or claim with respect to personal injury, death or property damage, or any loss, liability or expense whatsoever arising or occurring upon or in connection with the Franchised Business.  Such insurance policies must be written by an insurance company acceptable to us and which has a rating of "A-" or higher with A.M. Best Company.

12.2     Such policy or policies shall be written by a responsible, duly licensed carrier or carriers reasonably acceptable to us and shall include, at a minimum (except as additional coverages and higher policy limits may reasonably be specified by us from time to time), in accordance with standards and specifications set forth in writing, any insurance that you must have according to the terms of the lease for the Accepted Location and as required by applicable law.  All insurance must be on an "occurrence" basis. Currently you must maintain the following insurance:

12.2.1   Coverage which includes CRAVE Franchising, LLC as additional insureds on a primary non-contributory basis to the general liability policy and the auto liability policy.  The additional insureds should be listed on the certificate as follows: CRAVE Franchising, LLC and its member, officers, directors, partners, shareholders, regional directors, subsidiaries and affiliates, agents and employees; and it must be provided on an Additional Insured Grantor of Franchise Endorsement form CG2029 (or an endorsement form with comparable wording acceptable to us).

12.2.2   Insurance must be underwritten by insurers licensed and permitted to write coverage in the state in which the Franchised Business is located.  These policies must include the coverage that we require, which currently includes: (a) "all risk" or "special" property insurance covering all real and personal property and equipment on a replacement costs basis, including business interruption and extra expense insurance on an actual loss sustained basis; (b) comprehensive general liability insurance, including products and completed operations in an amount of not less than the following combined single limits: Two Million Dollars ($2,000,000) per occurrence, Two Million Dollars ($2,000,000) personal and advertising injury, Two Million Dollars ($2,000,000) completed operations/products aggregate, Two Million Dollars ($2,000,000) aggregate per location; (c) employment practices liability coverage with a limit of One Hundred Thousand Dollars ($100,000) per occurrence and in the aggregate; (d) commercial automobile liability coverage, including coverage of owned, non-owned, rented or hired vehicles with coverage in amounts not less than One Million Dollars ($1,000,000) combined single limit; and (e) workers' compensation insurance for statutory limits and employer's liability insurance in amounts not less than One Million Dollars ($1,000,000) per accident, One Million Dollars ($1,000,000) each employee per disease and One Million Dollars ($1,000,000) policy limit per disease; (f) liquor liability insurance with limits of not less than One Million Dollars ($1,000,000) per occurrence; and (g) umbrella or excess liability insurance with limits of Two Million Dollars ($2,000,000) per occurrence and Two Million Dollars ($2,000,000) general aggregate.

12.2.3   You and your insurers shall agree to waive rights of subrogation against CRAVE Franchising, LLC.  At least ten (10) days before construction and/or improvement of your Franchised Business begins, and thereafter no fewer than thirty (30) days prior to the expiration of any such policy, you shall deliver to us Certificates of Insurance evidencing the existence and continuation of proper

coverage with limits not less than those required hereunder, and you must deliver to us evidence of the waiver. Each year CRAVE Franchising, LLC may unilaterally modify the insurance minimum coverage requirements which may include an increase to the minimum coverage requirements to reflect changes in inflation or as market conditions warrant.

        12.2.4   In addition, related to any construction, renovation or remodeling of the Franchised Business, you must maintain builders' risks insurance and performance and completion bonds in forms and amounts, and written by a carrier or carriers, satisfactory to us. All of the policies must name us and those of our affiliates that we specify, and the respective officers, directors, shareholders, partners, agents, representatives, independent contractors, servants and employees of each of them, as additional named insureds and must include a waiver of subrogation in favor of all those parties.

        12.3    Your obligation to obtain and maintain the foregoing policy or policies in the amounts specified shall not be limited in any way by reason of any insurance which may be maintained by us, nor shall your performance of that obligation relieve you of liability under the indemnity provisions set forth in Article 15 of this Agreement.

        12.4    All general liability and property damage policies shall contain a provision that we, our affiliates and the officers, directors, shareholders, partners, agents, representatives, independent contractors, servants and employees of each of them, although named as insureds, shall nevertheless be entitled to recover under such policies on any loss occasioned to us or our servants, agents or employees by reason of the negligence of you or your servants, agents or employees.

        12.5    If requested by us, you shall deliver to us a copy of the insurance policy or policies required hereunder. All insurance policies required hereunder, with the exception of workers' compensation, shall name us, our affiliates and the officers, directors, shareholders, partners, agents, representatives, independent contractors, servants and employees of each of them, as additional named insureds, and shall expressly provide that any interest of same therein shall not be affected by any breach by you of any policy provisions. Further, all insurance policies required hereunder shall expressly provide that no less than thirty (30) days' prior written notice shall be given to us in the event of a material alteration to or cancellation of the policies.

        12.6    Should you, for any reason, fail to procure or maintain the insurance required by this Agreement, as such requirements may be revised from time to time by us in writing, we shall have the right and authority (without, however, any obligation to do so) immediately to procure such insurance and to charge same to you, which charges shall be payable by you immediately upon notice together with a ten percent (10%) administrative fee. The foregoing remedies shall be in addition to any other remedies we may have at law or in equity.

        12.7    Upon written request by us, you shall procure from your insurance carrier or carriers a report of claims made and reserves set against your insurance policies.

        12.8    We reserve the right to modify the types of insurance coverages and amounts of coverage that you are required to maintain for the Franchised Business, and you agree to comply with any such changes, at your expense.

**ARTICLE 13**
**DEBTS AND TAXES**

### 13.1     Taxes

You shall promptly pay when due all Taxes (as defined below), levied or assessed, and all accounts and other indebtedness of every kind incurred by you in the conduct of the Franchised Business under this Agreement.  Without limiting the provisions of Article 15, you shall be solely liable for the payment of all Taxes and shall indemnify us for the full amount of all such Taxes and for any liability (including penalties, interest and expenses) arising from or concerning the payment of Taxes, whether such Taxes were correctly or legally asserted or not.  You shall submit a copy of all tax filings sent to federal, state and local tax authorities to us within ten (10) business days after such filing has been made with the appropriate taxing authority.

The term "Taxes" means any present or future taxes, levies, imposts, duties or other charges of whatever nature, including any interest or penalties thereon, imposed by any government or political subdivision of such government on or relating to the operation of the Franchised Business, the payment of monies, taxes imposed on the Royalty Fees paid to us, or the exercise of rights granted pursuant to this Agreement, whether imposed upon you or us.

### 13.2     Payments to Us

Each payment to be made to us hereunder shall be made free and clear and without deduction for any Taxes.

### 13.3     Tax Disputes

In the event of any bona fide dispute as to your liability for taxes assessed or other indebtedness, you may contest the validity or the amount of the tax or indebtedness in accordance with the procedures of the taxing authority or applicable law.  However, in no event shall you permit a tax sale or seizure by levy of execution or similar writ or warrant or attachment by a creditor to occur against the premises of the Franchised Business or any improvements thereon.

### 13.4     Compliance with Laws

You shall comply with all federal, state and local laws, rules and regulations and shall timely obtain any and all permits, certificates or licenses necessary for the full and proper conduct of the Franchised Business, including, without limitation, licenses to do business, fictitious name registrations, sales tax permits, fire clearances, health permits, certificates of occupancy and any permits, certificates or licenses required by any environmental law, rule or regulation.

### 13.5     Notification of Action or Proceeding

You shall notify and deliver to us, in writing within five (5) days of the commencement of any action, suit or proceeding and of the issuance of any order, writ, injunction, award or decree of any court, agency or other governmental instrumentality, which may adversely affect the operation or financial condition of the Franchised Business.

## ARTICLE 14
## TRANSFER OF INTEREST

### 14.1    Transfer by Us

We shall have the right to assign this Agreement and all of our attendant rights and privileges to any person, firm, corporation or other entity provided that, with respect to any assignment resulting in the subsequent performance by the assignee of our functions:  (i) the assignee shall, at the time of such assignment, be financially responsible and economically capable of performing our obligations; and (ii) the assignee shall expressly assume and agree to perform such obligations.

You expressly affirm and agree that we may sell our assets, our rights to the Marks or to the System outright to a third party; may go public; may engage in a private placement of some or all of our securities; may merge, acquire other corporations, or be acquired by another corporation; may undertake a refinancing, recapitalization, leveraged buyout or other economic or financial restructuring; and, with regard to any or all of the above sales, assignments and dispositions, you expressly and specifically waive any claims, demands or damages arising from or related to the loss of said Marks (or any variation thereof) and/or the loss of association with or identification of "CRAVE Franchising, LLC" as Franchisor.  Nothing contained in this Agreement shall require us to remain in the food service business or to offer the same products and services, whether or not bearing the Marks, in the event that we exercise our right to assign our rights in this Agreement.

### 14.2    Transfer by You

14.2.1  You understand and acknowledge that the rights and duties set forth in this Agreement are personal to you, and that we have granted rights under this Agreement in reliance on the business skill, financial capacity and personal character of you and the Principals.  Accordingly, neither you nor any Principal shall sell, assign (including but not limited to by operation of law, such as an assignment under bankruptcy or insolvency laws, in connection with a merger, divorce or otherwise), transfer, convey, give away, pledge, mortgage or otherwise encumber any direct or indirect interest in you, in this Agreement, in the Franchised Business and/or any of the Franchised Business' material assets (other than in connection with replacing, upgrading or otherwise dealing with such assets as required or permitted by this Agreement), without our prior written consent.  Any purported assignment or transfer, by operation of law or otherwise, made in violation of this Agreement shall be null and void and shall constitute a material event of default under this Agreement.

14.2.2  If you wish to transfer all or part of your interest in the Franchised Business, any of the Franchised Business' material assets (except as provided in Section 14.2.1 above) or this Agreement, or if you or a Principal wishes to transfer or permit a transfer of any ownership interest in you, then in each such case (any or all of which are referred to in this Article 14 as a "Restricted Transfer"), transferor and the proposed transferee shall apply to us for our consent.  We shall not unreasonably withhold our consent to a Restricted Transfer.  We may, in our sole discretion, require any or all of the following as conditions of our approval:

(a)    All of the accrued monetary obligations of you or any of your affiliates and all other outstanding obligations to us arising under this Agreement or any other agreement shall have been satisfied in a timely manner and you shall have satisfied all trade accounts and other debts, of whatever nature or kind, in a timely manner;

(b)    You and your affiliates shall not be in default of any provision of this Agreement, any amendment hereof or successor hereto, or any other agreement between you or any of your affiliates and us or any of our affiliates at the time of transaction;

(c)     The transferor and its principals (if applicable) shall have executed a general release, in a form reasonably satisfactory to us, of any and all claims against us, our officers, directors, shareholders, partners, agents, representatives, independent contractors, servants and employees of each of them, in their corporate and individual capacities, including, without limitation, claims arising under this Agreement and federal, state and local laws, rules and regulations;

(d)     The transferee shall demonstrate to our reasonable satisfaction that transferee meets the criteria considered by us when reviewing a prospective franchisee's application for a franchise, including, but not limited to, our educational, managerial and business standards; transferee's good moral character, business reputation and credit rating; transferee's aptitude and ability to conduct the business franchised herein (as may be evidenced by prior related business experience or otherwise); transferee's financial resources and capital for operation of the business; and the geographic proximity and number of other Franchised Businesses owned or operated by transferee;

(e)     The transferee shall enter into a written agreement, in a form reasonably satisfactory to us, assuming full, unconditional, joint and several liability for, and agreeing to perform from the date of the transfer, all obligations, covenants and agreements contained in this Agreement; and, if transferee is a corporation or a partnership, transferee's shareholders, partners or other investors, as applicable, shall execute such agreement as transferee's principals and guarantee the performance of all such obligations, covenants and agreements;

(f)     The transferee shall execute, for a term ending on the expiration date of this Agreement and with such renewal terms as may be provided by this Agreement, the standard form franchise agreement then being offered to new System franchisees and other ancillary agreements as we may require for the Franchised Business, which agreements shall supersede this Agreement and its ancillary documents in all respects and the terms of which agreements may differ from the terms of this Agreement, including, without limitation, the then-current Royalty Fee and Brand Development Fee (as applicable); provided, however, that the transferee shall not be required to pay any initial franchise fee;

(g)     The transferee, at its expense, shall renovate, modernize and otherwise upgrade the Franchised Business and, if applicable, any delivery vehicles to conform to the then-current standards and specifications of the System, and shall complete the upgrading and other requirements which conform to the System-wide standards within the time period reasonably specified by us;

(h)     The transferor shall remain liable for all of the obligations to us in connection with the Franchised Business incurred prior to the effective date of the transfer and shall execute any and all instruments reasonably requested by us to evidence such liability;

(i)     At the transferee's expense, the transferee, the transferee's General Manager and/or any other applicable Franchised Business personnel shall complete any training programs then in effect for franchisees of Crave businesses upon such terms and conditions as we may reasonably require;

(j)     When you submit your request for our approval of the transfer, you shall pay to us a transfer fee equal to Five Thousand Dollars ($5,000) to reimburse us for reviewing the application to transfer, including, without limitation, training expenses, legal and accounting fees;

(k)     If the transferee is a corporation, limited liability company or a partnership, the transferee shall make and will be bound by any or all of the representations, warranties and

covenants set forth at Article 6 as we request.  Transferee shall provide to us evidence satisfactory to us that the terms of such Section have been satisfied and are true and correct on the date of transfer.

14.2.3   You shall not grant a security interest in the Franchised Business or in any of your assets without our prior written consent, which shall not be unreasonably withheld.  In connection therewith, the secured party will be required by us to agree that in the event of any default by you under any documents related to the security interest, we shall have the right and option to be substituted as obligor to the secured party and to cure any default of yours.

14.2.4   You acknowledge and agree that each condition which must be met by the transferee is reasonable and necessary to assure such transferee's full performance of the obligations hereunder.

### 14.3     Transfer to a Corporation or Limited Liability Company

In the event you desire to operate the Franchised Business through a corporation or limited liability company formed solely for the convenience of ownership, our consent may be conditioned upon any of the requirements set forth at Section 14.2.2, except that the requirements set forth in Sections 14.2.2(c), 14.2.2(d), 14.2.2(f), 14.2.2(g), 14.2.2(i), 14.2.2(j) and 14.2.2(k) shall not apply.  With respect to a transfer to a corporation formed for the convenience of ownership, you shall be the owner of all of the voting stock or interest of the corporation and if you are more than one (1) individual, each individual shall have the same proportionate ownership interest in the entity as he had in you prior to the transfer.

Additionally, the following conditions shall apply: (i) ownership of the corporation or limited liability company shall remain with the original Principal(s) of this Agreement; (ii) the Principals shall remain personally liable for the performance of all obligations under this Agreement and are not released from any obligations to us; (iii) the newly formed corporation or limited liability company shall conduct no business other than the Franchised Business; and (iv) copies of your articles of incorporation, bylaws, operating agreement, other governing documents, any amendments thereto, and any certificates, buy-sell agreements or other documents restricting the sale or transfer of stock of the corporation, and any other documents as may be reasonably required by us shall be furnished to us prior to addition of your corporation or limited liability company as a "franchisee" under this Agreement.  A transfer under this Section 14.3 may occur one (1) time only.

### 14.4     Our Right to Purchase Business

14.4.1   If you wish to transfer all or part of your interest in the Franchised Business or this Agreement or if you or a Principal wishes to transfer any ownership interest in you, pursuant to any bona fide offer received from a third party to purchase such interest, then such proposed seller shall promptly notify us in writing of each such offer, and shall provide such information and documentation relating to the offer as we may require.  We shall have the right and option, exercisable within thirty (30) days after receipt of such written notification and copies of all documentation required by us describing such offer, to send written notice to the seller that we intend to purchase the seller's interest on the same terms and conditions offered by the third party.  In the event that we elect to purchase the seller's interest, closing on such purchase must occur within the latest of (i) sixty (60) days from the date of notice to the seller of the election to purchase by us, (ii) sixty (60) days from the date we receive or obtain all necessary documentation, permits and approvals, or (iii) such other date as the parties agree upon in writing.  Any material change in the terms of any offer prior to closing shall constitute a new offer subject to the same right of first refusal by us as in the case of an initial offer.  Our failure or refusal to exercise the option afforded by this Section 14.4 shall not constitute a waiver of any other provision of this Agreement, including all of the requirements of Article 14, with respect to a proposed transfer.

(a)      In the case of a Restricted Transfer involving a bona fide purchase offer, then such proposed seller shall promptly notify us in writing of each such offer and shall provide such information and documentation relating to the offer as we may require.  We shall have the right and option, exercisable within thirty (30) days after receipt of such written notification and copies of all documentation required by us describing such offer, to send written notice to the seller that we intend to purchase the interest proposed to be transferred in the Restricted Transfer on the same terms and conditions offered by the proposed purchaser (the "Offer Terms").  In the event that we elect to purchase the seller's interest, closing on such purchase must occur within the latest of (i) sixty (60) days from the date of notice to the seller of the election to purchase by us, (ii) sixty (60) days from the date we receive or obtain all necessary documentation, permits and approvals, or (iii) such other date as the parties agree upon in writing.  Any material change in the terms of any offer prior to closing shall constitute a new offer subject to the same right of first refusal by us as in the case of an initial offer.  Our failure or refusal to exercise the option afforded by this Section 14.4 shall not constitute a waiver of any other provision of this Agreement, including all of the requirements of Article 14 with respect to a proposed transfer.

(b)      Notwithstanding the provisions of Section 14.4.1(a) above, where the Restricted Transfer (alone or together with any other Restricted Transfer or event effected within the prior twenty-four (24) month period) results in a "Change of Control", we may elect, in our sole discretion, to treat the notice given pursuant to such Section 14.4.1(a) as an offer to assign to us all of your rights under this Agreement and to the Franchised Business (including lease and contract rights and other assets of you and your affiliates used in connection with the Franchised Business, excluding the assets of your benefit plans) (collectively, the "Franchised Business Interests").  As used in this Section 14.4.1(b), Change of Control means any circumstance resulting in one or more of your Principals ceasing to be a Principal and/or the addition of any new Principal.  In such case, we shall notify you of the special election provided for in this Section 14.4.1(b) at the time we exercise our option as provided in Section 14.4.1(a).  The terms of such purchase shall be the same as the Offer Terms (subject to the other provisions of this Section 14.4), but the price shall be the lesser of (1) the Implied Market Price or (2) the fair market value of the Franchised Business Interests, determined in a manner consistent with Section 18.12.1.  As used herein, "Implied Market Price" shall mean an amount equal to the total price to be paid by the transferee under the Offer Terms, divided by the percentage (expressed as a decimal) of ownership of you proposed to be acquired (directly or indirectly) by the transferee, less the fair market value (determined as provided in Section 18.12.1) of any assets included in the Restricted Transfer that are not related to the Franchised Business.  If you have more than one (1) Franchised Business, then the Implied Market Price shall, unless otherwise agreed by us and you, be allocated among all Franchised Businesses equally.

(c)      We may assign our rights under this Section 14.4 to any other person or entity, subject to Section 14.1 above.

(d)      It shall be a material obligation of yours under this Agreement to cause any transferor and transferee described in this Article 14 to perform all of the obligations imposed on such persons under this Article 14.

14.4.2   In the event an offer from a third party provides for payment of consideration other than cash or involves certain intangible benefits, we may elect to purchase the interest proposed to be sold for the reasonable cash equivalent.  If the parties cannot agree within a reasonable time on the reasonable cash equivalent of the non-cash part of the Offer Terms, then such amount shall be determined by two (2) appraisers, with each party selecting one (1) appraiser, and the average of their determinations shall be binding.  In the event of such appraisal, each party shall bear its own legal and other costs, and each shall pay one-half (1/2) of the appraisal fees.  In the event that we exercise our right of first refusal herein provided, we shall have the right to set off against any payment therefor (i) all fees for any such independent appraiser due from you hereunder and (ii) all amounts due from you to us.

14.4.3   Failure to comply with the provisions of this Section prior to the transfer of any interest in you, the Franchised Business or this Agreement shall constitute a material event of default under this Agreement.

**14.5      Death or Disability**

14.5.1   Upon your death (if you are a natural person) or upon the death of any Principal who has an interest in this Agreement, the Franchised Business or you (the "Deceased"), the executor, administrator or other personal representative of the Deceased shall transfer such interest to a third party approved by us within twelve (12) months after the death.  If no personal representative is designated or appointed or no probate proceedings are instituted with respect to the estate of the Deceased, then the distributee of such interest must be approved by us.  If the distributee is not approved by us, then the distributee shall transfer such interest to a third party approved by us within twelve (12) months after the death of the Deceased.

14.5.2   Upon your permanent disability (if you are a natural person) or upon the permanent disability of any Principal who has an interest in this Agreement, the Franchised Business or you, we may, in our reasonable discretion, require such interest to be transferred to a third party in accordance with the conditions described in this Article 14 within six (6) months after notice to you.  "Permanent disability" shall mean any physical, emotional or mental injury, illness or incapacity which would prevent a person from performing the obligations set forth in this Agreement or in the guaranty made part of this Agreement for at least ninety (90) consecutive days and from which condition recovery within ninety (90) days from the date of determination of disability is unlikely.  Permanent disability shall be determined by a licensed practicing physician selected by us, upon examination of the person; or if the person refuses to submit to an examination, then such person automatically shall be deemed permanently disabled as of the date of such refusal for the purpose of this Section 14.5.  The costs of any examination required by this Section shall be paid by us.

14.5.3   Upon the death or claim of permanent disability of you or any Principal, you or a representative of yours must notify us of such death or claim of permanent disability within ten (10) days of its occurrence.  Any transfer upon death or permanent disability shall be subject to the same terms and conditions as described in this Section for any *inter vivos* transfer.  If an interest is not transferred upon death or permanent disability as required in this Section, then such failure shall constitute a material event of default under this Agreement.

14.5.4   In order to prevent any interruption of the Franchised Business' operations which would cause harm to the Franchised Business, thereby depreciating the value thereof, you authorize us, who may, at our option, in the event that you are absent for any reason or are incapacitated by reason of illness and are unable, in our sole and reasonable judgment, to operate the Franchised Business to our required standards, operate the Franchised Business for so long as we deem necessary and practical, and without waiver of any other rights or remedies we may have under this Agreement.  All monies from the operation of the Franchised Business during such period of operation by us shall be kept in a separate account, and the expenses of the Franchised Business, including reasonable compensation and expenses for our representative, shall be charged to said account.  If, as herein provided, we temporarily operate the Franchised Business for you, you agree to indemnify and hold harmless us and any representative of ours who may act hereunder, from any and all acts which we may perform, as regards the interests of you or third parties.

### 14.6     No Waiver of Claims

Our consent to a transfer of any interest described herein shall not constitute a waiver of any claims which we may have against the transferring party, nor shall it be deemed a waiver of our right to demand material and full compliance with any of the terms of this Agreement by the transferee.

### 14.7     Transfer Between Owners

If you or any Principal desires to transfer their interest, whether to another Principal or to a new Principal, then you shall promptly submit to us a request for our approval of such proposed transfer in writing and shall provide such information relative thereto as we may reasonably request prior to such transfer, together with payment of Five Thousand Dollars ($5,000).  Such transferee may not be a competitor of ours.  Such transferee will be your Principal and as such agrees to be individually bound by certain obligations in this Agreement, including covenants concerning confidentiality and non-competition and agrees to personally guarantee your performance under this Agreement.  Notwithstanding the provisions contained in Section 14.2 to the contrary, the Principals may freely transfer their ownership interests in you among themselves and, provided management control does not change, to their family members (or to trusts for the benefit of such family members), and our right of first refusal shall be inapplicable with respect to such transfers, provided you provide us with thirty (30) days prior written notice of such transfer, which notice shall include the names and percentages transferred.  You shall complete and submit to us an updated Attachment 3 as necessary.

### 14.8     Our Right to Purchase Your Franchised Business

14.8.1    At any time during the term of this Agreement, we shall have the right to purchase the Franchised Business from you by giving you written notice that we are exercising our option to purchase the Franchised Business pursuant to this Section 14.8.  The purchase of the Franchised Business shall include, without limitation, leasehold improvements, equipment, furniture, fixtures, signs, inventory and the lease or sublease for the Accepted Location.  We shall have the unrestricted right to assign this option to purchase.  We or our assignee shall be entitled to all customary warranties and representations given by the seller of a business including, without limitation, representations and warranties as to (a) ownership, condition and title to assets; (b) liens and encumbrances relating to the assets; (c) validity of contracts inuring to us or affecting the assets; and (d) contingent or other liabilities.

14.8.2    The purchase price for the assets of the Franchised Business shall be the fair market value determined as of the date of our written notice to you in a manner consistent with reasonable depreciation of leasehold improvements owned by you and the equipment, furniture, fixtures, signs and inventory of the Franchised Business.  The purchase price shall not contain any factor or increment for any trademark, service mark or other commercial symbol used in connection with the operation of the Franchised Business, or goodwill or "going concern" value for the Franchised Business.  We may exclude from the assets purchased hereunder any equipment, furniture, fixtures, signs and inventory that are not approved as meeting quality standards for Crave businesses.  The length of the remaining term of the lease or sublease for the Accepted Location shall also be considered in determining the fair market value hereunder.  If we and you are unable to agree on the fair market value of the assets, the fair market value shall be determined by an independent appraiser selected by us and you.  If we and you are unable to agree on an appraiser, we shall each select one (1) appraiser who shall select a third appraiser and the fair market value shall be deemed to be the average of the three (3) independent appraisals.  Nothing contained herein shall restrict the manner in which the appraisers so selected value the leasehold improvements, equipment, furniture, fixtures, signs and inventory.

14.8.3    The purchase price shall be paid in cash, a cash equivalent, or marketable securities of equal value at the closing of the purchase, which shall take place no later than ninety (90) days after

receipt by you of our notice of exercise of this option to purchase.  At that time you shall deliver instruments transferring to us or our assignee:  (a) good and merchantable title to the assets purchased free and clear of all liens and encumbrances, other than liens and security interests acceptable to us or our assignee, with all sales and other transfer taxes paid by you; (b) all licenses and permits of the Franchised Business which may be assigned or transferred; and (c) the lease or sublease for the Accepted Location.  In the event that you cannot deliver clear title to all of the purchased assets as aforesaid or in the event there shall be other unresolved issues, the closing of the sale shall be accomplished through an escrow.  Prior to closing, you and we shall comply with all applicable legal requirements including the bulk sales provisions of the Uniform Commercial Code of the state in which the Franchised Business is located.

14.8.4   We shall have the right to set off against, and reduce the purchase price by, any and all amounts owed by you to us or our affiliates and the amount of any encumbrances or liens against the assets or any obligations assumed by us.  If we or our assignee exercise this option to purchase, we shall have the right to appoint a General Manager to maintain the operation of the Franchised Business pending the closing of such purchase.  Alternatively, we may require you to close the Franchised Business during such time period without removing any assets from the Accepted Location.  You shall maintain in force all insurance policies required pursuant to this Agreement until the date of closing.  If the Accepted Location is leased, we agree to use reasonable efforts to effect a termination of the existing lease for the Accepted Location and enter into a new lease on reasonable terms with the landlord.  In the event we are unable to enter into a new lease, we will indemnify and hold you harmless from any ongoing liability under the lease from the date we assume possession of the Accepted Location.

## ARTICLE 15
## INDEMNIFICATION

### 15.1    Indemnification by You

You and each of the Principals shall, at all times, indemnify and hold harmless to the fullest extent permitted by law us, our successors and assigns, their respective partners and affiliates and the officers, directors, shareholders, partners, agents, representatives, independent contractors, servants and employees of each of them ("Indemnitees"), from all "losses and expenses" (as defined in Section 15.4 below) incurred in connection with any action, suit, proceeding, claim, demand, investigation or inquiry (formal or informal), or any settlement thereof (whether or not a formal proceeding or action has been instituted) which arises out of or is based upon any of the following:

15.1.1   The infringement, alleged infringement, or any other violation or alleged violation by you or any of the Principals of any patent, trademark or copyright or other proprietary right owned or controlled by third parties (except as such may occur with respect to any right to use the Marks, any copyrights or other proprietary information granted hereunder pursuant to Article 10), including, but not limited to, the unauthorized use of any image, likeness or recording of a public figure;

15.1.2   The violation, breach or asserted violation or breach by you or any of the Principals of any federal, state or local law, regulation, ruling, standard or directive or any industry standard;

15.1.3   Libel, slander or any other form of defamation of us, the System or any franchisee operating under the System, by you or by any of the Principals;

15.1.4   The violation or breach by you or by any of the Principals of any warranty, representation, agreement or obligation in this Agreement or in any other agreement between you or any of your affiliates and us and our Indemnitees; and

15.1.5   Acts, errors, or omissions of you, any of your affiliates and any of the Principals and the officers, directors, shareholders, partners, agents, representatives, independent contractors and employees of you and your affiliates in connection with the establishment and operation of the Franchised Business, including, but not limited to, any acts, errors or omissions of any of the foregoing in the operation of any motor vehicle.  The parties understand and agree that we cannot and do not exercise control over the manner of operation of any motor vehicles used by, or on behalf of, you or any employee, agent or independent contractor of yours and that the safe operation of any motor vehicle is, therefore, entirely your responsibility.

### 15.2   Notification of Action or Claim

You and each of the Principals agree to give us prompt notice of any such action, suit, proceeding, claim, demand, inquiry, or investigation.  At the expense and risk of you and each of the Principals, we may elect to assume (but under no circumstance are we obligated to undertake) or appoint associate counsel of our own choosing with respect to, the defense and/or settlement of any such action, suit, proceeding, claim, demand, inquiry or investigation.  Such an undertaking by us shall, in no manner or form, diminish the obligation of you and each of the Principals to indemnify the Indemnitees and to hold them harmless.

### 15.3   We May Settle

In order to protect persons or property, or our reputation or goodwill, or the reputation or goodwill of others, we may, at any time and without notice, as we in our reasonable judgment deem appropriate, consent or agree to settlements or take such other remedial or corrective action as we deem expedient with respect to the action, suit, proceeding, claim, demand, inquiry or investigation if, in our reasonable judgment, there are reasonable grounds to believe that:

15.3.1   any of the acts or circumstances enumerated in Section 15.1.1 through 15.1.4 above have occurred; or

15.3.2   any act, error, or omission as described in Section 15.1.5 may result directly or indirectly in damage, injury, or harm to the System, any person or any property.

### 15.4   Losses and Expenses

All losses and expenses incurred under this Article 15 shall be chargeable to and paid by you or the Principals pursuant to your obligations of indemnity under this Section, regardless of any actions, activity or defense undertaken by us or the subsequent success or failure of such actions, activity, or defense.

As used in this Article 15, the phrase "losses and expenses" shall include, without limitation, all losses, compensatory, exemplary or punitive damages, fines, charges, costs, expenses, lost profits, reasonable attorneys' fees, court costs, settlement amounts, judgments, compensation for damages to our reputation and goodwill, costs of or resulting from delays, financing, costs of advertising material and media time/space, and costs of changing, substituting or replacing the same, and any and all expenses of recall, refunds, compensation, public notices and other such amounts incurred in connection with the matters described.

### 15.5   Indemnitees Do Not Assume Liability

The Indemnitees do not hereby assume any liability whatsoever for acts, errors, or omissions of any third party with whom you, any of the Principals, your affiliates or any of the officers, directors, shareholders, partners, agents, representatives, independent contractors and employees of you or your affiliates may contract, regardless of the purpose.  You and the Principals shall hold harmless and indemnify the Indemnitees for all losses and expenses which may arise out of any acts, errors or omissions of you, the

Principals, your affiliates, the officers, directors, shareholders, partners, agents, representatives, independent contractors and employees of you and your affiliates and any such other third parties without limitation and without regard to the cause or causes thereof or the negligence of us or any other party or parties arising in connection therewith and whether such negligence be sole, joint or concurrent, or active or passive.

### 15.6     Recovery from Third Parties

Under no circumstances shall the Indemnitees be required or obligated to seek recovery from third parties or otherwise mitigate their losses in order to maintain a claim against you or any of the Principals. You and the Principals agree that the failure to pursue such recovery or mitigate loss will in no way reduce the amounts recoverable from you or any of the Principals by the Indemnitees.

### 15.7     Survival of Terms

You and the Principals expressly agree that the terms of this Article 15 shall survive the termination, expiration or transfer of this Agreement or any interest herein.

**ARTICLE 16**
**RELATIONSHIP OF THE PARTIES**

### 16.1     No Fiduciary Relationship

The parties acknowledge and agree that you shall be an independent contractor and this Agreement does not create a fiduciary relationship between them, and that nothing in this Agreement is intended to constitute either party an agent, legal representative, subsidiary, joint venturer, partner, employee, joint employer or servant of the other for any purpose. You understand and agree that you are and will be an independent contractor under this Agreement. Nothing in this Agreement may be interpreted as creating a partnership, joint venture, agency, employment or fiduciary relationship of any kind. Your employees are not our employees. Neither you nor any of your employees whose compensation you pay may in any way, directly or by implication, shall be considered our employee for any purpose, regardless of inclusion in mandated or other insurance coverage, tax or contributions, or requirements pertaining to withholdings, levied or fixed by any city, state or federal governmental agency. We will not have the power to hire or terminate the employment of your employees. You expressly agree, and will never claim otherwise, that our authority under this Agreement to determine that certain of your employees are qualified to perform certain tasks for your Franchised Business does not directly or indirectly vest in us the power to influence the employment terms of any such employee.

You agree that you alone are to exercise day-to-day control over all operations, activities and elements of your Franchised Business, and that under no circumstance shall we do so or be deemed to do so. You further acknowledge and agree, and will never claim otherwise, that the various restrictions, prohibitions, specifications and procedures of the System which you are required to comply with under this Agreement, whether set forth in our Manual or otherwise, do not directly or indirectly constitute, suggest, infer or imply that we control any aspect or element of the day-to-day operations of your Franchised Business, which you alone control, but only constitute standards you must adhere to when exercising your control of the day-to-day operations of your Franchised Business.

### 16.2     Independent Contractor

During the term of this Agreement, you shall hold yourself out to the public as an independent contractor conducting your Franchised Business' operations pursuant to the rights granted by us. You agree to take such action as shall be reasonably necessary to that end, including, without limitation, exhibiting a notice of that fact in a conspicuous place on the Franchised Business premises established for the purposes

hereunder or on any delivery vehicle and on all letterhead, business cards, forms, and as further described in the Manual.  We reserve the right to specify in writing the content and form of such notice.

You acknowledge and agree that any training we provide for your employees is geared to impart to those employees, with your ultimate authority, the various procedures, protocols, systems and operations of a Crave business and in no fashion reflects any employment relationship between us and such employees. If it is ever asserted that we are the employer, joint employer or co-employer of any of your employees in any private or government investigation, action, proceeding, arbitration or other setting, you irrevocably agree to assist us in defending said allegation, appearing at any venue requested by us to testify on our behalf; participating in depositions or other appearances; or preparing affidavits rejecting any assertion that we are the employer, joint employer or co-employer of any of your employees.

### 16.3    Sole and Exclusive Employer of Your Employees

You hereby irrevocably affirm, attest and covenant your understanding that your employees are employed exclusively by you and in no fashion are any such employee employed, jointly employed or co-employed by us.  You further affirm and attest that each of your employees is under your exclusive dominion and control and never under our direct or indirect control in any fashion whatsoever.  You alone hire each of your employees; set their schedules; establish their compensation rates; and pay all salaries, benefits and employment-related liabilities (such as workers' compensation insurance premiums/payroll taxes/Social Security contributions/unemployment insurance premiums).  You alone have the ability to discipline or terminate your employees to the exclusion of us, and you acknowledge that we have no such authority or ability.  You further attest and affirm that any minimum staffing requirements established by us are solely for the purpose of ensuring that the Franchised Business is at all times staffed at those levels necessary to operate the Franchised Business in conformity with the System and the products, services, standards of quality and efficiency, and other Crave brand attributes known to and desired by the consuming public and associated with the Proprietary Marks.  You affirm, warrant and understand that you may staff the Franchised Business with as many employees as you desire at any time so long as our minimal staffing levels are achieved.  You also affirm and attest that any recommendations you may receive from us regarding salaries, hourly wages or other compensation for employees are recommendations only, designed to assist you to efficiently operate your Franchised Business, and that you are entirely free to disregard our recommendations regarding such employee compensation.  Moreover, you affirm and attest that any training provided by us for your employees is geared to impart to those employees, with your ultimate authority, the various procedures, protocols, systems and operations of a Crave business and in no fashion reflects any employment relationship between us and such employees.  Finally, should it ever be asserted that we are the employer, joint employer or co-employer of any of your employees in any private or government investigation, action, proceeding, arbitration or other setting, you irrevocably agree to assist us in defending said allegation, including (if necessary) appearing at any venue requested by us to testify on our behalf (and, as may be necessary, submitting yourself to depositions, other appearances and/or preparing affidavits dismissive of any allegation that we are the employer, joint employer or co-employer of any of your employees).  To the extent we are the only named party in any such investigation, action, proceeding, arbitration or other setting to the exclusion of you, should any such appearance by you be required or requested by us, we will recompense you the reasonable costs associated with your appearing at any such venue.

### 16.4    You are Not Authorized

You understand and agree that nothing in this Agreement authorizes you or any of the Principals to make any contract, agreement, warranty or representation on our behalf, or to incur any debt or other obligation in our name or the Marks, and that we shall in no event assume liability for, or be deemed liable under this Agreement as a result of, any such action, or for any act or omission of you or any of the Principals or any claim or judgment arising therefrom.

## ARTICLE 17
## <u>TERMINATION</u>

**17.1    Automatic Termination – No Right to Cure**

17.1.1   You acknowledge and agree that each of your obligations described in this Agreement is a material and essential obligation of yours; that non-performance of such obligations will adversely and substantially affect us and the System; and that our exercise of the rights and remedies set forth herein is appropriate and reasonable.

17.1.2   You shall be in default under this Agreement, and all rights granted to you herein shall automatically terminate without notice to you, if you, or any of your partners, if you are a partnership, or any of your officers, directors, shareholders, or members, if you are a corporation or limited liability company, shall become insolvent or make a general assignment for the benefit of creditors; if a petition in bankruptcy is filed by you or such a petition is filed against and not opposed by you; if you are adjudicated a bankrupt or insolvent; if a bill in equity or other proceeding for the appointment of a receiver or other custodian for you or your business or assets is filed and consented to by you; if a receiver or other custodian (permanent or temporary) of your assets or property, or any part thereof, is appointed by any court of competent jurisdiction; if proceedings for a composition with creditors under any state or federal law should be instituted by or against you; if a final judgment remains unsatisfied or of record for thirty (30) days or longer (unless a *supersedeas* bond is filed); if you are dissolved; if execution is levied against your business or property; if suit to foreclose any lien or mortgage against the premises or equipment is instituted against you and not dismissed within thirty (30) days; or if the real or personal property of the Franchised Business shall be sold after levy thereupon by any sheriff, marshal, or constable.

17.1.3   You shall be deemed to be in material default and we may, at our option, terminate this Agreement and all rights granted hereunder, without affording you any opportunity to cure the default, (except as otherwise stated below), effective immediately upon notice to you, upon the occurrence of any of the following events:

       (a)    If you operate the Franchised Business or sell any products or services authorized by us for sale at the Franchised Business at a location which has not been approved by us;

       (b)    If you fail to acquire an Accepted Location for the Franchised Business within the time and in the manner specified in Article 2;

       (c)    If you fail to construct or remodel the Franchised Business in accordance with the plans and specifications provided to you under Section 5.3 as such plans may be adapted with our approval in accordance with Section 2.5;

       (d)    If you fail to open the Franchised Business for business within the period specified in Section 2.7 hereof;

       (e)    If you at any time cease to operate or otherwise abandon the Franchised Business (you will be deemed to have abandoned the Franchised Business if you do not operate it for three (3) consecutive days, unless the closure is due to circumstances beyond your control or we have consented to such closure), or lose the right to possession of the premises (including, without limitation, if the lease or any other agreement by which you have the right to possess the premises is terminated), or otherwise forfeit the right to do or transact business in the jurisdiction where the Franchised Business is located; provided, however, that this provision shall not apply in cases of Force Majeure (acts of God, strikes,

lockouts or other industrial disturbances, war, riot, epidemic, acts of terrorism, fire or other catastrophe or other forces beyond your control; provided, however, that Force Majeure shall not include your lack of financing), if through no fault of yours the premises are damaged or destroyed by an event as described above, provided that you apply within thirty (30) days after such event for our approval to relocate or reconstruct the premises (which approval shall not be unreasonably withheld) and you diligently pursue such reconstruction or relocation; such approval may be conditioned upon the payment of our relocation fee;

(f)      If you or any of the Principals are convicted of, or have entered a plea of *nolo contendere* to, a felony, a crime involving moral turpitude, or other crime that we believe is reasonably likely to have an adverse effect on the System, the Marks, the goodwill associated therewith, or our interests therein;

(g)      If a threat or danger to public health or safety results from the construction, maintenance or operation of the Franchised Business;

(h)      If you or any of the Principals purport to transfer any rights or obligations under this Agreement or any interest in you or the Franchised Business to any third party without our prior written consent or without offering us a right of first refusal with respect to such transfer, contrary to the terms of Article 14 of this Agreement;

(i)      If you or any of your affiliates fail, refuse, or neglect promptly to pay any monies owing to us, or any of our affiliates or vendors, when due under this Agreement or any other agreement, or to submit the financial or other information required by us under this Agreement and do not cure such default within five (5) days following notice from us (or such other cure period specified in such other agreement, unless no cure period is stated or such period is less than five (5) days, in which case the five (5) day cure period shall apply);

(j)      If you or any of the Principals fail to comply with the in-term covenants in Section 10.3 hereof or you fail to obtain execution of the covenants and related agreements required under Section 10.3.4 hereof within thirty (30) days following notice from us;

(k)      If, contrary to the terms of Section 10.2.1 hereof, you or any of the Principals disclose or divulge any confidential information provided to you or the Principals by us, or fail to obtain execution of covenants and related agreements required under Section 10.2.2 hereof within thirty (30) days following notice from us;

(l)      If a transfer upon death or permanent disability is not transferred in accordance with Article 14 and within the time periods therein;

(m)      If you knowingly maintain false books or records, or submit any false reports to us;

(n)      If you breach in any material respect any of the covenants in any material respect set forth in Article 6 or have falsely made any of the representations or warranties set forth in Article 6;

(o)      If you fail to propose a qualified replacement or successor General Manager within the time required under Section 6.3.4 following ten (10) days prior written notice;

(p)      If you fail to procure and maintain the insurance policies required by Article 12 and you fail to cure such default within ten (10) days following notice from us;

(q)      If you misuse or make any unauthorized use of the Marks or otherwise materially impair the goodwill associated therewith or our rights therein; provided that, notwithstanding the above, you shall be entitled to notice of such event of default and shall have twenty-four (24) hours to cure such default;

(r)      If you or any of the Principals commit three (3) material events of default under this Agreement within any twelve (12) month period, whether or not such defaults are of the same or different nature and whether or not such defaults have been cured by you after notice by us;

(s)      If any of your managers is not able to complete our initial training program to our satisfaction, after having given you the opportunity to designate a replacement manager;

(t)      If you fail to comply with all applicable laws and ordinances relating to the Franchised Business, including Anti-Terrorism Laws, or if your or any of your owners' assets, property, or interests are blocked under any law, ordinance, or regulation relating to terrorist activities, or you or any of your owners otherwise violate any such law, ordinance, or regulation;

(u)      If you fail a quality assurance audit or inspection and do not cure any deficiencies detected during such audit or inspection within fifteen (15) days; or

(v)      Any license or permit you are required to maintain for the operation of the Franchised Business is revoked.

### 17.2    Notice of Termination – 30 Days to Cure

Except as provided in Sections 17.1.2 and 17.1.3 of this Agreement, upon any default by you which is susceptible of being cured, we may terminate this Agreement by giving written notice of termination stating the nature of such default to you at least thirty (30) days prior to the effective date of termination. However, you may avoid termination by immediately initiating a remedy to cure such default and curing it to our reasonable or making a bona fide attempt to cure to our reasonable satisfaction within the thirty (30) day period and by promptly providing proof thereof to us. If any such default is not cured within the specified time, or such longer period as applicable law may require, this Agreement shall terminate without further notice to you effective immediately upon the expiration of the thirty (30) day period or such longer period as applicable law may require. Defaults which are susceptible of cure hereunder may include, but are not limited to, the following illustrative events:

17.2.1   If you fail to comply with any of the requirements imposed by this Agreement, as it may from time to time be amended or reasonably be supplemented by us, or fail to carry out the terms of this Agreement in good faith.

17.2.2   If you fail to maintain or observe any of the standards, specifications or procedures prescribed by us in this Agreement or otherwise in writing.

17.2.3   If you fail, refuse, or neglect to obtain our prior written approval or consent as required by this Agreement.

17.2.4   If any license or permit you are required to maintain for the operation of the Franchised Business is suspended.

### 17.3    Cross-Defaults, Non-Exclusive Remedies, etc.

Any default by you (or any person/company affiliated with you) under this Agreement may be regarded as a default under any other agreement between us (or any of our affiliates) and you (or any of your affiliates).  Any default by you (or any person/company affiliated with you) under any other agreement, including, but not limited to, any lease and/or sublease, between us (or any of our affiliates) and you (or any person/company affiliated with you), and any default by you (or any person/company affiliated with you) under any obligation to us (or any of our affiliates) may be regarded as a default under this Agreement.  Any default by you (or any person/company affiliated with you) under any lease, sublease, loan agreement, security interest or otherwise, whether with us, any of our affiliates and/or any third party may be regarded as a default under this Agreement and/or any other agreement between us (or any of our affiliates) and you (or any of your affiliates).

In each of the foregoing cases, we (and any of our affiliates) will have all remedies allowed at law, including termination of your rights (and/or those of any person/company affiliated with you) and our (and/or our affiliates') obligations.  No right or remedy which we may have (including termination) is exclusive of any other right or remedy provided under law or equity and we may pursue any rights and/or remedies available.

### 17.4    Our Right to Discontinue Services to You

If you are in breach of any obligation under this Agreement, and we deliver to you a notice of termination pursuant to this Article 17, we have the right to suspend our performance of any of our obligations under this Agreement including, without limitation, the sale or supply of any services or products for which we are an approved supplier to you and/or suspension of your Franchised Business' listing or your "click though" subpage on our website, until such time as you correct the breach.

### 17.5    Amendment Pursuant to Applicable Law

Notwithstanding anything to the contrary contained in this Article, if any valid, applicable law or regulation of a competent governmental authority having jurisdiction over this franchise and the parties hereto shall limit our rights of termination under this Agreement or shall require longer notice periods than those set forth above, this Agreement is deemed amended to satisfy the minimum notice periods or restrictions upon such termination required by such laws and regulations; provided, however, that such constructive amendment shall not be deemed a concession by us that the grounds for termination set forth in this Agreement do not constitute "good cause" for termination within the meaning ascribed to that term by any applicable law or regulation.  We shall not be precluded from contesting the validity, enforceability or application of such laws or regulations in any action, hearing or proceeding relating to this Agreement or the termination of this Agreement.

## ARTICLE 18
## POST-TERMINATION

Upon termination or expiration of this Agreement, all rights granted hereunder to you shall forthwith terminate, and:

### 18.1    Cease Operations

You shall immediately cease to operate the Franchised Business under this Agreement, and shall not thereafter, directly or indirectly, represent to the public or hold yourself out as a present or former franchisee of ours.

### 18.2 Stop Using the System

You shall immediately and permanently cease to use, in any manner whatsoever, any confidential methods, computer software, procedures, and techniques associated with the System; the mark "Crave"; and all other Marks and distinctive forms, slogans, signs, symbols, and devices associated with the System. In particular, you shall cease to use, without limitation, all signs, advertising materials, displays, stationery, forms and any other articles which display the Marks, and shall immediately change all paint colors, remove all of our proprietary or non-proprietary design items.

### 18.3 Cancellation of Assumed Names

You shall take such action as may be necessary to cancel any assumed name or equivalent registration which contains the mark "Crave" or any other service mark or trademark of ours, and you shall furnish us with evidence satisfactory to us of compliance with this obligation within five (5) days after termination or expiration of this Agreement.

### 18.4 No Use of Similar Marks

You agree, in the event you continue to operate or subsequently begin to operate any other business, not to use any reproduction, counterfeit, copy or colorable imitation of the Marks, either in connection with such other business or the promotion thereof, which is likely to cause confusion, mistake or deception, or which is likely to dilute our rights in and to the Marks, and further agree not to utilize any designation of origin or description or representation which falsely suggests or represents an association or connection with us constituting unfair competition.

### 18.5 Payment of Sums Owed

You and your Principals shall promptly pay all sums owing to us.  Such sums shall include all damages, costs and expenses, including reasonable attorneys' fees, incurred by us as a result of any default by you, which obligation shall give rise to and remain, until paid in full, a lien in our favor against any and all of the personal property, furnishings, equipment, fixtures, and inventory owned by you and on the premises operated hereunder at the time of default.

### 18.6 Payment of Damages, Costs and Expenses

You and the Principals shall pay to us all damages, costs and expenses, including reasonable attorneys' fees, incurred by us in connection with obtaining any remedy available to us for any violation of this Agreement and, subsequent to the termination or expiration of this Agreement, in obtaining injunctive or other relief for the enforcement of any provisions of this Article 18.

### 18.7 Delivery of Manual and Materials

You shall immediately deliver to us all Manual, software licensed by us (if any), records, files, instructions, correspondence, all materials related to operating the Franchised Business, including, without limitation, agreements, invoices, and any and all other materials relating to the operation of the Franchised Business in your possession or control, and all copies thereof (all of which are acknowledged to be our property), and shall retain no copy or record of any of the foregoing, except your copy of this Agreement and of any correspondence between the parties and any other documents which you reasonably need for compliance with any provision of law.

### 18.8 Confidential Information

You and the Principals shall comply with the restrictions on confidential information contained in Article 10 of this Agreement and shall also comply with the non-competition covenants contained in Article

10. Any other person required to execute similar covenants pursuant to Article 10 shall also comply with such covenants.

### 18.9 Marketing and Promotional Materials

You shall also immediately furnish us with an itemized list of all marketing and sales promotion materials bearing the Marks or any of our distinctive markings, designs, labels, or other marks thereon, whether located on your premises or under your control at any other location. We shall have the right to inspect these materials. We shall have the option, exercisable within thirty (30) days after such inspection, to purchase any or all of the materials at your cost, or to require you to destroy and properly dispose of such materials. Materials not purchased by us shall not be utilized by you or any other party for any purpose unless authorized in writing by us.

### 18.10 Signage

Upon execution of this Agreement, in partial consideration of the rights granted hereunder, you acknowledge and agree that all right, title and interest in the signs used at the Franchised Business are hereby assigned to us, and that upon termination or expiration of this Agreement, neither you nor any lien holder of yours shall have any further interest therein.

### 18.11 Assignment of Lease

If you operate the Franchised Business under a lease for premises with a third party or, with respect to any lease for equipment used in the operation of the Franchised Business, then you shall, at our option, assign to us any interest which we have in any lease or sublease for the premises of the Restaurant or any equipment related thereto. We may exercise such option at or within thirty (30) days after either termination or (subject to any existing right to renew) expiration of this Agreement. In the event we do not elect to exercise our option to acquire the lease or sublease for the Franchised Business premises or do not have such option, you shall make such modifications or alterations to the Franchised Business premises as are necessary to distinguish the appearance of the Franchised Business premises from that of other Crave restaurants operating under the System and shall make such specific additional changes as we may reasonably request. If you fail or refuse to comply with the requirements of this Section 18.11, we shall have the right to enter upon the premises of the Franchised Business, without being guilty of trespass or any other crime or tort, to make or cause to be made such changes as may be required, at your expense, which expense you agree to pay upon demand. Notwithstanding the provisions of this Section 18.11 to the contrary, in the event the lease is assigned to us, we hereby indemnify and hold harmless you and any guarantors under said lease, for any breach by us or our successors or assigns from any liability arising out of the lease for the Franchised Business premises from and after the date of the assignment of lease.

### 18.12 Our Right to Purchase

18.12.1 Except as provided in Sections 18.9, 18.10 and 18.13, we shall have the option, to be exercised within thirty (30) days after termination or expiration of this Agreement, to purchase from you any or all of the furnishings, equipment (including any point of sale or computer hardware and software systems), signs, fixtures, motor vehicles, supplies, and inventory of yours related to the operation of the Franchised Business, at fair market value. If we exercise our right to purchase all or a portion of your assets, we shall be purchasing such assets only and shall be assuming no liabilities whatsoever, unless otherwise agreed to in writing by the parties. If the parties cannot agree on the fair market value within thirty (30) days of our exercise of this option, fair market value shall be determined by two (2) appraisers, with each party selecting one (1) appraiser, and the average of their determinations shall be binding. In the event of such appraisal, each party shall bear its own legal and other costs, and each shall pay one-half (1/2) of the appraisal fees. If we elect to exercise any option to purchase herein provided, we shall have the right to set off (i) all fees for any such independent appraiser due from you, (ii) all amounts due from you to us

and (iii) any costs incurred in connection with any escrow arrangement (including reasonable legal fees), against any payment therefor and shall pay the remaining amount in cash.

18.12.2 In addition to the options described above and if you own the Franchised Business premises, then we shall have the option, to be exercised at or within thirty (30) days after termination or expiration of this Agreement, to purchase the premises, including any building thereon, if applicable, for the fair market value of the land and building, and any or all of the furnishings, equipment, signs, fixtures, vehicles, supplies and inventory therein at fair market value. We shall purchase assets only and shall assume no liabilities whatsoever, unless otherwise agreed to in writing by the parties. If you do not own the land on which the Franchised Business is operated and we exercise our option for an assignment of the lease, we may exercise this option for the purpose of purchasing the building if owned by you and related assets as described above. If the parties cannot agree on fair market value within thirty (30) days of our exercise of this option, fair market value shall be determined in accordance with appraisal procedure described above.

18.12.3 With respect to the options described in Sections 18.11, 18.12.1 and 18.12.2, you shall deliver to us in a form satisfactory to us, such warranties, deeds, releases of lien, bills of sale, assignments and such other documents and instruments which we deem necessary in order to perfect our title and possession in and to the properties being purchased or assigned and to meet the requirements of all tax and government authorities. If, at the time of closing, you have not obtained all of these certificates and other documents, we may, in our sole discretion, place the purchase price in escrow pending issuance of any required certificates or documents.

18.12.4 The time for closing of the purchase and sale of the properties described in Sections 18.12.1 and 18.12.2 shall be a date not later than thirty (30) days after the purchase price is determined by the parties or the determination of the appraisers, or such date we receive and obtain all necessary permits and approvals, whichever is later, unless the parties mutually agree to designate another date. The time for closing on the assignment of the lease described in Section 18.11 shall be a date no later than ten (10) days after our exercise of the option thereunder unless we are exercising our options under either Section 18.12.1 or 18.12.2, in which case the date of the closing shall be on the same closing date prescribed for such option. Closing shall take place at our corporate offices or at such other location as the parties may agree.

### 18.13   Franchised Business Assets

Notwithstanding anything to the contrary contained in Sections 18.11 and 18.12, if you operate the Franchised Business from a premises that is subleased to you by us, upon termination (or expiration without renewal) of this Agreement, we shall have the right to take immediate possession of the assets of the Franchised Business, including, any or all of the furnishings, equipment (including any point of sale or computer hardware and software systems), signs, fixtures, motor vehicles, supplies, and inventory of yours related to the operation of the Franchised Business. We shall have a lien against all such assets in the amount of any amounts due to us under this Agreement or any other agreement. We shall have the right to have such assets appraised at the lower of cost or fair market value of the used assets, and to acquire all right, title and interest to such assets, without conducting any public sale, by paying to you (or to any lender of yours who has a lienholder interest in the assets) the difference between the appraised value and the amounts owed to us by you at the time of termination. If the lien on the assets from your lender has priority over any lien of ours, and the amount of the lien is in excess of the appraised value of such assets, we shall have the right to deal directly with your lienholder, and to pay any amounts due to you directly to the lienholder. You agree to provide all further assurances, and to execute all documents required by us or by law to lawfully effect such transfer, and to perfect our security interest. We shall have the right to take such action without the execution of any further documents by you if you fail or refuse to comply with these further assurances.

### 18.14    Assignment of Options by Us

We shall be entitled to assign any and all of our options in this Section to any other party, without your consent.

### 18.15    Telephone Numbers, Internet Pages Listings, etc.

You, at our option, shall assign to us all rights to the telephone numbers of the Franchised Business and any related internet pages trademark listing or other business listings and execute all forms and documents required by us and any telephone company at any time to transfer such service and numbers to us.  Further, you shall assign to us all internet listings, domain names, internet accounts, advertising on the internet or world wide web, websites, listings with search engines, email addresses or any other similar listing or usage related to the Franchised Business.  The forms we may require you to execute include, but are not limited to, those included in Attachment 6 hereto.  Notwithstanding any forms and documents which may have been executed under Section 7.9, you hereby appoint us as your true and lawful agent and attorney-in-fact with full power and authority, for the sole purpose of taking such action as is necessary to complete such assignment.  This power of attorney shall survive the expiration or termination of this Agreement.  You shall thereafter use different telephone numbers, email addresses or other listings or usages at or in connection with any subsequent business conducted by you.

### 18.16    Liquidated Damages

If we terminate this Agreement with cause, you agree to pay to us, within fifteen (15) days after the date of termination, liquidated damages equal to the average value of the Royalty Fees you paid or owed (per month) to us during the twelve (12) months before the termination multiplied by (i) twenty-four (24), being the number of months in two (2) full years, or (ii) the number of months remaining during the term of this Agreement, whichever is lower.

The parties hereto acknowledge and agree that it would be impracticable to determine precisely the damages we would incur from this Agreement's termination and the loss of cash flow from Royalty Fees due to, among other things, the complications of determining what costs, if any, we might have saved and how much the Royalty Fees would have grown over what would have been this Agreement's remaining term.  The parties hereto consider this liquidated damages provision to be a reasonable, good faith pre-estimate of those damages.

The liquidated damages provision only covers our damages from the loss of cash flow from the Royalty Fees.  It does not cover any other damages, including damages to our reputation with the public and landlords and damages arising from a violation of any provision of this Agreement other than the Royalty Fee section.  You and each of your Principals agree that the liquidated damages provision does not give us an adequate remedy at law for any default under, or for the enforcement of, any provision of this Agreement other than the Royalty Fee section.

**ARTICLE 19**
**MISCELLANEOUS**

### 19.1    Notices

Any and all notices required or permitted under this Agreement shall be in writing and shall be personally delivered or sent by expedited delivery service or certified or registered mail, return receipt requested, first class postage prepaid, or sent by facsimile or email (provided that the sender confirms the facsimile by sending an original confirmation copy by certified or registered mail or expedited delivery service within three (3) business days after transmission) to the respective parties at the addresses set forth

in the introductory paragraph of this Agreement, unless and until a different address has been designated by written notice to the other party.

Any notice shall be deemed to have been given at the time of personal delivery or, in the case of facsimile, upon transmission (provided confirmation is sent as described above) or, in the case of expedited delivery service or registered or certified mail, three (3) business days after the date and time of mailing.

### 19.2    Entire Agreement

This Agreement, the documents referred to herein, and the Attachments hereto, constitute the entire, full and complete agreement between us and you and the Principals concerning the subject matter hereof and shall supersede all prior related agreements between us and you and the Principals; provided, however, that nothing in this or any related agreement is intended to disclaim the representations made by us in the Disclosure Document that was furnished to you by us.  Except for those permitted to be made unilaterally by us hereunder, no amendment, change or variance from this Agreement shall be binding on either party unless mutually agreed to by the parties and executed by their authorized officers or agents in writing.

### 19.3    No Waiver

No delay, waiver, omission or forbearance on our part to exercise any right, option, duty or power arising out of any breach or default by you or the Principals under this Agreement shall constitute a waiver by us to enforce any such right, option, duty or power against you or the Principals, or as to a subsequent breach or default by you or the Principals.  Acceptance by us of any payments due to us hereunder subsequent to the time at which such payments are due shall not be deemed to be a waiver by us of any preceding breach by you or the Principals of any terms, provisions, covenants or conditions of this Agreement.

### 19.4    Our Prior Approval

Whenever this Agreement requires our prior approval or consent, you shall make a timely written request to us, and such approval or consent shall be obtained in writing.

### 19.5    No Warranty or Guaranty

We make no warranties or guarantees upon which you may rely and assume no liability or obligation to you or any third party to which we would not otherwise be subject, by providing any waiver, approval, advice, consent or suggestion to you in connection with this Agreement, or by reason of any neglect, delay or denial of any request therefor.

### 19.6    Continued Obligation to Pay Sums

If a Force Majeure event shall occur, then, in addition to payments required under Section 17.1.3(e), you shall continue to be obligated to pay to us any and all amounts that you shall have duly become obligated to pay in accordance with the terms of this Agreement prior to the occurrence of any Force Majeure event and the Indemnitees shall continue to be indemnified and held harmless by you in accordance with Article 15.  Except as provided in Section 17.1.3(e) and the immediately preceding sentence herein, none of the parties hereto shall be held liable for a failure to comply with any terms and conditions of this Agreement when such failure is caused by an event of Force Majeure.  Upon the occurrence of any event of the type referred to herein, the party affected thereby shall give prompt notice thereof to the other parties, together with a description of the event, the duration for which the party expects its ability to comply with the provisions of the Agreement to be affected thereby and a plan for resuming operation under the Agreement, which the party shall promptly undertake and maintain with due diligence.  Such affected party shall be liable for failure to give timely notice only to the extent of damage actually caused.

### 19.7    Arbitration

Except to the extent we elect to enforce the provisions of this Agreement by judicial process and injunction in our sole discretion, all disputes, claims and controversies between the parties arising under or in connection with this Agreement or the making, performance or interpretation thereof (including claims of fraud in the inducement and other claims of fraud and the arbitrability of any matter) which have not been settled through negotiation will be settled by binding arbitration within Wilmington, Delaware, under the authority of the statutes of Delaware (the "Statutes").  The arbitrator(s) will have a minimum of five (5) years of experience in franchising or distribution law and will have the right to award specific performance of this Agreement.  If the parties cannot agree upon a mutually agreeable arbitrator, then the arbitration shall be conducted as per the selection method set forth in the Statutes.  To the extent such rules are not inconsistent with the provisions of this arbitration provision or the Statutes, the proceedings will be conducted under the commercial arbitration rules of the American Arbitration Association.  The decision of the arbitrator(s) will be final and binding on all parties.  This Section will survive termination or non-renewal of this Agreement under any circumstances.  Judgment upon the award of the arbitrator(s) may be entered in any court having jurisdiction thereof.  During the pendency of any arbitration proceeding, you and we shall fully perform our respective obligations under this Agreement.

### 19.8    Venue; Governing Law

With respect to any claims, controversies or disputes which are not finally resolved through negotiation or arbitration, or as otherwise provided above, you and the Principals hereby irrevocably submit themselves to the jurisdiction of the state courts and the Federal District Court nearest to Wilmington, Delaware.  You and the Principals hereby waive all questions of personal jurisdiction for the purpose of carrying out this provision.  You and the Principals hereby agree that service of process may be made upon any of them in any proceeding relating to or arising out of this Agreement or the relationship created by this Agreement by any means allowed by Delaware or federal law.  You and the Principals further agree that venue for any proceeding relating to or arising out of this Agreement shall be Wilmington, Delaware; provided, however, with respect to any action (1) for monies owed, (2) for injunctive or other extraordinary relief or (3) involving possession or disposition of, or other relief relating to, real property, we may bring such action in any State or Federal District Court which has jurisdiction.

Except as provided elsewhere in this Agreement (for example, with regard to the applicability of the Federal Arbitration Act, 9 U.S.C. §1 et seq. and the effect of federal preemption of state law by such Act) and except to the extent governed by the United States Trademark Act and other federal laws, the parties agree that this Agreement (including any claims, counter-claims or otherwise by you) and all other matters concerning the parties will be governed by, and construed and enforced in accordance with, the laws of the state of Delaware.

### 19.9    Agreement Regarding Governing Law and Choice of Forum

You, the Principals and we acknowledge that the parties' agreement regarding applicable state law and forum set forth in Sections 19.7 and 19.8 above provide each of the parties with the mutual benefit of uniform interpretation of this Agreement and any dispute arising out of this Agreement or the parties' relationship created by this Agreement.  Each of you, the Principals and we further acknowledge the receipt and sufficiency of mutual consideration for such benefit and that each party's agreement regarding applicable state law and choice of forum have been negotiated in good faith and are part of the benefit of the bargain reflected by this Agreement.

### 19.10    Waiver of Punitive Damages; Waiver of Jury Trial

You, the Principals and we hereby waive, to the fullest extent permitted by law, any right to or claim or any punitive, exemplary, incidental, indirect, special, consequential or other damages (including, without limitation, loss of profits) against either party, their officers, directors, shareholders, partners, agents, representatives, independent contractors, servants and employees, in their corporate and individual capacities, arising out of any cause whatsoever (whether such cause be based in contract, negligence, strict liability, other tort or otherwise) and agree that in the event of a dispute, either party shall be limited to the recovery of any actual damages sustained by it.  If any other term of this Agreement is found or determined to be unconscionable or unenforceable for any reason, the foregoing provisions of waiver by agreement of punitive, exemplary, incidental, indirect, special, consequential or other damages (including, without limitation, loss of profits) shall continue in full force and effect.

We and you irrevocably waive trial by jury in any action, proceeding, or counterclaim, whether at law or in equity, brought by either of us against the other.  Any and all claims and actions arising out of or relating to this Agreement, the relationship of you and us, or your operation of the Franchised Business, brought by either party hereto against the other, whether in arbitration, or a legal action, shall be commenced within two (2) years from the occurrence of the facts giving rise to such claim or action, or such claim or action shall be barred.

### 19.11    Execution in Multiple Counterparts

This Agreement may be executed in multiple counterparts, each of which when so executed shall be an original, and all of which shall constitute one and the same instrument.

### 19.12    Captions

The captions used in connection with the sections and subsections of this Agreement are inserted only for purpose of reference.  Such captions shall not be deemed to govern, limit, modify or in any other manner affect the scope, meaning or intent of the provisions of this Agreement or any part thereof nor shall such captions otherwise be given any legal effect.

### 19.13    Survival of Terms

Any obligation of you or the Principals that contemplates performance of such obligation after termination or expiration of this Agreement or the transfer of any interest of you or the Principals therein, shall be deemed to survive such termination, expiration or transfer.

### 19.14    Severability of Provisions

Except as expressly provided to the contrary herein, each portion, section, part, term and provision of this Agreement shall be considered severable; and if, for any reason, any portion, section, part, term or provision is determined to be invalid and contrary to, or in conflict with, any existing or future law or regulation by a court or agency having valid jurisdiction, this shall not impair the operation of, or have any other effect upon, the other portions, sections, parts, terms or provisions of this Agreement that may remain otherwise intelligible, and the latter shall continue to be given full force and effect and bind the parties; the invalid portions, sections, parts, terms or provisions shall be deemed not to be part of this Agreement; and there shall be automatically added such portion, section, part, term or provision as similar as possible to that which was severed which shall be valid and not contrary to or in conflict with any law or regulation.

### 19.15    Joint and Several Obligations

All references herein to the masculine, neuter or singular shall be construed to include the masculine, feminine, neuter or plural, where applicable.  Without limiting the obligations individually

undertaken by the Principals under this Agreement, all acknowledgments, promises, covenants, agreements and obligations made or undertaken by you in this Agreement shall be deemed, jointly and severally, undertaken by all of the Principals.

### 19.16    Rights and Remedies Cumulative

All rights and remedies of the parties to this Agreement shall be cumulative and not alternative, in addition to and not exclusive of any other rights or remedies which are provided for herein or which may be available at law or in equity in case of any breach, failure or default or threatened breach, failure or default of any term, provision or condition of this Agreement or any other agreement between you or any of your affiliates and us.  The rights and remedies of the parties to this Agreement shall be continuing and shall not be exhausted by any one or more uses thereof, and may be exercised at any time or from time to time as often as may be expedient; and any option or election to enforce any such right or remedy may be exercised or taken at any time and from time to time.  The expiration, earlier termination or exercise of our rights pursuant to Article 17 of this Agreement shall not discharge or release you or any of the Principals from any liability or obligation then accrued, or any liability or obligation continuing beyond, or arising out of, the expiration, the earlier termination or the exercise of such rights under this Agreement.

### 19.17    References

Each reference in this Agreement to a corporation or partnership shall be deemed to also refer to a limited liability company and any other entity or organization similar thereto.  Each reference to the organizational documents, equity owners, directors, and officers of a corporation in this Agreement shall be deemed to refer to the functional equivalents of such organizational documents, equity owners, directors, and officers, as applicable, in the case of a limited liability company or any other entity or organization similar thereto.

### 19.18    No Rights or Remedies Except to the Parties

Except as expressly provided to the contrary herein, nothing in this Agreement is intended, nor shall be deemed, to confer upon any person or legal entity other than you, us, our officers, directors, members and employees and such of your and our respective successors and assigns as may be contemplated (and, as to you, authorized by Article 14), any rights or remedies under or as a result of this Agreement.

### 19.19    Effectiveness of Agreement

This Agreement shall not become effective until signed by an authorized officer of ours.

### 19.20    Modification of the System

You understand and agree that the System must not remain static if it is to meet, without limitation, presently unforeseen changes in technology, competitive circumstances, demographics, populations, consumer trends, societal trends and other marketplace variables, and if it is to best serve the interests of us, you and all other franchisees.  Accordingly, you expressly understand and agree that we may from time to time change the components of the System including, but not limited to, altering the products, programs, services, methods, standards, forms, policies and procedures of that System; abandoning the System altogether in favor of another system in connection with a merger, acquisition, other business combination or for other reasons; adding to, deleting from or modifying those products, programs and services which your Franchised Business is authorized and required to offer; modifying or substituting entirely the building, premises, equipment, signage, trade dress, décor, color schemes and uniform specifications and all other unit construction, design, appearance and operation attributes which you are required to observe hereunder; and changing, improving, modifying, or substituting other words or designs for, the Marks.  You

expressly agree to comply with any such modifications, changes, additions, deletions, substitutions and alterations; provided, however, that such changes shall not materially and unreasonably increase your obligations hereunder.

You shall accept, use and effectuate any such changes or modifications to, or substitution of, the System as if they were part of the System at the time that this Agreement was executed.

We shall not be liable to you for any expenses, losses or damages sustained by you as a result of any of the modifications contemplated hereby.  You hereby covenant not to commence or join in any litigation or other proceeding against us or any third party complaining of any such modifications or seeking expenses, losses or damages caused thereby.  You expressly waive any claims, demands or damages arising from or related to the foregoing activities including, without limitation, any claim of breach of contract, breach of fiduciary duty, fraud, and/or breach of the implied covenant of good faith and fair dealing.

### 19.21    Operation in the Event of Absence or Disability

In order to prevent any interruption of the Franchised Business operations which would cause harm to the Franchised Business, thereby depreciating the value thereof, you authorize us, who may, at our option, in the event that you are absent for any reason or are incapacitated by reason of illness and are unable, in our sole and reasonable judgment, to operate the Franchised Business, operate the Franchised Business for so long as we deem necessary and practical, and without waiver of any other rights or remedies we may have under this Agreement.  All monies from the operation of the Franchised Business during such period of operation by us shall be kept in a separate account, and the expenses of the Franchised Business, including reasonable compensation and expenses for our representative, shall be charged to said account. If, as herein provided, we temporarily operate the Franchised Business franchised herein for you, you agree to indemnify and hold harmless us and any representative of ours who may act hereunder, from any and all acts which we may perform, as regards the interests of you or third parties.

### 19.22    Step-In Rights

If we determine in our sole judgment that the operation of your business is in jeopardy, or if a default occurs, then in order to prevent an interruption of the Franchised Business which would cause harm to the System and thereby lessen its value, you authorize us to operate your business for as long as we deem necessary and practical, and without waiver of any other rights or remedies which we may have under this Agreement.  In our sole judgment, we may deem you incapable of operating the Franchised Business if, without limitation, you are absent or incapacitated by reason of illness or death; you have failed to pay when due or have failed to remove any and all liens or encumbrances of every kind placed upon or against your business; or we determine that operational problems require that we operate your business for a period of time that we determine, in our sole discretion, to be necessary to maintain the operation of the business as a going concern.

We shall keep in a separate account all monies generated by the operation of your business, less the expenses of the business, including reasonable compensation and expenses for our representatives.  If we temporarily operate the Franchised Business on your behalf, you also agree to pay us the then-current fee for the management and maintenance of the Franchised Business in your absence.  In the event of our exercise of the Step-In Rights**,** you agree to hold harmless us and our representatives for all actions occurring during the course of such temporary operation.  You agree to pay all of our reasonable attorneys' fees and costs incurred as a consequence of our exercise of the Step-In Rights.  Nothing contained herein shall prevent us from exercising any other right which we may have under this Agreement, including, without limitation, termination.

### 19.23   Costs and Legal Fees

If we are required to enforce this Agreement in a judicial or arbitration proceeding, you shall reimburse us for our costs and expenses, including, without limitation, reasonable accountants', attorneys', attorney assistants', and expert witness fees, costs of investigation and proof of facts, court costs, other litigation expenses and travel and living expenses, whether incurred prior to, in preparation for or in contemplation of the filing of any such proceeding.  If we are required to engage legal counsel in connection with any failure by you to comply with this Agreement, you shall reimburse us for any of the above-listed costs and expenses incurred by us.

**ARTICLE 20**
**SECURITY INTERESTS**

### 20.1   Collateral

You grant to us a security interest ("Security Interest") in all of the furniture, fixtures, equipment, signage, and realty (including your interests under all real property and personal property leases) of the Franchised Business, together with all similar property now owned or hereafter acquired, additions, substitutions, replacements, proceeds, and products thereof, wherever located, used in connection with the Franchised Business.  All items in which a security interest is granted are referred to as the "Collateral".

### 20.2   Indebtedness Secured

The Security Interest is to secure payment of the following (the "Indebtedness"):

20.2.1   All amounts due under this Agreement or otherwise by you;

20.2.2   All sums which we may, at our option, expend or advance for the maintenance, preservation, and protection of the Collateral, including, without limitation, payment of rent, taxes, levies, assessments, insurance premiums, and discharge of liens, together with interest, or any other property given as security for payment of the Indebtedness;

20.2.3   All expenses, including reasonable attorneys' fees, which we incur in connection with collecting any or all Indebtedness secured hereby or in enforcing or protecting our rights under the Security Interest and this Agreement; and

20.2.4   All other present or future, direct or indirect, absolute or contingent, liabilities, obligations, and indebtedness of you to us or third parties under this Agreement, however created, and specifically including all or part of any renewal or extension of this Agreement, whether or not you execute any extension agreement or renewal instruments.

Our security interest, as described herein, shall be subordinated to any financing related to your operation of the Franchised Business, including, but not limited to, a real property mortgage and equipment leases.

### 20.3   Additional Documents

You will from time to time as required by us join with us in executing any additional documents and one or more financing statements pursuant to the Uniform Commercial Code (and any assignments, extensions, or modifications thereof) in form satisfactory to us.

### 20.4     Possession of Collateral

Upon default and termination of your rights under this Agreement, we shall have the immediate right to possession and use of the Collateral.

### 20.5     Our Remedies in Event of Default

You agree that, upon the occurrence of any default set forth above, the full amount remaining unpaid on the Indebtedness secured shall, at our option and without notice, become due and payable immediately, and we shall then have the rights, options, duties, and remedies of a secured party under, and you shall have the rights and duties of a debtor under, the Uniform Commercial Code of Delaware (or other applicable law), including, without limitation, our right to take possession of the Collateral and without legal process to enter any premises where the Collateral may be found.  Any sale of the Collateral may be conducted by us in a commercially reasonable manner.  Reasonable notification of the time and place of any sale shall be satisfied by mailing to you pursuant to the notice provisions set forth above.

### 20.6     Special Filing as Financing Statement

This Agreement shall be deemed a Security Agreement and a Financing Statement.  This Agreement may be filed for record in the real estate records of each county in which the Collateral, or any part thereof, is situated and may also be filed as a Financing Statement in the counties or in the office of the Secretary of State, as appropriate, in respect of those items of Collateral of a kind or character defined in or subject to the applicable provisions of the Uniform Commercial Code as in effect in the appropriate jurisdiction.

**ARTICLE 21**
**TECHNOLOGY**

### 21.1     Computer Systems and Software

The following terms and conditions shall apply with respect to your computer system:

21.1.1   We shall have the right to specify or require that certain brands, types, makes, and/or models of communications, computer systems, and hardware to be used by, between, or among Crave businesses, including without limitation:  (a) back office and point of sale systems, data, audio, video, and voice storage, retrieval, and transmission systems for use at Crave businesses, between or among Franchised Businesses, and between and among the Franchised Businesses and us and/or you; (b) Point of Sale Systems; (c) physical, electronic, and other security systems; (d) printers and other peripheral devices; (e) archival back-up systems; and (f) internet access mode and speed (collectively, the "Computer System").

21.1.2   We shall have the right, but not the obligation, to develop or have developed for us, or to designate:  (a) computer software programs and accounting system software that you must use in connection with the Computer System ("Required Software"), which you shall install; (b) updates, supplements, modifications, or enhancements to the Required Software, which you shall install; (c) the tangible media upon which you shall record data; and (d) the database file structure of your Computer System.

21.1.3   You shall record all sales on computer-based point of sale systems approved by us or on such other types of systems as may be designated by us in the Manual or otherwise in writing ("Point of Sale Systems"), which shall be deemed part of your Computer System.

21.1.4   You shall make, from time to time, such upgrades and other changes to the Computer System and Required Software as we may request in writing (collectively, "Computer Upgrades").

21.1.5   You shall comply with all specifications issued by us with respect to the Computer System and the Required Software, and with respect to Computer Upgrades.  You shall also afford us unimpeded access to your Computer System and Required Software as we may request, in the manner, form, and at the times requested by us.

### 21.2    Data

We may, from time-to-time, specify in the Manual or otherwise in writing the information that you shall collect and maintain on the Computer System installed at the Franchised Business, and you shall provide to us such reports as we may reasonably request from the data so collected and maintained.  All data pertaining to the Franchised Business, and all data created or collected by you in connection with the System, or in connection with your operation of the Franchised Business (including without limitation data pertaining to or otherwise concerning the Franchised Business' customers) or otherwise provided by you (including, without limitation, data uploaded to, or downloaded from your Computer System) is and will be owned exclusively by us, and we will have the right to use such data in any manner that we deem appropriate without compensation to you.  Copies and/or originals of such data must be provided to us upon our request.  We hereby license use of such data back to you for the term of this Agreement, at no additional cost, solely for your use in connection with the business franchised under this Agreement.

### 21.3    Privacy

You shall abide by all applicable laws pertaining to privacy of information collected or maintained regarding customers or other individuals ("Privacy") and shall comply with our standards and policies pertaining to Privacy.  If there is a conflict between our standards and policies pertaining to Privacy and applicable law, you shall:  (a) comply with the requirements of applicable law; (b) immediately give us written notice of said conflict; and (c) promptly and fully cooperate with us and our counsel as we may request to assist us in our determination regarding the most effective way, if any, to meet our standards and policies pertaining to Privacy within the bounds of applicable law.

### 21.4    Telecommunications

You shall comply with our requirements (as set forth in the Manual or otherwise in writing) with respect to establishing and maintaining telecommunications connections between your Computer System and our Intranet (as defined below), if any, and/or such other computer systems as we may reasonably require.

### 21.5    Intranet

We may establish a website providing private and secure communications between us, you, franchisees, licensees and other persons and entities as determined by us, in our sole discretion (an "Intranet").  You shall comply with our requirements (as set forth in the Manual or otherwise in writing) with respect to connecting to the Intranet and utilizing the Intranet in connection with the operation of the Franchised Business.  The Intranet may include, without limitation, the Manual, training other assistance materials, and management reporting solutions (both upstream and downstream, as we may direct).  You shall purchase and maintain such computer software and hardware as may be required to connect to and utilize the Intranet.

### 21.6   On-line Use of Proprietary Marks

You shall not use the Proprietary Marks, or any abbreviation or other name associated with us and/or the System as part of any email address, domain name, and/or other identification of you in any electronic medium.  You agree not to transmit or cause any other party to transmit advertisements or solicitations by email or other electronic media without our prior written consent as to your plan for transmitting such advertisements.

### 21.7   No Outsourcing Without Prior Written Consent

You shall not hire third party or outside vendors to perform any services or obligations in connection with the Computer System, Required Software, or any other of your obligations without our prior written approval therefor, unless we have designated an approved supplier to provide such services. Our consideration of any proposed outsourcing vendor(s) may be conditioned upon, among other things, such third party or outside vendor's entry into a confidentiality agreement with us and you in a form that is reasonably provided by us.

### 21.8   Changes to Technology

You and we acknowledge and agree that changes to technology are dynamic and not predictable within the term of this Agreement.  In order to provide for inevitable but unpredictable changes to technological needs and opportunities, you agree that we shall have the right to establish, in writing, reasonable new standards for the implementation of technology in the System; and you agree that you shall abide by those reasonable new standards established by us as if this Article 21 were periodically revised by us for that purpose.  You acknowledge and understand that this Agreement does not place any limitations on either our right to require you to obtain Computer Upgrades or the cost of such Computer Upgrades.

### ARTICLE 22
### YOUR REPRESENTATIONS AND ACKNOWLEDGMENTS

### 22.1   Your Representations

You represent and warrant to us, with the intention that we are relying thereon in entering into this Agreement, that:

22.1.1  If you are a corporation, limited liability company, general partnership, partnership, or limited partnership, then you are organized under the laws of the state of your principal place of business (or another state which you have identified to us) and are in good standing with and qualified to do business in each state and political/governmental subdivision having jurisdiction over the Franchised Business.

22.1.2  If you are a corporation, limited liability company, general partnership, partnership, or limited partnership, you have all corporate power and authority to execute, deliver, consummate and perform this Agreement, and it will be binding upon you and your successors and assigns when executed.

22.1.3  You do not have any material liabilities, adverse claims, commitments or obligations of any nature as of the date of execution of this Agreement, whether accrued, unliquidated, absolute, contingent or otherwise which are not reflected as liabilities on the balance sheets of your current financial statements, which you have furnished to us before the execution of this Agreement.

22.1.4  As of the date of execution of this Agreement, there are no actions, suits, proceedings or investigations pending or, to your knowledge or the knowledge any of your officers,

directors, principal shareholders, proprietors, partners or principals (as applicable) after due inquiry, threatened, in any court or arbitral forum, or before any governmental agency or instrumentality, nor to the best of your knowledge or the knowledge of any such persons or entities (after due inquiry) is there any basis for any claim, action, suit, proceeding or investigation which affects or could affect, directly or indirectly, any of your assets, properties, rights or business; your right to operate and use your assets, properties or rights to carry on your business; and/or which affects or could affect your right to assume and carry out in all respects the duties, obligations and responsibilities specified in this Agreement.

22.1.5   Neither you nor any of your Principals is a party to any contract, agreement, covenant not to compete or other restriction of any type which may conflict with, or be breached by, the execution, delivery, consummation and/or performance of this Agreement.

22.1.6   All of your representations and warranties contained in this Agreement are complete, correct and accurate as of the date of execution of this Agreement and will survive any termination or expiration of this Agreement.

**22.2    Your Acknowledgments**

You acknowledge the truthfulness of the statements contained in Attachment 7 hereto.  Your acknowledgments are an inducement for us to enter into this Agreement.  You shall immediately notify us, prior to acknowledgment, if any statement in Attachment 7 is incomplete or incorrect.

Each of the parties hereto has caused this Agreement to be executed by its duly authorized representative as of the date first above written.

FRANCHISEE:                                                    FRANCHISOR:
                                                                         CRAVE FRANCHISING, LLC
_____

By:_____                          By:_____
Name:_____                         Name:_____
Title:_____                          Title:_____
                                                                         Accepted On:_____
                                                                                    (the "Effective Date")

PRINCIPALS:


_____

Name:_____


_____

Name:_____

## ATTACHMENT 1 TO THE FRANCHISE AGREEMENT

## ACCEPTED LOCATION AND DESIGNATED TERRITORY

1.    ACCEPTED LOCATION

Pursuant to Section 1.2 of the Franchise Agreement, the Franchised Business shall be located at the following Accepted Location:

_____

_____

_____


2.    DESIGNATED TERRITORY:

Pursuant to Section 1.4 of the Franchise Agreement, the Designated Territory shall be:

_____

_____


FRANCHISEE:                                FRANCHISOR:
_____                  CRAVE FRANCHISING, LLC


By:_____                 By:_____
Name:_____                 Name:_____
Title:_____               Title:_____

PRINCIPALS:


_____
Name:_____


_____
Name:_____

## ATTACHMENT 2 TO THE FRANCHISE AGREEMENT

## <u>COLLATERAL ASSIGNMENT OF LEASE</u>

**FOR VALUE RECEIVED**, the undersigned ("Assignor") assigns, transfers and sets over to CRAVE Franchising, LLC, a Wyoming limited liability company ("Assignee"), all of Assignor's right and title to and interest in that certain "Lease" a copy of which is attached as Exhibit A respecting premises commonly known as _____. This assignment is for collateral purposes only and except as specified in this document Assignee will have no liability or obligation of any kind whatsoever arising from or in connection with this assignment or the Lease unless and until Assignee takes possession of the premises the Lease demises according to the terms of this document and assumes Assignor's obligations under the Lease.

Assignor represents and warrants to Assignee that it has full power and authority to assign the Lease and that Assignor has not previously assigned or transferred and is not otherwise obligated to assign or transfer any of its interest in the Lease or the premises it demises.

Upon Assignor's default under the Lease or under the "Franchise Agreement" for a Crave Restaurant between Assignee and Assignor or in the event Assignor defaults under any document or instrument securing the Franchise Agreement Assignee has the right to take possession of the premises the Lease demises and expel Assignor from the premises. In that event Assignor will have no further right and title to or interest in the Lease but will remain liable to Assignee for any past due rental payments or other charges Assignee is required to pay Lessor to effectuate the assignment this document contemplates.

Assignor agrees that it will not suffer or permit any surrender, termination, amendment or modification of the Lease without Assignee's prior written consent. Throughout the term of the Franchise Agreement Assignor agrees that it will elect and exercise all options to extend the term of or renew the Lease not less than thirty (30) days before the last day upon which the option must be exercised unless Assignee agrees otherwise in writing. Upon Assignee's failure to agree otherwise in writing and upon Assignor's failure to elect to extend or renew the Lease as required Assignor appoints Assignee as its true and lawful attorney-in-fact with the authority to exercise the extension or renewal options in the name, place and stead of Assignor for the sole purpose of effecting the extension or renewal.

ASSIGNEE:                                             ASSIGNOR:
CRAVE FRANCHISING, LLC                      _____


By:_____      By:_____
Name:_____      Name:_____
Title:_____      Title:_____
Date:_____      Date:_____

**CONSENT TO COLLATERAL ASSIGNMENT AND AGREEMENT OF LESSOR**

The undersigned Lessor under the Lease:

(a)     Agrees to notify Assignee in writing of and upon Assignor's failure to cure any default by Assignor under the Lease;

(b)     Agrees that Assignee will have the right, but not the obligation, to cure any default by Assignor under the Lease within thirty (30) days after Lessor's delivery of notice of the default under section (a) above;

(c)     Consents to the Collateral Assignment and agrees that if Assignee takes possession of the premises the Lease demises and confirms to Lessor that it has assumed the Lease as tenant, Lessor will recognize Assignee as tenant under the Lease, provided that Assignee cures within the thirty (30) day period noted in section (b) above Assignor's defaults under the Lease; and

(d)     Agrees that Assignee may further assign the Lease to or enter into a sublease with a person, firm or corporation who agrees to assume the tenant's obligations under the Lease and is reasonably acceptable to Lessor and that upon that assignment Assignee will have no further liability or obligation under the Lease as assignee, tenant or otherwise, other than to certify that the additional assignee or sublessee operates the premises the Lease demises as a Crave restaurant.

Dated:_____

_____

_____, Lessor

**ATTACHMENT 3 TO THE FRANCHISE AGREEMENT**

**STATEMENT OF OWNERSHIP INTERESTS IN FRANCHISEE/ENTITY**

**Name**                                                  **Percentage of Ownership**

**ATTACHMENT 4 TO THE FRANCHISE AGREEMENT**

**CONFIDENTIALITY AND NON-COMPETITION AGREEMENT**
**(for trained employees and others with access to Franchisor's confidential information)**

        In consideration of my being a _____ of _____ ("Franchisee"), and other good and valuable consideration, the receipt and sufficiency of which is acknowledged, I hereby acknowledge and agree that:

        1.        Pursuant to a Franchise Agreement dated _____ (the "Franchise Agreement"), Franchisee has acquired the right and franchise from CRAVE Franchising, LLC (the "Company") to establish and operate a Crave business (the "Franchised Business") and the right to use in the operation of the Franchised Business the Company's trade names, service marks, trademarks, logos, emblems, and indicia of origin (the "Proprietary Marks"), as they may be changed, improved and further developed from time to time in the Company's sole discretion, only at the following authorized and Accepted Location: _____ (the "Accepted Location").

        2.        The Company, as the result of the expenditure of time, skill, effort and resources has developed and owns a distinctive format and system (the "System") relating to the establishment and operation of Franchised Businesses offering hot dogs, other cased meats, barbeque items, beverages, appetizers and side dishes.  The Company possesses certain proprietary and confidential information relating to the operation of the System, which includes certain proprietary trade secrets, recipes, methods, techniques, formats, specifications, systems, procedures, methods of business practices and management, sales and promotional techniques and knowledge of, and experience in, the operation of the Franchised Business (the "Confidential Information").

        3.        Any and all information, knowledge, know-how, and techniques which the Company specifically designates as confidential shall be deemed to be Confidential Information for purposes of this Agreement.

        4.        As _____ of the Franchisee, the Company and Franchisee will disclose the Confidential Information to me in furnishing to me training programs, the Company's Confidential Operations Manual (the "Manual"), and other general assistance during the term of the Franchise Agreement.

        5.        I will not acquire any interest in the Confidential Information, other than the right to utilize it in the operation of the Franchised Business during the term of the Franchise Agreement, and the use or duplication of the Confidential Information for any use outside the System would constitute an unfair method of competition.

        6.        The Confidential Information is proprietary, involves trade secrets of the Company, and is disclosed to me solely on the condition that I agree, and I do hereby agree, that I shall hold in strict confidence all Confidential Information and all other information designated by the Company as confidential.  Unless the Company otherwise agrees in writing, I will disclose and/or use the Confidential Information only in connection with my duties as _____ of the Franchisee, and will continue not to disclose any such information even after I cease to be in that position and will not use any such information even after I cease to be in that position unless I can demonstrate that such information has become generally known or easily accessible other than by the breach of an obligation of Franchisee under the Franchise Agreement.

7.      Except as otherwise approved in writing by the Company, I shall not, while in my position with the Franchisee, either directly or indirectly for myself, or through, on behalf of, or in conjunction with any person, persons, partnership, or corporation, own, maintain, operate, engage in, act as a consultant for, perform services for, or have any interest in any food service business which:  (a) is the same as, or substantially similar to, a Franchised Business; or (b) offers to sell or sells any products or services which are the same as, or substantially similar to, any of the products offered by a Franchised Business (a "Competitive Business"); and for a continuous uninterrupted period commencing upon the cessation or termination of my position with Franchisee, regardless of the cause for termination, or upon the expiration, termination, transfer, or assignment of the Franchise Agreement, whichever occurs first, and continuing for two (2) years thereafter, either directly or indirectly, for myself, or through, on behalf of, or in conjunction with any person, persons, partnership, or corporation, own, maintain, operate, engage in, act as a consultant for, perform services for, or have any interest in any Competitive Business that is, or is intended to be, located at or within:

        7.1     Franchisee's Designated Territory, as defined in the Franchise Agreement ("Franchisee's Designated Territory");

        7.2     Twenty (20) miles of Franchisee's Designated Territory; or

        7.3     Twenty (20) miles of any Franchised Business operating under the System and the Proprietary Marks.

        The prohibitions in this Paragraph 7 do not apply to my interests in or activities performed in connection with a Franchised Business.  This restriction does not apply to my ownership of less than five percent (5%) beneficial interest in the outstanding securities of any publicly held company.

8.      I agree that each of the foregoing covenants shall be construed as independent of any other covenant or provision of this Agreement.  If all or any portion of a covenant in this Agreement is held unreasonable or unenforceable by a court or agency having valid jurisdiction in an unappealed final decision to which the Company is a party, I expressly agree to be bound by any lesser covenant subsumed within the terms of such covenant that imposes the maximum duty permitted by law, as if the resulting covenant were separately stated in and made a part of this Agreement.

9.      I understand and acknowledge that the Company shall have the right, in its sole discretion, to reduce the scope of any covenant set forth in this Agreement, or any portion thereof, without my consent, effective immediately upon receipt by me of written notice thereof; and I agree to comply forthwith with any covenant as so modified.

10.     The Company is a third-party beneficiary of this Agreement and may enforce it, solely and/or jointly with the Franchisee.  I am aware that my violation of this Agreement will cause the Company and the Franchisee irreparable harm; therefore, I acknowledge and agree that the Franchisee and/or the Company may apply for the issuance of an injunction preventing me from violating this Agreement, and I agree to pay the Franchisee and the Company all the costs it/they incur(s), including, without limitation, legal fees and expenses, if this Agreement is enforced against me.  Due to the importance of this Agreement to the Franchisee and the Company, any claim I have against the Franchisee or the Company is a separate matter and does not entitle me to violate or justify any violation of this Agreement.

11.     This Agreement shall be construed under the laws of the State of Delaware, without regard to the application of state conflict of law rules.  The only way this Agreement can be changed is in writing signed by both the Franchisee and me.

_____

Signature

_____

Name

_____

Address

_____

Title

**ACKNOWLEDGED BY FRANCHISEE**

By:_____
Name:_____
Title:_____

**ATTACHMENT 5 TO THE FRANCHISE AGREEMENT**
**ELECTRONIC TRANSFER AUTHORIZATION**

**AUTHORIZATION TO HONOR CHARGES DRAWN BY AND**
**PAYABLE TO CRAVE FRANCHISING, LLC ("COMPANY")**

Depositor hereby authorizes and requests _____ (the "Depository") to initiate debit and credit entries to Depositor's ☐ checking or ☐ savings account (select one) indicated below drawn by and payable to the order of Company by Electronic Funds Transfer, provided there are sufficient funds in said account to pay the amount upon presentation.

Depositor agrees that the Depository's rights with respect to each such charge shall be the same as if it were a check drawn by the Depository and signed by Depositor. Depositor further agrees that if any such charge is dishonored, whether with or without cause and whether intentionally or inadvertently, the Depository shall be under no liability whatsoever.

Depository Name:_____

City:_____     State:_____     Zip Code:_____

Transit/ABA Number:_____     Account Number:_____

This authority is to remain in full force and effect until Company has received written notification from me (or either of us) of its termination in such time and in such manner to afford Company and Depository a responsible opportunity to act on such request.

Depositor:  (Please Print)

_____

_____

_____
Date Signed

_____

_____
Signature(s) of Depositor, as Printed Above

**Please attach a voided blank check, for purposes of setting up Bank and Transit Numbers.**

**ATTACHMENT 6 TO THE FRANCHISE AGREEMENT**

**INTERNET ADVERTISING, SOCIAL MEDIA AND**
<u>**TELEPHONE ACCOUNT AGREEMENT**</u>

   **THIS INTERNET ADVERTISING, SOCIAL MEDIA AND TELEPHONE ACCOUNT AGREEMENT** (the "Agreement") is made and entered into this day of _____ (the "Effective Date") by and between CRAVE Franchising, LLC, a Wyoming limited liability company (the "Franchisor"), and _____, a _____ (the "Franchisee").

   **WHEREAS**, Franchisee desires to enter into a franchise agreement with Franchisor for a CRAVE business ("Franchise Agreement") which will allow Franchisee to conduct internet-based advertising, maintain social media accounts, and use telephone listings linked to the CRAVE brand.

   **WHEREAS**, Franchisor would not enter into the Franchise Agreement without Franchisee's agreement to enter into, comply with, and be bound by all the terms and provisions of this Agreement;

   **NOW, THEREFORE**, for and in consideration of the foregoing and the mutual promises and covenants contained herein, and in further consideration of the Franchise Agreement and the mutual promises and covenants contained therein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.  <u>**Definitions**</u>

   All terms used but not otherwise defined in this Agreement shall have the meanings set forth in the Franchise Agreement.  "Termination" of the Franchise Agreement shall include, but shall not be limited to, the voluntary termination, involuntary termination, or natural expiration thereof.

2.  <u>**Internet Advertising and Telephone Accounts**</u>

   2.1  <u>Interest in Websites, Social Media Accounts and Other Electronic Listings</u>.  Franchisee may acquire (whether in accordance with or in violation of the Franchise Agreement) during the term of Franchise Agreement, certain right, title, or interest in and to certain domain names, social media accounts, hypertext markup language, uniform resource locator addresses, access to corresponding internet websites, and the right to hyperlink to certain websites and listings on various internet search engines (collectively, "Electronic Advertising") related to the Franchised Business or the Marks.

   2.2  <u>Interest in Telephone Numbers and Listings</u>.  Franchisee has or will acquire during the term of the Franchise Agreement, certain right, title, and interest in and to those certain telephone numbers and regular, classified, internet page, and other telephone directory listings (collectively, the "Telephone Listings") related to the Franchised Business or the Marks.

   2.3  <u>Transfer</u>.  On Termination of the Franchise Agreement, or on periodic request of Franchisor, Franchisee will immediately:

     2.3.1  direct all internet service providers, domain name registries, internet search engines, social media companies, and other listing agencies (collectively, the "Internet Companies") with which Franchisee has Electronic Advertising: (i) to transfer all of Franchisee's interest in such Electronic Advertising to Franchisor; and (ii) to execute such documents and take such actions as may be necessary to effectuate such transfer.  In the event Franchisor does not desire to accept any or all such Electronic Advertising, Franchisee will immediately direct the Internet Companies to terminate such Electronic

Advertising or will take such other actions with respect to the Electronic Advertising as Franchisor directs; and

2.3.2    direct all telephone companies, telephone directory publishers, and telephone directory listing agencies (collectively, the "Telephone Companies") with which Franchisee has Telephone Listings: (i) to transfer all Franchisee's interest in such Telephone Listings to Franchisor; and (ii) to execute such documents and take such actions as may be necessary to effectuate such transfer.  In the event Franchisor does not desire to accept any or all such Telephone Listings, Franchisee will immediately direct the Telephone Companies to terminate such Telephone Listings or will take such other actions with respect to the Telephone Listings as Franchisor directs.

2.4    <u>Appointment; Power of Attorney</u>.  Franchisee hereby constitutes and appoints Franchisor and any officer or agent of Franchisor, for Franchisor's benefit under the Franchise Agreement and this Agreement or otherwise, with full power of substitution, as Franchisee's true and lawful attorney-in-fact with full power and authority in Franchisee's place and stead, and in Franchisee's name or the name of any affiliated person or affiliated company of Franchisee, to take any and all appropriate action and to execute and deliver any and all documents that may be necessary or desirable to accomplish the purposes of this Agreement.  Franchisee further agrees that this appointment constitutes a power coupled with an interest and is irrevocable until Franchisee has satisfied all of its obligations under the Franchise Agreement and any and all other agreements to which Franchisee and any of its affiliates on the one hand, and Franchisor and any of its affiliates on the other, are parties, including without limitation this Agreement.  Without limiting the generality of the foregoing, Franchisee hereby grants to Franchisor the power and right to do the following:

2.4.1    Direct the Internet Companies to transfer all Franchisee's interest in and to the Electronic Advertising to Franchisor, or alternatively, to direct the Internet Companies to terminate any or all of the Electronic Advertising;

2.4.2    Direct the Telephone Companies to transfer all Franchisee's interest in and to the Telephone Listings to Franchisor, or alternatively, to direct the Telephone Companies to terminate any or all of the Telephone Listings; and

2.4.3    Execute such standard assignment forms or other documents as the Internet Companies and/or Telephone Companies may require in order to affect such transfers or terminations of Franchisee's interest.

2.5    <u>Certification of Termination</u>.  Franchisee hereby directs the Internet Companies and Telephone Companies to accept, as conclusive proof of Termination of the Franchise Agreement, Franchisor's written statement, signed by an officer or agent of Franchisor, that the Franchise Agreement has terminated.

2.6    <u>Cessation of Obligations</u>.  After the Internet Companies and the Telephone Companies have duly transferred all Franchisee's interests as described in paragraph 2.3 above to Franchisor, as between Franchisee and Franchisor, Franchisee will have no further interest in, or obligations with respect to the particular Electronic Advertising and/or Telephone Listings.  Notwithstanding the foregoing, Franchisee will remain liable to each and all of the Internet Companies and Telephone Companies for the respective sums Franchisee is obligated to pay to them for obligations Franchisee incurred before the date Franchisor duly accepted the transfer of such interests, or for any other obligations not subject to the Franchise Agreement or this Agreement.

3.      **Miscellaneous**

    3.1      <u>Release</u>.  Franchisee hereby releases, remises, acquits, and forever discharges each and all of the Internet Companies and/or Telephone Companies and each and all of their parent corporations, subsidiaries, affiliates, directors, officers, stockholders, employees, and agents, and the successors and assigns of any of them, from any and all rights, demands, claims, damage, losses, costs, expenses, actions, and causes of action whatsoever, whether in tort or in contract, at law or in equity, known or unknown, contingent or fixed, suspected or unsuspected, arising out of, asserted in, assertible in, or in any way related to this Agreement.

    3.2      <u>Indemnification</u>.  Franchisee is solely responsible for all costs and expenses related to its performance, its nonperformance, and Franchisor's enforcement of this Agreement, which costs and expenses Franchisee will pay Franchisor in full, without defense or setoff, on demand.  Franchisee agrees that it will indemnify, defend, and hold harmless Franchisor and its affiliates, and its and their directors, officers, shareholders, partners, members, employees, agents, and attorneys, and the successors and assigns of any and all of them, from and against, and will reimburse Franchisor and any and all of them for, any and all loss, losses, damage, damages, claims, debts, claims, demands, or obligations that are related to or are based on this Agreement.

    3.3      <u>No Duty</u>.  The powers conferred on Franchisor hereunder are solely to protect Franchisor's interests and shall not impose any duty on Franchisor to exercise any such powers.  Franchisee expressly agrees that in no event shall Franchisor be obligated to accept the transfer of any or all of Franchisee's interest in any matter hereunder.

    3.4      <u>Further Assurances</u>.  Franchisee agrees that at any time after the date of this Agreement, Franchisee will perform such acts and execute and deliver such documents as may be necessary to assist in or accomplish the purposes of this Agreement.

    3.5      <u>Successors, Assigns, and Affiliates</u>.  All Franchisor's rights and powers, and all Franchisee's obligations, under this Agreement shall be binding on Franchisee's successors, assigns, and affiliated persons or entities as if they had duly executed this Agreement.

    3.6      <u>Effect on Other Agreements</u>.  Except as otherwise provided in this Agreement, all provisions of the Franchise Agreement and attachments and schedules thereto shall remain in effect as set forth therein.

    3.7      <u>Survival</u>.  This Agreement shall survive the Termination of the Franchise Agreement.

    3.8      <u>Governing Law</u>.  This Agreement shall be governed by and construed under the laws of the State of Delaware, without regard to the application of Delaware conflict of law rules.

-Remainder of Page Intentionally Blank-

The undersigned have executed or caused their duly authorized representatives to execute this Agreement as of the Effective Date.

FRANCHISEE:                                                  FRANCHISOR:
                                                             CRAVE FRANCHISING, LLC
_____

By:_____          By:_____
Name:_____          Name:_____
Title:_____          Title:_____

PRINCIPALS:


_____
Name:_____


_____
Name:_____

## ATTACHMENT 7 TO THE FRANCHISE AGREEMENT

## FRANCHISEE ACKNOWLEDGMENT STATEMENT

You hereby acknowledge the following:

1.      You have conducted an independent investigation of all aspects relating to the financial, operational and other aspects of the business of operating the Franchised Business.  You further acknowledge that, except as may be set forth in our Disclosure Document, no representations of performance (financial or otherwise) for the Franchised Business provided for in this Agreement has been made to you by us and you and any and all Principals hereby waive any claim against us for any business failure you may experience as a franchisee under this Agreement.

_____
Initial

2.      You have conducted an independent investigation of the business contemplated by this Agreement and understand and acknowledge that the business contemplated by this Agreement involves business risks making the success of the venture largely dependent upon the business abilities and participation of you and your efforts as an independent business operation.

_____
Initial

3.      You agree that no claims of success or failure have been made to you prior to signing the Franchise Agreement and that you understand all the terms and conditions of the Franchise Agreement.  You further acknowledge that the Franchise Agreement contains all oral and written agreements, representations and arrangements between the parties hereto, and any rights which the respective parties hereto may have had under any other previous contracts are hereby cancelled and terminated, and that this Agreement cannot be changed or terminated orally.

_____
Initial

4.      You have no knowledge of any representations by us or our officers, directors, shareholders, employees, sales representatives, agents or servants, about the business contemplated by the Franchise Agreement that are contrary to the terms of the Franchise Agreement or the documents incorporated herein.  You acknowledge that no representations or warranties are made or implied, except as specifically set forth in the Franchise Agreement.  You represent, as an inducement to our entry into this Agreement, that you have made no misrepresentations in obtaining the Franchise Agreement.

_____
Initial

5.      You expressly disclaim the making of, and you acknowledge that you have not received or relied upon, any warranty or guarantee, express or implied, as to the potential volume, profits or success of the business venture contemplated by the Franchise Agreement.

                                                                                  _____
                                                                                  Initial

6.      You acknowledge that our approval or acceptance of your Franchised Business' location does not constitute a warranty, recommendation or endorsement of the location for the Franchised Business, nor any assurance by us that the operation of the Franchised Business at the premises will be successful or profitable.

                                                                                  _____
                                                                                  Initial

7.      You acknowledge that you have received the CRAVE Franchising, LLC Franchise Disclosure Document with a complete copy of the Franchise Agreement and all related Attachments and agreements at least fourteen (14) calendar days prior to the date on which the Franchise Agreement was executed.  You further acknowledge that you have read such Franchise Disclosure Document and understand its contents.

                                                                                  _____
                                                                                  Initial

8.      You acknowledge that you have had ample opportunity to consult with your own attorneys, accountants and other advisors and that the attorneys for us have not advised or represented you with respect to the Franchise Agreement or the relationship thereby created.

                                                                                  _____
                                                                                  Initial

9.      You, together with your advisers, have sufficient knowledge and experience in financial and business matters to make an informed investment decision with respect to the Franchise granted by the Franchise Agreement.

                                                                                  _____
                                                                                  Initial

10.     You are aware of the fact that other present or future franchisees of ours may operate under different forms of agreement(s), and consequently that our obligations and rights with respect to our various franchisees may differ materially in certain circumstances.

                                                                                  _____
                                                                                  Initial

11.   It is recognized by the parties that we are also (or may become) a manufacturer or distributor of certain products under the Marks licensed herein; and it is understood that we do not warrant that such products will not be sold within your Designated Territory by others who may have purchased such products from us.

_____<br>
Initial

12.   BY EXECUTING THE FRANCHISE AGREEMENT, YOU AND ANY PRINCIPAL, INDIVIDUALLY AND ON BEHALF OF YOUR AND SUCH PRINCIPAL'S HEIRS, LEGAL REPRESENTATIVES, SUCCESSORS AND ASSIGNS, HEREBY FOREVER RELEASE AND DISCHARGE CRAVE FRANCHISING, LLC, RINCIONE INVESTMENTS LLC AND ANY OF THE ABOVE'S PARENT COMPANY, SUBSIDIARIES, DIVISIONS, AFFILIATES, SUCCESSORS, ASSIGNS AND DESIGNEES, AND THE FOREGOING ENTITIES' DIRECTORS, OFFICERS, EMPLOYEES, AGENTS, SHAREHOLDERS, SUCCESSORS, DESIGNEES AND REPRESENTATIVES FROM ANY AND ALL CLAIMS, DEMANDS AND JUDGMENTS RELATING TO OR ARISING UNDER THE STATEMENTS, CONDUCT, CLAIMS OR ANY OTHER AGREEMENT BETWEEN THE PARTIES EXECUTED PRIOR TO THE DATE OF THE FRANCHISE AGREEMENT, INCLUDING, BUT NOT LIMITED TO, ANY AND ALL CLAIMS, WHETHER PRESENTLY KNOWN OR UNKNOWN, SUSPECTED OR UNSUSPECTED, ARISING UNDER THE FRANCHISE, SECURITIES, TAX OR ANTITRUST LAWS OF THE UNITED STATES OR OF ANY STATE OR TERRITORY THEREOF.

_____<br>
Initial

Acknowledged this day of _____.

PRINCIPAL:                                          FRANCHISEE:

                                                    _____

_____<br>
*Signature*                                         By:_____<br>
Name:_____                       Name:_____<br>
                                                    Title:_____

**ATTACHMENT 8 TO THE FRANCHISE AGREEMENT**

**AMERICANS WITH DISABILITIES ACT CERTIFICATION**

      CRAVE Franchising, LLC ("Franchisor") and _____ ("Franchisee") are parties to a Franchise Agreement dated _____, for the operation of a Crave restaurant at _____ (the "Franchised Business").  In accordance with Article 2 of the Franchise Agreement, Franchisee certifies to Franchisor that, to the best of Franchisee's knowledge, the Franchised Business and its adjacent areas comply with all applicable federal, state and local accessibility laws, statutes, codes, rules, regulations and standards, including but not limited to the Americans with Disabilities Act.  Franchisee acknowledges that it is an independent contractor and the requirement of this certification by Franchisee does not constitute ownership, control, leasing or operation of the Franchised Business.  Franchisee acknowledges that Franchisee has relied on the information contained in this certification.  Furthermore, Franchisee acknowledge its obligation under this Franchise Agreement to indemnify Franchisor and the officers, directors, and employees of Franchisor in connection with any and all claims, losses, costs, expenses, liabilities, compliance costs, and damages incurred by the indemnified party(ies) as a result of any matters associated with Franchisee's compliance with the Americans with Disabilities Act, as well as the costs, including attorneys' fees, related to the same.

 

**FRANCHISEE**

_____

By:_____
Name:_____
Title:_____

## ATTACHMENT 9 TO THE FRANCHISE AGREEMENT

## <u>SPOUSAL GUARANTY</u>

This Guaranty and Covenant (this "Guaranty") is given by the undersigned ("Guarantor") on \_\_\_\_ _____ (the "Effective Date"), to CRAVE Franchising, LLC, a Wyoming limited liability company ("Franchisor"), in order to induce Franchisor to enter into that certain Franchise Agreement dated on or about the Effective Date hereof (the "Franchisee Agreement") with _____ \_\_\_\_\_ _____, a(n) _____, \_\_\_\_\_ _____ and _____(collectively "Franchisee").

Guarantor acknowledges that Guarantor is the spouse of Franchisee's Principal, as that term is used in the Franchise Agreement.

Guarantor acknowledges that Guarantor has read the terms and conditions of the Franchise Agreement and acknowledges that the execution of this Guaranty is in partial consideration for, and a condition to the granting of, the rights granted in the Franchise Agreement to Franchisee, and that Franchisor would not have granted these rights without the execution of this Guaranty by Guarantor.

Guarantor hereby individually makes, agrees to be bound by, and agrees to perform, all of the monetary obligations and non-competition covenants and agreements of the Franchisee as set forth in the Franchise Agreement, including but not limited to, the covenants set forth in Article 10 of the Franchise Agreement ("Guaranteed Obligations"). Guarantor shall perform and/or make punctual payment to Franchisor of the Guaranteed Obligations in accordance with the terms of the Franchise Agreement or other applicable document forthwith upon demand by Franchisor.

This Guaranty is an absolute and unconditional continuing guaranty of payment and performance of the Guaranteed Obligations. This Guaranty shall not be discharged by renewal of any claims guaranteed by this instrument, change in ownership or control of the Franchisee entity, transfer of the Franchise Agreement, the suffering of any indulgence to any debtor, extension of time of payment thereof, nor the discharge of Franchisee by bankruptcy, operation of law or otherwise. Presentment, demand, protest, notice of protest and dishonor, notice of default or nonpayment and diligence in collecting any obligation under any agreement between Franchisee and Franchisor are each and all waived by Guarantor and/or acknowledged as inapplicable. Guarantor waives notice of amendment of any agreement between Franchisee and Franchisor and notice of demand for payment by Franchisee. Guarantor further agrees to be bound by any and all amendments and changes to any agreement between Franchisee and Franchisor.

Franchisor may pursue its rights against Guarantor without first exhausting its remedies against Franchisee and without joining any other guarantor hereto and no delay on the part of Franchisor in the exercise of any right or remedy shall operate as a waiver of such right or remedy, and no single or partial exercise by Franchisor of any right or remedy shall preclude the further exercise of such right or remedy.

If other guarantors have guaranteed any and or all of the Guaranteed Obligations, their liability shall be joint and several to that of Guarantor.

Until all of the Guaranteed Obligations have been paid in full and/or performed in full, Guarantor shall not have any right of subrogation, unless expressly given to Guarantor in writing by Franchisor.

All Franchisor's rights, powers and remedies hereunder and under any other agreement now or at any time hereafter in force between Franchisor and Guarantor shall be cumulative and not alternative and shall be in addition to all rights, powers and remedies given to Franchisor by law.

Should any one or more provisions of this Guaranty be determined to be illegal or unenforceable, all other provisions nevertheless shall remain effective.

This Guaranty shall extend to and inure to the benefit of Franchisor and its successors and assigns and shall be binding on Guarantor and its successors and assigns.

Guarantor has signed this Guaranty as of the date set forth above.

GUARANTOR - SPOUSE OF FRANCHISEE'S PRINCIPAL:

_____
*Signature*
Name:_____
Address:_____
_____
_____

**Exhibit B-2 to the**
**Crave Franchise Disclosure Document**

## **FOOD TRUCK ADDENDUM**

## ADDENDUM TO THE CRAVE FRANCHISING, LLC
## FRANCHISE AGREEMENT

This Addendum (the "Addendum') is being entered into this day of _____ _____, (the "Effective Date") by and between CRAVE Franchising, LLC, a Wyoming limited liability company, with its principal address at Herschler Building East, Suite 101, 122 West 25th Street, Cheyenne, Wyoming, 82002-0020 ("Franchisor", "we", "our", or "us") and _____, a(n) _____ _____, with its principal place of business located at _____ _____ and _____'s principals _____, an individual residing at _____, and _____, an individual residing at _____ ("Principal(s)"). _____ _____ and Principal(s) shall be collectively referred to in this Addendum as "Franchisee", "you", or "your".

### RECITALS

**WHEREAS**, Franchisor and Franchisee are parties to a franchise agreement of even date herewith which grants Franchisee the rights to establish a Crave® franchise in accordance with said agreement (the "Franchise Agreement");

**WHEREAS**, Franchisee elects, with Franchisor's consent, to operate Franchisee's Franchised Business at and from a food truck ("Food Truck"); and

**WHEREAS**, Franchisor and Franchisee desire to amend the Franchise Agreement as set forth herein.

**NOW, THEREFORE**, in consideration of the mutual promises contained in the Franchise Agreement and this Addendum, and for good and valuable considerations in hand paid by each of the parties to the others, the receipt and sufficiency of which the parties acknowledge, the parties agree as follows:

1.     Section 2.2 of the Franchise Agreement is hereby deleted in its entirety and replaced with the following:

"**2.2**     **Site Selection**.  You must obtain our acceptance of the municipality in which your Food Truck will operate before you begin operations.  Once the municipality for your Food Truck has been accepted by us, we shall designate your Designated Territory pursuant to Section 1.4.  In the event you are unable to locate a suitable municipality within ninety (90) days following the execution of this Agreement, we may provide an extension of this timeframe or we may terminate this Agreement."

2.     The second sentence of Section 2.3 of the Franchise Agreement is hereby amended to replace "Prior to beginning the construction and/or improvement of the Franchised Business premises," with "Prior to beginning the installation, equipping and/or outfitting of the Food Truck".

3.     Section 2.5 of the Franchise Agreement is hereby deleted in its entirety and replaced with the following:

"**2.5**     **Build-Out of Food Truck**.  You shall purchase and/or finance your Food Truck only from our sole approved supplier.  You are

required to provide a down payment of ten percent (10%) at minimum to the sole approved supplier before the build-out will commence on your Food Truck.  The Food Truck will be delivered to you upon completion of the build-out, which should be completed within twelve (12) weeks and shall be fully outfitted with all equipment and signage as approved and required by us."

4.      Section 2.6 of the Franchise Agreement is hereby deleted in its entirety and replaced with the following:

> "**2.6      Opening Date; Time is of the Essence**.  You acknowledge that time is of the essence.  Subject to your compliance with the conditions stated below, you shall commence operations of the Food Truck business not later than six (6) months after the Effective Date.  The date the Franchised Business actually opens for business to the public is herein called the "Opening Date".  Prior to commencing operations, you shall have taken delivery of your fully equipped Food Truck and shall have complied with all of your other pre-opening obligations, including, but not limited to, those obligations described in Sections 6.2 through 6.7, to our reasonable satisfaction.  If you fail to reasonably comply with any of such obligations, except for delay caused by a force majeure event as described in Section 17.1.3(e), we shall have the right to prohibit you from commencing business.  If you are unable to commence operations of your Food Truck business within the timeframe required herein, we may provide you with an extension of this timeframe or we may terminate this Agreement."

5.      Sections 4.3 and 8.3, including all subsections, of the Franchise Agreement are hereby deleted in their entireties.  Franchisee has no obligation to pay a Brand Development Fee.

6.      Section 8.2 of the Franchise Agreement is hereby amended to replace "one percent (1%)" with "two percent (2%)".

7.      Section 14.8, including all subsections, of the Franchise Agreement are hereby amended to include the Food Truck as part of the assets of the Franchised Business that Franchisor is entitled to purchase, in accordance with the remaining provisions of this Section and all subsections.

8.      The second sentence of Section 16.2 of the Franchise Agreement is hereby amended to replace "Franchised Business premises" with "Food Truck".

9.      Section 18.12, including all subsections, of the Franchise Agreement are hereby amended to include the Food Truck as part of the assets of the Franchised Business that Franchisor is entitled to purchase, in accordance with the remaining provisions of this Section and all subsections.

10.     In addition to all other obligations to comply with System standards, Franchisee shall, at Franchisee's sole expense:

> (i)      maintain and repair the Food Truck, to ensure that the Food Truck remains in good working order and condition.  Franchisee, at Franchisee's sole expense, shall cause the Food Truck to be regularly serviced in accordance with

any warranty and manufacturer's guidelines.  Franchisee shall provide Franchisor with copies of all maintenance and repair records and invoices upon request;

(ii)     maintain the exterior of the Food Truck in clean and good appearance.  Franchisee shall promptly repair all scratches and dents and shall have the Food Truck professionally washed no less than one (1) time per week; and

(iii)    file all required state registration and inspection reports for the Food Truck.  Franchisee shall submit the Food Truck for annual vehicle inspection, as required by state law, and submit such reports to Franchisor.  Franchisee shall pay all registration and inspections fees.

Except as specifically amended hereby, all provisions of the Franchise Agreement remain in full force and effect.


The parties hereto have duly signed and executed this Addendum to the Crave Franchising, LLC, Franchise Agreement as of the day and year first above written.


FRANCHISEE:                                          FRANCHISOR:
_____                            CRAVE FRANCHISING, LLC


By:_____                           By:_____
Name:_____                           Name:_____
Title:_____                         Title:_____


PRINCIPALS:


_____
Name:_____


_____
Name:_____

CRAVE/Food Truck Addendum-FA

**Exhibit C to the**
**Crave Franchise Disclosure Document**

**<u>MULTI-UNIT DEVELOPMENT AGREEMENT</u>**

**CRAVE FRANCHISING, LLC**

**MULTI-UNIT DEVELOPMENT AGREEMENT**

_____

**MULTI-UNIT DEVELOPER**

_____

**DATE OF AGREEMENT**

## TABLE OF CONTENTS

**SECTION 1**.............................................................................................................................................**1**

   GRANT .....................................................................................................................................................1

**SECTION 2**.............................................................................................................................................**2**

   DEVELOPMENT FEE; INITIAL FRANCHISE FEES .........................................................................2

**SECTION 3**.............................................................................................................................................**3**

   SCHEDULE AND MANNER FOR EXERCISING DEVELOPMENT RIGHTS ....................................3

**SECTION 4**.............................................................................................................................................**3**

   DEVELOPMENT RIGHTS AND OBLIGATIONS ...............................................................................3

**SECTION 5**.............................................................................................................................................**4**

   RENEWAL ...............................................................................................................................................4

**SECTION 6**.............................................................................................................................................**5**

   TERM AND RIGHT OF FIRST REFUSAL ..........................................................................................5

**SECTION 7**.............................................................................................................................................**5**

   YOUR OBLIGATIONS ...........................................................................................................................5

**SECTION 8**.............................................................................................................................................**6**

   OUR SERVICES .....................................................................................................................................6

**SECTION 9**.............................................................................................................................................**7**

   DEFAULT AND TERMINATION ..........................................................................................................7

**SECTION 10**...........................................................................................................................................**8**

   OBLIGATIONS FOLLOWING TERMINATION ..................................................................................8

**SECTION 11**...........................................................................................................................................**9**

   TRANSFER OF INTEREST ...................................................................................................................9

**SECTION 12**.........................................................................................................................................**11**

   COVENANTS .......................................................................................................................................11

**SECTION 13**.........................................................................................................................................**12**

   NOTICES ..............................................................................................................................................12

**SECTION 14**.........................................................................................................................................**13**

   INDEPENDENT CONTRACTOR AND INDEMNIFICATION ..........................................................13

**SECTION 15**.........................................................................................................................................**14**

   APPROVALS ........................................................................................................................................14

**SECTION 16**.........................................................................................................................................**14**

   NON-WAIVER ......................................................................................................................................14

**SECTION 17**.........................................................................................................................................**14**

SEVERABILITY AND CONSTRUCTION ........................................................................................... 14

**SECTION 18** ........................................................................................................................................ **15**

ENTIRE AGREEMENT .................................................................................................................... 15

**SECTION 19** ........................................................................................................................................ **15**

DISPUTE RESOLUTION; APPLICABLE LAW ............................................................................. 15

**SECTION 20** ........................................................................................................................................ **16**

TIMELY PERFORMANCE ............................................................................................................. 16

**SECTION 21** ........................................................................................................................................ **17**

ACKNOWLEDGMENTS .................................................................................................................. 17

**SECTION 22** ........................................................................................................................................ **17**

EFFECTIVE DATE ........................................................................................................................... 17

ATTACHMENTS:

| | |
|---|---|
| 1 | Acknowledgments by Multi-Unit Developer |
| 2 | Minimum Performance Schedule |
| 3 | Development Area |

## CRAVE FRANCHISING, LLC

## MULTI-UNIT DEVELOPMENT AGREEMENT

      **THIS MULTI-UNIT DEVELOPMENT AGREEMENT** ("Agreement") is made and entered into this day of _____, between CRAVE Franchising, LLC, a Wyoming limited liability company, having its principal place of business at Herschler Building East, Suite 101, 122 West 25th Street, Cheyenne, Wyoming, 82002-0020 ("we", "us" or "our"), and _____ _____, an individual residing at _____ (hereinafter "you" or "your").

## W I T N E S S E T H :

      **WHEREAS**, as the result of the expenditure of time, skill, effort and money, we and our affiliate have developed and own a unique and distinctive system (hereinafter "System") relating to the establishment and operation of a quick-serve restaurant ("Restaurant") or food truck ("Food Truck") offering hot dogs, other cased meats, barbeque items, beer, wine and other beverages, appetizers and side dishes ("Franchised Business"), provided on a dine-in, take-out, catering and delivery basis;

      **WHEREAS**, the distinguishing characteristics of the System include, without limitation, distinctive exterior and interior design, décor, color scheme, and furnishings; proprietary products and ingredients; proprietary recipes and special menu items; uniform standards, specifications, and procedures for operations; quality and uniformity of products and services offered; procedures for inventory, management and financial control; training and assistance; and advertising and promotional programs; all of which may be changed, improved, and further developed by us from time to time;

      **WHEREAS**, the System is identified by means of certain trade names, service marks, trademarks, logos, emblems and indicia of origin, including, but not limited to, the mark "Crave" and such other trade names, service marks, and trademarks as are now designated (and may hereafter be designated by us in writing) for use in connection with the System (hereinafter referred to as "Marks" or "Proprietary Marks");

      **WHEREAS**, we and our affiliate continue to develop, use and control the use of such Marks in order to identify for the public the source of services and products marketed thereunder and under the System, and to represent the System's high standards of quality, appearance and service; and

      **WHEREAS**, you wish to obtain certain development rights to open and operate Franchised Businesses operating under the Marks and the System within the Development Area described in this Agreement.

      **NOW, THEREFORE**, the parties, in consideration of the undertakings and commitments of each party to the other party stated herein, hereby agree as follows:

## SECTION 1
## GRANT

      1.1     We hereby grant to you, pursuant to the terms and conditions of this Agreement, certain development rights ("Development Rights") to establish and operate _____ (_____) Franchised Businesses, and to use the Marks and System solely in connection therewith, at specific locations to be designated in separate Franchise Agreements executed as provided in Section 3.1 hereof, and pursuant to the schedule established in Attachment 2 of this Agreement (hereinafter "Minimum Performance

Schedule"). Each Franchised Business developed hereunder shall be located in the area described in Attachment 3 of this Agreement (hereinafter "Development Area"). The Minimum Performance Schedule shall be deemed completed, and this Agreement shall expire, upon the opening of the Franchised Business to be developed hereunder.

1.2     Each Franchised Business for which a Development Right is granted hereunder shall be established and operated pursuant to a Franchise Agreement to be entered into between you and us in accordance with Section 3.1 hereof.

1.3     Except as otherwise provided in this Agreement, we shall not establish, nor franchise anyone other than you to establish, a dedicated Crave outlet in the Development Area during the term of this Agreement, provided you are not in default hereunder.

1.4     This Agreement is not a Franchise Agreement and does not grant to you any right to use the Marks or System.

1.5     You shall have no right under this Agreement to franchise others under the Marks or System.

## SECTION 2
## DEVELOPMENT FEE; INITIAL FRANCHISE FEES

2.1     In consideration of the Development Rights granted herein, you shall pay to us a development fee of _____ Thousand Dollars ($_____), payable upon execution of this Agreement ("Development Fee"). The Development Fee is calculated as one hundred percent (100%) of the initial franchise fee for the first Franchised Business to be developed hereunder, plus a deposit equal to fifty percent (50%) of the initial franchise fee for each additional Franchised Business to be developed hereunder.

2.2     The Development Fee shall be fully earned by us upon execution of this Agreement, is not refundable, and will not be credited against any other fees you may pay to us pursuant to this Agreement or any Franchise Agreement.

2.3     The initial franchise fee payable for each Franchised Business to be developed hereunder shall be as follows:

2.3.1     For Restaurant outlets, the initial franchise fee shall be: Forty Thousand Dollars ($40,000) for the first Restaurant, Thirty-Five Thousand Dollars ($35,000) for the second and third Restaurants, and Thirty Thousand Dollars ($30,000), for the fourth and each additional Restaurant.

2.3.2     For each Food Truck outlet, the initial franchise fee shall be Twenty-Five Thousand Dollars ($25,000).

2.4     The initial franchise fee for the first Franchised Business has been paid in full in the Development Fee. You shall execute the Franchise Agreement for the first Franchised Business contemporaneously with your execution of this Agreement and a portion of the Development Fee will be used to satisfy the initial franchise fee for such first Franchised Business in full. For each additional Franchised Business developed hereunder, we will apply a credit of fifty percent (50%) of the amount of the initial franchise fee toward the amount of the initial franchise fee due for such Franchised Business. The balance of the initial franchise fee is payable to us in a lump sum upon execution of the Franchise Agreement for that Franchised Business.

## SECTION 3
## SCHEDULE AND MANNER FOR EXERCISING DEVELOPMENT RIGHTS

3.1     You shall assume all responsibility and expense for locating potential sites for Franchised Businesses and shall submit to us for our evaluation and approval, in the form specified by us, a description of the site, the terms of the lease or purchase, a market feasibility study for the site and such other information and materials as we may reasonably require, together with a letter of intent or other evidence satisfactory to us which confirms your favorable prospects for obtaining the site.  We shall have thirty (30) days after receipt of such information and materials from you to accept or decline the site in our sole discretion.  If the site is accepted, you will then be presented with the Franchise Agreement for execution.

3.2     Recognizing that time is of the essence, you agree to exercise each of the Development Rights granted hereunder in the manner specified herein, and in accordance with the Minimum Performance Schedule.  Your failure to adhere to the Minimum Performance Schedule shall constitute a default under this Agreement as provided in Section 9.1 hereof.  Under no circumstances may you open a Franchised Business for business unless and until there is a fully executed Franchise Agreement in place for such Franchised Business and we have been paid all amounts payable to us.

3.3     You shall exercise each Development Right granted herein only by executing a Franchise Agreement for each Franchised Business at a site approved by us in the Development Area as hereinafter provided within ten (10) days after receipt of said Franchise Agreement from us for the approved site and return same to us for our execution.  The Franchise Agreement for the first Development Right exercised hereunder has been executed contemporaneously with this Agreement.  The Franchise Agreement for each additional Development Right exercised hereunder shall be the then-current Franchise Agreement, subject to any non-material changes therein which are required to be made by changes in any applicable law, regulation or ordinance in effect from time to time.  In the event we do not receive the properly executed Franchise Agreement with the appropriate number of copies within said ten (10) days from delivery thereof to you, our approval of the site shall be void and you shall have no rights with respect to said site.

3.4     You acknowledge that the approval of a particular site for a Franchised Business by us shall not be deemed to be an assurance or guaranty that the Franchised Business will operate successfully or at a profit from such site.

3.5     You may enter into the initial Franchise Agreement or any subsequent Franchise Agreement as required under this Agreement using a newly formed entity, such as a limited liability company, corporation or partnership for the sole purpose of entering into a Franchise Agreement and operating the CRAVE Franchised Business pursuant thereto, provided that you shall also personally sign such Franchise Agreement as a principal.

## SECTION 4
## DEVELOPMENT RIGHTS AND OBLIGATIONS

4.1     Subject to the provisions of this Agreement, we grant to you the Development Rights, as described in Section 1.1.  Notwithstanding any other provision of this Agreement, Development Rights under this Agreement may or may not, in our sole discretion, include the right to develop Franchised Businesses at any "Non-Traditional Sites".  Non-Traditional Sites include without limitation gas stations or convenience stores; transportation facilities, including airports, train stations, subways and rail and bus stations; military bases and government offices; sports facilities, including stadiums and arenas; amusement parks, zoos and convention centers; car and truck rest stops and travel centers; educational facilities; recreational theme parks; hospitals; hotels; business or industrial foodservice venues; venues in which

foodservice is or may be provided by a master concessionaire or contract foodservice provider; Indian reservations; casinos; or any similar captive market location not reasonably available to you, whether currently existing or constructed or established subsequent to the date hereof.

4.2     Provided you are in full compliance with all the terms and conditions of this Agreement, including without limitation your development obligations described in Section 3.2 and the Minimum Performance Schedule, and you are in full compliance with all of your obligations under all franchise agreements executed pursuant to this Agreement, then during the term of this Agreement neither we nor any of our affiliates will develop or operate or grant franchises for the development or operation of Franchised Businesses within the Development Area, except the franchises that are granted to you pursuant to this Agreement and except as otherwise expressly provided in this Agreement.

4.3     Upon the termination or expiration of this Agreement, we and our affiliates shall have the right to develop and operate, and to grant to others development rights and franchises to develop and operate, dedicated Crave outlets within the Development Area subject only to the territorial rights granted to you with respect to Franchised Businesses operated by you pursuant to the Franchise Agreements and subject, further, to the right of first refusal described in Section 6 below.

4.4     We and our affiliates retain all rights not expressly granted to you with respect to Crave outlets, the Marks and the sale of any goods and services, anywhere in the world, including, without limitation, the right:

4.4.1     to produce, offer and sell and to grant others the right to produce, offer and sell the products offered at dedicated Crave outlets and any other goods displaying the Marks or other trade and service marks through alternative distribution channels, as described below, both within and outside the Development Area, and under any terms and conditions we deem appropriate.  "Alternative distribution channels" include, but are not limited to, the internet, catalog sales, grocery stores, club stores, specialty food stores, telemarketing or other direct marketing sales;

4.4.2     to operate and to grant others the right to operate dedicated Crave outlets located outside the Development Area under any terms and conditions we deem appropriate and regardless of proximity to a Franchised Business;

4.4.3     to operate and to grant others the right to operate dedicated Crave outlets at Non-Traditional Sites within and outside the Development Area under any terms and conditions we deem appropriate, subject to the right of first refusal described in Section 6.2; and

4.4.4     to acquire and operate a business operating one or more restaurants or food service businesses located or operating in the Development Area, except that these businesses will not operate using the Proprietary Marks.

**SECTION 5**
**RENEWAL**

This Agreement shall not be subject to renewal; however, if you wish to purchase a new Development Area and continue to develop Franchised Businesses, we will, in good faith, negotiate a new Multi-Unit Development Agreement with you.

## SECTION 6
## TERM AND RIGHT OF FIRST REFUSAL

6.1     Unless sooner terminated in accordance with the terms of this Agreement, the term of this Agreement and all Development Rights granted hereunder shall expire on the date the last Franchised Business is opened pursuant to the Minimum Performance Schedule established in Attachment 2.

6.2     If, during the term of this Agreement, a Non-Traditional Site becomes available in your Development Area, then we may, in our sole discretion, offer to you the opportunity to develop a Franchised Business at such Non-Traditional Site.  You shall have thirty (30) days after receipt of our notice in which to accept or decline this right of first refusal.  Your failure to notify us within such thirty (30) day period shall be interpreted that you have declined the right of first refusal.  Nothing in this Agreement shall require us to provide you with a right of first refusal for a Non-Traditional Site.

6.3     Upon completion of the Minimum Performance Schedule, if we determine that it is desirable to operate one or more additional Restaurants or Food Trucks in the Development Area, and provided you have timely complied with the Minimum Performance Schedule and are then in compliance with all terms and conditions of all Franchise Agreements, you shall have a right of first refusal to obtain the Development Rights to such additional Franchised Businesses upon such reasonable terms and conditions as are then determined by us including, but not limited to, the imposition of a new Development Fee and the payment of the then-current initial fees upon execution of the then-current Franchise Agreements.  In such case, we shall advise you in writing of the terms and conditions for the acquisition of the Development Rights for such additional Franchised Businesses.  You must notify us in writing within sixty (60) days of the receipt of such notice whether you wish to acquire the Development Rights to such additional Franchised Businesses.  If you do not exercise this right of first refusal, in whole, we may, following the expiration of the sixty (60) day period, grant the Development Rights to such additional Franchised Businesses to any other person or persons on the same terms and conditions or we may elect to develop, construct and/or operate any of such additional Restaurants or Food Trucks.

## SECTION 7
## YOUR OBLIGATIONS

You acknowledge and agree that:

7.1     Except as otherwise provided herein, this Agreement includes only the right to select sites for the establishment of Franchised Businesses and to submit the same to us for our approval in accordance with the terms of this Agreement.  This Agreement does not include the grant of a license by us to you of any rights to use the Marks, the System, or to open or operate any Franchised Businesses within the Development Area.  You shall obtain the license to use such additional rights at each Franchised Business upon the execution of each Franchise Agreement by both you and us and only in accordance with the terms of each Franchise Agreement.

7.2     The Development Rights granted hereunder are personal to you and cannot be sold, assigned, transferred or encumbered, in whole or in part, except as stated in Section 11 hereof.

7.3     Except as provided in Section 6 hereof, the Development Rights granted hereunder are non-exclusive, and we retain the right, in our sole discretion:

7.3.1     To continue to construct and operate other dedicated Crave outlets and to use the System and the Marks at any location outside the Development Area, and to license others to do so.

7.3.2     To develop, use and franchise the rights to any trade names, trademarks, service marks, trade symbols, emblems, signs, slogans, insignia, or copyrights not designated by us as Marks for use with different franchise systems for the sale of the different products or services not in connection with the System at any location, on such terms and conditions as we may deem advisable and without granting you any rights therein.

7.3.3     To develop, merchandise, sell and license others to sell any of our products, proprietary or otherwise, presently existing or to be developed in the future, to the public through alternative distribution channels outside or inside of the Development Area and to use the Marks in connection therewith.

7.4     You have sole responsibility for the performance of all obligations arising out of the operation of your business pursuant to this Agreement, including, but not limited to, the payment when due of any and all taxes levied or assessed by reason of such operation.

7.5     In all public records, in your relationship with other persons, and in any documents, you shall indicate clearly the independent ownership of your business and that the operations of said business are separate and distinct from the operation of a Crave Franchised Business.

7.6     You shall at all times preserve in confidence any and all materials and information furnished or disclosed to you by us and you shall disclose such information or materials only to such of your employees or agents who must have access to it in connection with their employment.  You shall not at any time, without our prior written consent, copy, duplicate, record or otherwise reproduce such materials or information, in whole or in part, nor otherwise make the same available to any unauthorized person.

7.7     You shall comply with all requirements of federal, state and local laws, rules and regulations.

7.8     You shall at no time have the right to sub-franchise any of your Development Rights hereunder.

7.9     In no event shall any Franchised Business be opened for business unless and until a Franchise Agreement for such Franchised Business has been fully executed and the initial franchise fee for such Franchised Business has been fully paid.

## SECTION 8
## OUR SERVICES

We shall, at our expense, provide the following services:

8.1     Review your site selection for conformity to our standards and criteria for selection and acquisition of sites upon our receipt of your written request for approval thereof.

8.2     Assist you in determining the layout and configuration of each Franchised Business once the location has been approved.  After you and we have determined the layout and configuration of each Franchised Business, you must arrange for site plan and build-out plans and specifications to be prepared and submitted to us for our review and approval.

8.3     Review of your site plan and final build-out plans and specifications for conformity to the construction standards and specifications of the System, upon our receipt of your written request for approval thereof.

8.4     Provide such other resources and assistance as may hereafter be developed and offered by us to our other multi-unit developers.

## SECTION 9
## DEFAULT AND TERMINATION

9.1     The occurrence of any of the following events of default shall constitute good cause for us, at our option and without prejudice to any other rights or remedies provided for hereunder or by law or equity, to terminate this Agreement upon notice to you without opportunity to cure the default, except where prohibited by any applicable state or federal law, whereupon this Agreement shall be terminated in accordance with the provisions of any such law:

9.1.1     If you shall, in any respect, fail to meet the Minimum Performance Schedule.

9.1.2     If you shall purport to effect any assignment other than in accordance with Section 11 hereof.

9.1.3     Except as provided in Section 11 hereof, if you attempt to sell, assign, transfer or encumber this Agreement prior to the time that at least twenty-five percent (25%) of the Franchised Businesses to be constructed and opened for business in accordance with the Minimum Performance Schedule are, in fact, open or under construction.

9.1.4     If you make, or have made, any material misrepresentation to us in connection with obtaining this Agreement, any site approval hereunder, or any Franchise Agreement.

9.1.5     If you default in the performance of any obligation under any Franchise Agreement with us, provided such default results in the termination of the Franchise Agreement.

9.1.6     If you suffer a violation of any law, ordinance, rule or regulation of a governmental agency in connection with the operation of the Franchised Business, and permit the same to go uncorrected after notification thereof, unless there is a bona fide dispute as to the violation or legality of such law, ordinance, rule or regulation, and you promptly resort to courts or forums of appropriate jurisdiction to contest such violation or legality.

9.1.7     If any of you is convicted in a court of competent jurisdiction of an indictable offense punishable by a term of imprisonment in excess of one (1) year.

9.1.8     If any of you shall become insolvent or make a general assignment for the benefit of creditors; if a petition in bankruptcy is filed by you or such a petition is filed against and not opposed by you; if you are adjudicated a bankrupt or insolvent; if a bill in equity or other proceeding for the appointment of a receiver or other custodian for you or your business or assets is filed and consented to by you; if a receiver or other custodian (permanent or temporary) of your assets or property, or any part thereof, is appointed by any court of competent jurisdiction; if proceedings for a composition with creditors under any state or federal law should be instituted by or against you; if a final judgment remains unsatisfied or of record for thirty (30) days or longer (unless a *supersedeas* bond is filed); if execution is levied against your business or property; if suit to foreclose any lien or mortgage against the premises or equipment is instituted against you and not dismissed within thirty (30) days; or if the real or personal property of the business shall be sold after levy thereupon by any sheriff, marshal, or constable.

9.1.9    If you or any of your affiliates cease to operate all of the Franchised Businesses developed pursuant to the terms of this Agreement.

9.2    Upon occurrence of any of the events stated in this Section 9.2, we may, without prejudice to any other rights or remedies contained in this Agreement or provided by law or equity, terminate this Agreement.  Such termination shall be effective thirty (30) days after written notice (or such other notice as may be required by applicable state law) is given by us to you of any of such events, if such defaults are not cured within such period:

9.2.1    If you shall use the System or Marks, or any other names, marks, systems, insignia, symbols, or rights which are our property, except pursuant to and in accordance with, a valid and effective Franchise Agreement.

9.2.2    If you shall have any interest, direct or indirect, in the ownership or operation of any food service business engaged in the sale of products the same as or substantially similar to those permitted to be sold by a Crave outlet or in any food service business which looks like, copies or imitates the Franchised Business or operates in a manner tending to have such effect other than pursuant to a valid and effective Franchise Agreement with us.

9.2.3    If you shall fail to remit to us any payments pursuant to Section 2 when same are due.

9.2.4    If you shall begin work upon any Franchised Business at any site unless all the conditions stated in Section 3 hereof have been met.

9.2.5    If you fail to obtain our prior written approval or consent, including but not limited to site approval or site plan approval, as expressly required by this Agreement.

9.2.6    If you default in the performance of any other obligation under this Agreement.

9.2.7    If you open any Franchised Business for business before a Franchise Agreement for such Franchised Business has been fully executed and the initial franchise fee due to us has been paid.

## SECTION 10
## OBLIGATIONS FOLLOWING TERMINATION

10.1    Upon termination of this Agreement becoming effective for any reason, or upon expiration of the term hereof, you agree as follows:

10.1.1    To cease immediately any attempts to select sites on which to establish Franchised Businesses.

10.1.2    To cease immediately to hold yourself out in any way as a multi-unit developer of ours or to do anything which would indicate a relationship between you and us.

10.2    No right or remedy herein conferred upon or reserved to us is exclusive of any other right or remedy provided or permitted by law or in equity.

## SECTION 11
## <u>TRANSFER OF INTEREST</u>

11.1     This Agreement is personal to you and you shall neither sell, assign, transfer nor encumber this Agreement, the Development Rights, or any other interest hereunder, nor suffer or permit any such assignment, transfer or encumbrance to occur directly, indirectly or contingently by agreement or by operation of law without our prior written consent.  You understand that this Agreement may not be pledged, mortgaged, hypothecated, given as security for an obligation or in any manner encumbered.  The assignment or transfer of any interest, except in accordance with this Section shall constitute a material breach of this Agreement.

11.2     You have represented to us that you are entering into this Agreement with the intention of complying with its terms and conditions and not for the purpose of resale of the Development Rights hereunder.  Therefore, you agree that any attempt to assign this Agreement, prior to the time that at least twenty-five percent (25%) of the Franchised Businesses to be constructed hereunder are opened or under construction shall be deemed to be an event of default.

11.3     If you receive from an unaffiliated third party and desire to accept a bona fide written offer to purchase your business, Development Rights and interests, we shall have the option, exercisable within thirty (30) days after receipt of written notice setting forth the name and address of the prospective purchaser, the price and terms of such offer, and a copy of such offer and the other information stated in this Section 11.3, to purchase such business, Development Rights and interests, including your right to develop sites within the Development Area, on the same terms and conditions as offered by said third party. In order that we may have information sufficient to enable us to determine whether to exercise this option, we may require you to deliver to us certified financial statements as of the end of your most recent fiscal year and such other information about your business and operations as we may request.  If we decline or do not accept the offer in writing within thirty (30) days, you may, within thirty (30) days from the expiration of the option period, sell, assign and transfer your business, Development Rights and interest to said third party, provided we have consented to such transfer as required by this Section 11.  Any material change in the terms of the offer prior to closing of the sale to such third party shall constitute a new offer, subject to the same rights of first refusal by us or our nominee, as in the case of an initial offer.  Our failure to exercise the option afforded by this Section 11.3 shall not constitute a waiver of any other provision of this Agreement, including all of the requirements of this Section with respect to the proposed transfer.

11.4     You acknowledge and agree that the restrictions on transfer imposed herein are reasonable and are necessary to protect the Development Rights, the System and the Marks, as well as our reputation and image, and are for the protection of us, you and other multi-unit developers and franchisees.  Any assignment or transfer permitted by this Section 11 shall not be effective until we receive a completely executed copy of all transfer documents, and we consent in writing thereto.

11.5     Except as provided in this Section 11, we agree not to unreasonably withhold our consent to a sale, assignment or transfer by you hereunder.  Consent to such transfer otherwise permitted or permissible as reasonable may be refused unless:

11.5.1   All of your obligations created by this Agreement, all other franchise documents, including all Franchise Agreements, and the relationship created hereunder are assumed by the transferee.

11.5.2   All ascertained or liquidated debts of you to us or our affiliated or subsidiary corporations are paid.

11.5.3   You are not in default hereunder.

11.5.4   We are reasonably satisfied that the transferee meets all of our requirements for new multi-unit developers, including but not limited to, good reputation and character, business acumen, operational ability, management skills, financial strength and other business considerations.

11.5.5   Transferee executes or, in appropriate circumstances, causes all necessary parties to execute, our standard form of Multi-Unit Development Agreement, Franchise Agreements for all Franchised Businesses open or under construction hereunder, and such other then-current ancillary agreements being required by us of new multi-unit developers on the date of transfer.

11.5.6   You execute a general release, in a form satisfactory to us, of any and all claims against us, our officers, directors, employees and principal stockholders of any and all claims and causes of action that you may have against us or any subsidiary or affiliated corporations in any way relating to this Agreement or the performance or non-performance thereof by us.

11.5.7   When you submit your request for our approval of the transfer, you shall pay to us a transfer fee equal to Five Thousand Dollars ($5,000) to cover our reasonable costs in effecting the transfer and in providing training and other initial assistance to transferee.

11.6     If the proposed transfer is a transfer between any of you, or if you wish to add a new owner, then you shall submit to us, in writing, a request for our approval of the proposed transfer between any of you or to a new owner together with any information we require in order to evaluate the proposed transfer, including, without limitation, financial and other information relating to the proposed transferee, and a transfer fee in the amount of Five Thousand Dollars ($5,000).  Our approval of your request will not be unreasonably withheld.  If you are requesting to add an owner, the proposed new owner must meet our criteria, including financial capability and that the new owner is not participating in a competing business, and the new ownership structure shall not change your majority ownership.  If we approve the addition of a new owner, such new owner shall be bound by the covenants of confidentiality and non-competition set forth herein and shall execute any documents we may require to enforce these covenants.

11.7     As it relates to death or disability:

11.7.1   Upon your death or upon the death of any person who has an interest of more than fifty percent (50%) in this Agreement or the Development Rights (the "Deceased"), the executor, administrator or other personal representative of the Deceased shall transfer such interest to a third party approved by us within twelve (12) months after the death.  If no personal representative is designated or appointed or no probate proceedings are instituted with respect to the estate of the Deceased, then the distributee of such interest must be approved by us.  If the distributee is not approved by us, then the distributee shall transfer such interest to a third party approved by us within twelve (12) months after the death of the Deceased.

11.7.2   Upon your permanent disability or upon the permanent disability of any person who has an interest of more than fifty percent (50%) in this Agreement or the Development Rights, we may, in our reasonable discretion, require such interest to be transferred to a third party in accordance with the conditions described in this Section 11 within six (6) months after notice to you.  "Permanent disability" shall mean any physical, emotional or mental injury, illness or incapacity which would prevent a person from performing the obligations set forth in this Agreement or in the guaranty made part of this Agreement for at least ninety (90) consecutive days and from which condition recovery within ninety (90) days from the date of determination of disability is unlikely.  Permanent disability shall be determined by a licensed practicing physician selected by us, upon examination of the person; or if the person refuses to submit to an examination, then such person automatically shall be deemed permanently disabled as of the date of

such refusal for the purpose of this Section 11.7.  The costs of any examination required by this Section shall be paid by us.

11.7.3   Upon the death or claim of permanent disability of you or any person who has an interest of more than fifty percent (50%) in this Agreement or the Development Rights, you or a representative of yours must notify us of such death or claim of permanent disability within ten (10) days of its occurrence.  Any transfer upon death or permanent disability shall be subject to the same terms and conditions as described in this Section for any *inter vivos* transfer.  If an interest is not transferred upon death or permanent disability as required in this Section, then such failure shall constitute a material event of default under this Agreement.

11.8     Our consent to a transfer of any interest by you or of any of the Development Rights pursuant to this Section shall not constitute a waiver of any claims we may have against the transferring party, nor shall it be deemed a waiver of our right to demand exact compliance with any of the terms of this Agreement by the transferee.

11.9     We shall have the right to assign this Agreement and all of our attendant rights and privileges to any person, firm, corporation or other entity provided that, with respect to any assignment resulting in the subsequent performance by the assignee of our functions:  (i) the assignee shall, at the time of such assignment, be financially responsible and economically capable of performing our obligations; and (ii) the assignee shall expressly assume and agree to perform such obligations.

You expressly affirm and agree that we may sell our assets, our rights to the Marks or to the System outright to a third party; may go public; may engage in a private placement of some or all of our securities; may merge, acquire other corporations, or be acquired by another corporation; may undertake a refinancing, recapitalization, leveraged buyout or other economic or financial restructuring; and, with regard to any or all of the above sales, assignments and dispositions, you expressly and specifically waive any claims, demands or damages arising from or related to the loss of said Marks (or any variation thereof) and/or the loss of association with or identification of "CRAVE Franchising, LLC" as Franchisor.  Nothing contained in this Agreement shall require us to remain in the restaurant business or to offer the same products and services, whether or not bearing the Marks, in the event that we exercise our right to assign our rights in this Agreement.

## SECTION 12
## COVENANTS

12.1     You specifically acknowledge that, pursuant to this Agreement, you will receive valuable training and confidential information, including, without limitation, secret recipes, information regarding the marketing methods and techniques of us and the System.  You covenant that during the term of this Agreement, except as otherwise approved in writing by us, you shall not, either directly or indirectly, for yourself/himself, or through, on behalf of or in conjunction with any person, persons or legal entity:

12.1.1   Divert or attempt to divert any business or client of the Franchised Business to any competitor, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Marks and the System.

12.1.2   Own, maintain, advise, help, invest in, make loans to, be employed by, engage in or have any interest in any restaurant or food service business other than the Franchised Business (including any business operated by you prior to entry into this Agreement), which business is of a character and concept similar to the Franchised Business, including a restaurant which offers and sells the same or substantially similar food products (a "Competitive Business").

12.2     You covenant that, except as otherwise approved in writing by us, you shall not, for a continuous and uninterrupted period commencing upon the expiration or termination of this Agreement, and continuing for two (2) years thereafter (and, in case of any violation of this covenant, for two (2) years after the violation ceases), either directly or indirectly, for yourself, or through, on behalf of or in conjunction with any person, persons, partnership or corporation, own, maintain, advise, help, invest in, make loans to, be employed by, engage in or have any interest in any Competitive Business which is located within twenty (20) miles of any Crave outlet in the System.

12.3     Subsections 12.1.2 and 12.2 of this Section shall not apply to ownership by you of less than a five percent (5%) beneficial interest in the outstanding equity securities of any company which is registered under the Securities Exchange Act of 1934.

12.4     The parties agree that each of the foregoing covenants shall be construed as independent of any other covenant or provision of this Agreement.  If all or any portion of a covenant in this Section 12 is held unreasonable or unenforceable by a court or agency having valid jurisdiction in any unappealed final decision to which we are a party, you expressly agree to be bound by any lesser covenant subsumed within the terms of such covenant that imposes the maximum duty permitted by law, as if the resulting covenant were separately stated in and made a part of this Section 12.

12.5     You understand and acknowledge that we shall have the right, in our sole discretion, to reduce the scope of any covenant stated in Sections 12.1 and 12.2 or any portion thereof, without your consent, effective immediately upon receipt by you of written notice thereof, and you agree that you shall comply forthwith with any covenant as so modified, which shall be fully enforceable notwithstanding the provisions of Section 16 hereof.

12.6     You expressly agree that the existence of any claim you may have against us, whether or not arising from this Agreement, shall not constitute a defense to our enforcement of the covenants in this Section 12.

12.7     You acknowledge that any failure to comply with the requirements of this Section 12 would cause us irreparable injury for which no adequate remedy at law may be available, and you hereby accordingly consent to our seeking injunctive relief prohibiting any conduct by you in violation of the terms of this Section 12.  We may further avail ourselves of any other legal or equitable rights and remedies which we may have under this Agreement or otherwise.

12.8     During the term of this Agreement, an officer or agent of ours shall have the right to inspect any Franchised Business in which you have an interest at reasonable times and during normal business hours to the extent reasonably necessary to determine whether the conditions of this Section 12 are being satisfied.  If, by reason of such inspections or otherwise, we have reason to believe that you are not in full compliance with the terms of this Section, we shall give notice of such default to you, specifying the nature of such default.  If you deny that you are in default hereunder, as specified by us, you shall have the burden of establishing that such default does not exist and shall give notice to us of your position within ten (10) days of receipt of the notice from us.  Unless you so deny such default, you shall immediately take all steps to cure said default in a manner satisfactory to us.

## SECTION 13
## NOTICES

Any and all notices required or permitted under this Agreement shall be in writing and shall be personally delivered or mailed by certified or registered mail, return receipt requested, to the respective

parties at the addresses set forth in the introductory paragraph of this Agreement, unless and until a different address has been designated by written notice to the other party.

Any notice by certified or registered mail shall be deemed to have been given at the date and time of mailing.

**SECTION 14**
**INDEPENDENT CONTRACTOR AND INDEMNIFICATION**

14.1     The parties acknowledge and agree that you shall be an independent contractor and this Agreement does not create a fiduciary relationship between them, and that nothing in this Agreement is intended to constitute either party an agent, legal representative, subsidiary, joint venturer, partner, employee, joint employer or servant of the other for any purpose.  You understand and agree that you are and will be an independent contractor under this Agreement.  Nothing in this Agreement may be interpreted as creating a partnership, joint venture, agency, employment or fiduciary relationship of any kind.  Your employees are not our employees.  Neither you nor any of your employees whose compensation you pay may in any way, directly or by implication, shall be considered our employee for any purpose, regardless of inclusion in mandated or other insurance coverage, tax or contributions, or requirements pertaining to withholdings, levied or fixed by any city, state or federal governmental agency.  We will not have the power to hire or terminate the employment of your employees.  You expressly agree, and will never claim otherwise, that our authority under this Agreement to determine that certain of your employees are qualified to perform certain tasks for you does not directly or indirectly vest in us the power to influence the employment terms of any such employee.

You agree that you alone are to exercise day-to-day control over all operations, activities and elements of your business, and that under no circumstance shall we do so or be deemed to do so.  You further acknowledge and agree, and will never claim otherwise, that the various restrictions, prohibitions, specifications and procedures of the System which you are required to comply with under this Agreement, whether set forth in our Manual or otherwise, do not directly or indirectly constitute, suggest, infer or imply that we control any aspect or element of the day-to-day operations of your Franchised Business, which you alone control, but only constitute standards you must adhere to when exercising your control of the day-to-day operations of your Franchised Business.

14.2     During the term of this Agreement, you shall hold yourself out to the public as an independent contractor conducting your operations pursuant to the rights granted by us.  You agree to take such action as shall be reasonably necessary to that end, including, without limitation, exhibiting a notice of that fact in a conspicuous place on any Franchised Business premises established for the purposes hereunder and on all letterhead, business cards, forms, and as further described in the Manual.  We reserve the right to specify in writing the content and form of such notice.

You acknowledge and agree that any training we provide for your employees is geared to impart to those employees, with your ultimate authority, the various procedures, protocols, systems and operations of a Crave outlet and in no fashion reflects any employment relationship between us and such employees.  If it is ever asserted that we are the employer, joint employer or co-employer of any of your employees in any private or government investigation, action, proceeding, arbitration or other setting, you irrevocably agree to assist us in defending said allegation, appearing at any venue requested by us to testify on our behalf; participating in depositions or other appearances; or preparing affidavits rejecting any assertion that we are the employer, joint employer or co-employer of any of your employees.

14.3     You understand and agree that nothing in this Agreement authorizes you to make any contract, agreement, warranty or representation on our behalf, or to incur any debt or other obligation in

our name, and that we assume no liability for, nor shall be deemed liable by reason of, any act or omission of yours or any claim or judgment arising therefrom.  You shall indemnify and hold us and our officers, directors, and employees harmless against any and all such claims arising directly or indirectly from, as a result of, or in connection with your activities hereunder, as well as the cost, including reasonable attorneys' fees, of defending against them, except that the foregoing shall not apply to infringement actions regarding the Marks which are caused solely by our actions or actions caused by the negligent acts of us or our agents.

### SECTION 15
### APPROVALS

15.1    Whenever this Agreement requires our prior approval or consent, you shall make a timely written request to us for such approval or consent, and, except as otherwise provided herein, any approval or consent granted shall be in writing.

15.2    We make no warranties or guarantees upon which you may rely, and assume no liability or obligation to you or any third party to which we would not otherwise be subject, by providing any waiver, approval, advise, consent or services to you in connection with this Agreement, or by reason of any neglect, delay or denial of any request therefor.

### SECTION 16
### NON-WAIVER

No failure of ours to exercise any power reserved to us under this Agreement or to insist upon compliance by you with any obligation or condition in this Agreement, and no custom or practice of the parties at variance with the terms hereof, shall constitute a waiver of our rights to demand exact compliance with the terms of this Agreement.  Our waiver of any particular default shall not affect or impair our right with respect to any subsequent default of the same or of a different nature; nor shall any delay, forbearance or omission of ours to exercise any power or right arising out of any breach or default by you of any of the terms, provisions or covenants of this Agreement affect or impair our rights, nor shall such constitute a waiver by us of any rights hereunder or rights to declare any subsequent breach or default.

### SECTION 17
### SEVERABILITY AND CONSTRUCTION

17.1    Each covenant and provision of this Agreement shall be construed as independent of any other covenant or provision of this Agreement.  The provisions of this Agreement shall be deemed severable.

17.2    If all or any portion of a covenant or provision of this Agreement is held unreasonable or unenforceable by a court or agency having valid jurisdiction in a decision to which we are a party, you expressly agree to be bound by any lesser covenant or provision imposing the maximum duty permitted by law which is subsumed within the terms of such covenant or provision, as if that lesser covenant or provision were separately stated in and made a part of this Agreement.

17.3    Nothing in this Agreement shall confer upon any person or legal entity other than us or you, and such of our respective successors and assigns as may be contemplated by Section 11 hereof, any rights or remedies under or by reason of this Agreement.

17.4    All captions in this Agreement are intended solely for the convenience of the parties and none shall be deemed to affect the meaning or construction of any provision hereof.

17.5    All references herein to gender and number shall be construed to include such other gender and number as the context may require, and all acknowledgments, promises, covenants, agreements and obligations herein made or undertaken by you shall be deemed jointly and severally undertaken by all those executing this Agreement on your behalf.

17.6    This Agreement may be executed in multiple copies, each of which shall be deemed an original.

## SECTION 18
## ENTIRE AGREEMENT

This Agreement, the documents referred to herein and the Attachments attached hereto constitute the entire, full and complete agreement between us and you concerning the subject matter hereof and supersede any and all prior agreements; provided, however, that nothing in this or any related agreement is intended to disclaim the representations made by us in the Disclosure Document that was furnished to you by us.  No amendment, change, or variance from this Agreement shall be binding on either party unless mutually agreed to by the parties and executed by their authorized officers or agents in writing.

## SECTION 19
## DISPUTE RESOLUTION; APPLICABLE LAW

19.1    Except to the extent we elect to enforce the provisions of this Agreement by judicial process and injunction in our sole discretion, all disputes, claims and controversies between the parties arising under or in connection with this Agreement or the making, performance or interpretation thereof (including claims of fraud in the inducement and other claims of fraud and the arbitrability of any matter) which have not been settled through negotiation will be settled by binding arbitration within Wilmington, Delaware, under the authority of the statutes of Delaware (the "Statutes").  The arbitrator(s) will have a minimum of five (5) years of experience in franchising or distribution law and will have the right to award specific performance of this Agreement.  If the parties cannot agree upon a mutually agreeable arbitrator, then the arbitration shall be conducted as per the selection method set forth in the Statutes.  The proceedings will be conducted under the commercial arbitration rules of the American Arbitration Association, to the extent such rules are not inconsistent with the provisions of this arbitration provision or the Statutes.  The decision of the arbitrator(s) will be final and binding on all parties.  This Section will survive termination or non-renewal of this Agreement under any circumstances.  Judgment upon the award of the arbitrator(s) may be entered in any court having jurisdiction thereof.  During the pendency of any arbitration proceeding, you and we shall fully perform our respective obligations under this Agreement.

19.2    With respect to any claims, controversies or disputes which are not finally resolved through negotiation or arbitration, or as otherwise provided above, you hereby irrevocably submit yourself to the jurisdiction of the state courts and the Federal District Court nearest to Wilmington, Delaware.  You hereby waive all questions of personal jurisdiction for the purpose of carrying out this provision.  You hereby agree that service of process may be made upon any of you in any proceeding relating to or arising out of this Agreement or the relationship created by this Agreement by any means allowed by Delaware or federal law.  You further agree that venue for any proceeding relating to or arising out of this Agreement shall be Wilmington, Delaware; provided, however, with respect to any action (1) for monies owed, (2) for injunctive or other extraordinary relief or (3) involving possession or disposition of, or other relief relating to, real property, we may bring such action in any State or Federal District Court which has jurisdiction.

19.3    Except as provided elsewhere in this Agreement (for example, with regard to the applicability of the Federal Arbitration Act, 9 U.S.C. §1 et seq. and the effect of federal preemption of state law by such Act) and except to the extent governed by the United States Trademark Act and other federal

laws, the parties agree that this Agreement (including any claims, counter-claims or otherwise by you) and all other matters concerning the parties will be governed by, and construed and enforced in accordance with, the laws of the state of Delaware.

19.4     You and we acknowledge that the parties' agreement regarding applicable state law and forum set forth in Sections 19.1, 19.2 and 19.3 above provide each of the parties with the mutual benefit of uniform interpretation of this Agreement and any dispute arising out of this Agreement or the parties' relationship created by this Agreement.  You and we further acknowledge the receipt and sufficiency of mutual consideration for such benefit and that each party's agreement regarding applicable state law and choice of forum have been negotiated in good faith and are part of the benefit of the bargain reflected by this Agreement.

19.5     You and we acknowledge that the execution of this Agreement and acceptance of the terms by the parties occurred in Wilmington, Delaware, and further acknowledge that the performance of certain of your obligations arising under this Agreement, including, but not limited to, the payment of monies due hereunder and the satisfaction of certain training requirements of ours, shall occur in Wilmington, Delaware.

19.6     You and we hereby waive, to the fullest extent permitted by law, any right to or claim or any punitive, exemplary, incidental, indirect, special, consequential or other damages (including, without limitation, loss of profits) against either party, their officers, directors, shareholders, partners, agents, representatives, independent contractors, servants and employees, in their corporate and individual capacities, arising out of any cause whatsoever (whether such cause be based in contract, negligence, strict liability, other tort or otherwise) and agree that in the event of a dispute, either party shall be limited to the recovery of any actual damages sustained by it.  If any other term of this Agreement is found or determined to be unconscionable or unenforceable for any reason, the foregoing provisions of waiver by agreement of punitive, exemplary, incidental, indirect, special, consequential or other damages (including, without limitation, loss of profits) shall continue in full force and effect.

19.7     We and you irrevocably waive trial by jury in any action, proceeding, or counterclaim, whether at law or in equity, brought by either of us against the other.  Any and all claims and actions arising out of or relating to this Agreement, the relationship of you and us, or your operation of the Franchised Business, brought by either party hereto against the other, whether in arbitration, or a legal action, shall be commenced within two (2) years from the occurrence of the facts giving rise to such claim or action, or such claim or action shall be barred.

19.8     If we are required to enforce this Agreement in a judicial or arbitration proceeding, you shall reimburse us for our costs and expenses, including, without limitation, reasonable accountants', attorneys', attorney assistants', and expert witness fees, costs of investigation and proof of facts, court costs, other litigation expenses and travel and living expenses, whether incurred prior to, in preparation for or in contemplation of the filing of any such proceeding.  If we are required to engage legal counsel in connection with any failure by you to comply with this Agreement, you shall reimburse us for any of the above-listed costs and expenses incurred by us.

## SECTION 20
## TIMELY PERFORMANCE

You hereby acknowledge that your timely development of the Franchised Businesses in the Development Area in accordance with the Minimum Performance Schedule is of material importance to us and you.  You agree, as a condition of the continuance of the rights granted hereunder, to develop and open Franchised Businesses within the Development Area in accordance with the Minimum Performance

Schedule, to operate such Franchised Businesses pursuant to the terms of the Franchise Agreements and to maintain all such Franchised Businesses in operation continuously.  We agree to diligently act upon any request of or approval from you and any material delay in your ability to meet the Minimum Performance Schedule which is directly caused by our failure to act diligently upon a request for approval shall not constitute a default hereunder.  Further, a failure or delay in performance by any party to this Agreement shall not be a default hereunder if such failure or delay arises out of or results from a Force Majeure, which for purposes of this Agreement shall be defined as fire, flood, earthquake or other natural disasters, or acts of a public enemy, war, rebellion or sabotage.  Force Majeure shall not include your lack of financing.

**SECTION 21**
**ACKNOWLEDGMENTS**

You acknowledge the truthfulness of the statements contained in Attachment 1 hereto.  Your acknowledgments are an inducement for us to enter into this Agreement.  You shall immediately notify us, prior to acknowledgment, if any statement in Attachment 1 is incomplete or incorrect.

**SECTION 22**
**EFFECTIVE DATE**

This Agreement shall be effective as of the date it is executed by us.

The parties hereto have duly executed, sealed and delivered this Agreement in triplicate on the day and year first above written.

MULTI-UNIT DEVELOPER:

FRANCHISOR:
CRAVE FRANCHISING, LLC

Name:_____

By:_____
Name:_____
Title:_____

**CRAVE FRANCHISING, LLC**
**MULTI-UNIT DEVELOPMENT AGREEMENT**

**ATTACHMENT 1**

**ACKNOWLEDGMENTS BY MULTI-UNIT DEVELOPER**

You hereby acknowledge the following:

You have conducted an independent investigation of all aspects relating to the financial, operational and other aspects of the business of developing the CRAVE outlets contemplated hereunder. You further acknowledge that, except as may be set forth in our Disclosure Document, no representations of performance (financial or otherwise) for the CRAVE outlets to be developed hereunder have been made to you by us and you hereby waive any claim against us for any business failure you may experience as a developer under this Agreement.

‾‾‾‾
Initial

You agree that no claims of success or failure have been made to you prior to signing this Agreement and that you understand all the terms and conditions of this Agreement.  You further acknowledge that this Agreement contains all oral and written agreements, representations and arrangements between the parties hereto, and any rights which the respective parties hereto may have had under any other previous contracts are hereby cancelled and terminated, and that this Agreement cannot be changed or terminated orally; provided, however, nothing in this Multi-Unit Development Agreement or in any related agreement is intended to disclaim the representations made to you in our Franchise Disclosure Document.

‾‾‾‾
Initial

You have no knowledge of any representations by us or our officers, directors, shareholders, employees, sales representatives, agents or servants, about the business contemplated by this Agreement that are contrary to the terms of this Agreement or the documents incorporated herein.  You acknowledge that no representations or warranties are made or implied, except as specifically set forth herein.  You represent, as an inducement to our entry into this Agreement, that you have made no misrepresentations in obtaining this Agreement.

‾‾‾‾
Initial

We expressly disclaim the making of, and you acknowledge that you have not received or relied upon, any warranty or guarantee, express or implied, as to the potential volume, profits or success of the business venture contemplated by this Agreement.

‾‾‾‾
Initial

CRAVE MUDA 2020 i

You acknowledge that you have received the CRAVE Franchising, LLC Franchise Disclosure Document with a complete copy of this Agreement and all related Exhibits and agreements at least fourteen (14) calendar days prior to the date on which this Agreement was executed.  You further acknowledge that you have read such Franchise Disclosure Document and understand its contents.

_____
Initial

You acknowledge that you have had ample opportunity to consult with your own attorneys, accountants and other advisors and that our attorneys have not advised or represented you with respect to this Agreement or the relationship thereby created.

_____
Initial

You, together with your advisers, have sufficient knowledge and experience in financial and business matters to make an informed investment decision with respect to the development rights granted by this Agreement.

_____
Initial

BY EXECUTING THIS AGREEMENT, YOU, INDIVIDUALLY AND ON BEHALF OF YOUR HEIRS, LEGAL REPRESENTATIVES, SUCCESSORS AND ASSIGNS, HEREBY FOREVER RELEASE AND DISCHARGE CRAVE FRANCHISING, LLC, RINCIONE INVESTMENTS LLC, AND ANY OF THE ABOVE'S PARENTS, AFFILIATES, AND SUBSIDIARIES, AND ALL OF THEIR OFFICERS, DIRECTORS, SHAREHOLDERS, AGENTS AND SUCCESSORS AND ASSIGNS FROM ANY AND ALL CLAIMS, DEMANDS AND JUDGMENTS RELATING TO OR ARISING UNDER THE STATEMENTS, CONDUCT, CLAIMS OR ANY OTHER AGREEMENT BETWEEN THE PARTIES EXECUTED PRIOR TO THE DATE OF THIS AGREEMENT, INCLUDING, BUT NOT LIMITED TO, ANY AND ALL CLAIMS, WHETHER PRESENTLY KNOWN OR UNKNOWN, SUSPECTED OR UNSUSPECTED, ARISING UNDER THE FRANCHISE, SECURITIES, TAX OR ANTITRUST LAWS OF THE UNITED STATES OR OF ANY STATE OR TERRITORY THEREOF.

_____
Initial

Acknowledged this day of _____.

_____
Name:_____

**CRAVE FRANCHISING, LLC**
**MULTI-UNIT DEVELOPMENT AGREEMENT**

**ATTACHMENT 2**

**<u>MINIMUM PERFORMANCE SCHEDULE</u>**

The Agreement authorizes and obliges Multi-Unit Developer to establish and operate _____ (___) "Crave" outlets pursuant to a Franchise Agreement for each Franchised Business. The following is Multi-Unit Developer's Minimum Performance Schedule:

| Minimum Cumulative Number of Franchise Agreements for Franchised Businesses to be located and Operating <u>within the Development Area</u> | <u>By this Date</u> |
|---|---|
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |

Total:_____

The Minimum Performance Schedule shall be deemed completed, and this Agreement shall expire, upon the opening of the final Franchised Business to be developed pursuant to this Agreement.

APPROVED:
MULTI-UNIT DEVELOPER:                     FRANCHISOR:
                                          CRAVE FRANCHISING, LLC

_____

Name:_____        By:_____
                                         Name:_____
                                         Title:_____

**CRAVE FRANCHISING, LLC**
**MULTI-UNIT DEVELOPMENT AGREEMENT**

**ATTACHMENT 3**

**DEVELOPMENT AREA**

The following describes the Development Area within which Multi-Unit Developer may locate "Crave" outlets under this Agreement:

APPROVED:
MULTI-UNIT DEVELOPER:                    FRANCHISOR:
                                         CRAVE FRANCHISING, LLC


Name:_____          By:_____
                                         Name:_____
                                         Title:_____

**Exhibit D to the**
**Crave Franchise Disclosure Document**

<u>**LIST OF FRANCHISEES**</u>
(As of December 31, 2019)

| GEORGIA | |
|---|---|
| **Franchisee** | **Location** |
| <u>Pointe Bluff LLC</u><br>Brandon Walker<br>217-620-5122 | Dawson Crossroads<br>145 Forest Boulevard, Suite 465<br>Dawsonville, Georgia 30534<br>706-265-2337 |
| **NORTH CAROLINA** | |
| **Franchisee** | **Location** |
| <u>2 Marines, LLC</u><br>Wayne Decker<br>Laura Decker<br>252-241-3043 | The Pointe at Barclay<br>1407 Barclay Pointe Boulevard<br>Building 4, Unit 401<br>Wilmington, North Carolina 28412<br>910-399-5550 |
| **OKLAHOMA** | |
| **Franchisee** | **Location** |
| <u>Oakbloom LLC</u><br>Eddie Steffensen<br>Kevyn Steffensen<br>405-397-0211 | The Plaza at Stone Mill<br>2121 South Yukon Parkway, Suite 150<br>Yukon, Oklahoma 73099<br>405-467-4027 |
| **TEXAS** | |
| **Franchisee** | **Location** |
| Tex L. Ridings<br>Brandi Ridings<br>281-513-6552 | Grand Parkway Marketplace II<br>6633 Spring Stuebner Road, Suite 330<br>Spring, Texas 77389<br>832-559-3202 |

**Multi-Unit Developers:**        None


**Franchise Agreements signed before December 31, 2019, but units not yet open:**

| FLORIDA | |
|---|---|
| **Franchisee** | **Location** |
| <u>Planinz Holdings of Central Florida LLC</u><br>Justin Planinz<br>Tracy Planinz<br>11210 Elderberry Court<br>Clermont, Florida 34715<br>321-848-3004 | TBD<br>Orlando, Florida |

| COLORADO | |
|---|---|
| **Franchisee** | **Location** |
| JKWest LLC<br>Jamal Westry<br>Kelly Ann Westry<br>843-810-7941 | The Plaza at Barnes West<br>5600 Barnes Road, Suite 164/172<br>Colorado Springs, Colorado 80917 |
| GEORGIA | |
| **Franchisee** | **Location** |
| Pointe Bluff LLC<br>Brandon Walker<br>1625 Silverleaf Way<br>Alpharetta, Georgia 30005<br>217-620-5122 | TBD<br>Alpharetta, Georgia |
| LOUISIANA | |
| **Franchisee** | **Location** |
| C&H Capers LLC<br>Timothy Capers<br>Nicole Capers<br>318-426-6842 | TBD<br>Shreveport, Louisiana |
| Southern Krave LLC<br>Karl Wulf<br>504-782-6636 | Arlington Marketplace<br>636 Arlington Creek Center Boulevard<br>Baton Rouge, Louisiana 70820 |
| TEXAS | |
| **Franchisee** | **Location** |
| GKJ Enterprises LLC<br>Gregory Johnstone<br>Kristine Johnstone<br>281-435-1750 | 14303 East Sam Houston Parkway, Suite 800<br>Houston, Texas 77044<br>281-529-6427 |
| Mooreblanton LLC<br>Carl Moore<br>Shirley Moore<br>254-247-9004 | Gattis Crossing<br>21315 State Highway 130<br>Pflugerville, Texas 78660 |

## FRANCHISEES WHO HAVE LEFT THE SYSTEM
(As of December 31, 2019)

| DISTRICT OF COLUMBIA | |
|---|---|
| **Franchisee** | **Location** |
| Floyd Bui<br>703-945-8467 | Washington, DC<br><br>**Terminated before lease signing** |

| GEORGIA | |
|---|---|
| **Franchisee** | **Location** |
| <u>Blackrock Foodservice LLC</u><br>Robert Bibb<br>128 Headwaters Trail<br>Delohghia, Georgia 30533<br>678-360-8844 | Dawson Crossroads<br>145 Forest Boulevard, Suite 465<br>Dawsonville, Georgia 30534<br><br>**Opened & transferred in 2019 to existing franchisee** |

**Exhibit E to the**
**Crave Franchise Disclosure Document**

**TABLE OF CONTENTS OF CONFIDENTIAL OPERATIONS MANUAL**

## Table of Contents

| Topic | Page # |
|---|---|
| Welcome to The CRAVE Family | 3 |
| This Operations Manual and Confidential Notice | 4 |
| Your Employment | 5 |
| Business Philosophy and Values | 6 |
| Philosophy of Management | 7-8 |
| Philosophy of Guest Service | 9-10 |
| Principles of Employee Conduct and Teamwork | 11 |
| Job Descriptions for Hiring | 12-22 |
| Employee Manual | 23-33 |
| Marketing & Social Media | 34-38 |
| Training Manual (FOOD) | 39-49 |
| Training Manual (BEVERAGE) | 50-57 |
| Position Responsibilities | 58-60 |

**Exhibit F to the**
**Crave Franchise Disclosure Document**

### STATE SPECIFIC ADDENDUM

### ADDENDUM REQUIRED BY THE DEPARTMENT OF LAW OF THE STATE OF NEW YORK

1.      The following information is added to the cover page of the Franchise Disclosure Document:

**INFORMATION COMPARING FRANCHISORS IS AVAILABLE.  CALL THE STATE ADMINISTRATORS LISTED IN EXHIBIT G OR YOUR PUBLIC LIBRARY FOR SOURCES OF INFORMATION.  REGISTRATION OF THIS FRANCHISE BY NEW YORK STATE DOES NOT MEAN THAT NEW YORK STATE RECOMMENDS IT OR HAS VERIFIED THE INFORMATION IN THIS FRANCHISE DISCLOSURE DOCUMENT. IF YOU LEARN THAT ANYTHING IN THE FRANCHISE DISCLOSURE DOCUMENT IS UNTRUE, CONTACT THE FEDERAL TRADE COMMISSION AND NEW YORK STATE DEPARTMENT OF LAW, INVESTOR PROTECTION BUREAU, 28 LIBERTY STREET, 21ST FLOOR, NEW YORK, NEW YORK, 10005. THE FRANCHISOR MAY, IF IT CHOOSES, NEGOTIATE WITH YOU ABOUT ITEMS COVERED IN THE FRANCHISE DISCLOSURE DOCUMENT.  HOWEVER, THE FRANCHISOR CANNOT USE THE NEGOTIATING PROCESS TO PREVAIL UPON A PROSPECTIVE FRANCHISEE TO ACCEPT TERMS WHICH ARE LESS FAVORABLE THAN THOSE SET FORTH IN THIS FRANCHISE DISCLOSURE DOCUMENT.**

2.      The following is added at the end of Item 3:

Except as provided above, with regard to the franchisor, its predecessor, a person identified in Item 2, or an affiliate offering franchises under the franchisor's principal trademark:

A.      No such party has an administrative, criminal or civil action pending against that person alleging: a felony, a violation of a franchise, antitrust, or securities law, fraud, embezzlement, fraudulent conversion, misappropriation of property, unfair or deceptive practices, or comparable civil or misdemeanor allegations.

B.      No such party has pending actions, other than routine litigation incidental to the business, which are significant in the context of the number of franchisees and the size, nature or financial condition of the franchise system or its business operations.

C.      No such party has been convicted of a felony or pleaded nolo contendere to a felony charge or, within the 10-year period immediately preceding the application for registration, has been convicted of or pleaded nolo contendere to a misdemeanor charge or has been the subject of a civil action alleging: violation of a franchise, antifraud, or securities law; fraud; embezzlement; fraudulent conversion or misappropriation of property; or unfair or deceptive practices or comparable allegations.

D.      No such party is subject to a currently effective injunctive or restrictive order or decree relating to the franchise, or under a Federal, State, or Canadian franchise, securities, antitrust, trade regulation or trade practice law, resulting from a concluded or pending action or proceeding brought by a public agency; or is subject to any currently effective order of any national securities association or national securities exchange, as defined in the Securities and Exchange Act of 1934, suspending or expelling such person from membership in such association or exchange; or is subject to a currently effective injunctive

or restrictive order relating to any other business activity as a result of an action brought by a public agency or department, including, without limitation, actions affecting a license as a real estate broker or sales agent.

3.      The following is added to the end of Item 4:

Neither the franchisor, its affiliate, its predecessor, officers, or general partner during the 10-year period immediately before the date of the offering circular: (a) filed as debtor (or had filed against it) a petition to start an action under the U.S. Bankruptcy Code; (b) obtained a discharge of its debts under the bankruptcy code; or (c) was a principal officer of a company or a general partner in a partnership that either filed as a debtor (or had filed against it) a petition to start an action under the U.S. Bankruptcy Code or that obtained a discharge of its debts under the U.S. Bankruptcy Code during or within 1 year after that officer or general partner of the franchisor held this position in the company or partnership.

4.      The following is added to the end of Item 5:

The initial franchise fee constitutes part of our general operating funds and will be used as such in our discretion.

5.      The following is added to the end of the "Summary" sections of Item 17(c), titled "**Requirements for franchisee to renew or extend**", and Item 17(m), entitled "**Conditions for franchisor approval of transfer**":

However, to the extent required by applicable law, all rights you enjoy and any causes of action arising in your favor from the provisions of Article 33 of the General Business Law of the State of New York and the regulations issued thereunder shall remain in force; it being the intent of this proviso that the non-waiver provisions of General Business Law Sections 687.4 and 687.5 be satisfied.

6.      The following language replaces the "Summary" section of Item 17(d), titled "**Termination by franchisee**":

You may terminate the agreement on any grounds available by law.

7.      The following is added to the end of the "Summary" section of Item 17(j), titled "**Assignment of contract by franchisor**":

However, no assignment will be made except to an assignee who in good faith and judgment of the franchisor, is willing and financially able to assume the franchisor's obligations under the Franchise Agreement.

8.      The following is added to the end of the "Summary" sections of Item 17(v), titled "**Choice of forum**", and Item 17(w), titled "**Choice of law**":

The foregoing choice of law should not be considered a waiver of any right conferred upon the franchisor or upon the franchisee by Article 33 of the General Business Law of the State of New York.

The parties hereto have duly executed, sealed, and delivered this Addendum dated _____.

FRANCHISEE:                                         FRANCHISOR:
                                                    CRAVE FRANCHISING, LLC
_____

By:_____                          By:_____
Name:_____                          Name:_____
Title:_____                          Title:_____

PRINCIPALS:

_____

Name:_____

_____

Name:_____

**Exhibit G to the**
**Crave Franchise Disclosure Document**

## STATE ADMINISTRATORS/AGENTS FOR SERVICE OF PROCESS

Listed here are the names, addresses and telephone numbers of the state agencies having responsibility for franchising disclosure/registration laws and for service of process.  We may not yet be registered to sell franchises in any or all of these states.

If a state is not listed, CRAVE Franchising, LLC has not appointed an agent for service of process in that state in connection with the requirements of franchise laws.  There may be states in addition to those listed below in which CRAVE Franchising, LLC has appointed an agent for service of process.

There may also be additional agents appointed in some of the states listed.

| CALIFORNIA | CONNECTICUT |
|---|---|
| Department of Business Oversight:<br>320 West 4th Street, Suite 750<br>Los Angeles, CA 90013<br>(213) 576-7500  Toll Free (866) 275-2677<br>Agent: California Commissioner of Business Oversight<br><br>1515 K Street, Suite 200<br>Sacramento, CA 95814<br>(916) 445-7205<br><br>1350 Front Street<br>San Diego, CA 92101<br>(619) 525-4233<br><br>1 Sansome Street, Suite 600<br>San Francisco, CA 94104<br>(415) 972-8559 | State of Connecticut<br>Department of Banking<br>Securities & Business Investments Division<br>260 Constitution Plaza<br>Hartford, CT  06103-1800<br>(860) 240-8230<br><br>Agent:  Banking Commissioner |
| HAWAII<br>(state administrator)<br><br>Business Registration Division<br>Department of Commerce and Consumer Affairs<br>335 Merchant Street, Room 203<br>Honolulu, Hawaii 96813<br>(808) 586-2722<br><br><br>(agent for service of process)<br><br>Commissioner of Securities<br>State of Hawaii<br>335 Merchant Street<br>Honolulu, Hawaii  96813<br>(808) 586-2722 | ILLINOIS<br><br>The Attorney General<br>Office of the Attorney General<br>500 South Second Street<br>Springfield, Illinois 62706<br>(217) 782-4465 |

| | |
|---|---|
| **INDIANA**<br>(state administrator)<br><br>Indiana Secretary of State<br>Securities Division, E-111<br>302 Washington Street<br>Indianapolis, Indiana 46204<br>(317) 232-6681<br><br>(agent for service of process)<br>Indiana Secretary of State<br>201 State House<br>200 West Washington Street<br>Indianapolis, Indiana 46204<br>(317) 232-6531 | **MARYLAND**<br>(state administrator)<br><br>Office of the Attorney General<br>Securities Division<br>200 St. Paul Place<br>Baltimore, Maryland 21202-2021<br>(410) 576-6360<br><br>(for service of process)<br>Maryland Securities Commissioner<br>200 St. Paul Place<br>Baltimore, Maryland 21202-2021<br>(410) 576-6360 |
| **MICHIGAN**<br>(state administrator)<br><br>Consumer Protection Division<br>Franchise Section<br>Michigan Department of Attorney General<br>525 W. Ottawa Street, 1st Floor<br>Lansing, Michigan 48933<br>(517)335-7567<br><br>(for service of process)<br>Corporations Division<br>Bureau of Commercial Services<br>Department of Labor and Economic Growth<br>P.O. Box 30054<br>Lansing, Michigan 48909 | **MINNESOTA**<br>(state administrator)<br><br>Minnesota Department of Commerce<br>85 7th Place East, Suite 280<br>St. Paul, Minnesota 55101-2198<br>(651) 539-1600<br><br>(for service of process)<br>Minnesota Commissioner of Commerce |
| **NEW YORK**<br>(Administrator)<br>New York State Department of Law<br>Investor Protection Bureau<br>28 Liberty Street, 21st Floor<br>New York, New York 10005<br>(212) 416-8236 Phone<br>(212) 416-6042 Fax<br><br>(Agent for service of process)<br>Attention:  NY Secretary of State<br>New York Department of State<br>One Commerce Plaza<br>99 Washington Avenue, 6th Floor<br>Albany, New York 12231-0001<br>(518) 473-2492 | **NORTH DAKOTA**<br><br>North Dakota Securities Department<br>State Capitol, Fifth Floor, Dept. 414<br>600 East Boulevard Avenue<br>Bismarck, North Dakota 58505<br>(701) 328-4712 |

| OREGON | RHODE ISLAND |
|---|---|
| Department of Consumer and Business Services<br>Division of Finance and Corporate Securities<br>Labor and Industries Building<br>Salem, Oregon 97310<br>(503) 378-4387<br><br>Agent:  Director of the Department of Consumer and Business Services | Division of Securities<br>Rhode Island Dept. of Business Regulation<br>John O. Pastore Complex – Bldg. 69-1<br>1511 Pontiac Avenue<br>Cranston, RI 02920<br>(401) 462-9500 |
| **SOUTH CAROLINA**<br>(state administrator)<br>Secretary of State<br>P.O. Box 11350<br>Columbia, SC 29211<br>(803)734-2166<br><br>(for service of process)<br>Liberty Corporate Services Inc.<br>317 Ruth Vista<br>Lexington, South Carolina 29073<br>(803)356-9934 | **SOUTH DAKOTA**<br><br>Division of Insurance<br>Securities Regulation<br>124 S. Euclid Avenue, Suite 104<br>Pierre, South Dakota 57501-3168<br>(605)773-3563 |
| **VIRGINIA**<br><br>State Corporation Commission<br>Division of Securities and Retail Franchising<br>1300 East Main Street, 9th Floor<br>Richmond, Virginia 23219<br>(804) 371-9051<br><br>(for service of process)<br>Clerk of the State Corporation Commission<br>1300 East Main Street, 1st Floor<br>Richmond, Virginia 23219<br>(804) 371-9733 | **WASHINGTON**<br>(state administrator)<br><br>Department of Financial Institutions<br>Securities Division<br>150 Israel Road S.W.<br>Tumwater, Washington 98501<br>(360) 902-8760<br><br>(for service of process)<br>Director, Department of Financial Institutions<br>Securities Division<br>150 Israel Road S.W.<br>Tumwater, Washington 98501 |
| **WISCONSIN**<br>(state administrator)<br><br>Division of Securities<br>Department of Financial Institutions<br>201 W. Washington Ave., 3rd Floor<br>Madison, Wisconsin 53703<br>(608) 266-1064<br><br>(for service of process)<br>Administrator, Division of Securities<br>Department of Financial Institutions<br>201 W. Washington Ave., 3rd Floor<br>Madison, Wisconsin 53703 | |

**Exhibit H to the**
**Crave Franchise Disclosure Document**

**FORM OF GENERAL RELEASE**

THIS AGREEMENT ("Agreement") is made and entered into this day of _____ _____, by and between CRAVE Franchising, LLC, a Wyoming limited liability company having its principal address at 122 West 25th Street, Suite 101, Cheyenne, Wyoming, 82002 (the "Franchisor"), and _____, a _____ with a principal address at _____ (hereinafter referred to as "Releasor"), wherein the parties hereto, in exchange for good and valuable consideration, the sufficiency and receipt of which is hereby acknowledged, and in reliance upon the representations, warranties, and comments herein are set forth, do agree as follows:

1.    **Release by Releasor**:

Releasor does for itself, its successors and assigns, hereby release and forever discharge generally the Franchisor and any affiliate, wholly owned or controlled corporation, subsidiary, successor or assign thereof and any shareholder, officer, director, employee, or agent of any of them, from any and all claims, demands, damages, injuries, agreements and contracts, indebtedness, accounts of every kind or nature, whether presently known or unknown, suspected or unsuspected, disclosed or undisclosed, actual or potential, which Releasor may now have, or may hereafter claim to have or to have acquired against them of whatever source or origin, arising out of or related to any and all transactions of any kind or character at any time prior to and including the date hereof, including generally any and all claims at law or in equity, those arising under the common law or state or federal statutes, rules or regulations such as, by way of example only, franchising, securities and anti-trust statutes, rules or regulations, in any way arising out of or connected with the Agreement, and further promises never from this day forward, directly or indirectly, to institute, prosecute, commence, join in, or generally attempt to assert or maintain any action thereon against the Franchisor, any affiliate, successor, assign, parent corporation, subsidiary, director, officer, shareholder, employee, agent, executor, administrator, estate, trustee or heir, in any court or tribunal of the United States of America, any state thereof, or any other jurisdiction for any matter or claim arising before execution of this Agreement.  In the event Releasor breaches any of the promises, covenants, or undertakings made herein by any act or omission, Releasor shall pay, by way of indemnification, all costs and expenses of the Franchisor caused by the act or omission, including reasonable attorneys' fees.

2.    Releasor hereto represents and warrants that no portion of any claim, right, demand, obligation, debt, guarantee, or cause of action released hereby has been assigned or transferred by Releasor party to any other party, firm or entity in any manner including, but not limited to, assignment or transfer by subrogation or by operation of law.  In the event that any claim, demand or suit shall be made or institute against any released party because of any such purported assignment, transfer or subrogation, the assigning or transferring party agrees to indemnify and hold such released party free and harmless from and against any such claim, demand or suit, including reasonable costs and attorneys' fees incurred in connection therewith.  It is further agreed that this indemnification and hold harmless agreement shall not require payment to such claimant as a condition precedent to recovery under this paragraph.

3.    Each party acknowledges and warrants that his, her or its execution of this Agreement is free and voluntary.

4.    Delaware law shall govern the validity and interpretation of this Agreement, as well as the performance due thereunder.  This Agreement is binding upon and inures to the benefit of the respective assigns, successors, heirs, and legal representatives of the parties hereto.

5.      In the event that any action is filed to interpret any provision of this Agreement, or to enforce any of the terms thereof, the prevailing party shall be entitled to its reasonable attorneys' fees and costs incurred therein, and said action must be filed in the State of Delaware.

6.      This Agreement may be signed in counterparts, each of which shall be binding against the party executing it and considered as the original.

The parties hereto, intending to be legally bound hereby, have executed this agreement effective as of the date first above.

RELEASOR:

_____
(Name)

CRAVE FRANCHISING, LLC:

By:_____
Name:_____
Title:_____

**State Effective Dates**

The following states have franchise laws that require that the Franchise Disclosure Document be registered or filed with the states, or be exempt from registration: California, Hawaii, Illinois, Indiana, Maryland, Michigan, Minnesota, New York, North Dakota, Rhode Island, South Dakota, Virginia, Washington, and Wisconsin.

This document is effective and may be used in the following states, where the document is filed, registered, or exempt from registration, as of the Effective Date stated below:

| State | Effective Date |
|---|---|
| New York | Pending |

Other states may require registration, filing, or exemption of a franchise under other laws, such as those that regulate the offer and sale of business opportunities or seller-assisted marketing plans.

CRAVE FDD 2020 A6

**Exhibit I to the**
**Crave Franchise Disclosure Document**

<u>**RECEIPTS**</u>

This Franchise Disclosure Document summarizes certain provisions of the Franchise Agreement and other information in plain language.  Read this Franchise Disclosure Document and all exhibits carefully.

If CRAVE Franchising, LLC offers you a franchise, it must provide this Disclosure Document to you 14 calendar-days before you sign a binding agreement with, or make a payment to, the franchisor or an affiliate in connection with the proposed franchise sale.  New York requires you to receive this Franchise Disclosure Document at the earlier of the first personal meeting or 10 business days before the execution of the franchise or other agreement or the payment of any consideration that relates to the franchise relationship.  Michigan requires you to receive this disclosure document at least 10 business days before the execution of any binding franchise or other agreement or the payment of any consideration, whichever occurs first.

If CRAVE Franchising, LLC does not deliver this Disclosure Document on time or if it contains a false or misleading statement, or a material omission, a violation of federal and state law may have occurred and should be reported to the Federal Trade Commission, Washington, DC, 20580, and to your state authority listed on Exhibit G.

The name and principal business address and telephone number of each franchise seller offering the franchise is:

| Samantha Rincione<br>122 West 25th Street, Suite 101<br>Cheyenne, Wyoming 82002<br>516-316-7420 | Salvatore Rincione<br>122 West 25th Street, Suite 101<br>Cheyenne, Wyoming 82002<br>516-316-7420 |
|---|---|

Issuance Date: April 6, 2020

I received a Disclosure Document date April 6, 2020, that included the following Exhibits:

      EXHIBIT A:  Financial Statements
      EXHIBIT B-1:  Franchise Agreement with Attachments
      EXHIBIT B-2:  Food Truck Addendum
      EXHIBIT C:  Multi-Unit Development Agreement with Attachments
      EXHIBIT D:  List of Franchisees and Franchisees Who Have Left the System
      EXHIBIT E:  Table of Contents of the Operations Manual
      EXHIBIT F:  State Specific Addendum
      EXHIBIT G:  State Administrators/Agents for Service of Process
      EXHIBIT H:  Form of General Release
      EXHIBIT I:  Receipts

DATED:_____

_____
(Signature of recipient)

Print Name:_____
Address:_____
_____

<u>**KEEP FOR YOUR RECORDS**</u>

CRAVE FDD 2020 A6

## <u>RECEIPT</u>

This Franchise Disclosure Document summarizes certain provisions of the Franchise Agreement and other information in plain language.  Read this Franchise Disclosure Document and all exhibits carefully.

If CRAVE Franchising, LLC offers you a franchise, it must provide this Disclosure Document to you 14 calendar-days before you sign a binding agreement with, or make a payment to, the franchisor or an affiliate in connection with the proposed franchise sale.  New York requires you to receive this Franchise Disclosure Document at the earlier of the first personal meeting or 10 business days before the execution of the franchise or other agreement or the payment of any consideration that relates to the franchise relationship. Michigan requires you to receive this disclosure document at least 10 business days before the execution of any binding franchise or other agreement or the payment of any consideration, whichever occurs first.

If CRAVE Franchising, LLC does not deliver this Disclosure Document on time or if it contains a false or misleading statement, or a material omission, a violation of federal and state law may have occurred and should be reported to the Federal Trade Commission, Washington, DC, 20580, and to your state authority listed on Exhibit G.

The name and principal business address and telephone number of each franchise seller offering the franchise is:

| | |
|---|---|
| Samantha Rincione<br>122 West 25th Street, Suite 101<br>Cheyenne, Wyoming 82002<br>516-316-7420 | Salvatore Rincione<br>122 West 25th Street, Suite 101<br>Cheyenne, Wyoming 82002<br>516-316-7420 |

Issuance Date: April 6, 2020

I received a Disclosure Document dated April 6, 2020, that included the following Exhibits:

      EXHIBIT A:  Financial Statements
      EXHIBIT B-1:  Franchise Agreement with Attachments
      EXHIBIT B-2:  Food Truck Addendum
      EXHIBIT C:  Multi-Unit Development Agreement with Attachments
      EXHIBIT D:  List of Franchisees and Franchisees Who Have Left the System
      EXHIBIT E:  Table of Contents of the Operations Manual
      EXHIBIT F:  State Specific Addendum
      EXHIBIT G:  State Administrators/Agents for Service of Process
      EXHIBIT H:  Form of General Release
      EXHIBIT I:  Receipts

DATED:_____

_____
(Signature of recipient)

Print Name:_____
Address:_____

_____

**<u>Please return signed Receipt to: CRAVE Franchising, LLC</u>**
Herschler Building East, Suite 101
122 West 25th Street
Cheyenne, Wyoming 82202-0020

CRAVE FDD 2020 A6