# EX. M

**FRANCHISE DISCLOSURE DOCUMENT**
**CRAVE Franchising, LLC**
A Wyoming limited liability company
Herschler Building East, Suite 101
122 West 25th Street
Cheyenne, Wyoming 82002-0020
Tel: (516)316-7420
www.iwantcrave.com
email: samantha@iwantcrave.com



The franchise offered is for a quick serve "Crave" restaurant or food truck offering hot dogs, other cased meats, barbeque items, beverages, appetizers, and side dishes.  Your restaurant will also offer beer and may serve wine.  Your food truck will not offer beer or wine.  A Crave franchised business operates using the franchisor's proprietary recipes, formulae, techniques, trade dress, trademarks, and logos.

The total investment necessary to begin operation of a Crave restaurant franchise is $219,500 to $694,500.  This includes $45,000 that must be paid to the franchisor and/or its affiliate.  The total investment necessary to begin operation of a Crave food truck franchise is $186,300 to $272,300.  This includes $27,500 that must be paid to the franchisor and/or its affiliate.

The total investment necessary to begin the operation of a Crave multi-unit development business ranges from $213,300 to $732,000.  This includes $52,500 to $80,000 that must be paid to the franchisor and/or its affiliate.

This disclosure document summarizes certain provisions of your franchise agreement and other information in plain English.  Read this disclosure document and all accompanying agreements carefully.  You must receive the disclosure document at least 14 calendar days before you sign a binding agreement with, or make any payment to the franchisor or an affiliate in connection with the proposed franchise sale.  **Note, however, that no government agency has verified the information contained in this document.**

You may wish to receive your disclosure document in another format that is more convenient for you.  To discuss the availability of disclosures in different formats, contact Samantha Rincione at 122 West 25th Street, Suite 101, Cheyenne, Wyoming, 82002, and (516)316-7420.

The terms of your contract will govern your franchise relationship.  Don't rely on the disclosure document alone to understand your contract.  Read all of your contract carefully.  Show your contract and this disclosure document to an advisor, like a lawyer or an accountant.

Buying a franchise is a complex investment.  The information in this disclosure document can help you make up your mind.  More information on franchising, such as "*A Consumer's Guide to Buying a*

*Franchise*," which can help you understand how to use this disclosure document, is available from the Federal Trade Commission.  You can contact the FTC at 1-877-FTC-HELP or by writing to the FTC at 600 Pennsylvania Avenue, NW, Washington, DC, 20580.  You can also visit the FTC's home page at *www.ftc.gov* for additional information.  Call your state agency or visit your public library for other sources of information on franchising.

There may also be laws on franchising in your state.  Ask your state agencies about them.

**Issuance Date: March 30, 2021**

## How to Use this Franchise Disclosure Document

Here are some questions you may be asking about buying a franchise and tips on how to find more information.

| QUESTION | WHERE TO FIND INFORMATION |
|---|---|
| **How much can I earn?** | Item 19 may give you information about outlet sales, costs, profits, or losses. You should also try to obtain this information from others, like current and former franchisees. You can find their names and contact information in Item 20 or Exhibit D. |
| **How much will I need to invest?** | Items 5 and 6 list fees you will be paying to the franchisor or at the franchisor's direction. Item 7 lists the initial investment to open. Item 8 describes the suppliers you must use. |
| **Does the franchisor have the financial ability to provide support to my business?** | Item 21 or Exhibit A includes financial statements. Review these statements carefully. |
| **Is the franchise system stable, growing or shrinking?** | Item 20 summarizes the recent history of the number of company-owned and franchised outlets. |
| **Will my business be the only CRAVE business in my area?** | Item 12 and the "territory" provisions in the franchise agreement and multi-unit development agreement describe whether the franchisor and other franchisees can compete with you. |
| **Does the franchisor have a troubled legal history?** | Items 3 and 4 tell you whether the franchisor or its management have been involved in material litigation or bankruptcy proceedings. |
| **What's it like to be a CRAVE franchisee?** | Item 20 or Exhibit D lists current and former franchisees. You can contact them to ask about their experiences. |
| **What else should I know?** | These questions are only a few things you should look for. Review all 23 Items and all Exhibits in this disclosure document to better understand this franchise opportunity. See the table of contents. |

## What You Need to Know About Franchising *Generally*

**<u>Continuing responsibility to pay fees</u>.**  You may have to pay royalties and other fees even if you are losing money.

**<u>Business model can change.</u>**  The franchise agreement may allow the franchisor to change its manuals and business model without your consent.  These changes may require you to make additional investments in your franchise business or may harm your franchise business.

**<u>Supplier restrictions.</u>**  You may have to buy or lease items from the franchisor or a limited group of suppliers the franchisor designates.  These items may be more expensive than similar items you could buy on your own.

**<u>Operating restrictions.</u>**  The franchise agreement may prohibit you from operating a similar business during the term of the franchise.  There are usually other restrictions.  Some examples may include controlling your location, your access to customers, what you sell, how you market, and your hours of operation.

**<u>Competition from franchisor.</u>**  Even if the franchise agreement grants you a territory, the franchisor may have the right to compete with you in your territory.

**<u>Renewal.</u>**  Your franchise agreement may not permit you to renew.  Even if it does, you may have to sign a new agreement with different terms and conditions in order to continue to operate your franchise business.

**<u>When your franchise ends.</u>**  The franchise agreement may prohibit you from operating a similar business after your franchise ends even if you still have obligations to your landlord or other creditors.


## Some States Require Registration

Your state may have a franchise law, or other law, that requires franchisors to register before offering or selling franchises in the state.  Registration does not mean that the state recommends the franchise or has verified the information in this document.  To find out if your state has a registration requirement, or to contact your state, use the agency information in Exhibit G.

Your state also may have laws that require special disclosures or amendments be made to your franchise agreement.  If so, you should check the State Specific Addendum.  See the Table of Contents for the location of the State Specific Addendum.

**Special Risks to Consider About *This* Franchise**

Certain states require that the following risk(s) be highlighted:

1) **Out-of-State Dispute Resolution.**  The franchise agreement and multi-unit development agreement require you to resolve disputes with the franchisor by arbitration and/or litigation only in Delaware.  Out-of-state arbitration or litigation may force you to accept a less favorable settlement for disputes.  It may also cost more to arbitrate or litigate with the franchisor in Delaware than in your own state.

2) **Spousal Liability.**  Your spouse must sign a document that makes your spouse liable for all financial obligations under the franchise agreement even though your spouse has no ownership interest in the franchise.  This guarantee will place both your and your spouse's marital and personal assets, perhaps including your house, at risk if your franchise fails.

3) **Financial Condition.**  The Franchisor's financial condition as reflected in its financial statements (see Item 20) calls into question the Franchisor's financial ability to provide services and support to you.

Certain states may require other risks to be highlighted. If so, check the "State Specific Addendum" (if any) to see whether your state requires other risks to be highlighted.

## TABLE OF CONTENTS

**ITEM 1** ...................................................................................................................................**1**

THE FRANCHISOR, AND ANY PARENTS, PREDECESSORS AND AFFILIATES ..........................1

**ITEM 2** ...................................................................................................................................**3**

BUSINESS EXPERIENCE ....................................................................................................3

**ITEM 3** ...................................................................................................................................**4**

LITIGATION .......................................................................................................................4

**ITEM 4** ...................................................................................................................................**4**

BANKRUPTCY ....................................................................................................................4

**ITEM 5** ...................................................................................................................................**4**

INITIAL FEES .....................................................................................................................4

**ITEM 6** ...................................................................................................................................**5**

OTHER FEES ......................................................................................................................5

**ITEM 7** .................................................................................................................................**12**

ESTIMATED INITIAL INVESTMENT ....................................................................................12

**ITEM 8** .................................................................................................................................**17**

RESTRICTIONS ON SOURCES OF PRODUCTS AND SERVICES ................................................17

**ITEM 9** .................................................................................................................................**22**

FRANCHISEE'S OBLIGATIONS ..........................................................................................22

**ITEM 10** ...............................................................................................................................**23**

FINANCING ......................................................................................................................23

**ITEM 11** ...............................................................................................................................**23**

FRANCHISOR'S ASSISTANCE, ADVERTISING, COMPUTER SYSTEMS AND TRAINING.......23

**ITEM 12** ...............................................................................................................................**33**

TERRITORY ......................................................................................................................33

**ITEM 13** ...............................................................................................................................**37**

TRADEMARKS ..................................................................................................................37

**ITEM 14** ...............................................................................................................................**39**

PATENTS, COPYRIGHTS AND PROPRIETARY INFORMATION ................................................39

**ITEM 15** ...............................................................................................................................**40**

OBLIGATION TO PARTICIPATE IN THE ACTUAL OPERATION OF THE FRANCHISE BUSINESS ........................................................................................................................40

**ITEM 16** ...............................................................................................................................**41**

RESTRICTIONS ON WHAT THE FRANCHISEE MAY SELL .......................................................41

i

**ITEM 17**................................................................................................................**41**

    RENEWAL, TERMINATION, TRANSFER AND DISPUTE RESOLUTION ....................................41

**ITEM 18**................................................................................................................**48**

    PUBLIC FIGURES ..................................................................................................48

**ITEM 19**................................................................................................................**48**

    FINANCIAL PERFORMANCE REPRESENTATIONS ........................................................48

**ITEM 20**................................................................................................................**48**

    OUTLETS AND FRANCHISEE INFORMATION ............................................................48

**ITEM 21**................................................................................................................**51**

    FINANCIAL STATEMENTS ......................................................................................51

**ITEM 22**................................................................................................................**52**

    CONTRACTS ........................................................................................................52

**ITEM 23**................................................................................................................**52**

    RECEIPTS ............................................................................................................52

<u>EXHIBITS</u>

A – Financial Statements
B-1 – Franchise Agreement
B-2 – Food Truck Addendum
C – Multi-Unit Development Agreement
D – List of Franchisees and Franchisees Who Have Left the System
E – Table of Contents of Confidential Operations Manual
F – State Specific Addendum
G – List of State Administrators/Agents for Service of Process
H – Form of General Release
I – Receipt

## ITEM 1
## THE FRANCHISOR, AND ANY PARENTS, PREDECESSORS AND AFFILIATES

**The Franchisor**

CRAVE Franchising, LLC (referred to in this Disclosure Document as "Crave," "we," "us," or "our" and where the context requires also includes our affiliates) was formed as a Wyoming limited liability company on February 24, 2018.  Our principal business address is at Herschler Building East, Suite 101, 122 West 25th Street, Cheyenne, Wyoming, 82002-0020, and we do business under our corporate name and the Marks as described below.  In this Disclosure Document, we refer to the person or entity that will be signing the Franchise Agreement (defined below) as "you," "your," or "Franchisee," which includes all franchise owners and partners, if you are a corporation, partnership or other entity.

We do not own or operate any businesses of the type being franchised.  We have not offered franchises in any other line of business and we do not engage in any other business activity.  We began offering franchises in February 2018.  In September 2019, we entered into a license agreement with Bud's Place Franchising, LLC that permits all Crave menu items to be offered and sold in all Bud's Place company-owned and franchised outlets.

Our agents for service of process are listed in Exhibit G.

**Our Parents, Predecessors and Affiliates**

We have no predecessor or affiliate.  Our parent is Rincione Investments LLC, a Wyoming limited liability company formed on February 14, 2018, and headquartered at our address ("Parent").  Our Parent does not own or operate a business of the type being franchised and will not guarantee our performance under either the Franchise Agreement or Multi-Unit Development Agreement.  Our Parent is not an approved supplier of any product or service you must purchase or lease.  Our Parent owns the proprietary marks, as described in Item 13.

**Description of Franchise**

We offer franchises for the right to establish and operate a quick serve "Crave" restaurant or food truck offering hot dogs, other cased meats, barbeque items, beverages, appetizers, and side dishes ("Restaurant", "Food Truck" or "Franchised Business").  If you choose to, and if permitted by your local ordinances, you may also offer beer and wine from your Restaurant.  Food Trucks will not offer beer and wine.  The Franchised Businesses operate under the trade name and mark "Crave" and the additional principal service marks, trademarks, trade names, logos, emblems, and indicia of origin identified in Item 13.  These principal marks and all other marks which may be designated by us in the future in writing for use with the System (defined below) are referred to in this Disclosure Document as the "Marks" or "Proprietary Marks".

Crave Franchised Businesses are operated under the Marks and the System in accordance with the terms of the Franchise Agreement.  Crave Restaurants are typically located in shopping malls, in strip centers or as free-standing locations with easy access and ample parking and will need approximately 2,500 to 3,500 square feet of space.  Each Restaurant will offer dine-in, take out, delivery and catering services and may have a drive-through.  Crave Food Trucks typically operate in densely populated towns and cities and near parks and other large public outdoor spaces.

The Franchised Businesses are established and operated under a comprehensive and unique system (the "System").  The System includes distinctive signage, interior and exterior design, décor and color

scheme; special recipes and menu items, including proprietary products and ingredients; uniform standards, specifications, and procedures for operations; quality and uniformity of products and services offered; inventory, management and financial control procedures (including point of sales and tracking systems); training and assistance; and advertising and promotional programs; all of which we may change, improve, and further develop, in our discretion.  Certain aspects of the System are more fully described in this Disclosure Document and the confidential operations manual (the "Manual"), which you should expect to evolve over time, that are provided to you as a Franchisee.

## Franchise Agreement

We offer the right to establish and operate a Restaurant or Food Truck under the terms of a single unit franchise agreement within a designated territory (the "Franchise Agreement").  Our current form of Franchise Agreement and Food Truck Addendum are Exhibits B-1 and B-2 of this Disclosure Document. You may be an individual, corporation, partnership, or other form of legal entity.  If you are an entity, then under the Franchise Agreement, each of your owners would be characterized as Franchisee's Principals (referred to in this Disclosure Document as "your Principals").  The Franchise Agreement is signed by us, by you, and individually by each of your Principals.  By signing the Franchise Agreement, your Principals agree to be individually bound by the obligations contained in the Franchise Agreement.  Depending on the type of business activities in which you or your Principals may be involved, we may require you or your Principals to sign additional confidentiality and non-competition agreements.

## Multi-Unit Development Agreement

In certain circumstances, we will offer the right to enter into a multi-unit development agreement in the form attached as Exhibit C to this Disclosure Document (the "Multi-Unit Development Agreement") to develop any combination of multiple franchised Restaurants or Food Trucks to be located within a specifically described geographic area (the "Development Area").  We will determine the Development Area before you sign the Multi-Unit Development Agreement and it will be included in the Multi-Unit Development Agreement.  You must establish at least three Franchised Businesses within the Development Area according to a minimum performance schedule, and you must sign a separate Franchise Agreement for each Franchised Business established under the Multi-Unit Development Agreement.

You will sign the Franchise Agreement for the first Franchised Business to be developed under the Multi-Unit Development Agreement at the same time you sign the Multi-Unit Development Agreement. For each additional Crave franchise developed under the Multi-Unit Development Agreement, you must sign the form of Franchise Agreement that we are then offering to new franchisees, which may differ from the current Franchise Agreement included in this Disclosure Document.  The size of the Development Area will vary depending upon local market conditions and the number of Franchised Businesses to be developed.

## Market and Competition

The market for restaurants and food trucks in general is well developed and intensely competitive. You will serve the general public and will compete with a variety of businesses, including locally owned to regional, national and chain restaurants, some of which may be franchise systems.

## Industry Regulations

The restaurant industry is heavily regulated.  A wide variety of Federal, state and local laws, rules and regulations have been enacted that may impact the operation of your Restaurant, and may include those which: (a) establish general standards, zoning, permitting restrictions and requirements and other

specifications and requirements for the location, construction, design, maintenance and operation of the Restaurant's premises; (b) set standards pertaining to employee health and safety; (c) regulate matters affecting the health, safety and welfare of your customers, such as general health and sanitation requirements for restaurants and laws and regulations relating to access by persons with disabilities; employee practices concerning the storage, handling, cooking and preparation of food; restrictions on smoking; availability of and requirements for public accommodations and requirements for fire safety and general emergency preparedness; (d) regulate food and liquor service operations including establishing requirements for food identification and labeling; and (e) regulate advertisements.  State and local agencies inspect restaurants to ensure that they comply with these laws and regulations.  You should investigate whether there are regulations and requirements that may apply in the geographic area in which you are interested in locating your Restaurant and you should consider both their effect and costs of compliance.  Additionally, each of your managers and other employees we designate must be ServSafe (or similar) certified.  Certain managers and other employees we designate (including cashiers) must also complete alcohol awareness or TIPS training.

Many of the regulations that apply to restaurants, as detailed in the paragraph above, also apply to the operation of food trucks.  The following are additional regulations that may apply to food trucks: (a) special health and food service licensing requirements and special accommodations for restrooms; (b) restrictions and requirements governing the use of vending machines; and (c) regulations regarding the proper use, storage and disposal of waste, insecticides, and other hazardous materials.  You must investigate the state and local laws that relate to zoning and permitting in the area where you will operate your Food Truck, and in the area where you will park and store your Food Truck when not in use.  You must comply with all local, state, and federal laws that apply to your Food Truck relating to driver's licensing, commercial food vehicle registration, permitting and licensing, automobile insurance requirements, health laws, sanitation requirements, and no-smoking laws.  In some states, a physical examination may be required to obtain a license to drive a commercial vehicle.  Most states require liability insurance coverage for both the driver and the vehicle.

## ITEM 2
## BUSINESS EXPERIENCE

### Chief Executive Officer (CEO) and Chief Operations Officer (COO) – Samantha Rincione

Mrs. Rincione has been our CEO and COO since our inception in February 2018 and has been CEO and COO of our Parent since its inception in February 2018.  From June 2017 to the present, she has been a principal of Emerging Franchises, a consulting firm based in St. James, New York.  From February 2015 to June 2017, she was Vice President of Franchise Development of UFood Grill in Burlington, Massachusetts.  From February 2015 to June 2017, she was an independent franchise development consultant based in Burlington. Massachusetts.  Mrs. Rincione was CEO/President of restaurant operator SG Mango, LLC in Westhampton Beach, New York, from February 2010 to February 2015.

### Chief Development Officer (CDO) – Salvatore Rincione

Mr. Rincione has been our CDO since our inception in February 2018 and has been CDO of our Parent since its inception in February 2018.  From June 2017 to the present, he has been a principal of SR Consulting, a restaurant consulting firm based in St. James, New York.  From February 2015 to June 2017, he was Chief Executive Officer of UFood Grill in Burlington, Massachusetts.  From February 2015 to June 2017, he was Vice President of Healthy Acquisitions Corp. in Burlington, Massachusetts.  From September 2007 to January 2015, he was Vice President of BRIX Holdings in Holbrook, New York.

**Director of Operations, Logistics and Franchisee Relations – Jake Moran**

Mr. Moran has been our Director of Operations, Logistics and Franchisee Relations since February 2021.  Prior to that he had been our Director of Operations and Training since our inception in February 2018.  From June 2017 to the present, Mr. Moran has been Franchise Director for Emerging Franchises, a consulting firm based in St. James, New York.  From February 2015 to June 2017, he was Training Manager for BRIX Holdings in Deer Park, New York.  Mr. Moran was Training Manager for SG Mango North Babylon LLC in Deer Park, New York, from September 2012 to February 2015.

**Director of Training and Franchise Support – Jeremy Shoemaker**

Mr. Shoemaker has been our Director of Training and Franchise Support since February 2021.  From October 2020 to February 2021, he was a consultant with Planet 13 in Las Vegas, Nevada, and was the General Manager at Essence, also in Las Vegas, Nevada, from October 2019 to April 2020.  Mr. Shoemaker was the Senior Area Coach with Diversified Restaurant Group located in Las Vegas, Nevada, from September 2016 to October 2019.

**ITEM 3**
**LITIGATION**

No litigation is required to be disclosed in this Item.

**ITEM 4**
**BANKRUPTCY**

No bankruptcy information is required to be disclosed in this Item.

**ITEM 5**
**INITIAL FEES**

**Franchise Agreement**:  You must pay us an initial franchise fee of $40,000 for the right to establish a single Crave Restaurant under a Franchise Agreement.  If you are purchasing your second or third Restaurant, the initial franchise fee will be reduced to $35,000.  If you are purchasing your fourth or later Restaurant, the initial franchise fee will be reduced to $30,000.

You must pay us an initial franchise fee of $25,000 for the right to establish a single Crave Food Truck business under a Franchise Agreement.  If you already own and operate a Crave Restaurant and desire to own and operate a Food Truck business, the initial franchise fee for the Food Truck will be reduced to $20,000.

From time to time we may offer special incentive programs as part of our franchise development activities.  We currently offer an incentive program where we will discount the initial franchise fee by $5,000 to veterans and active-duty military personnel for the first Franchised Business purchased.  We have the right to offer, modify or withdraw any incentive program without notice to you.  The initial franchise fee is imposed uniformly on all franchisees and is not refundable under any circumstances.

In the last fiscal year, the initial franchise fees for four franchisees were discounted between $5,000 and $15,000.

**Grand Opening Marketing**:  You must pay us $5,000 if you are opening a Restaurant or $2,500 if you are starting a Food Truck business, for a grand opening marketing campaign that we will conduct on your behalf around the opening of your Franchised Business.  This money is not refundable.

**Multi-Unit Development Agreement**:  If you qualify to develop and operate multiple Crave Franchised Businesses, then you will pay to us a development fee equal to 100% of the initial franchise fee for the first Franchised Business you commit to develop under the Multi-Unit Development Agreement plus 50% of the initial franchise fee for each additional Franchised Business you commit to develop under the Multi-Unit Development Agreement.  You may commit to develop any combination of Restaurants and Food Trucks under a Multi-Unit Development Agreement.  For example, if you commit to develop three Food Trucks, the development fee is calculated as $25,000 + (2 x $12,500 = $25,000) = $50,000.  If you commit to develop three Restaurants, the development fee is calculated as $40,000 + (2 x $17,500 = $35,000) = $75,000.  If you commit to develop a minimum of three units in some other combination of Food Trucks and Restaurants, the development fee will be an amount between $50,000 and $75,000.  The development fee is fully earned by us when received and is not refundable or credited against any future fees payable by you under any Franchise Agreement or otherwise.

You will sign the Franchise Agreement for the first Franchised Business at the same time you sign the Multi-Unit Development Agreement, and we will apply a portion of the development fee to pay the initial franchise fee for the first Franchised Business in full.  For each additional Franchised Business you will develop under the Multi-Unit Development Agreement, we will apply a credit of 50% of the amount of the initial franchise fee for that Franchised Business, and the balance of the initial franchise fee due for that Franchised Business is payable in a lump sum when you sign the Franchise Agreement for that Franchised Business.  The development fee is imposed uniformly on all multi-unit developers and is not refundable under any circumstances.

There are no other purchases from or payments to us or any affiliate of ours that you must make before your Franchised Business opens for business.

## ITEM 6
## OTHER FEES

| (1)<br>Fees [1] | (2)<br>Amount | (3)<br>Due Date | (4)<br>Remarks |
|---|---|---|---|
| Royalty Fee [2] | 7% of Gross Sales | Payable weekly on Wednesday (unless Wednesday is not a business day, then it is due on the next business day) | Royalty Fees are calculated based on Gross Sales for the previous week ending Sunday.  Amounts due will be withdrawn by EFT from your designated bank account. |
| Brand Development Fee [3] | 1% of Gross Sales | Payable together with the Royalty Fee | The Brand Development Fund is described in Item 11.  Franchisees who own only a Food Truck business are not required to pay the brand development fee. |

| (1)<br>Fees [1] | (2)<br>Amount | (3)<br>Due Date | (4)<br>Remarks |
|---|---|---|---|
| Local Marketing | 1% of Gross Sales for Restaurants<br><br>2% of Gross Sales for Food Trucks | Must be spent on a quarterly basis | Payable to your local marketing suppliers.  Any marketing you wish to use must first be approved by us. |
| Cooperative Marketing [4] | As determined by the members | As determined by the members | If a marketing cooperative is formed for the geographic area where your Franchised Business is located, you must join the cooperative.  Any money you contribute to a cooperative will count toward your local marketing requirement. |
| Initial Training (For New or Replacement Employees) | Our then-current per diem training fee, plus trainees' expenses<br><br>Current per diem fee, per trainee = $500 | Before training | The cost to train two people is included in the initial franchise fee.  If you request that we provide our initial training program to any additional employees, or to new or replacement employees during the term of your Franchise Agreement, you must pay our training fee as well as the trainees' expenses, including travel, lodging, meals and wages. |
| Additional On-Site Training / Remedial Training | Our then-current per diem rate per trainer, plus expenses<br><br>Current per diem rate = $500 | When billed | If you request that we provide additional training at your Franchised Business, or if as the result of an inspection or quality assurance audit we believe that remedial training is necessary, you must pay our daily fee for each trainer we send to your Franchised Business, and you must reimburse each trainer's expenses, including travel, lodging and meals. |

| (1)<br>Fees [1] | (2)<br>Amount | (3)<br>Due Date | (4)<br>Remarks |
|---|---|---|---|
| Interest | 18% per annum or the highest interest rate allowed by applicable law, whichever is greater | On demand | Interest may be charged on all overdue amounts.  Interest accrues from the original due date until payment is received in full. |
| Audit Fee | Cost of audit (estimated to be between $1,000 and $5,000) | When billed | Payable only if we find, after an audit, that you have understated Gross Sales by 2% or more or you have understated any amount you owe to us.  You must also pay the understated amount plus interest. |
| Insufficient Funds Fee | $100 per occurrence | On demand, if incurred | Payable if there are insufficient funds in your account to pay fees due to us. If you incur three insufficient funds fees in any 12-month period, we have the right to terminate your Franchise Agreement. |
| Transfer Fee – Transfer Between Owners | $5,000 | With request for approval of transfer | For any transfer of ownership interests or shares between the owners of the franchise, or if you are adding a new owner (as long as majority ownership does not change). |
| Transfer Fee – Franchise Agreement | $5,000 | With request for approval of transfer | No fee charged for a one-time transfer from individual(s) to a corporate entity formed for convenience of ownership of the franchise. |
| Transfer Fee – Multi-Unit Development Agreement | $5,000 | With request for approval of transfer | No fee charged for a one-time transfer from individual(s) to a corporate entity formed for convenience of ownership of the franchise. |
| Renewal Fee | $5,000 | Upon renewal of the Franchise Agreement | |

| (1)<br>Fees [1] | (2)<br>Amount | (3)<br>Due Date | (4)<br>Remarks |
|---|---|---|---|
| Relocation Fee | $5,000 | With request for approval of relocation | If you wish to relocate your Restaurant or operate your Food Truck in a different municipality |
| Inspection / Product and Supplier Evaluation | $250 per product or supplier to be evaluated, plus reimbursement of our expenses | On demand | Payable if you request that we evaluate a product or supplier that we have not previously approved and that you want to use for your Franchised Business. Payable also if we determine that your Franchised Business is offering items that do not conform to our specifications. |
| Liquidated Damages | See footnote 5 | | |
| Costs and Attorneys' Fees | Will vary under circumstances | On demand | If you default under your agreement, you must reimburse us for the expenses we incur (such as attorneys' fees) in enforcing or terminating the agreement. |
| Indemnification | Will vary under circumstances | On demand | You must reimburse us for the costs we incur if we are sued or held liable for claims that arise from your operation of the Franchised Business or for costs associated with defending claims that you used the trademarks in an unauthorized manner. |
| Repair, Maintenance, and Remodeling/ Redecorating | Will vary under circumstances | As incurred | Payable to approved suppliers. You must regularly clean and maintain your Franchised Business and its equipment. We may require you to remodel or redecorate your Franchised Business to meet our then-current image for all Crave businesses. We will not require you to remodel or redecorate your Franchised Business more frequently than every five years. |

| (1) Fees [1] | (2) Amount | (3) Due Date | (4) Remarks |
|---|---|---|---|
| Charges for "mystery shopper" quality control evaluation | Up to $150 | Monthly | See Note 6.  The mystery shopper program will be separate from our programs for customer surveys and customer satisfaction audits (which may require you to accept coupons from participating customers for discounted or complimentary items). |
| ServSafe / TIPS (or similar) Certification | $150 per person or the then-current market rate | As needed | Each of your managers and other employees we designate must be ServSafe and TIPS or similarly certified.  Payable to an approved supplier |
| Insurance Premiums | Reimbursement of our costs, plus 10% administrative fee | On demand | If you do not obtain or maintain the required insurance coverages, we have the right (but not the obligation) to obtain insurance on your behalf and you must reimburse us. |
| Management Fee | 10% of Gross Sales, plus expenses | If incurred | We may step in and manage your Franchised Business in certain circumstances, such as death, disability, or prolonged absence.  We will charge a management fee if we manage your Franchised Business, and you must reimburse our expenses. |
| Co2 Equipment Fee | $100 to 300 | Monthly | Payable to approved supplier |
| Point of Sale Software Fee-Clover POS System | $135 to $175 for Restaurant $50 to $75 for Food Truck | Monthly | Payable to Clover Network, Inc., our designated supplier for the point of sale system. |
| Point of Sale Reporting App-Abreeze | $5 to $48 | Monthly | See Note 7.  Payable to Clover Network, Inc., for use of the Abreeze Reporting App that is required for weekly Gross Sales reporting. |

| (1)<br>Fees [1] | (2)<br>Amount | (3)<br>Due Date | (4)<br>Remarks |
|---|---|---|---|
| Untappd App Subscription | $500 per year or $20-$50 per month | Annually or Monthly | Payable to Untappd for use of the app used for updating the tap beers on the beer wall and for communication with the local beer community. Subscriptions may be purchased annually or monthly but use of this app is mandatory.  This subscription is not required for Food Truck businesses. |
| Gift Card Program | $500 to $1,500 for initial inventory depending on the number purchased<br><br>$3.05 monthly processing fee, plus $0.25 per transaction<br><br>$0.02 ACH transaction surcharge | As incurred | Payable to approved supplier. You must participate in our gift card program.  Gift cards will be available for sale and redemption at any Restaurant or Food Truck in the System. |
| Crave Loyalty Program and Digital Ordering Mobile Solution—Appetizer App | $90 to $105 | Monthly | Payable to Clover Network, Inc., our designated supplier of loyalty, mobile application, digital ordering, and self-order kiosk services. |
| Prohibited Product or Service Fee | $500 per day for each day the infraction continues | As incurred | If you offer any product or service at your Franchised Business that we have not approved |
| Menu Board and Music | $139 to $250 | Monthly | Payable to approved supplier. Food Truck businesses will pay the lower end of this fee because they are not required to have music but are required to have the Menu Board. |
| PourMyBeer Support Fee | $250 | Monthly | Payable to PourMyBeer for the support and maintenance services related to the beer wall in your Restaurant. Food Truck businesses are not required to pay this fee. |

**Notes**:

1.      All fees described in this Item 6 are non-refundable and are uniformly imposed.  Except as otherwise indicated in the preceding chart, we impose all fees and expenses listed and you must pay them to us.  Except as specifically stated above, the amounts given may be due to changes in market conditions, our cost of providing services and future policy changes.  At the present time we have no plans to increase payments over which we have control, but as noted in the chart above and in these notes, we have the right to increase certain fees upon notice to you.

2.      For the purposes of determining the royalties to be paid under the Franchise Agreement, "Gross Sales" means the total selling price of all services and products and all income of every other kind and nature related to the Franchised Business, whether for cash or credit and regardless of collection in the case of credit.  If a cash shortage occurs, the amount of Gross Sales will be determined based on the records of the point of sale system and any cash shortage will not be considered in the determination.  Gross Sales expressly excludes taxes collected from your customers and paid to the appropriate taxing authority and customer refunds or adjustments.

You must report your Gross Sales to us by Tuesday each week for the previous week ending Sunday.  The Royalty Fee and brand development fee (for Restaurants only) will be withdrawn from your designated bank account by electronic funds transfer ("EFT") weekly on Wednesday based on the Franchised Business' Gross Sales for the preceding week ending Sunday.  If you do not report the Franchised Business' Gross Sales, we may debit your account for 120% of the last Royalty Fee and brand development fee (for Restaurants only) that we debited.  If the fees we debit are less than the fees you actually owe us, once we have been able to determine the true and correct Gross Sales, we will debit your account for the balance on a day we specify.  If the fees we debit are greater than the fees you actually owe us, we will credit the excess against the amount we otherwise would debit from your account during the following week.

If any state imposes a sales or other tax on the Royalty Fees, then we have the right to collect this tax from you.

If a state or local law applicable to your Restaurant prohibits or restricts in any way your ability to pay Royalty Fees or other amounts based on Gross Sales derived from the sale of beverage alcohol at the Restaurant, then the percentage rate for calculating Royalty Fees shall be increased, and the definition of Gross Sales shall be changed to exclude sales of beverage alcohol, so that the Royalty Fees to be paid by you shall be equal to the amounts you would have had to pay if sales from beverage alcohol were included in Gross Sales.  For example, if you generated $1,000 in Gross Sales, of which $200 is from the sale of beverage alcohol, then your weekly Royalty Fee is $60 (6% x $1,000).  If you are not permitted by law to pay Royalty Fees on the sale of beverage alcohol, then we must recalculate your royalty percentage so that you still pay the full Royalty Fee.  In our example, we must deduct $200 from the Gross Sales and raise your royalty percentage to 7.5% so that we may collect the same $60 Royalty Fee ($1,000 - $200 = $800 x 7.5% = $60).

3.      We will establish and administer a Brand Development Fund on behalf of the System to provide national or regional creative materials for the benefit of the System.

4.      Cooperatives will include all Franchised Businesses in a designated geographic area and may include Crave businesses owned by us and our affiliates.  Each Crave business has one vote in the cooperative, but no one Crave business or commonly controlled group of businesses will have more than 25% of the total vote.  No cooperatives have been established as of the date of this Disclosure Document.

5.      If we terminate your Franchise Agreement for cause, you must pay us within 15 days after the effective date of termination liquidated damages equal to the average monthly Royalty Fees you paid or owed to us during the 12 months of operation preceding the effective date of termination multiplied by (a) 24 (being the number of months in two full years), or (b) the number of months remaining in the Agreement had it not been terminated, whichever is lower.

6.      We may use an independent service to conduct a "mystery shopper" quality control and evaluation program.  You must participate in this program, and we may require that you pay the then-current charges imposed by the evaluation service (as we direct, either directly to the evaluation service provider or to us as a reimbursement).

7.      Although the computer system is designed to enable us to have independent access to the information monitored by the system, this does not diminish your responsibility to report your Gross Sales to us weekly as described in Note 2 above.  Gross Sales will be reported to us through the Abreeze Reporting App available through the Clover point of sale system.  You are required to use the app to calculate and report your Gross Sales to us each week.

### ITEM 7
### ESTIMATED INITIAL INVESTMENT

### YOUR ESTIMATED INITIAL INVESTMENT - RESTAURANT

| (1)<br>Type of Expenditure | (2)<br>Amount | (3)<br>Method of Payment | (4)<br>When Due | (5)<br>To Whom Payment is to be Made |
|---|---|---|---|---|
| Initial Franchise Fee [(1)] | $40,000 | Lump Sum | When Franchise Agreement Signed | Us |
| Rent – 3 Months [(2)] | $9,000 to $30,000 | As arranged | As arranged | Landlord |
| Lease & Utility Security Deposit [(3)] | $4,000 to $15,500 | As arranged | As arranged | Landlord, Utility Companies |
| Design & Architect Fees [(4)] | $1,000 to $13,500 | As arranged | As arranged | Designer or Architect |
| Leasehold Improvements [(5)] | $50,000 to $350,000 | As arranged | As arranged | Contractor |
| Signage [(6)] | $3,000 to $25,000 | As arranged | As arranged | Suppliers |
| Equipment, Furniture and Fixtures [(7)] | $75,000 to $150,000 | As arranged | As arranged | Suppliers |
| Point of Sale & Computer Equipment [(8)] | $1,500 to $5,500 | As arranged | As arranged | Suppliers |

| (1) Type of Expenditure | (2) Amount | (3) Method of Payment | (4) When Due | (5) To Whom Payment is to be Made |
|---|---|---|---|---|
| Business Licenses & Permits (Not Including Beer/Wine License) [9] | $500 to $4,000 | As arranged | As arranged | Government Agencies |
| Professional Fees [10] | $1,000 to $2,500 | As arranged | As arranged | Attorney, Accountant |
| Insurance – 3 Months [11] | $1,000 to $2,000 | As arranged | As arranged | Insurance Companies |
| Initial Inventory- Food & Other Items [12] | $8,000 to $12,000 | As arranged | As arranged | Suppliers |
| Initial Inventory- Alcohol [12] | $5,000 to $8,000 | As arranged | As arranged | Suppliers |
| Training Expenses [13] | $500 to $1,500 | As arranged | As arranged | Airline, Hotel, Restaurant, etc. |
| Grand Opening Marketing [14] | $5,000 | As arranged | As arranged | Us |
| Additional Funds – 3 Months [16] | $15,000 to $30,000 | As arranged | As arranged | You Determine |
| Total [17] | $219,500 to $694,500 | | | |

### YOUR ESTIMATED INITIAL INVESTMENT – FOOD TRUCK

| (1) Type of Expenditure | (2) Amount | (3) Method of Payment | (4) When Due | (5) To Whom Payment is to be Made |
|---|---|---|---|---|
| Initial Franchise Fee [1] | $25,000 | Lump Sum | When Franchise Agreement Signed | Us |
| Truck with Equipment [15] | $150,000 to $216,000 | As arranged | As arranged | Designated Supplier |
| Signage [6] | $0 to $1,000 | As arranged | As arranged | Suppliers |
| Point of Sale & Computer Equipment [8] | $1,000 to $2,500 | As arranged | As arranged | Suppliers |

| (1) Type of Expenditure | (2) Amount | (3) Method of Payment | (4) When Due | (5) To Whom Payment is to be Made |
|---|---|---|---|---|
| Business Licenses & Permits [9] | $200 to $1,000 | As arranged | As arranged | Government Agencies |
| Insurance – 3 Months [11] | $100 to $300 | As arranged | As arranged | Insurance Companies |
| Initial Inventory- Food & Other Items [12] | $2,000 to $7,500 | As arranged | As arranged | Suppliers |
| Training Expenses [13] | $500 to $1,500 | As arranged | As arranged | Airline, Hotel, Restaurant, etc. |
| Grand Opening Marketing [14] | $2,500 | As arranged | As arranged | Us |
| Additional Funds – 3 Months [16] | $5,000 to $15,000 | As arranged | As arranged | You Determine |
| Total [17] | $186,300 to $272,300 | | | |

In general, none of the expenses listed in the above chart are refundable, except any security deposits you must make may be refundable. We do not finance any portion of your initial investment. All of our estimates assume that you will purchase the required items. Your costs may be lower if you choose to lease some items.

**Notes:**

1.   *Initial Franchise Fee*. The initial franchise fees are discussed in Item 5.

2.   *Rent*. Our estimates assume that you will lease space for your Restaurant. Your Restaurant must be in a shopping mall, in strip centers or a free-standing location with easy access and ample parking, and you will need approximately 2,500 to 3,500 square feet. Landlords may vary the base rental rate and charge rent based on a percentage of gross sales. In addition to base rent, your lease may require you to pay common area maintenance charges ("CAM Charges") for your pro rata share of the real estate taxes and insurance, and your pro rata share of other charges. The actual amount you pay under the lease will vary depending on the size of the Restaurant, the types of charges that are allocated to tenants under the lease, your ability to negotiate with landlords and the prevailing rental rates in the geographic region.

If you choose to purchase real property on which to build your Restaurant, your initial investment will probably be higher than what we estimate above. If you purchase real property, we cannot estimate how this purchase will affect your total initial investment.

3.   *Lease & Utility Security Deposit*. Our estimate assumes you will need to provide one month of rent as a security deposit to your landlord, and you may need to provide security deposits for your utilities (such as gas, water and/or electric).

4. ***Design & Architect Fees***.  You must obtain construction plans for the build-out of your Restaurant according to our specifications.  We have the right to designate and/or approve of the designer and/or architect you use.

5. ***Leasehold Improvements***.  The cost of leasehold improvements will vary depending on many factors, including: (a) the size and configuration of the premises; (b) pre-construction costs (including demolition of existing walls and removal of existing improvements and fixtures); and (c) cost of materials and labor, which may vary based on geography and location or whether you must use union labor for the build-out of your Restaurant.  These amounts may vary substantially based on local conditions, including the availability and prices of labor and materials.  These costs may also vary depending on whether certain of these costs will be incurred by the landlord or through landlord tenant improvement contributions, and the condition of the space before you take possession of the premises.  The low end of our estimate assumes that you have leased space that previously operated as a restaurant and that you will convert to a Crave Restaurant.  The high end of our estimate assumes that you have leased a "vanilla box" space and that more improvements are required.  Our estimate does not include any tenant improvement allowance that you may negotiate.  We must approve of the contractor you wish to use in the build-out of your Restaurant.

6. ***Signage***.  The amounts on the Restaurant table represent your cost for interior and exterior signage, including the temporary vehicle signage we may require to be placed on delivery vehicles.  Your landlord or your local ordinances may have different restrictions it places on interior and exterior signage which may affect your costs.  The amounts on the Food Truck table represent the costs for optional exterior free-standing signage.

7. ***Equipment, Furniture and Fixtures***.  The equipment you will need includes freezer, refrigerators, prep tables, cooking ovens, sound system, small wares, and other typical items necessary to outfit and operate a restaurant.  The furniture you will need for your Restaurant includes chairs, counters, tables, and barstools.  The fixtures you will need include artwork, décor items, and lighting.  Our estimate includes the equipment and services necessary for installation of a self-serve beer tap wall, which must be purchased from PourMyBeer.  PourMyBeer is the sole approved supplier of self-serve beer tap wall equipment and installation services.  The self-serve beer tap wall in your Restaurant must have at least a 24 to 32 tap system but may have more than 32 taps.

8. ***Point of Sale & Computer Equipment***.  You must purchase or lease the point of sale and computer system that we designate for your Franchised Business.  Additional information regarding the required point of sale and computer system is included in Item 11.

9. ***Business Licenses and Permits***.  These are estimates of the costs for obtaining local business licenses which typically remain in effect for one year.  These figures do not include occupancy and construction permits for your Restaurant which are included in the leasehold improvements estimate.  The cost of these permits and licenses will vary substantially depending on whether you operate a Restaurant or a Food Truck and on the location of the Franchised Business.  We strongly recommend that you verify the cost for all licenses and permits required in your jurisdiction before signing the Franchise Agreement.

You will offer beer and may offer wine from your Restaurant, unless local law prohibits you from offering beverage alcohol.  Since the availability and expenses of acquiring a beer and wine license vary substantially from jurisdiction to jurisdiction, you should consult the appropriate governmental authority concerning the availability of the required license and the associated expenses for your Restaurant before you sign a Franchise Agreement.  We have not included the cost of a beer and wine license in our estimate.  The cost of a beer and wine license can range from under $2,000 to over $100,000 depending on the location and jurisdiction but can be even higher in some states.  We strongly recommend that you verify the cost

and availability of a beer and wine license in your jurisdiction before signing the Franchise Agreement, if your Restaurant will offer beer and wine.

10. **Professional Fees**.  We strongly recommend that you engage an accountant and a franchise attorney to advise you in your evaluation of the franchise we are offering.

11. **Insurance**.  These figures are estimates of the cost of the quarterly premiums for the insurance you must obtain and maintain for your Franchised Business, as described in Item 8.  Insurance premiums may be payable monthly, quarterly, semi-annually, or annually, based on the insurance company's practices and your creditworthiness.

12. **Initial Inventory-Food & Other Items/Initial Inventory-Alcohol**.  These amounts represent your initial inventory of food, beer, wine and other beverage supplies, paper products, and cleaning materials and supplies.  Food Truck businesses will not offer beer and alcohol and will not incur expenses related to alcohol inventory.

13. **Training Expenses**.  These estimates include only your out-of-pocket costs associated with attending our initial training program, including travel, lodging, meals, and applicable wages for two trainees.  These amounts do not include any fees or expenses for training any other personnel.  Your costs may vary depending on your selection of lodging and dining facilities and mode and distance of transportation.  Our training program lasts for approximately one week.

14. **Grand Opening Marketing**.  You must pay to us $5,000 to conduct a grand opening marketing campaign for your Restaurant or Food Truck on your behalf.  The grand opening marketing campaign will be conducted during your first 90 days of operation or we may choose a different time period to conduct the grand opening marketing campaign for you.

15. **Truck with Equipment**.  You will purchase or finance your Food Truck through our designated supplier.  A 10% down payment must be paid to the designated supplier before the build-out will commence on your Food Truck.  These estimates include the cost of the Food Truck, the vehicle wrap, all the food service equipment required by us (refrigerator, ovens, etc.) to operate the Food Truck and the labor costs to build-out the truck.

16. **Additional Funds**.  We relied upon our principals' experience in opening and operating restaurants and food truck businesses since 2007 in preparing these figures.  You will need capital to support ongoing expenses, such as payroll, utilities, rent, Royalty Fees, brand development and other advertising fees, and other start-up fees (ex., gift card program) if these costs are not covered by sales revenue for your first three months of operation.  Our estimate does not include any sales revenue you may generate.  New businesses often generate a negative cash flow.  We estimate that the amount given will be sufficient to cover ongoing expenses for the start-up phase of the business, which we calculate to be three months.  This is only an estimate and there is no guarantee that additional working capital will not be necessary during this start-up phase or after.  Your actual costs may vary and will depend on factors such as the size and condition of the space and cost to convert to a Restaurant; your management skill, experience and business acumen; local economic conditions; the local market for the Franchised Business' products; the prevailing wage rate; competition; the sales level reached during the start-up phase; actual rental prices in your area, and other site-specific requirements or regulations.  These amounts do not include any estimates for debt service.

*     *     *     *     *

**YOUR ESTIMATED INITIAL INVESTMENT**
**MULTI-UNIT DEVELOPER – DEVELOPMENT OF THREE FRANCHISED BUSINESSES**

| (1)<br>Type of<br>Expenditure | (2)<br>Amount | (3)<br>Method of<br>Payment | (4)<br>When Due | (5)<br>To Whom<br>Payment is to<br>be Made |
|---|---|---|---|---|
| Development Fee [(1)] | $50,000 to $75,000 | Lump Sum | On signing Multi-Unit Development Agreement | Us |
| Vehicle – 3 Months [(2)] | $2,000 to $2,500 | As Arranged | As Incurred | Suppliers |
| Other Expenditures for First Franchised Business [(3)] | $161,300 to $654,500 | See First Table | See First Table | See First Table |
| **Total** | **$213,300 to $732,000** | | | |

In general, none of the expenses listed in the above chart are refundable. We do not finance any portion of your initial investment.

**Notes:**

1.      ***Development Fee; Initial Franchise Fee***. These fees are discussed in Item 5. Our estimate assumes you will develop the minimum of three Franchised Businesses, with the low end representing the development fee if you commit to develop three Food Trucks and the high end representing the development fee if you commit to develop three Restaurants. If you choose to develop additional Franchised Businesses, your development fee will increase by 50% of the initial franchise fee for each additional Food Truck or Restaurant you commit to develop.

2.      ***Vehicle***. We anticipate that you will need a vehicle to view potential sites and to oversee the build-out of the Restaurant or the customization of the Food Truck. Our estimate includes three months of expenses for gas, maintenance, and vehicle payments.

3.      ***Other Expenditures for First Franchised Business***. These are the estimates to establish your first Franchised Business. Because you may commit to any combination of Restaurants or Food Trucks under a Multi-Unit Development Agreement, the low end of this estimate represents the costs associated with establishing a Food Truck as your first unit. The high end of this estimate represents the costs associated with establishing a Restaurant for your first unit. Costs associated with establishing additional Franchised Businesses are subject to factors that we cannot estimate or control, such as inflation, increased labor costs or increased materials costs.

**ITEM 8**
**RESTRICTIONS ON SOURCES OF PRODUCTS AND SERVICES**

You must purchase or lease and install all fixtures, furnishings, equipment (including point of sales system), décor items, signs and related items we require, all of which must conform to the standards and specifications stated in our Confidential Operations Manual (the "Manual") or otherwise in writing, unless

you have first obtained our written consent to do otherwise. You may not install or permit to be installed on the Restaurant premises, or on or in the Food Truck, any fixtures, furnishings, equipment, décor items, signs, games, vending machines or other items without our written consent or that do not comply with our specifications.

To make sure that the highest degree of quality and service is maintained, you must operate the Franchised Business in strict conformity with the methods, standards, and specifications that we prescribe in the Manual or otherwise in writing. You must maintain in sufficient supply and use and sell at all times only those food and beverage items, ingredients, products, materials, supplies and paper goods that meet our standards and specifications. All menu items must be prepared in accordance with the recipes and procedures specified in the Manual or other written materials. You must not deviate from these standards and specifications by the use or offer of non-conforming items, or differing amounts of any items, without obtaining our written consent first. We can, and expect to, modify our standards and specifications as we deem necessary. We will provide you notice in the Manual or otherwise in writing (such as via email) of any changes in our standards and/or specifications.

You must permit us or our agents, during normal business hours, to remove a reasonable number of samples of food or non-food items from your inventory or from the Franchised Business free of charge for testing by us or by an independent laboratory to determine whether the samples meet our then-current standards and specifications. In addition to any other remedies we may have, we may require you to reimburse our costs for the testing if we have not previously approved the supplier of the item or if the sample fails to conform to our specifications.

You must obtain all food and beverage items, ingredients, supplies, materials, fixtures, furnishings, equipment (including point of sale system and communication systems), and other products used or offered for sale at the Franchised Business solely from suppliers who demonstrate, to our continuing reasonable satisfaction, the ability to meet our then-current standards or in accordance with our standards and specifications. A complete list of our approved products and suppliers will be included in the Manual and is subject to change over time. We will provide you notice in the Manual or otherwise in writing (such as via email) of any changes to the lists of approved products and approved suppliers.

Our sole approved supplier for the required self-serve beer tap wall equipment and installation services and for the support and maintenance of the beer wall in your Restaurant is PourMyBeer based in Chicago, Illinois. You must purchase all non-beer tap wall equipment, and all furniture and small wares from our designated supplier for these products, Burkett Restaurant Equipment & Supplies in Perrysburg, Ohio. You must also purchase or lease the eight-valve legacy system (bag-in-box) soda dispensing machine from The Coca-Cola Company, and it must include the dispenser for Gold Peak Tea. Food Truck businesses are not required to have the soda dispensing machine. You must use the Untappd App in operating your Restaurant in order to update the tap beers on the beer wall and to communicate with the local beer community. The designated supplier for this app is Untappd (www.untappd.com). Use of this app is not required for Food Truck businesses.

You must use the Clover point of sale system, and Clover Network, Inc. in Sunnyvale, California, is our designated supplier for this system and for the Abreeze Reporting App. You must also participate in our Crave Loyalty Program and offer digital ordering and mobile services through our mobile application and self-order kiosks (kiosks in Restaurants only), and you must use our designated Appetizer App. The fees for this program and these services are also paid to Clover Network, Inc.

You must purchase or lease your Food Truck from our designated supplier, Premier Food Trucks located in Palm Coast, Florida (phone: 386-597-7580). None of our officers has an ownership interest in any of the above and below-named suppliers.

*Additional Mandatory Approved Suppliers:*  You must purchase from or use the services of the following mandatory approved suppliers in the following designated categories.

<u>Architect</u>:
Ni Design
Wesley Krech, Project Manager
11 Talcott Notch Road
Farmington, Connecticut 06032
Phone: 860-678-1946 x104
Fax: 860-678-7111
Web: www.nidesign.net

<u>All Food Items</u>:
Sysco Corporation
1032 Baugh Road
Selma, North Carolina 27576
Phone: 866-755-5060
Web: www.sysco.com

<u>All Non-Alcoholic Beverage Items</u>:
The Coca-Cola Company
1 Coca-Cola Plaza NW
Atlanta, Georgia 30313
Phone: 404-676-2121
Email: echeyne@coca-cola.com

or

Sysco Corporation
1032 Baugh Road
Selma, North Carolina 27576
Phone: 866-755-5060
Web: www.sysco.com

<u>Exterior Signage</u>:
Universal Signs & Service
435 Brook Avenue
Deer Park, New York 11729
Contact: Rick Lackner
Phone: 631-446-1121
Web: www.universalsignsny.com

<u>Window Signage/Uniforms/Advertising Materials</u>:
Boston Creative Design
520 Main Street, Building 3
Wilmington, Massachusetts 01887
Contact: Bil Gallagher
Phone: 978-988-1000 or 978-566-9743
Web: www.bostoncreative.com

If you wish to purchase, lease or use any products that we have not previously approved, or purchase or lease from a supplier we have not previously approved, you must submit a written request for approval or you must request the supplier to do so. You must pay our then-current evaluation fee for each product or supplier you request to have approved, and you must reimburse our reasonable costs related to our testing and inspection. We must approve any product or supplier in writing before you make any purchases of that product or from that supplier. We can require that our representatives be permitted to inspect the supplier's facilities and that samples from the supplier be delivered, either to us or to an independent laboratory, for testing. We have the right to re-inspect the facilities and products of any approved supplier and to revoke our approval if the supplier fails to continue to meet any of our then-current standards. Our supplier approval procedure does not obligate us to approve any particular supplier. We will notify you in writing within 30 days after you have requested our approval whether the proposed product or supplier is, in fact, approved or disapproved. We are not required to make available to you or to any supplier our criteria for product or supplier approval. We are not obligated to approve any specific product or supplier if we believe that approval of that product or supplier is not in the best interests of the System. We may revoke our prior approval of any product or supplier at any time, and after your receipt of written notice from us regarding our revocation you must stop using that product or stop purchasing from that supplier.

We and/or our affiliates may develop for use in the System certain products which are prepared from confidential proprietary recipes and other proprietary products which bear the Marks. Because of the importance of quality and uniformity of production and the significance of those products in the System, it is to your and our benefit that we closely control the production and distribution of those products. Therefore, you will use only our proprietary recipes and other proprietary products and will purchase those items solely from us or from a source designated by us all of your inventory of those products.

Currently neither we nor our Parent are an approved supplier of any product or service. None of our officers has an ownership interest in any approved supplier.

We may, when appropriate, negotiate purchase arrangements, including price terms, with designated and approved suppliers on behalf of the System. As of the date of this Disclosure Document, there are no purchasing or distribution cooperatives in which you must participate. When determining whether to grant new, additional or renewal franchises, we consider many factors, including your compliance with the requirements described in this Item 8, but your compliance with these requirements does not automatically give you the right to an additional or renewal franchise.

We may establish strategic alliances or preferred vendor programs with suppliers that are willing to supply some products, equipment, or services to some or all of the restaurants and food trucks in our System. We and/or our affiliates may negotiate supply contracts with our suppliers under which we are able to purchase products, equipment, supplies, services, and other items at a price that will benefit us and our franchisees. If we do establish those types of alliances or programs, we may limit the number of approved suppliers with whom you may deal, we may designate sources that you must use for some or all products, equipment and services, and we may refuse to approve proposals from franchisees to add new suppliers if we believe that approval would not be in the best interests of the System or the franchised network of restaurants and food trucks.

We have the right to collect and retain any and all allowances, rebates, credits, incentives, or benefits (collectively, "Allowances") offered by manufacturers, suppliers, and distributors to you, to us, or to our affiliates based upon your purchases of products and services from manufacturers, suppliers, and distributors. We or our affiliates will have all of your right, title, and interest in and to any and all of these Allowances. We or our affiliates may collect and retain any or all of these Allowances without restriction (unless otherwise instructed by the manufacturer, supplier, or distributor). We may also choose to

contribute these Allowances to the Brand Development Fund, but if we do so it does not reduce or eliminate your obligation to pay the brand development fee. For the fiscal year ended December 31, 2020, neither we nor our affiliates earned revenue from Allowances.

For the catering or delivery services your Restaurant will provide, we anticipate that your employees will use their personal vehicles to provide these services from your Restaurant. We have the right to require you to have temporary signage placed on each delivery vehicle. We expect that all delivery vehicles will be kept clean, in good working order and be properly insured. You must have each person providing those services to comply with all laws, regulations, and rules of the road and to use due care and caution operating and maintaining the motor vehicles. Except as described in this paragraph, we do not have any standards or exercise control over any motor vehicle that you use. You must also offer delivery through third-party delivery services like Grubhub and Uber Eats.

Food Trucks may also provide catering and delivery services in the designated territory. We expect that all Food Trucks will be kept clean, in good working order and be properly insured according to our System requirements. Each person who will drive the Food Truck must comply with all laws, regulations and rules of the road and must use due care and caution in operating the Food Truck. Food Trucks must be professionally washed at least once each week

All advertising and promotional materials, signs, decorations, paper goods (including menus and all forms and stationery used in the Franchised Business) and other items we designate must bear the Marks in the form, color, location, and manner we prescribe. In addition, all your advertising and promotion in any medium must be conducted in a dignified manner and must conform to the standards and requirements in the Manual or otherwise. You must obtain our approval before you use any advertising and promotional materials and plans if we have not prepared or approved them during the 12 months before their proposed use. Any advertising and promotional materials you submit to us for our review will become our property.

You must purchase or finance your Food Truck from our designated supplier, and it will come fully outfitted with all the equipment and signage we require and have approved for use with your Food Truck. If you choose to finance your Food Truck through our designated supplier, we will not review or approve the purchase contract, however we do require you to provide a down payment of at least 10% to the designated supplier before they will begin the build-out of your Food Truck.

Before you begin construction of the Restaurant, or before you take delivery of your Food Truck, you must obtain the insurance coverages we require. The insurance must be underwritten by insurers licensed and permitted to write coverage in the state in which the Restaurant is located or the Food Truck will be operating and with a rating of "A-" or better with A.M. Best Company. These policies must include the coverage that we require as detailed in the Franchise Agreement. We may modify our insurance requirements during the term of your Franchise Agreement, and any modifications will be communicated to you in our Manual or otherwise in writing. The insurance coverage must be maintained during the term of the Franchise Agreement and must be obtained from a responsible, duly licensed carrier or carriers acceptable to us. All insurance must be on an "occurrence" basis. You must provide us with certificates of insurance showing that you have obtained the required insurance coverages at least ten days before construction of your Restaurant begins or before you take delivery of Food Truck, and then 30 days before expiration of each policy. In addition, related to any construction, renovation, or remodeling of the Restaurant, you must maintain builders' risks insurance and performance and completion bonds in forms and amounts, and written by a carrier or carriers, satisfactory to us.

We estimate that your purchases from us or approved suppliers, or that must conform to our specifications, will represent approximately 68% to 78% of your total purchases in establishing the

Franchised Business, and approximately 50% of your total purchases in the continuing operation of the Franchised Business.

**ITEM 9**
**FRANCHISEE'S OBLIGATIONS**

This table lists your principal obligations under the franchise and other agreements.  It will help you find more detailed information about your obligations in these agreements and in other items of this disclosure document.

| | Obligation | Article or Section in Agreement | Disclosure Document Item |
|---|---|---|---|
| a. | Site selection and acquisition/ lease | FA – Article 2 MUDA – Section 3 | Items 8 and 11 |
| b. | Pre-opening purchases/leases | FA – Articles 6, 7 and 8 | Items 6, 7, 8 and 11 |
| c. | Site development and other pre-opening requirements | FA – Article 2 | Items 8 and 11 |
| d. | Initial and ongoing training | FA – Article 6 | Items 6, 7 and 11 |
| e. | Opening | FA – Articles 2 and 6 | Item 11 |
| f. | Fees | FA – Articles 3, 4, 6, 7, 8, 11, 14 and 18 MUDA – Sections 2 and 3 | Items 5, 6, 7 and 11 |
| g. | Compliance with standards and policies/ operating manual | FA – Articles 2, 3, 6, 8, 9, 10, 11 and 12 | Items 8, 11 and 14 |
| h. | Trademarks and proprietary information | FA – Articles 9 and 10 and Attachment 4 MUDA – Section 7 | Items 13 and 14 |
| i. | Restrictions on products/services offered | FA – Article 7 MUDA – Section 7 | Item 16 |
| j. | Warranty and customer service requirements | FA – Article 7 | Not applicable |
| k. | Territorial development and sales quotas | MUDA – Section 3 | Item 12 |
| l. | Ongoing product/service purchases | FA – Article 7 | Items 6 and 8 |
| m. | Maintenance, appearance, and remodeling requirements | FA – Articles 2, 7 and 14 | Items 6 and 11 |
| n. | Insurance | FA – Article 12 | Items 6, 7 and 8 |
| o. | Advertising | FA – Article 8 | Items 6, 8 and 11 |
| p. | Indemnification | FA – Article 15 MUDA – Section 14 | Item 6 |

| | Obligation | Article or Section in Agreement | Disclosure Document Item |
|---|---|---|---|
| q. | Owner's participation/ management/staffing | FA – Articles 6, 14, 15 and 16 MUDA – Section 7 | Items 1, 11 and 15 |
| r. | Records and reports | FA – Articles 4, 7 and 11 | Item 6 |
| s. | Inspections and audits | FA – Articles 2, 7 and 11 MUDA – Section 12 | Items 6, 8 and 11 |
| t. | Transfer | FA – Article 14 MUDA – Section 11 | Items 6 and 17 |
| u. | Renewal | FA – Article 3 MUDA – Section 5 | Items 6 and 17 |
| v. | Post-termination obligations | FA – Article 18 MUDA – Section 10 | Items 6 and 17 |
| w. | Non-competition covenants | FA – Article 10 and Attachment 4 MUDA – Section 12 | Item 17 |
| x. | Dispute resolution | FA – Article 19 MUDA – Section 19 | Items 6 and 17 |
| y. | Liquidated damages | FA –Article 18 | Item 6 |

## ITEM 10
## FINANCING

We do not offer direct or indirect financing.  We do not guarantee your note, lease, or obligation.

## ITEM 11
## FRANCHISOR'S ASSISTANCE, ADVERTISING, COMPUTER SYSTEMS AND TRAINING

**Except as listed below, CRAVE Franchising, LLC is not required to provide you with any assistance**.

**Pre-Opening Obligations**

**Multi-Unit Development Agreement**:  Under the Multi-Unit Development Agreement, we will grant to you rights to a Development Area within which you will establish and operate an agreed-upon number of Franchised Businesses under separate Franchise Agreements.  (Multi-Unit Development Agreement, Section 1.1.)

**Franchise Agreement**:  Before the opening of a Franchised Business we will provide the following assistance and services:

1.      If you will establish a Restaurant, our written site selection guidelines, and the site selection assistance we deem advisable.  (Franchise Agreement, Section 5.1.)  We will also describe your designated territory when we have approved a proposed location for your Restaurant or when we have approved a municipality for operation of your Food Truck.

2.      On-site evaluation of the proposed site for your Restaurant, if we determine an on-site evaluation is necessary.  (Franchise Agreement, Section 5.2.)

3.      Standard specifications and layouts for building and furnishing the Restaurant, which you will use to have site plans and build-out plans prepared, at your expense.  (Franchise Agreement, Section 5.3.)  We have the right to require you to use the architect/designer we designate and to inspect your Restaurant during its construction.  We must approve of the contractor you wish to use for the Restaurant's construction.

4.      On loan, our Manual, which we may revise during the term of your Franchise Agreement.  (Franchise Agreement, Sections 5.4 and 10.1.)  We may provide all or a portion of the Manual to you electronically, such as via a password-protected website.

5.      A list of approved products and suppliers, which we may revise during the term of your Franchise Agreement and which may include us and/or our affiliates as approved suppliers.  (Franchise Agreement, Sections 5.9 and 7.4.)

6.      An initial training program at our headquarters for two people.  (Franchise Agreement, Sections 5.10 and 6.4.)

7.      One of our representatives to provide up to two days of opening assistance and training around the opening of your Franchised Business.  We will provide this opening assistance and training at our expense, but if you request additional days of on-site assistance you must reimburse our costs for the additional days, including our per diem fee for our representative and the additional out-of-pocket expenses our representative incurs.  (Franchise Agreement, Section 6.4.)  If you are opening your second or later Franchised Business, we have the right to reduce the duration of our representative's visit or to not provide opening assistance.

8.      If you request it, our assistance with compiling financing documents.  (Franchise Agreement, Section 2.7)

**Continuing Obligations**

    **Multi-Unit Development Agreement**:  Under the Multi-Unit Development Agreement:

1.      We will review the information regarding potential sites or municipalities that you provide to us to determine whether the sites or municipalities meet our standards and criteria for a Crave Restaurant or Crave Food Truck and, if the site or municipality meets our criteria, approve the site for the Restaurant or the municipality for the Food Truck.  (Multi-Unit Development Agreement, Section 8.1.)

2.      We will provide you with standard specifications and layouts for building and furnishing Restaurants.  (Multi-Unit Development Agreement, Section 8.2.)

3.      We will review your site plan and final build-out plans and specifications for conformity to our standards and specifications for a Restaurant.  (Multi-Unit Development Agreement, Section 8.3.)

4.      We will provide other resources and assistance as may be developed and offered to our multi-unit developers.  (Multi-Unit Development Agreement, Section 8.4.)

    **Franchise Agreement**:  During the operation of a Franchised Business we will provide the following assistance and services:

1.      As we reasonably determine necessary, visits to and evaluations of the Franchised Business and the products and services provided to make sure that our high standards of quality, appearance and service of the System are maintained.  (Franchise Agreement, Sections 5.5 and 7.5.6.)

2.      Advice and written materials (including updates to the Manual) concerning techniques of managing and operating the Franchised Business, including new developments and improvements in equipment, food products, packaging, and preparation.  (Franchise Agreement, Section 5.7.)

3.      Training programs and seminars and other related activities regarding the operation of the Franchised Business as we may conduct for you or your business' personnel generally, which may be mandatory for you, your general manager, and/or other Franchised Business personnel.  (Franchise Agreement, Section 6.4.)

4.      At your request or if we determine it is necessary, additional on-site training or assistance at your Franchised Business.  You must pay our per diem fee for each trainer providing the training and you must reimburse our expenses.  (Franchise Agreement, Section 6.4.)

5.      Administration of the Brand Development Fund.  (Franchise Agreement, Section 8.3.)

6.      Indemnification against and reimbursement for all damages for which you are held liable in any proceeding arising out of your use of any of the Marks (including settlement amounts), if you and your Principals have fully complied with the terms of the Franchise Agreement.  (Franchise Agreement, Section 9.4.)

7.      Designate the maximum prices you may charge, as permitted by applicable law.  (Franchise Agreement, Section 7.13.)  Our designation of the maximum pricing is not a guarantee that you will achieve a specific level of sales or profitability.

8.      At our option, hold a meeting of our franchisees to discuss new menu offerings, new standards of operation, provide training, and other matters pertaining to the franchise.  We may designate that attendance at a franchisee meeting is mandatory for you, your general manager, and/or other Franchised Business personnel.  (Franchise Agreement, Section 6.5.)

**Site Selection**:  You must assume all costs, liabilities, expenses, and responsibility for locating, obtaining, and developing a site for the Restaurant and for constructing and equipping the Restaurant at the approved site.  You will select the site for the Restaurant subject to our approval and using our site selection criteria.  Before you lease or purchase the site for the Restaurant, you must locate a site that satisfies our site selection guidelines.  If we deem it necessary, we will conduct one on-site evaluation, but before we conduct the evaluation you must submit to us in the form we specify a description of the site, including evidence that the site satisfies our site selection guidelines, together with other information and materials that we may reasonably require, including a letter of intent or other evidence that confirms your favorable prospects for obtaining the site.  We have the right to approve deviations from our site selection standards based on the individual factors and components of a particular site.

You must have located and submitted to us, for our review, all information we require regarding the site you propose for your Restaurant no later than 90 days after you have signed the Franchise Agreement.  We will have 30 days after we receive all required information and materials from you to approve or decline the proposed site as the location for your Crave Restaurant.  If we do not provide our specific approval of a proposed site, the site is deemed not approved.

We will provide you with our current written site selection guidelines and any other site selection counseling and assistance we think is advisable.  Our criteria for site selection include: location of the site and its setting (free-standing building, shopping center, shopping mall, downtown location, etc.); availability of parking; visibility from main roads; availability, size and placement of signage; co-tenants in the shopping center or immediate area; other businesses in the immediate area; accessibility to the site; condition of the premises and how much build-out or construction it will need; proximity to competitive businesses; availability of utilities; and base population and median income in the immediate area.  We will use these and other factors in determining the suitability of your proposed site for a Crave Restaurant.

You must obtain our approval of the site for the Restaurant before you acquire it, and you must also obtain our approval of any contract of sale or lease for the Restaurant before you sign the contract or lease.  You must provide us with a copy of the fully signed lease for the Restaurant premises. We may require you and your landlord to sign a Collateral Assignment of Lease which permits us to assume your lease in certain circumstances, including the termination or expiration of your Franchise Agreement (Attachment 2 to the Franchise Agreement).

If you are not able to locate a suitable site for your Restaurant within 90 days after you sign the Franchise Agreement, we may provide you with an extension of this timeframe or we may terminate your Franchise Agreement.

You must obtain our approval of the municipality in which your Food Truck will operate before you may begin operations.  You must submit to us, for our review, all information we require regarding the municipality you propose for your Food Truck no later than 90 days after you have signed the Franchise Agreement.  We will have 30 days after we receive all required information and materials from you to approve or decline the proposed municipality for the operation of your Food Truck.  If we do not provide our specific approval of a proposed municipality, then it is deemed not approved.  Our criteria for approving municipalities includes: the number and size of shopping centers, malls, business parks or business districts, parks and open public spaces; availability of parking or standing on main roads; other food truck businesses in the immediate area; and population base and median income of the population.  We will use these and other factors in determining the suitability of your proposed municipality for a Crave Food Truck.

If you are not able to locate a suitable municipality in which to operate your Food Truck within 90 days after you sign the Franchise Agreement, we may provide you with an extension of this timeframe or we may terminate your Franchise Agreement.

**Opening**:  We estimate that the time from the signing of the Franchise Agreement to the opening of the Restaurant will be approximately four to eight months.  Your total timeframe may be shorter or longer depending on the time necessary to obtain an approved site, to obtain financing, to obtain the permits and licenses for the construction and operation of the Restaurant, to complete construction or remodeling as it may be affected by weather conditions, shortages, delivery schedules and other similar factors, to complete the interior and exterior of the Restaurant, including decorating, purchasing and installing fixtures, equipment and signs, and to complete preparation for operating the Restaurant, including purchasing inventory and supplies.  You must open the Restaurant and begin business within 12 months after you sign the Franchise Agreement.  If you are not able to open your Restaurant within this period, we have the right to terminate your Franchise Agreement or we may extend the period of time for you to open.  You may not open your Restaurant for business until we have approved you to do so.

Your Restaurant must be constructed according to plans that we have approved.  We will provide you with sample plans and/or our specifications for a Crave Restaurant.  We have the right to designate or approve the architect/designer that you use, and we must approve the contractor you select before you contract with them.  You must arrange for construction plans to be created that incorporate our requirements

into the size and shape of the approved site for your Restaurant.  You may not use the plans or begin building out your Restaurant until we have approved the construction plans, and any changes to the construction plans must also be approved by us before the change may be implemented.  Our review is not meant to assess compliance with any applicable laws, regulations or building codes.  Our review is only to verify that the construction plans accurately present our trade dress, the Marks and meet our specifications.  We have the right to inspect your Restaurant while it is being constructed.  You may not open your Restaurant for business without our approval.  You must certify to us that your Restaurant has been constructed in compliance with the Americans with Disabilities Act.

We estimate that the time from the signing of the Franchise Agreement to the opening of the Food Truck business will be three to six months.  It will take 12 weeks to equip, including vehicle wrap, and deliver the Food Truck and upon delivery it will be fully ready to begin operations.  Your total timeframe to open may be shorter or longer depending on the time necessary to obtain an approved municipality in which to operate, to obtain financing (if necessary) for the Food Truck, to obtain the permits and licenses for the operation of the Food Truck, and to complete preparation for operating the Food Truck, including purchasing inventory and supplies.  You must open the Food Truck business within six months after you sign the Franchise Agreement.  If you are not able to open your Food Truck business within this period, we have the right to terminate your Franchise Agreement or we may extend the period of time for you to open.  You may not open your Food Truck for business until we have approved you to do so.

If you are a Multi-Unit Developer, you must sign your first Franchise Agreement at the same time you sign the Multi-Unit Development Agreement.  The typical length of time between the signing of the Franchise Agreement and the opening of your first Franchised Business is the same as for an individual franchisee.  Each additional Restaurant or Food Truck you develop must be opened according to the terms of your Minimum Performance Schedule.

**Grand Opening Marketing**:  You must pay to us $5,000 so that we may conduct a marketing campaign on your behalf to announce the grand opening of your Franchised Business.  The grand opening marketing campaign will be conducted in the initial 90 days of operation unless we designate a different time period to conduct the grand opening marketing.  The grand opening marketing campaign will include giveaways of food samples and other promotions as we designate.

**Brand Development Fund**:  We have established a Brand Development Fund ("Fund") to promote the System, Crave Restaurants and the products and services offered by Crave Restaurants.  (Franchise Agreement, Section 8.3.)  You are required to participate in the Fund and pay a non-refundable brand development fee to the Fund in an amount equal to 1% of Gross Sales for each Restaurant business you own and operate.  Franchisees who own only Food Truck businesses are not required to contribute to the Fund.  In the calendar year ended December 31, 2020, 85% of the contributions to the Fund went toward advertising and promotion and 15% toward website maintenance and design.

The Fund is used for national and regional advertising, marketing, publicity, and promotional activity relating to our business.  We will determine, in our fully unrestricted discretion, the manner in which the Fund is spent.  Some portion of the Fund may be used for creative concept production, marketing surveys, test marketing and related purposes.  As stated in Item 8, we may contribute Allowances we receive from approved suppliers to the Fund.  If we choose to do this, it does not reduce or eliminate your obligation to pay the brand development fee.

We have the right to direct all advertising activities with sole discretion over creative concepts, materials and media used, as well as their placement and allocation.  We also have the right to determine, in our sole discretion, the composition of all geographic and market areas for the implementation of these advertising and promotional activities.  The Fund may be used to meet any and all costs of maintaining,

administering, directing and preparing national and/or regional advertising materials, programs and public relations activities (including, without limitation, the cost of preparing and conducting television, radio, magazine, billboard, newspaper, direct mail and other media programs and activities, for conducting marketing surveys, test marketing, employing advertising agencies to assist therewith, and providing promotional brochures, coupons and other marketing materials to all franchisees of the System). The Fund is intended to maximize general public recognition in all media of the Proprietary Marks and patronage of Crave Restaurants and we have no obligation to ensure that expenditures of the Fund in or affecting any geographic area are proportionate or equivalent to payments of the brand development fee by franchisees operating in that geographic area, or that any Restaurant will benefit directly or in proportion to the brand development fees paid for the development of advertising and marketing materials or the placement of advertising. We are not obligated to spend any amount on advertising in your area or territory. We may use up to 5% of the Fund for advertising that is principally a solicitation for the sale of franchises.

We have the right to reimburse ourselves out of the Fund for the total costs (including indirect costs such as salaries for our employees who devote time and effort to Fund related activities and overhead expenses) of developing, producing and distributing any advertising materials and collecting the brand development fee (including attorneys', auditors' and accountants' fees and other expenses incurred in connection with collecting any brand development fee). We also have the right to use a portion of the Fund to subsidize the cost of presenting refresher training and/or a franchisee meeting.

Restaurants owned by us or our affiliates may, but are not required to, contribute to the Fund on the same basis as you. Funds from the brand development fees paid will be kept in a non-interest bearing account separate from our other funds. These funds will not be used to defray any of our general operating expenses, except as described in the paragraph above. Any sums paid to the Fund that are not spent in the year they are collected will carry over to the following year. We will prepare, and furnish to you upon written request, an annual statement of funds collected and costs incurred. We are not required to have any Fund statement audited, but if we choose to have the Fund audited it will be at the Fund's expense.

Although the Fund is intended to be perpetual, we may terminate the Fund at any time. The Fund will not be terminated until all monies in the Fund have been spent for advertising or promotional purposes or returned to contributors on a pro rata basis. If we terminate the Fund, we have the right to reinstate it at any time and you must again contribute to the Fund. Any reinstated Fund will be maintained as described above.

Money in the Fund can be used to produce commercials and ad layout templates that you must adapt for your Restaurant and use in local marketing, at your expense. The Fund may also develop new menus and table tents for use by all Crave Restaurants in the System, and we may designate that our approved supplier will automatically ship these items to you, at your expense, when they are to be used.

**Local Marketing**: You must conduct local marketing in your designated territory, and you must spend at least 1% of Gross Sales each quarter on local marketing for your Restaurant or 2% of Gross Sales each quarter on local marketing for your Food Truck. Within 30 days of our request, you must provide us with proof of your local marketing expenditures, including verification copies of the advertisements.

We must approve all marketing materials before you use them. You must not advertise or use our Marks in any fashion on the internet, world wide web or via other means of advertising through telecommunication, including social media, without our express written consent.

Any marketing that you propose to use that has either not been prepared by us or has not been approved by us in the immediately preceding 12-month period must be submitted to us for our review not later than 15 days before you intend to use it. Unless we provide our specific disapproval of the proposed

materials, the materials are deemed approved.  Any materials you submit to us for our review will become our property, and there will be no restriction on our use or distribution of these materials.

We have the right to require you to include certain language in your local marketing, such as "Franchises Available" and our website address and phone number.

**Cooperative Marketing**:  We may designate any geographic area in which two or more Restaurants are located, or in which two or more Food Trucks operate, as a region for purposes of establishing a marketing cooperative ("Cooperative"), or we may approve of the formation of a Cooperative by our franchisees.  The members of the Cooperative for any area will consist of all franchised Restaurants and Food Trucks; Restaurants and Food Trucks owned and operated by us and/or our affiliates may, but are not required to, participate in a Cooperative.  We have the right to dissolve, merge or change the structure of the Cooperatives.  Each Cooperative will be organized for the exclusive purposes of administering marketing programs and developing promotional materials for use by the members in local marketing, subject to our approval as described above.  If a Cooperative has been established for the geographic area where your Restaurant is located, or where your Food Truck operates, when the Franchise Agreement is signed, or if any Cooperative is established during the term of the Franchise Agreement, you must become a member of the Cooperative.  If the Cooperative will operate according to written documents, we must approve of these documents, and a copy of the Cooperative documents applicable to the geographic area in which your Restaurant will be located, or in which your Food Truck will operate, will be provided to you if you request it.  You will not have to participate in more than one Cooperative.

The payments you make to a Cooperative may be applied by you toward satisfaction of your local marketing requirement.  If the amount you contribute to a Cooperative is less than your local marketing requirement, you must still spend the difference locally.  By vote of the members, the members will determine the amount that each member must contribute to the Cooperative.  All Crave businesses in the Cooperative, including those owned by us and/or our affiliates, will have the same voting rights as franchisees, but no one Crave business (or commonly controlled group of Crave businesses) will have more than 25% of the total vote.

All contributions to the Cooperative will be maintained and administered in accordance with the documents governing the Cooperative, if any.  The Cooperative will be operated solely as a conduit for the collection and expenditure of the Cooperative fees for the purposes outlined above.  No advertising or promotional plans or materials may be used by the Cooperative or furnished to its members without first obtaining our approval.  Currently there are no Cooperatives in the System.  The Cooperative is not required to prepare an annual financial statement.

**Website / Intranet**:  We alone may establish, maintain, modify, or discontinue all internet, world wide web and electronic commerce activities pertaining to the System.  We have established one or more websites accessible through one or more uniform resource locators ("URLs").  We will provide your Franchised Business with a listing on our website and we may, but are not required to, design and provide for the benefit of your Franchised Business a "click through" subpage at our website for the promotion of your Franchised Business.  If we establish one or more websites or other modes of electronic commerce and if we provide a "click through" subpage at the website(s) for the promotion of your Franchised Business, you must routinely provide us with updated copy, photographs and news stories about your Franchised Business suitable for posting on your "click through" subpage.  We have the right to specify the content, frequency, and procedure you must follow for updating your "click through" subpage.

Any websites or other modes of electronic commerce that we establish or maintain, including but not limited to any mobile applications ("apps") that we may introduce, may – in addition to advertising and promoting the products, programs or services available at Crave Restaurants and Food Trucks – also be

devoted in part to offering Crave franchises for sale and be used by us to exploit the electronic commerce rights which we alone have.

In addition to these activities, we may also establish an intranet through which downloads of operations and marketing materials, exchanges of franchisee email, System discussion forums and System-wide communications (among other activities) can be done. You may not maintain your own website; otherwise maintain a presence or advertise on the internet or any other mode of electronic commerce in connection with your Franchised Business; establish a link to any website we establish at or from any other website or page; or at any time establish any other website, electronic commerce presence or URL which in whole or in part incorporates the "Crave" name or any names confusingly similar to the Proprietary Marks.

You are not permitted to promote your Franchised Business or use any of the Proprietary Marks in any manner on any social or networking websites, such as Facebook, Foursquare, Instagram, LinkedIn, or Twitter, without our prior written consent. We will control all social media initiatives. You must comply with our System standards regarding the use of social media in your Franchised Business' operation, including prohibitions on your and the Franchised Business' employees posting or blogging comments about the Franchised Business or the System, other than on a website established or authorized by us ("social media" includes personal blogs, common social networks like Facebook, Foursquare, Instagram and MySpace, professional networks like LinkedIn, live-blogging tools like Twitter, virtual worlds, file, audio and video-sharing sites, and other similar social networking or media sites or tools). We will provide access to branded social media pages/handles/assets, and you must update these regularly. We have the right to conduct collective/national campaigns via local social media on your behalf.

We alone will be, and at all times will remain, the sole owner of the copyrights to all material which appears on any website we establish and maintain, including any and all material you may furnish to us for your "click through" subpage.

**Advisory Council**: We may, in our discretion, form an advisory council to work with us to improve the System, the products offered by Crave businesses, advertising conducted by the Fund, and any other matters that we deem appropriate. If an advisory council is formed, it will act solely in an advisory capacity, and will not have decision making authority. We will have the right to form, change, merge or dissolve any advisory council. We may develop by-laws for any advisory council.

If formed, an advisory council will be comprised of our representatives and franchisee representatives. Franchisee representatives may be selected by us or by a vote of other franchisees in the System. If you participate on an advisory council, you will pay any expenses you incur related to your participation, such as travel and living expenses to attend council meetings.

**Training**: No later than 30 days before the date the Restaurant or Food Trucks is scheduled to begin operation, two trainees must have completed, to our satisfaction, our mandatory initial training program. We will conduct this training at our corporate headquarters, at an affiliate's Crave business, or at another location we designate. Your trainees must include you or your general manager. Our initial training program lasts for approximately one week. Initial training programs will be offered at various times during the year depending on the number of new franchisees entering the System, replacement general managers and other personnel needing training, the number of new Restaurants and Food Trucks being opened and the timing of the scheduled openings of Restaurants and Food Trucks.

We will provide instructors and training materials for two trainees (the cost of which is included in the initial franchise fee). You may also have additional personnel trained by us for the Franchised Business, at your expense. We will determine whether your trainees have satisfactorily completed initial training. If

you or your general manager do not satisfactorily complete the initial training program or if we determine that these persons cannot satisfactorily complete the training program, you must designate a replacement to satisfactorily complete the training before you will be permitted to open your Franchised Business.  If the replacement general manager cannot complete the initial training program to our satisfaction, we have the right to terminate your Franchise Agreement.

Any manager subsequently designated by you must also receive and complete the initial training program to our satisfaction, even if this requires sending that manager to our headquarters training program, at your expense.  We have the right to charge a reasonable fee for the initial training we provide to a replacement or successor employee if we have not approved you to provide the training.  You must also pay for all expenses your trainees incur for any training program, including costs of travel, lodging, meals, and applicable wages.  We may approve you to train replacement managers under our training program before permitting you to train your entire staff for a third or later Franchised Business opening.  You may not train any personnel until we have approved you as a trainer.

For the opening of the Franchised Business, we will provide you with one of our representatives.  The trained representative will provide on-site pre-opening and opening training, supervision, and assistance to you for up to two days around your Franchised Business' opening.  If you request that our representative provide additional days of on-site assistance, you must reimburse the expenses our representative incurs while providing the additional assistance, including travel, lodging and meals and you must pay our then-current per diem fee.  If you are opening your second (or later) Franchised Business, we have the right to reduce the duration of our representative's visit or to not provide opening assistance.

If, during the term of your Franchise Agreement, you request that we provide additional training or assistance on-site at your Franchised Business or if we determine that additional training or assistance is necessary, you must pay our then-current per diem fee for each trainer we provide, and you must reimburse us for any expenses our trainers incur, such as costs of travel, lodging, and meals.

The instructional materials used in the initial training include our Manual, marketing and promotion materials, materials related to the operation of the point of sale system, and any other materials that we believe will be beneficial to our franchisees in the training process.

The training schedule and activities of the initial training program are described below:

### TRAINING PROGRAM - RESTAURANT

| Subject | Hours of Classroom Training | Hours of On-the-Job Training | Location |
|---|---|---|---|
| Orientation | 2 | 0 | A training facility we designate or at an operating Crave business |
| Restaurant Operations | 5 | 5 | A training facility we designate or at an operating Crave business |
| Food Prep Station | 1 | 2 | A training facility we designate or at an operating Crave business |
| Line Cook/Food Assembly | 1 | 2 | A training facility we designate or at an operating Crave business |
| Food Expediter & Delivery | 1 | 2 | A training facility we designate or at an operating Crave business |

| Subject | Hours of Classroom Training | Hours of On-the-Job Training | Location |
|---|---|---|---|
| General Manager | 5 | 7 | A training facility we designate or at an operating Crave business |
| **Totals** | **15** | **18** | |
| | **33 total hours** | | |

### TRAINING PROGRAM - FOOD TRUCK

| Subject | Hours of Classroom Training | Hours of On-the-Job Training | Location |
|---|---|---|---|
| Orientation | 1 | 1 | A training facility we designate or at an operating Crave business |
| Truck Operations | 5 | 6 | A training facility we designate or at an operating Crave business |
| Food Prep Station | 1 | 1 | A training facility we designate or at an operating Crave business |
| Line Cook/Food Assembly | 0 | 2 | A training facility we designate or at an operating Crave business |
| General Manager | 5 | 6 | A training facility we designate or at an operating Crave business |
| **Totals** | **12** | **16** | |
| | **28 total hours** | | |

The instructor primarily conducting our initial training program is Jake Moran. Each of our instructors has at least five years of experience relevant to the subjects they are teaching and one year of experience with us and/or our affiliates.

The entire training program is subject to change due to updates in materials, methods, manuals, and personnel without notice to you. The subjects and time periods allocated to the subjects actually taught to a specific franchisee and its personnel may vary based on the individual needs and/or experience of those persons being trained.

We may choose to hold refresher training courses, and we may designate that attendance at refresher training is mandatory for you, your general manager, and/or other Franchised Business personnel. We do not anticipate charging a fee for refresher training, but you will pay for all of the expenses incurred by your trainees, including travel, lodging, meals, and wages.

We may also choose to hold an annual meeting of our franchisees to provide additional training, introduce new products or changes to the System, or for other reasons. We may designate that attendance at an annual meeting is mandatory for you, your general manager, and/or other Franchised Business personnel. We do not anticipate charging a fee to attend the meeting, but you will pay for all of the expenses incurred by your attendees at the meeting, including travel, lodging, meals, and wages. We will designate the location of any franchisee meeting, such as a resort hotel, but we will not designate an unreasonably expensive site.

In addition to our initial training program, you, your managers, and any other personnel we designate must be ServSafe/TIPS (alcohol awareness), or similarly, certified.  The cost of these certifications is not included in the initial franchise fee and we do not provide certification.  You may need to receive periodic additional training and/or certification.

**Confidential Operations Manual**:  The Table of Contents for our Manual is attached to this Disclosure Document as Exhibit E.  Our Manual contains approximately 60 pages.

**Computer and Point of Sale Systems**:  You must purchase or lease and use certain point of sale systems, computer hardware and software that meet our specifications and that are capable of electronically interfacing with our computer system.  We currently require you to purchase and use the Clover point of sale system with back office systems.  The estimated cost of these systems is between $1,500 and $5,500 for a Restaurant and between $1,000 and $2,500 for a Food Truck.  The point of sale and computer systems will provide order processing, business reports, credit card processing, inventory control and other functions.  You will pay a monthly fee for the use of the Clover POS software and this fee ranges between $135 and $175 for a Restaurant and $50 to $75 for a Food Truck.  You are required to use the Abreeze Reporting App available through the Clover point of sale system to calculate and report your Gross Sales to us each week.  Merchant fees for use of this app range from $5 to $48 per month based on transactions.

The computer system is designed to enable us to have immediate access to the information monitored by the system, and there is no contractual limitation or restriction on our access to or use of the information we obtain.  The information we may access and/or download from your computer system includes Gross Sales.  You must install and maintain equipment and a high-speed internet connection in accordance with our specifications to permit us to access the computer system (or other computer hardware and software) either electronically or at the Franchised Business' premises.  This will permit us to electronically inspect and monitor information concerning your Franchised Business' Gross Sales and any other information that may be contained or stored in the equipment and software.  You must make sure that we have access at all times and in the manner we specify, at your cost.  It will be a material default under the Franchise Agreement if you do not maintain the equipment, lines, and communication methods in operation and accessible to us at all times throughout the term of the Franchise Agreement.

The approved supplier for the computer system, if we designate one, will be included in the Manual.  You must purchase a maintenance contract for your computer system, which we anticipate will cost $75 per month for the computer hardware and $35 to $50 per month for the software.  You must obtain any upgrades and/or updates to the software used with the computer system, at your expense.  In addition, we may require you to update and/or upgrade all or a portion of your point of sale and/or computer system during the term of your Franchise Agreement, at your expense.  The Franchise Agreement does not limit our ability to require you to update and/or upgrade your point of sale and/or computer system or the cost of any update and/or upgrade.  Neither we nor any affiliate of ours is responsible for providing you with any upgrades, updates, or maintenance for your point of sale or computer system.

You must participate in our Crave Loyalty Program and offer digital ordering and mobile services through our mobile application and self-order kiosks (kiosks in Restaurants only), and you must pay our designated supplier, Clover Network, Inc., for this program and these services.  This program and the services will cost between $90 and $105 per month.

## ITEM 12
## TERRITORY

**Franchise Agreement**:  Your Franchise Agreement will specify the site that will be the "Accepted Location" for your Restaurant.  Your Franchise Agreement will also specify a designated territory for the

Restaurant.  The "Designated Territory" will be a five-mile radius around the Accepted Location, except that if your Accepted Location is a Non-Traditional Site (as described below), you will not receive a Designated Territory.  In addition, because we have the right to establish Restaurants at Non-Traditional Sites, or to operate Food Trucks at Non-Traditional Sites (which may be within your Designated Territory), your Designated Territory is not exclusive to you.  If you operate a Food Truck, your Franchise Agreement will specify a Designated Territory that will be defined by a mileage radius based on the municipality in which you wish to operate and the general population density in that municipality.  If the municipality you select is in a rural area, your Designated Territory could be a mileage radius around a central point of up to 50 miles.  If you select a municipality that is considered suburban or urban, your Designated Territory could be limited to a mileage radius around a central point of up to five miles or up to ten city blocks.

You will not receive an exclusive territory.  You may face competition from other franchisees, from outlets that we own, or from other channels of distribution or competitive brands that we control.

During the term of the Franchise Agreement, we will not establish or operate, nor license any other person to establish or operate, a Restaurant or Food Truck in the Designated Territory, except as may be permitted under the Franchise Agreement and those exceptions are described below.  There are no circumstances under which the Designated Territory may be altered before your Franchise Agreement expires or is terminated.

Your Restaurant may not be relocated, and your Food Truck may not relocate to another municipality or operate outside the Designated Territory, without our prior written consent.  If, during the term of the Franchise Agreement, you wish to relocate your Restaurant or operate your Food Truck in a different municipality, or if the Restaurant is damaged or destroyed and cannot be repaired within 60 days, you must submit to us in writing the materials we require to consider your request, including information concerning the proposed new location for the Restaurant or new municipality for the Food Truck.  You must also meet certain other requirements, such as being in compliance with the Franchise Agreement, the new location meets our then-current requirements for a Crave Restaurant or the new municipality meets our then-current requirements for a Crave Food Truck, and the new location (for a Restaurant) is located within your Designated Territory, and you must sign our then-current form of Franchise Agreement.  If we permit you to relocate, you will not pay a new initial franchise fee when you sign the new Franchise Agreement, but you must pay our relocation fee.

Nothing in the Franchise Agreement will prohibit us from:  (1) operating and/or franchising others to operate restaurants or food trucks identified in whole or in part by the Proprietary Marks and/or utilizing the System in the Designated Territory that are located in gas stations or convenience stores; transportation facilities, including airports, train stations, subways and rail and bus stations; military bases and government offices; sports facilities, including stadiums and arenas; amusement parks, zoos and convention centers; car and truck rest stops and travel centers; educational facilities; recreational theme parks; hospitals; hotels; business or industrial foodservice venues; venues in which foodservice is or may be provided by a master concessionaire or contract foodservice provider; Indian reservations; casinos; or any similar captive market location not reasonably available to you (a "Non-Traditional Site"); (2) awarding national, regional or local licenses to third parties to sell products under the Proprietary Marks in foodservice facilities primarily identified by the third party's trademark; (3) merchandising and distributing products identified by the Proprietary Marks in the Designated Territory through any method or channel of distribution other than through the operation of a restaurant or food truck, including distribution of products (including any proprietary products) through grocery stores, club stores and similar stores; (4) selling and distributing products identified by the Proprietary Marks in the Designated Territory to restaurants other than Restaurants identified by the Proprietary Marks, regardless of whether the restaurants are licensed to use the Proprietary Marks in connection with their retail sales or not; (5) selling products and services through other channels of distribution, including the internet, wholesale, mail order and catalog; (6) developing

and/or owning other franchise systems for the same or similar products and services using trade names and trademarks other than the Proprietary Marks; and (7) purchasing, being purchased by, merging or combining with businesses that we deem to offer direct competition to Crave businesses.  We are not required to pay you any consideration if we exercise any right specified above in the Designated Territory.

According to a license agreement with Bud's Place Franchising, LLC, Crave menu items may be offered and sold in all Bud's Place company-owned and franchised outlets, wherever they are located. Bud's Place Franchising, LLC and we have agreed that neither of us will open a franchised Crave outlet or franchised Bud's Place outlet within five miles of each other.

If any Non-Traditional Site (as described above) is located within the physical boundaries of your Designated Territory, then the premises of this Non-Traditional Site will not be included in your Designated Territory and you will have no rights to this Non-Traditional Site.

We and our affiliates are not prohibited from:  (1) operating and franchising others to operate, during the term of the Franchise Agreement, Crave Restaurants or Food Trucks at any location outside of the Designated Territory; (2) operating and franchising others to operate, after the Franchise Agreement terminates or expires, Crave Restaurants or Food Trucks at any location, including locations inside the Designated Territory; and (3) operating and franchising others to operate at any location, during or after the term of the Franchise Agreement, any type of restaurant or food truck other than a Crave Restaurant or Food Truck.

The restrictions above do not apply to Crave Restaurants or Food Trucks in operation, under lease or construction or other commitment to open in the Designated Territory as of the effective date of the Franchise Agreement.

Except as expressly limited above, we and our affiliates have the right to conduct any business activities, under any name, in any geographic area and at any location, regardless of the proximity to your Restaurant or Food Truck or the economic effect on your Restaurant or Food Truck or your activities under the Franchise Agreement.

You may sell our menu items to customers who live anywhere but who choose to dine at or from your Restaurant or Food Truck.  You may not engage in any promotional activities or sell products or services, whether directly or indirectly, through or on the internet, the world wide web, or any other similar proprietary or common carrier electronic delivery system; through catalogs or other mail order devices sent or directed to customers or prospective customers located anywhere; or by telecopy or other telephonic or electronic communications, including toll-free numbers, directed to or received from customers or prospective customers located anywhere.  While you may place advertisements in printed media and on television and radio that are targeted to customers and prospective customers located within your Designated Territory, you will not be deemed to be in violation of the Franchise Agreement if those advertisements, because of the natural circulation of the printed media or reach of television and radio, are viewed by prospective customers outside of your Designated Territory.  You may not directly solicit customers outside of your Designated Territory.  You have no options, rights of first refusal, or similar rights to acquire additional franchises.  You may not sell any products to any business or other customer at wholesale.

We and our affiliates may sell products under the Marks within and outside your Designated Territory through any method of distribution other than a Crave Restaurant or Food Truck, including sales through channels of distribution such as the internet, catalog sales, grocery stores, club stores, specialty food stores, telemarketing or other direct marketing sales (together, "alternative distribution channels").

You may not use alternative distribution channels to make sales outside or inside your Designated Territory and you will not receive any compensation for our sales through alternative distribution channels.

We or our affiliate will fulfill all orders placed through the retail portion of our website and you will not be entitled to any portion of the profits received from this, even if the customer's order is generated from or delivered to an address in your Designated Territory.

Neither we nor any parent or affiliate has established, or presently intends to establish, other franchised or company-owned Restaurants or Food Trucks which sell our proprietary products or services under a different trade name or trademark, but we have the right to do so in the future, without first obtaining your consent. We describe earlier in this Item 12 what we may do anywhere and at any time.

**Multi-Unit Development Agreement**: Under the Multi-Unit Development Agreement we grant you the right to develop and operate (under separate Franchise Agreements) the number of Crave Restaurants or Food Trucks in the Development Area that is specified in the Minimum Performance Schedule, which is an attachment to the Multi-Unit Development Agreement. The Development Area is typically described in terms of municipal or county boundaries but may be defined as a specified trade area in a municipality. The actual size of the Development Area will vary depending upon the availability of contiguous markets, our long-range development plans, your financial and operational resources, the number and mix of Restaurants and Food Trucks you commit to develop, population, and market conditions. Our designation of a particular Development Area is not an assurance or warranty that there are a sufficient number of suitable sites for Restaurants or suitable municipalities for Food Trucks in the Development Area for you to meet your Minimum Performance Schedule. The responsibility to locate and prepare a sufficient number of suitable sites/municipalities is solely yours and we have no obligation to approve sites or municipalities which do not meet our criteria for you to meet the Minimum Performance Schedule.

Except as described below, during the term of the Multi-Unit Development Agreement, we and our affiliates will not operate or grant a franchise for the operation of Restaurants or Food Trucks to be located or to operate within the Development Area. However, we have the right to terminate this provision if you are not in full compliance with all of the terms and conditions of the Multi-Unit Development Agreement and all of the Franchise Agreements signed under it. Your territorial rights to the Development Area may or may not, in our discretion, include the right to develop Restaurants or operate Food Trucks at any Non-Traditional Sites. Because we have the right to develop Restaurants or operate Food Trucks at Non-Traditional Sites, as described above, your Development Area is not exclusive to you.

You will not receive an exclusive territory. You may face competition from other franchisees, from outlets that we own, or from other channels of distribution or competitive brands that we control.

Except as expressly limited by the Multi-Unit Development Agreement, we and our affiliates retain all rights with respect to Restaurants, Food Trucks, the Marks, and any products and services anywhere in the world including the right: (a) to produce, offer and sell and to grant others the right to produce, offer and sell the products offered at Restaurants and any other goods displaying the Marks or other trade and service marks through alternative distribution channels, as described above, both within and outside your Development Area, and under any terms and conditions we deem appropriate; (b) to operate and to grant others the right to operate Restaurants or Food Trucks located outside the Development Area under any terms and conditions we deem appropriate and regardless of proximity to your Restaurants or Food Trucks; (c) to operate and to grant others the right to operate Restaurants or Food Trucks at Non-Traditional Sites within and outside the Development Area under any terms and conditions we deem appropriate; and (d) the right to acquire and operate a business operating one or more restaurants, food trucks or food service businesses located or operating in your Development Area, except that these businesses will not operate

using the Proprietary Marks.  If a Non-Traditional Site becomes available within the Development Area during the term of the Multi-Unit Development Agreement, we may, in our sole discretion, offer you the opportunity to develop a Restaurant or Food Truck at the Non-Traditional Site.  You will have 30 days after we notify you that the site is available to accept this right of first refusal.

After the final Franchised Business under your Minimum Performance Schedule has opened, if we believe that it is desirable to establish additional Franchised Businesses within the Development Area, and if you complied with the terms of your Multi-Unit Development Agreement and are in compliance with your Franchise Agreements, we will offer you the right to develop these additional Franchised Businesses. You must exercise this option, in full, within 60 days after our notice to you.  If you do not exercise or you decline this right of first refusal, we will have the right to sell these development rights to another multi-unit developer or to develop the Restaurants or Food Trucks ourselves.

To maintain your rights under the Multi-Unit Development Agreement you must have open and in operation the cumulative number of Franchised Businesses stated on the Minimum Performance Schedule by the dates agreed upon in the Minimum Performance Schedule.  Failure to do so will be grounds for either a loss of territorial exclusivity or a termination of the Multi-Unit Development Agreement.

In addition, when the last Franchised Business to be developed within the Development Area opens for business, your rights under the Multi-Unit Development Agreement with respect to the Development Area will have expired and we and our affiliates will have the right to operate and to grant to others development rights and franchises to develop and operate Restaurants and Food Trucks within the Development Area.  This right will be subject only to the territorial rights under your franchise agreements for Restaurants and Food Trucks in the Development Area and the right of first refusal to develop additional Franchised Businesses described above.  The Development Area may not be altered unless we and you mutually agree to do so.  It will not be affected by your sales volume.  You are not granted any other option, right of first refusal or similar right to acquire additional Franchised Businesses in your Development Area under the Multi-Unit Development Agreement, except as described above.

## ITEM 13
## TRADEMARKS

The Franchise Agreement grants you the right to use certain trademarks, trade names, service marks, symbols, emblems, logos, and indicia of origin designated by us.  These Marks may be used only in the manner we authorize and only for the operation of your Franchised Business.  The Multi-Unit Development Agreement does not grant to you any right to use the Marks.

You may not use the Marks as a part of your corporate or other legal name, and you must comply with our instructions in filing and maintaining trade name or fictitious name registrations.  You must sign any documents we require to protect the Marks or to maintain their continued validity and enforceability. In addition, you may not directly or indirectly contest the validity of our ownership of or our rights in and to the Marks.

Our Parent owns the following principal Marks which have been registered with the U.S. Patent and Trademark Office ("USPTO") on the Principal Register:

| Mark | Registration Date | Registration Number | Register |
|---|---|---|---|
|  | July 30, 2019 | 5,822,628 | Principal |
| #BEATTHECRAVING | March 10, 2020 | 6,005,320 | Principal |

There are no currently effective determinations of the USPTO, the Trademark Trial and Appeal Board, the trademark administrator of any state or any court, no pending infringement, opposition or cancellation proceedings and no pending litigation involving any of the Marks that may significantly affect the ownership or use of any Mark listed above.  Our Parent has licensed the Marks to us so we may sub-license them to our franchisees in a perpetual, non-cancellable trademark license agreement dated February 24, 2018.  Other than one of the parties ceasing to exist, there are no circumstances under which this trademark license agreement may be terminated or modified.  If the trademark license agreement is terminated, you will still be able to use the Marks and the System until the end of the term of the Franchise Agreement.  Other than this trademark license, we know of no superior prior rights or infringing use that could materially affect your use of the Marks, and we know of no agreements currently in effect which significantly limit our rights to use or license the use of the Marks in any manner material to the franchise.  Our Parent intends to file all affidavits and other documents required to maintain its interests in and to the Marks.

You must immediately notify us of any apparent infringement of the Marks or challenge to your use of any of the Marks or claim by any person of any rights in any of the Marks.  You and your Principals are not permitted to communicate with any person other than us, or any designated affiliate, our counsel and your counsel involving any infringement, challenge, or claim.  We can take action and have the right to exclusively control any litigation or USPTO or other administrative or agency proceeding caused by any infringement, challenge or claim or otherwise relating to any of the Marks.  You must sign any and all documents, and do what may, in our counsel's opinion, be necessary or advisable to protect our interests in any litigation or USPTO or other administrative or agency proceeding or to otherwise protect and maintain our interests and the interests of any other person or entity (including any affiliate) having an interest in the Marks.

We will indemnify you against and reimburse you for all damages for which you are held liable for your use of any of the Marks, provided that the conduct of you and your Principals in the proceeding and use of the Marks is in full compliance with the terms of the Franchise Agreement.

Except as provided above, we are not obligated by the Franchise Agreement to protect any rights granted to you to use the Marks or to protect you against claims of infringement or unfair competition with respect to them.  Although we are not contractually obligated to protect the Marks or your right to use them, as a matter of corporate policy we intend to defend the Marks vigorously.

We may require you, at your expense, to discontinue or modify your use of any of the Marks or to use one or more additional or substitute trade names, service marks, trademarks, symbols, logos, emblems and indicia of origin if we determine that an addition or substitution will benefit the System.

The license to use the Marks granted in the Franchise Agreement is non-exclusive to you.  We have and retain certain rights in the Marks including the following:

      1.      To grant other licenses for the use of the Marks in addition to those licenses already granted or to be granted to franchisees;

      2.      To develop and establish other systems using the Marks or other names or marks, and to grant licenses or franchises in those systems without providing any rights to you; and

      3.      To engage, directly or indirectly, at wholesale, retail or otherwise, in (a) the production, distribution, license and sale of products and services and (b) the use of the Marks and any and all trademarks, trade names, service marks, logos, insignia, slogans, emblems, symbols, designs and other identifying characteristics we may develop for that purpose.

### ITEM 14
### PATENTS, COPYRIGHTS AND PROPRIETARY INFORMATION

**Patents and Copyrights**:  We do not have an ownership interest in any pending or registered patents or copyrights that are material to the franchise.

**Confidential Operations Manual**:  You must operate the Franchised Business in accordance with the standards and procedures specified in the Manual.  One copy of the Manual will be loaned to you by us for the term of the Franchise Agreement.  We may, instead of providing you with a hard copy of the Manual, make our Manual available electronically via a password protected website.

You must treat the Manual and any other manuals we create or approve for use in your operation of the Franchised Business, and the information contained in them, as confidential.  You must also use all reasonable efforts to maintain this information as secret and confidential and you must not duplicate, copy, record or otherwise reproduce these materials, in whole or in part, or make them available to any unauthorized person.  The Manual remains our sole property and must be kept in a secure place on the Franchised Business' premises.

We may revise the contents of the Manual and you must comply with each new or changed standard.  You must also ensure that the Manual is kept current at all times.  If there is a dispute regarding the contents of the Manual, the terms of the master copy maintained by us at our home office will be controlling.

**Confidential Information**:  We claim proprietary rights in certain of our recipes which are included in the Manual and which are our trade secrets.  Any and all information, knowledge, know-how and techniques related to the System that we communicate to you, including the Manual, plans and specifications, marketing information and strategies and site evaluation, selection guidelines and techniques, recipes, and the terms of your agreement with us, are considered confidential.  You and each of your Principals are prohibited, during and after the term of your Agreement, from communicating, or using for the benefit of any other person or entity, and, after the term of your Agreement, from using for your or their own benefit, any confidential information, knowledge or know-how concerning the methods of operation of the Franchised Business that may be communicated to you or any of your Principals or that you may learn about.  You and each of your Principals may divulge this confidential information only to your employees who must have access to it to operate the Franchised Business.  Neither you nor your Principals are permitted at any time, without first obtaining our written consent, to copy, record or otherwise reproduce the materials or information nor make them available to any unauthorized person.  If we ask, you

must have your general manager and any of your personnel who have received or will have access to confidential information sign similar confidentiality covenants.

If you, your Principals, general manager, or employees develop any new concept, process or improvement in the operation or promotion of the Franchised Business, you must promptly notify us and give us all necessary information, free of charge. You, your Principals, general manager, and employees must acknowledge that any of these concepts, processes or improvements will become our property and we may give the information to other franchisees.

## ITEM 15
## OBLIGATION TO PARTICIPATE IN THE ACTUAL
## OPERATION OF THE FRANCHISE BUSINESS

You must designate and retain at all times an individual to serve as the general manager who will be a full-time employee responsible for the daily operation of the Franchised Business (the "General Manager"). The General Manager must have relevant food service experience, must satisfy our educational and business criteria as provided to you in the Manual or other written instructions, must satisfy the applicable training requirements in the Franchise Agreement, and must be individually acceptable to us and approved by us to act as a General Manager. We recommend, but do not require, that you or one of the Principals acts as the General Manager. We do not require you to be actively involved in the daily operation of your Franchised Business, but you must still make sure that your Franchised Business is being operated according to the terms of your Franchise Agreement and the Manual. If you are not actively involved in the daily operation of your Franchised Business, then we may communicate with and rely on the decisions made by your General Manager. The General Manager does not have to own an equity interest in you or the franchise. The General Manager must be responsible for the supervision and management of the Franchised Business and must devote full time and best efforts to this activity. If the General Manager cannot serve in the position or does not meet the requirements, he or she must be replaced within 30 days after the General Manager stops serving or no longer meets the requirements.

In addition to the General Manager, you must have any assistant managers necessary for the efficient operation of the Franchised Business. All of your managers must have successfully completed our training program and be certified by us to operate your Franchised Business. We do not require that any of your managers have an ownership interest in you. While your Franchised Business is open, you must have at least one certified manager on-site. You must also retain other personnel as are needed to operate the Franchised Business.

Your General Manager and all other personnel who will have access to our proprietary and confidential information and training must sign our Confidentiality and Non-Competition Agreement which is attached to our Franchise Agreement as Attachment 4. We will be a third-party beneficiary of each agreement with the independent right to enforce the agreement's terms. We have the right, in our discretion, to decrease the period of time or geographic scope of the non-competition covenants contained in the attachments or eliminate the non-competition covenants altogether for any party that must sign an agreement as described in this paragraph.

If your Franchised Business is owned by an entity, all owners of the entity must personally sign the Franchise Agreement as a Principal. If you are a married individual, your spouse must sign our Spousal Guaranty which is attached to our Franchise Agreement as Attachment 9.

## ITEM 16
## RESTRICTIONS ON WHAT THE FRANCHISEE MAY SELL

You must sell or offer for sale all menu items, food products, merchandise, and other products and services we require, in the manner and style we require, including dine-in and carry-out, as expressly authorized by us in writing.  You must sell and offer for sale only the menu items, products, and services that we have expressly approved in writing.  You must not deviate from our standards and specifications without first obtaining our written consent.  You must discontinue selling and offering for sale any menu items, products, or services that we may disapprove in writing at any time.  We have the right to change the types of menu items, products and services offered by you at the Franchised Business at any time, and there are no limits on our right to make those changes.

You must maintain in sufficient supply and use and sell only the food and beverage items, ingredients, proprietary products, merchandise, other products, materials, supplies, and paper goods that conform to our standards and specifications.  You must prepare all menu items according to our recipes and procedures for preparation contained in the Manual or other written instructions, including the measurements of ingredients.  You must not deviate from our standards and specifications by the use or offer of nonconforming items or differing amounts of any items, without first obtaining our written consent.

We have the right to vary the menu items offered at certain Crave Franchised Businesses based on regional or local tastes or ingredients.  If we allow a Crave Restaurant or Food Truck to modify its menu to accommodate regional or local tastes or ingredients, we are not required to grant to you a similar variance or modification.

You must keep the Franchised Business very clean and maintain it in good repair and condition.  You must make any additions, alterations, repairs, and replacements, including repainting or replacement of obsolete signs, furnishings, equipment, and décor as we may reasonably direct.  You must not make any changes to the premises without obtaining our written consent before you make the changes.  You must obtain and pay for any new or additional equipment, including point of sale, computer hardware and software, fixtures, supplies and other products and materials that you must have to offer and sell new menu items from the Franchised Business.

We have the right to determine the maximum prices for the goods, products and services offered from your Franchised Business, as permitted by applicable law.  You must comply with the prices required by us, but we make no guarantees or warranties that offering the products or merchandise at the required price will enhance your sales or profits.

We do not impose any other restrictions in the Franchise Agreement or otherwise, as to the goods or services that you may offer or sell or as to the customers to whom you may offer or sell, except as described in Item 12.  You may not directly solicit customers outside of your Designated Territory.

## ITEM 17
## RENEWAL, TERMINATION, TRANSFER AND DISPUTE RESOLUTION

### THE FRANCHISE RELATIONSHIP

**This table lists certain important provisions of the franchise and related agreements.  You should read these provisions in the agreements attached to this disclosure document.**

| Provision | Section in Franchise Agreement | Summary |
|---|---|---|
| a. Length of the franchise term | Section 3.1 | 10 years |
| b. Renewal or extension of the term | Section 3.2 | One renewal term of 10 years |
| c. Requirements for franchisee to renew or extend | Section 3.2 | Renewal is automatic.  Within the last six months of the term of your Franchise Agreement, we will send you a bill for the renewal fee as well as any documents that you must sign for the renewal, which may include a renewal Franchise Agreement and a release. If you do not wish to renew your agreement, you must provide us with notice of this election no later than 60 days before your agreement expires.  If you do not pay the renewal fee and sign the documents we require, your agreement will not be renewed.<br><br>You may be asked to sign a contract with materially different terms and conditions than your original contract, but the boundaries of your territory will remain the same, and the fees on renewal will not be greater than the fees that we then impose on similarly situated renewing franchisees. |
| d. Termination by franchisee | Not applicable | You may terminate the Franchise Agreement on any grounds available by law. |
| e. Termination by franchisor without cause | Not applicable | Not applicable |
| f. Termination by franchisor with cause | Section 17.1.1 | Each of your obligations under the Franchise Agreement is a material and essential obligation, the breach of which may result in termination. |
| g. "Cause" defined – curable defaults | Sections 17.1.3 and 17.2 | We may terminate you for cause if you fail to cure certain defaults, including:  suspension of your beer and wine license; if you or any of your affiliates fail to pay any monies owed to us, or our affiliates or vendors, and do not cure within five days after notice (or longer period required); fail to obtain signed copies of the confidentiality and non-competition covenants contained in the Franchise Agreement within five days after a request; fail to obtain and maintain required insurance within seven days after notice; fail to cure a failed quality |

| Provision | Section in Franchise Agreement | Summary |
|---|---|---|
| | | assurance audit within 15 days after notice; suspension of required license or permit; use the Marks in an unauthorized manner and fail to cure within 24 hours after notice; fail to maintain quality standards; fail to cure any other default that is susceptible of cure within 30 days after notice |
| h.   "Cause" defined – non-curable defaults | Sections 17.1.2 and 17.1.3 | We may terminate you for cause if you fail to cure certain defaults, including: loss of your beer and wine license, if you become insolvent, make a general assignment for benefit of creditors, file a petition or have a petition initiated against you under federal bankruptcy laws, have outstanding judgments against you for over 30 days, sell unauthorized products or services, fail to find an approved location within time required, fail to remodel when required, fail to open Franchised Business when required, fail to comply with any term and condition of any sublease or related agreement and have not cured the default within the given cure period, abandon or lose right to the Franchised Business' premises, are convicted of a felony or other crime that may have an adverse effect on the System or Marks, transfer any interest without our consent, required license permit is revoked, repeated defaults, or maintain false books or records.  In addition, a default under one agreement with us may result in a termination of all of your other agreements with us.  This is known as a cross-default provision. |
| i.   Franchisee's obligations on termination/non-renewal | Section 18 | Obligations include:  You must stop operating the Franchised Business and using the Marks and System and completely de-identify the business, pay all amounts due to us or our affiliates, return the Manual and all other proprietary materials, comply with confidentiality requirements, pay liquidated damages (if applicable), and at our option, sell or assign to us your rights in the Franchised Business' premises and the equipment and fixtures used in the business |

| | Provision | Section in Franchise Agreement | Summary |
|---|---|---|---|
| j. | Assignment of contract by franchisor | Section 14.1 | We have the right to transfer or assign the Franchise Agreement to any person or entity without restriction.  However, no assignment will be granted except to an assignee who, in our good faith judgment, is willing and able to assume our obligations. |
| k. | "Transfer" by franchisee – defined | Section 14.2.1 | Includes sale, assignment, conveyance, pledge, mortgage, or other encumbrance of any interest in the Franchise Agreement, the Franchised Business or you (if you are not a natural person) |
| l. | Franchisor approval of transfer by franchisee | Section 14.2.2 | You must obtain our consent before transferring any interest.  We will not unreasonably withhold our consent. |
| m. | Conditions for franchisor approval of transfer | Section 14.2.2 | Conditions include:  You must pay all amounts due us or our affiliates, not otherwise be in default, sign a general release, and pay a transfer fee.  Transferee must meet our criteria, complete training to our satisfaction and sign current Franchise Agreement |
| n. | Franchisor's right of first refusal to acquire franchisee's business | Section 14.4 | Within 30 days after notice, we have the option to purchase the transferred interest on the same terms and conditions. |
| o. | Franchisor's option to purchase franchisee's business | Sections 14.8 and 18.12 | We have the right to purchase the assets of the Franchised Business for fair market value (a) at any time during the term of your Franchise Agreement, or (b) on termination or non-renewal of the Franchise Agreement. |
| p. | Death or disability of franchisee | Section 14.5 | Upon your death or permanent disability (if you are a natural person) or upon the death or permanent disability of any Principal, distributee must be approved by us, or franchise must be transferred to someone approved by us within 12 months after death or within six months after notice of permanent disability. |
| q. | Non-competition covenants during the term of the franchise | Section 10.3.1 | You are prohibited from operating or having an interest in a similar business without our prior written consent. |
| r. | Non-competition covenants after the franchise is terminated or expires | Section 10.3.2 | You and your Principals are prohibited for two years from expiration or termination of the franchise from operating or having an interest |

| Provision | Section in Franchise Agreement | Summary |
|---|---|---|
| | | in a similar business within 20 miles of any Franchised Business in the System. |
| s. Modification of the agreement | Sections 10.1.5 and 19.2 | The Franchise Agreement may not be modified unless mutually agreed to in writing.  You must comply with the Manual as amended. |
| t. Integration/merger clause | Section 19.2 | Only the terms of the Franchise Agreement and other related written agreements are binding (subject to applicable federal and/or state law).  Any representations or promises outside of the Disclosure Document and Franchise Agreement may not be enforceable.  Notwithstanding the foregoing, nothing in any agreement is intended to disclaim the express representations made in the Franchise Disclosure Document, its exhibits and amendments. |
| u. Dispute resolution by arbitration or mediation | Section 19.7 | Arbitration in Wilmington, Delaware, subject to applicable state and federal law |
| v. Choice of forum | Section 19.8 | Wilmington, Delaware, subject to applicable state and federal law |
| w. Choice of law | Section 19.8 | Delaware, subject to applicable state and federal law |

**THE MULTI-UNIT DEVELOPMENT RELATIONSHIP**

| Provision | Section in Multi-Unit Development Agreement | Summary |
|---|---|---|
| a. Length of the franchise term | 6 | Length of the Minimum Performance Schedule |
| b. Renewal or extension of the term | 5 | After all Franchised Businesses have been developed, we will negotiate in good faith another Multi-Unit Development Agreement. |
| c. Requirements for multi-unit developer to renew or extend | Not applicable | Not applicable |
| d. Termination by multi-unit developer | Not applicable | You may seek to terminate on any grounds available to you at law. |
| e. Termination by franchisor without cause | Not applicable | Not applicable |

| Provision | Section in Multi-Unit Development Agreement | Summary |
|---|---|---|
| f. Termination by franchisor with cause | 9 | We can terminate if you commit any one of several listed violations. |
| g. "Cause" defined – curable defaults | 9 | If you use the Marks or System without our consent; participating in a competing business; failure to pay money to us when due; you begin developing a Franchised Business before all of your pre-development obligations are met; failure to obtain our consent when required; you open or begin operating any Franchised Business before a Franchise Agreement for that Franchised Business has been signed |
| h. "Cause" defined – non-curable defaults | 9 | Failure to meet your minimum performance schedule; failure to comply with applicable laws; if all of your Franchised Businesses stop operating; unauthorized transfer; you make a material misrepresentation to us; conviction by you or your owners of an indictable offense; bankruptcy or insolvency; if a Franchise Agreement with us is terminated according to its terms (this is a cross-default provision) |
| i. Multi-unit developer's obligations on termination/non-renewal | 10 | You must stop selecting sites for Franchised Businesses, and you may not open any more Franchised Businesses |
| j. Assignment of contract by franchisor | 11 | No restriction on our right to assign.  However, no assignment will be made except to an assignee who, in our good faith judgment, is willing and able to assume our obligations under the Multi-Unit Development Agreement. |
| k. "Transfer" by multi-unit developer – defined | 11 | Includes transfer of any interest in the Multi-Unit Development Agreement |
| l. Franchisor approval of transfer by multi-unit developer | 11 | We have the right to approve all transfers, our consent not to be unreasonably withheld |
| m. Conditions for franchisor approval of transfer | 11 | Conditions for transfer include not being in default, at least 25% of all Franchised Businesses required to be developed are open or under construction, all debts are paid, the buyer meets our current criteria for new Multi-Unit Developers, execution of a general release, payment of transfer fee, buyer personally guarantees all obligations |

| | Provision | Section in Multi-Unit Development Agreement | Summary |
|---|---|---|---|
| n. | Franchisor's right of first refusal to acquire multi-unit developer's business | 11 | We have the right to match the offer. |
| o. | Franchisor's option to purchase multi-unit developer's business | Not applicable | Not applicable |
| p. | Death or disability of multi-unit developer | 11 | Upon your death or permanent disability (if you are a natural person) or upon the death or permanent disability of any Principal, distributee must be approved by us, or development rights must be transferred to someone approved by us, within 12 months after death or within six months after notice of permanent disability. |
| q. | Non-competition covenants during the term of the franchise | 12 | You are prohibited from operating or having an interest in a similar business without our prior written consent, except for Franchised Businesses operated under Franchise Agreements with us. |
| r. | Non-competition covenants after the franchise is terminated or expires | 12 | No competing business for two years and within 20 miles of any Franchised Business in the System |
| s. | Modification of the agreement | 18 | The Multi-Unit Development Agreement may not be modified unless mutually agreed to in writing. |
| t. | Integration/merger clause | 18 | Only the terms of the Multi-Unit Development Agreement and other related written agreements are binding (subject to applicable federal and/or state law.  Any representations or promises outside of the Disclosure Document and Multi-Unit Development Agreement may not be enforceable.  Notwithstanding the foregoing, nothing in any agreement is intended to disclaim the express representations made in the Franchise Disclosure Document, its exhibits and amendments. |
| u. | Dispute resolution by arbitration or mediation | 19 | Arbitration in Wilmington, Delaware, subject to applicable state and federal law. |
| v. | Choice of forum | 19 | Wilmington, Delaware, subject to applicable state and federal law |

| | Provision | Section in Multi-Unit Development Agreement | Summary |
|---|---|---|---|
| w. | Choice of law | 19 | Delaware, subject to applicable state and federal law |

## ITEM 18
## PUBLIC FIGURES

We do not use any public figure to promote our franchise.

## ITEM 19
## FINANCIAL PERFORMANCE REPRESENTATIONS

The FTC's Franchise Rule permits a franchisor to provide information about the actual or potential financial performance of its franchised and/or franchisor owned outlets, if there is a reasonable basis for the information, and if the information is included in the Franchise Disclosure Document. Financial performance information that differs from that included in Item 19 may be given only if: (1) a franchisor provides the actual records of an existing outlet you are considering buying; or (2) a franchisor supplements the information provided in this Item 19, for example, by providing information about performance at a particular location or under particular circumstances.

We do not make any representations about a franchisee's future financial performance or the past financial performance of company-owned or franchised outlets. We also do not authorize our employees or representatives to make any such representations either orally or in writing. If you are purchasing an existing outlet, however, we may provide you with the actual records of that outlet. If you receive any other financial performance information or projections of your future income, you should report it to the franchisor's management by contacting Samantha Rincione at 122 West 25th Street, Suite 101, Cheyenne, Wyoming, 82002, and (516)316-7420, the Federal Trade Commission, and the appropriate state regulatory agencies.

## ITEM 20
## OUTLETS AND FRANCHISEE INFORMATION

**Table No. 1**
**Systemwide Outlet Summary**
**For years 2018, 2019, 2020**

| Outlet Type | Year | Outlets at the Start of the Year | Outlets at the End of the Year | Net Change |
|---|---|---|---|---|
| Franchised | 2018 | 0 | 0 | 0 |
| | 2019 | 0 | 4 | +4 |
| | 2020 | 4 | 7 | +3 |

| Outlet Type | Year | Outlets at the Start of the Year | Outlets at the End of the Year | Net Change |
|---|---|---|---|---|
| Company-Owned* | 2018 | 0 | 0 | 0 |
| | 2019 | 0 | 0 | 0 |
| | 2020 | 0 | 0 | 0 |
| **Total Outlets** | **2018** | **0** | **0** | **0** |
| | **2019** | **0** | **4** | **+4** |
| | **2020** | **4** | **7** | **+3** |

**Table No. 2**
**Transfers of Outlets from Franchisees to New Owners (other than the Franchisor)**
**For years 2018, 2019, 2020**

| State | Year | Number of Transfers |
|---|---|---|
| Georgia | 2018 | 0 |
| | 2019 | 1 |
| | 2020 | 0 |
| **Total** | **2018** | **0** |
| | **2019** | **1** |
| | **2020** | **0** |

**Table No. 3**
**Status of Franchised Outlets**
**For years 2018, 2019, 2020**

| State | Year | Outlets at Start of Year | Outlets Opened | Termina-tions | Non-Renewals | Reacquired by Franchisor | Ceased Operations – Other Reasons | Outlets at End of the Year |
|---|---|---|---|---|---|---|---|---|
| Colorado | 2018 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2019 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2020 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Florida | 2018 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2019 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2020 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Georgia | 2018 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2019 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| | 2020 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |

| State | Year | Outlets at Start of Year | Outlets Opened | Termina-tions | Non-Renewals | Reacquired by Franchisor | Ceased Operations – Other Reasons | Outlets at End of the Year |
|---|---|---|---|---|---|---|---|---|
| North Carolina | 2018 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2019 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| | 2020 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Oklahoma | 2018 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2019 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| | 2020 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Texas | 2018 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2019 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| | 2020 | 1 | 1 | 0 | 0 | 0 | 0 | 2 |
| **Total** | **2018** | **0** | **0** | **0** | **0** | **0** | **0** | **0** |
| | **2019** | **0** | **4** | **0** | **0** | **0** | **0** | **4** |
| | **2020** | **4** | **3** | **0** | **0** | **0** | **0** | **7** |

**Table No. 4**
**Status of Company-Owned Outlets**
**For years 2018, 2019, 2020**

| State | Year | Outlets at Start of Year | Outlets Opened | Outlets Reacquired from Franchisee | Outlets Closed | Outlets Sold to Franchisee | Outlets at End of the Year |
|---|---|---|---|---|---|---|---|
| None | 2018 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2019 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2020 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total** | **2018** | **0** | **0** | **0** | **0** | **0** | **0** |
| | **2019** | **0** | **0** | **0** | **0** | **0** | **0** |
| | **2020** | **0** | **0** | **0** | **0** | **0** | **0** |

**Table No. 5**
**Projected Openings as of December 31, 2020**

| States | Franchise Agreements Signed But Outlet Not Opened | Projected New Franchised Outlets in the Next Fiscal Year | Projected New Company-Owned Outlets in the Next Fiscal Year |
|---|---|---|---|
| Colorado | 1 | 3 | 0 |
| Florida | 1 | 3 | 0 |

| States | Franchise Agreements Signed But Outlet Not Opened | Projected New Franchised Outlets in the Next Fiscal Year | Projected New Company-Owned Outlets in the Next Fiscal Year |
|---|---|---|---|
| Georgia | 2 | 2 | 0 |
| Iowa | 1 | 2 | 0 |
| Kansas | 0 | 1 | 0 |
| Louisiana | 3 | 4 | 0 |
| Michigan | 1 | 2 | 0 |
| Minnesota | 0 | 2 | 0 |
| Missouri | 0 | 1 | 0 |
| Nevada | 1 | 1 | 0 |
| New Mexico | 0 | 1 | 0 |
| New York | 0 | 2 | 1 |
| North Carolina | 4 | 6 | 0 |
| Ohio | 0 | 2 | 0 |
| South Carolina | 0 | 2 | 0 |
| Tennessee | 0 | 2 | 0 |
| Texas | 2 | 5 | 0 |
| **Total** | **16** | **41** | **1** |

A list of the names of all franchisees and multi-unit developers and the addresses and telephones numbers of their franchises will be provided in Exhibit D to this disclosure document when applicable.

The name, city, state and current business telephone number (or if unknown, the last known home telephone number) of every franchisee or multi-unit developer who had a franchise terminated, cancelled, not renewed or otherwise voluntarily or involuntarily ceased to do business under the applicable Agreement during the most recently completed fiscal year or who has not communicated with us within 10 weeks of the issuance date of this disclosure document will be listed on Exhibit D to this disclosure document when applicable.  **If you buy this franchise, your contact information may be disclosed to other buyers when you leave the franchise system.**

During the last three fiscal years, we have not had any franchisees sign confidentiality provisions that would restrict their ability to speak openly about their experience with the Crave System.

There are no trademark-specific organizations formed by our franchisees that are associated with the Crave System.

## ITEM 21
## FINANCIAL STATEMENTS

Attached to this Disclosure Document as Exhibit A are our audited financial statements for the fiscal years ended December 31, 2020, and December 31, 2019, and our unaudited financial statements for the fiscal year ended December 31, 2018.

Our fiscal year end is December 31st.

**ITEM 22**
**CONTRACTS**

Attached as Exhibits to this Disclosure Document are the following contracts and their attachments:

| | | |
|---|---|---|
| 1. | Franchise Agreement | Exhibit B |
| 2. | Multi-Unit Development Agreement | Exhibit C |
| 3. | Form of General Release | Exhibit H |

**ITEM 23**
**RECEIPTS**

Two copies of an acknowledgment of your receipt of this Disclosure Document appear at the end of the Disclosure Document.  Please return one signed copy to us and retain the other for your records.

**Exhibit A to the**
**Crave Franchise Disclosure Document**

**<u>FINANCIAL STATEMENTS</u>**

**Exhibit B-1 to the**
**Crave Franchise Disclosure Document**

## FRANCHISE AGREEMENT

**Exhibit B-2 to the**
**Crave Franchise Disclosure Document**

**<u>FOOD TRUCK ADDENDUM</u>**

**Exhibit C to the**
**Crave Franchise Disclosure Document**

## MULTI-UNIT DEVELOPMENT AGREEMENT

**Exhibit D to the**
**Crave Franchise Disclosure Document**

<u>**LIST OF FRANCHISEES**</u>
(As of December 31, 2020)

| COLORADO | |
|---|---|
| **Franchisee** | **Location** |
| <u>JKWest LLC</u><br>Jamal Westry<br>Kelly Ann Westry<br>843-810-7941 | The Plaza at Barnes West<br>5600 Barnes Road, Suite 164/172<br>Colorado Springs, Colorado 80917 |
| **FLORIDA** | |
| **Franchisee** | **Location** |
| <u>BkG Enterprises LLC</u><br>Melissa Gray<br>Vance Gray<br>23084 North West 11th Road<br>Newberry, Florida 32669<br>205-451-8922 | Food Truck in Gainesville, Florida |
| **GEORGIA** | |
| **Franchisee** | **Location** |
| <u>Pointe Bluff LLC</u><br>Brandon Walker<br>217-620-5122 | Dawson Crossroads<br>145 Forest Boulevard, Suite 465<br>Dawsonville, Georgia 30534<br>706-265-2337 |
| **NORTH CAROLINA** | |
| **Franchisee** | **Location** |
| <u>DEZ Holdings Co.</u><br>Daniel Morman<br>704-294-1075 | The Pointe at Barclay<br>1407 Barclay Pointe Boulevard<br>Building 4, Unit 401<br>Wilmington, North Carolina 28412<br>704-294-1075 |
| **OKLAHOMA** | |
| **Franchisee** | **Location** |
| <u>Oakbloom LLC</u><br>Eddie Steffensen<br>Kevyn Steffensen<br>405-397-0211 | The Plaza at Stone Mill<br>2121 South Yukon Parkway, Suite 150<br>Yukon, Oklahoma 73099<br>405-467-4027 |
| **TEXAS** | |
| **Franchisee** | **Location** |
| <u>GKJ Enterprises LLC</u><br>Gregory Johnstone<br>Kristine Johnstone<br>281-435-1750 | 14303 East Sam Houston Parkway, Suite 800<br>Houston, Texas 77044<br>281-529-6427 |
| | |

**Multi-Unit Developers:**          None

**Franchise Agreements signed before December 31, 2020, but units not yet open:**

| COLORADO | |
|---|---|
| **Franchisee** | **Location** |
| Lumberjack Hospitality LLC<br>Jason Davis<br>3020 South Xeric Court<br>Denver, Colorado 80231<br>253-381-7607 | TBD<br>Denver, Colorado |
| **FLORIDA** | |
| **Franchisee** | **Location** |
| Planinz Holdings of Central Florida LLC<br>Justin Planinz<br>Tracy Planinz<br>11210 Elderberry Court<br>Clermont, Florida 34715<br>321-848-3004 | Shoppes of South Orange<br>1737 South Orange Avenue<br>Orlando, Florida 32806 |
| **GEORGIA** | |
| **Franchisee** | **Location** |
| Pointe Bluff LLC<br>Brandon Walker<br>1625 Silverleaf Way<br>Alpharetta, Georgia 30005<br>217-620-5122 | TBD<br>Alpharetta, Georgia |
| GA Food Trucks Unlimited<br>Aneitra Shavers<br>1263 Park Hollow Lane<br>Lawrenceville, Georgia 30043<br>678-367-7235 | Food Truck in Atlanta, Georgia |
| **IOWA** | |
| **Franchisee** | **Location** |
| Shaxes LLC<br>James Ballard<br>563-209-3621 | TBD<br>Bettendorf, Iowa |
| **LOUISIANA** | |
| **Franchisee** | **Location** |
| C&H Capers LLC<br>Timothy Capers<br>Nicole Capers<br>318-426-6842 | 7041 Youree Drive<br>Shreveport, Louisiana 71105 |
| Southern Krave LLC<br>Karl Wulf<br>504-782-6636 | Arlington Marketplace<br>636 Arlington Creek Center Boulevard<br>Baton Rouge, Louisiana 70820 |

| | |
|---|---|
| <u>CF Management LLC</u><br>Felicia Heberts<br>Corey Heberts<br>3117 Highway 182 West<br>Patterson, Louisiana 70392<br>985-397-1243 | TBD<br>Broussard, Louisiana |
| **MICHIGAN** | |
| **Franchisee** | **Location** |
| <u>BDD Group</u><br>Brad Olds<br>Darrell Fuchs<br>7596 Andover Drive<br>Canton, Michigan 48187<br>734-612-3701 | TBD<br>Canton, Michigan |
| **NEVADA** | |
| **Franchisee** | **Location** |
| Rick Davies<br>475 Wright Way<br>Henderson, Nevada 89015<br>702-917-9814 | Food Truck in Las Vegas, Nevada |
| **NORTH CAROLINA** | |
| **Franchisee** | **Location** |
| <u>DEZ Holdings Co.</u><br>Daniel Morman<br>704-294-1075 | The Shoppes at Derita<br>3050 Derita Road, Unit 10<br>Concord, North Carolina 28027 |
| <u>Womack & Womack LLC</u><br>Eddie Womack<br>Carol Womack<br>2433 Larwood Drive<br>Fayetteville, North Carolina 28306<br>910-751-1730 | TBD<br>Fayetteville, North Carolina |
| <u>Terry's Tasty Eats LLC</u><br>Terry Joyner<br>319 South Cherrywood Street<br>Monroe, North Carolina 28110<br>323-580-3325 | TBD<br>Monroe, North Carolina |
| <u>His and Hers Legacy LLC</u><br>Eric Reyes<br>Jesse Cerna<br>1915 Alexander Springs Lane, Apt. 005<br>Wake Forest, North Carolina 27587<br>347-510-1318 | The Shoppes at Berlin Court<br>1028 Oberlin Road<br>Raleigh, North Carolina 87605 |
| **TEXAS** | |
| **Franchisee** | **Location** |
| <u>CKMS Associates LLC</u><br>Cynthia Kay<br>Mona Jones<br>4214 Wren Court<br>Grand Prairie, Texas 75052<br>254-289-8297 | Water's Edge at Veridian Shopping Center<br>3970-3990 North Collins Street<br>Arlington, Texas 76005 |

| Mooreblanton LLC | Gattis Crossing |
| Carl Moore | 21315 State Highway 130 |
| Shirley Moore | Pflugerville, Texas 78660 |
| 254-247-9004 | |

## **FRANCHISEES WHO HAVE LEFT THE SYSTEM**
(As of December 31, 2020)

None

**Exhibit E to the
Crave Franchise Disclosure Document**

<u>**TABLE OF CONTENTS OF CONFIDENTIAL OPERATIONS MANUAL**</u>

## Table of Contents

| Topic | Page # |
|---|---|
| Welcome to The CRAVE Family | 3 |
| This Operations Manual and Confidential Notice | 4 |
| Your Employment | 5 |
| Business Philosophy and Values | 6 |
| Philosophy of Management | 7-8 |
| Philosophy of Guest Service | 9-10 |
| Principles of Employee Conduct and Teamwork | 11 |
| Job Descriptions for Hiring | 12-22 |
| Employee Manual | 23-33 |
| Marketing & Social Media | 34-38 |
| Training Manual (FOOD) | 39-49 |
| Training Manual (BEVERAGE) | 50-57 |
| Position Responsibilities | 58-60 |

**Exhibit F to the**
**Crave Franchise Disclosure Document**

**STATE SPECIFIC ADDENDUM**

**CALIFORNIA APPENDIX**

1.   California Business and Professions Code Sections 20000 through 20043 provide rights to you concerning termination, transfer or non-renewal of a franchise.  If the Franchise Agreement or Multi-Unit Development Agreement contains provisions that are inconsistent with the law, the law will control.

2.   The Franchise Agreement and Multi-Unit Development Agreement provide for termination upon bankruptcy.  This provision may not be enforceable under Federal Bankruptcy Law (11 U.S.C.A. Sec. 101 et seq.).

3.   The Franchise Agreement and Multi-Unit Development Agreement contain covenants not to compete which extend beyond the termination of the agreements.  These provisions may not be enforceable under California law.

4.   Section 31125 of the California Corporation Code requires the franchisor to provide you with a disclosure document before asking you to agree to a material modification of an existing franchise.

5.   Neither the franchisor, any person or franchise broker in Item 2 of the Disclosure Document is subject to any currently effective order of any national securities association or national securities exchange, as defined in the Securities Exchange Act of 1934, 15 U.S.C.A. 79a et seq., suspending or expelling such persons from membership in such association or exchange.

6.   The Franchise Agreement and Multi-Unit Development Agreement require binding arbitration. The arbitration will occur at Wilmington, Delaware, with the costs being borne by each party. Prospective franchisees are encouraged to consult private legal counsel to determine the applicability of California and federal laws (such as Business and Professions Code Section 20040.5, Code of Civil Procedure Section 1281, and the Federal Arbitration Act) to any provisions of a franchise agreement restricting venue to a forum outside the State of California.

7.   The Franchise Agreement and Multi-Unit Development Agreement require application of the laws of Delaware.  This provision may not be enforceable under California law.

8.   You must sign a general release if you renew or transfer your franchise.  California Corporation Code 31512 voids a waiver of your rights under the Franchise Investment Law (California Corporations Code 31000 through 31516).  Business and Professions Code 20010 voids a waiver of your rights under the Franchise Relations Act (Business and Professions Code 20000 through 20043).

9.   THE CALIFORNIA FRANCHISE INVESTMENT LAW REQUIRES THAT A COPY OF ALL PROPOSED AGREEMENTS RELATING TO THE SALE OF THE FRANCHISE BE DELIVERED TOGETHER WITH THE DISCLOSURE DOCUMENT.

10.   The Franchise Agreement contains a liquidated damages clause. Under California Civil Code Section 1671, certain liquidated damages clauses are unenforceable.

11.   OUR WEBSITE, www.iwantcrave.com, HAS NOT BEEN REVIEWED OR APPROVED BY THE CALIFORNIA DEPARTMENT OF BUSINESS OVERSIGHT.   ANY

COMPLAINTS CONCERNING THE CONTENT OF THIS WEBSITE MAY BE DIRECTED TO THE CALIFORNIA DEPARTMENT OF BUSINESS OVERSIGHT at www.dbo.ca.gov.

12.     The Antitrust Law Section of the Office of the California Attorney General views minimum or maximum price agreements as per se violations of the Cartwright Act.

13.     The Department of Business Oversight requires that we defer the collection of all initial fees from California franchisees until we have completed all of our pre-opening obligations and you are open for business.  For California franchisees who sign a multi-unit development agreement, payment of the development and initial fees attributable to a specific unit is deferred until that unit is open.

## ADDENDUM TO THE FRANCHISE AGREEMENT AND MULTI-UNIT DEVELOPMENT AGREEMENT REQUIRED BY THE STATE OF ILLINOIS

Illinois law governs the agreements between the parties to this franchise.

Section 4 of the Illinois Franchise Disclosure Act provides that any provision in the franchise agreement which designates jurisdiction or venue outside of the State of Illinois is void. However, a franchise agreement may provide for arbitration outside of Illinois.

Section 41 of the Illinois Franchise Disclosure Act provides that any condition, stipulation, or provision purporting to bind any person acquiring any franchise to waive compliance with the Illinois Franchise Disclosure Act or any other law of Illinois is void.

Your right upon termination and non-renewal of a franchise agreement are set forth in sections 19 and 20 of the Illinois Franchise Disclosure Act.

The Fees sections of the Franchise Agreement and Multi-Unit Development Agreement are amended to state all initial franchise and development fees are deferred until Franchisor has satisfied its pre-opening obligations to franchisee and the franchisee has commenced business operations.  The Illinois Attorney General's Office imposed this deferral requirement due to Franchisor's financial condition.

For info about obtaining a liquor license in Illinois, see: https://www.illinois.gov/ilcc/Pages/Forms-and-Applications.aspx

For info about obtaining TIPS certification in Illinois, see: https://www.tipscertified.com/tips-state-pages/Illinois/

See: Liquor Control Act of 1934, 235 ILCS 5/ (West 2016) for Illinois Dram Shop laws.


The parties hereto have duly executed, sealed, and delivered this Addendum dated _____.

FRANCHISEE:                                       FRANCHISOR:
                                                  CRAVE FRANCHISING, LLC
_____


By:_____          By:_____
Name:_____          Name:_____
Title:_____          Title:_____


PRINCIPALS:


_____
Name:_____


_____
Name:_____

**ADDENDUM FOR THE STATE OF INDIANA
TO THE CRAVE FRANCHISING, LLC DISCLOSURE DOCUMENT, FRANCHISE
AGREEMENT AND MULTI-UNIT DEVELOPMENT AGREEMENT**

1.   To be added to Item 3 of the Disclosure Document, is the following statement:

There are presently no arbitration proceedings to which the Franchisor is a party.

2.   Item 17 of the Disclosure Document is amended to reflect the requirement under Indiana Code 23-2-2.7-1 (9), which states that any post term non-compete covenant must not extend beyond the franchisee's exclusive territory.

3.   Item 17 is amended to state that this is subject to Indiana Code 23-2-2.7-1 (10).

4.   Under Indiana Code 23-2-2.7-1 (10), jurisdiction and venue must be in Indiana if the franchisee so requests.  This amends Article 19 of the Franchise Agreement and Section 19 of the Multi-Unit Development Agreement.

5.   Under Indiana Code 23-2-2.7-1 (10), franchisee may not agree to waive any claims or rights.


The parties hereto have duly executed, sealed, and delivered this Addendum dated _____.

FRANCHISEE:                              FRANCHISOR:
                                         CRAVE FRANCHISING, LLC
_____

By:_____        By:_____
Name:_____        Name:_____
Title:_____        Title:_____


PRINCIPALS:


_____
Name:_____


_____
Name:_____

## <u>DISCLOSURE REQUIRED BY THE STATE OF MICHIGAN</u>

**THE STATE OF MICHIGAN PROHIBITS CERTAIN UNFAIR PROVISIONS THAT ARE SOMETIMES IN FRANCHISE DOCUMENTS.  IF ANY OF THE FOLLOWING PROVISIONS ARE IN THESE FRANCHISE DOCUMENTS, THE PROVISIONS ARE VOID AND CANNOT BE ENFORCED AGAINST YOU:**

(a)    A prohibition on the right of a franchisee to join an association of franchises.

(b)    A requirement that a franchisee assent to a release, assignment, novation, waiver or estoppel which deprives a franchisee of rights and protections provided in this act.  This shall not preclude a franchisee, after entering into a franchise agreement, from settling any and all claims.

(c)    A provision that permits a franchisor to terminate a franchise prior to the expiration of its term except for good cause.  Good cause shall include the failure of the franchisee to comply with any lawful provision of the franchise agreement and to cure such failure after being given written notice thereof and a reasonable opportunity, which in no event need be more than thirty (30) days, to cure such failure.

(d)    A provision that permits a franchisor to refuse to renew a franchise without fairly compensating the franchisee by repurchase or other means for the fair market value at the time of expiration of the franchisee's inventory, supplies, equipment, fixtures and furnishings.  Personalized materials which have no value to the franchisor and inventory, supplies, equipment, fixtures and furnishings not reasonably required in the conduct of the franchise business are not subject to compensation.  This subsection applies only if:  (i) the term of the franchise is less than five (5) years, and (ii) the franchisee is prohibited by the franchise or other agreement from continuing to conduct substantially the same business under another trademark, service mark, trade name, logotype, advertising or other commercial symbol in the same area subsequent to the expiration of the franchise or the franchisee does not receive at least six (6) months' advance notice of franchisor's intent not to renew the franchise.

(e)    A provision that permits the franchisor to refuse to renew a franchise on terms generally available to other franchisees of the same class or type under similar circumstances.  This section does not require a renewal provision.

(f)    A provision requiring that arbitration or litigation be conducted outside this state.  This shall not preclude the franchisee from entering into an agreement, at the time of arbitration, to conduct arbitration at a location outside this state.

(g)    A provision which permits a franchisor to refuse to permit a transfer of ownership of a franchise, except for good cause.  This subdivision does not prevent a franchisor from exercising a right of first refusal to purchase the franchise.  Good cause shall include, but is not limited to:

(i)    Failure of the proposed transferee to meet the franchisor's then-current reasonable qualifications or standards.

(ii)    The fact that the proposed transferee is a competitor of the franchisor or subfranchisor.

(iii)    The unwillingness of the proposed transferee to agree in writing to comply with all lawful obligations.

(iv)    The failure of the franchisee or proposed transferee to pay any sums owing to the franchisor or to cure any default in the franchise agreement existing at the time of the proposed transfer.

(h)     A provision that requires the franchisee to resell to the franchisor items that are not uniquely identified with the franchisor.  This subdivision does not prohibit a provision that grants to a franchisor a right of first refusal to purchase the assets of a franchise on the same terms and conditions as a bona fide third party willing and able to purchase those assets, nor does this subdivision prohibit a provision that grants the franchisor the right to acquire the assets of a franchise for the market or appraised value of such assets if the franchisee has breached the lawful provisions of the franchise agreement and has failed to cure the breach in the manner provided in subdivision (c).

(i)     A provision which permits the franchisor to directly or indirectly convey, assign or otherwise transfer its obligations to fulfill contractual obligations to the franchisee unless provision has been made for providing the required contractual services.

**THE FACT THAT THERE IS A NOTICE OF THIS OFFERING ON FILE WITH THE ATTORNEY GENERAL DOES NOT CONSTITUTE APPROVAL, RECOMMENDATION OR ENDORSEMENT BY THE ATTORNEY GENERAL.**

If the franchisor's most recent financial statements are unaudited and show a net worth of less than $100,000, franchisee has the right to request an escrow arrangement.

Any questions regarding this notice should be directed to:

Consumer Protection Division
Attn: Katharyn Barron
Michigan Department of Attorney General
525 W. Ottawa Street, 1st Floor
Lansing, Michigan 48933
(517) 335-7567

The parties hereto have duly executed, sealed and delivered this Addendum dated this day of _____ _____.

FRANCHISEE:                                          FRANCHISOR:
_____       CRAVE FRANCHISING, LLC

By:_____       By:_____
Name:_____       Name:_____
Title:_____       Title:_____

PRINCIPALS:

_____
Name:_____

_____
Name:_____

## ADDENDUM REQUIRED BY THE DEPARTMENT OF LAW OF THE STATE OF NEW YORK

1.    The following information is added to the cover page of the Franchise Disclosure Document:

**INFORMATION COMPARING FRANCHISORS IS AVAILABLE. CALL THE STATE ADMINISTRATORS LISTED IN EXHIBIT G OR YOUR PUBLIC LIBRARY FOR SOURCES OF INFORMATION. REGISTRATION OF THIS FRANCHISE BY NEW YORK STATE DOES NOT MEAN THAT NEW YORK STATE RECOMMENDS IT OR HAS VERIFIED THE INFORMATION IN THIS FRANCHISE DISCLOSURE DOCUMENT. IF YOU LEARN THAT ANYTHING IN THE FRANCHISE DISCLOSURE DOCUMENT IS UNTRUE, CONTACT THE FEDERAL TRADE COMMISSION AND NEW YORK STATE DEPARTMENT OF LAW, INVESTOR PROTECTION BUREAU, 28 LIBERTY STREET, 21ST FLOOR, NEW YORK, NEW YORK, 10005. THE FRANCHISOR MAY, IF IT CHOOSES, NEGOTIATE WITH YOU ABOUT ITEMS COVERED IN THE FRANCHISE DISCLOSURE DOCUMENT. HOWEVER, THE FRANCHISOR CANNOT USE THE NEGOTIATING PROCESS TO PREVAIL UPON A PROSPECTIVE FRANCHISEE TO ACCEPT TERMS WHICH ARE LESS FAVORABLE THAN THOSE SET FORTH IN THIS FRANCHISE DISCLOSURE DOCUMENT.**

2.    The following is added at the end of Item 3:

Except as provided above, with regard to the franchisor, its predecessor, a person identified in Item 2, or an affiliate offering franchises under the franchisor's principal trademark:

A.    No such party has an administrative, criminal or civil action pending against that person alleging: a felony, a violation of a franchise, antitrust, or securities law, fraud, embezzlement, fraudulent conversion, misappropriation of property, unfair or deceptive practices, or comparable civil or misdemeanor allegations.

B.    No such party has pending actions, other than routine litigation incidental to the business, which are significant in the context of the number of franchisees and the size, nature or financial condition of the franchise system or its business operations.

C.    No such party has been convicted of a felony or pleaded nolo contendere to a felony charge or, within the 10-year period immediately preceding the application for registration, has been convicted of or pleaded nolo contendere to a misdemeanor charge or has been the subject of a civil action alleging: violation of a franchise, antifraud, or securities law; fraud; embezzlement; fraudulent conversion or misappropriation of property; or unfair or deceptive practices or comparable allegations.

D.    No such party is subject to a currently effective injunctive or restrictive order or decree relating to the franchise, or under a Federal, State, or Canadian franchise, securities, antitrust, trade regulation or trade practice law, resulting from a concluded or pending action or proceeding brought by a public agency; or is subject to any currently effective order of any national securities association or national securities exchange, as defined in the Securities and Exchange Act of 1934, suspending or expelling such person from membership in such association or exchange; or is subject to a currently effective injunctive or restrictive order relating to any other business activity as a result of an action brought by a public agency or department, including, without limitation, actions affecting a license as a real estate broker or sales agent.

3.    The following is added to the end of Item 4:

Neither the franchisor, its affiliate, its predecessor, officers, or general partner during the 10-year period immediately before the date of the offering circular: (a) filed as debtor (or had filed against it) a petition to start an action under the U.S. Bankruptcy Code; (b) obtained a discharge of its debts under the bankruptcy code; or (c) was a principal officer of a company or a general partner in a partnership that either filed as a debtor (or had filed against it) a petition to start an action under the U.S. Bankruptcy Code or that obtained a discharge of its debts under the U.S. Bankruptcy Code during or within 1 year after that officer or general partner of the franchisor held this position in the company or partnership.

4.      The following is added to the end of Item 5:

The initial franchise fee constitutes part of our general operating funds and will be used as such in our discretion.

5.      The following is added to the end of the "Summary" sections of Item 17(c), titled "**Requirements for franchisee to renew or extend**", and Item 17(m), entitled "**Conditions for franchisor approval of transfer**":

However, to the extent required by applicable law, all rights you enjoy and any causes of action arising in your favor from the provisions of Article 33 of the General Business Law of the State of New York and the regulations issued thereunder shall remain in force; it being the intent of this proviso that the non-waiver provisions of General Business Law Sections 687.4 and 687.5 be satisfied.

6.      The following language replaces the "Summary" section of Item 17(d), titled "**Termination by franchisee**":

You may terminate the agreement on any grounds available by law.

7.      The following is added to the end of the "Summary" section of Item 17(j), titled "**Assignment of contract by franchisor**":

However, no assignment will be made except to an assignee who in good faith and judgment of the franchisor, is willing and financially able to assume the franchisor's obligations under the Franchise Agreement.

8.      The following is added to the end of the "Summary" sections of Item 17(v), titled "**Choice of forum**", and Item 17(w), titled "**Choice of law**":

The foregoing choice of law should not be considered a waiver of any right conferred upon the franchisor or upon the franchisee by Article 33 of the General Business Law of the State of New York.

The parties hereto have duly executed, sealed, and delivered this Addendum dated _____.

FRANCHISEE:                                    FRANCHISOR:
                                               CRAVE FRANCHISING, LLC
_____

By:_____                 By:_____
Name:_____                 Name:_____

CRAVE FDD 2021 A                               2

Title:_____

PRINCIPALS:

Name:_____

Name:_____

Title:_____

**Exhibit G to the**
**Crave Franchise Disclosure Document**

<u>**LIST OF STATE ADMINISTRATORS/AGENTS FOR SERVICE OF PROCESS**</u>

This list includes the names, addresses and telephone numbers of state agencies having responsibility for franchising disclosure/registration laws, and serving as our agents for service of process (to the extent that we are registered in their states). This list also includes the names, addresses and telephone numbers of other agencies, companies or entities serving as our agents for service of process.

| State | State Agency | Agent for Service of Process |
|-------|-------------|------------------------------|
| CALIFORNIA | Commissioner of the Department of Financial Protection and Innovation<br>Department of Financial Protection and Innovation<br>320 West 4th Street, Suite 750<br>Los Angeles, CA 90013<br>(213) 576-7505<br>Toll-free (866-275-2677) | Commissioner of the Department of Financial Protection and Innovation |
| HAWAII | Business Registration Division<br>Department of Commerce and<br> Consumer Affairs<br>335 Merchant Street, Room 203<br>Honolulu, HI 96813<br>(808) 586-2722 | Commissioner of Securities of the State of Hawaii |
| ILLINOIS | Office of Attorney General<br>Franchise Division<br>500 South Second Street<br>Springfield, IL 62706<br>(217) 782-4465 | Illinois Attorney General |
| INDIANA | Indiana Secretary of State<br>Securities Division<br>302 West Washington St., Room E-111<br>Indianapolis, IN 46204<br>(317) 232-6681 | Indiana Secretary of State<br>201 State House<br>Indianapolis, IN 46204 |
| MARYLAND | Office of the Attorney General<br>Division of Securities<br>200 St. Paul Place<br>Baltimore, MD 21202-2020<br>(410) 576-6360 | Maryland Securities Commissioner<br>200 St. Paul Place<br>Baltimore, MD 21202-2020<br>(410) 576-6360 |
| MICHIGAN | Michigan Department of Attorney General<br>Consumer Protection Division<br>Antitrust and Franchise Unit<br>670 Law Building<br>Lansing, MI 48913<br>(517) 373-7117 | Michigan Department of Commerce, Corporations and Securities Bureau |
| MINNESOTA | Minnesota Department of Commerce<br>85 7th Place East, Suite 280<br>St. Paul, MN 55101-2198<br>(651) 539-1500 | Minnesota Commissioner of Commerce |

| State | State Agency | Agent for Service of Process |
|---|---|---|
| NEW YORK | Office of the New York State Attorney General<br>Investor Protection Bureau, Franchise Section<br>28 Liberty Street, 21st Floor<br>New York, NY  10005<br>(212) 416-8236 Phone<br>(212) 416-6042   Fax | Attention: New York Secretary of State<br>New York Department of State<br>One Commerce Plaza<br>99 Washington Avenue, 6th Floor<br>Albany, NY 11231-0001<br>(518) 473-2492 |
| NORTH DAKOTA | North Dakota Securities Department<br>600 East Boulevard, 5th Floor<br>Bismarck, ND  58505-0510<br>(701) 328-4712 | North Dakota Securities Commissioner |
| RHODE ISLAND | Department of Business Regulation<br>Securities Division<br>1511 Pontiac Avenue, Building 68-2<br>Cranston, RI 02920<br>(401) 462-9585 | Director of Rhode Island Department of Business Regulation |
| SOUTH DAKOTA | Division of Insurance<br>Securities Regulation<br>124 South Euclid, Suite 104<br>Pierre, SD  57501<br>(605) 773-3563 | Director of South Dakota Division of Insurance-Securities Regulation |
| VIRGINIA | State Corporation Commission<br>Division of Securities and Retail Franchising<br>1300 East Main Street, 9th Floor<br>Richmond, VA  23219<br>(804) 371-9051 | Clerk of State Corporation Commission<br>1300 East Main Street, 1st Floor<br>Richmond, VA  23219<br>(804) 371-9733 |
| WASHINGTON | Department of Financial Institutions<br>Securities Division<br>P.O. Box 9033<br>Olympia, WA  98507-9033<br> (360) 902-8760 | Director of Washington Financial Institutions<br>Securities Division<br>150 Israel Road, SW<br>Tumwater, WA  98501 |
| WISCONSIN | Wisconsin Securities Commissioner<br>Securities and Franchise Registration<br>345 W. Washington Avenue<br>Madison, WI  53703<br>(608) 266-8559 | Commissioner of Securities of Wisconsin |

**Exhibit H to the**
**Crave Franchise Disclosure Document**

<u>**FORM OF GENERAL RELEASE**</u>

THIS AGREEMENT ("Agreement") is made and entered into this day of _____ _____, by and between CRAVE Franchising, LLC, a Wyoming limited liability company having its principal address at 122 West 25th Street, Suite 101, Cheyenne, Wyoming, 82002 (the "Franchisor"), and _____, a _____ with a principal address at _____ (hereinafter referred to as "Releasor"), wherein the parties hereto, in exchange for good and valuable consideration, the sufficiency and receipt of which is hereby acknowledged, and in reliance upon the representations, warranties, and comments herein are set forth, do agree as follows:

1.    <u>**Release by Releasor**</u>:

Releasor does for itself, its successors and assigns, hereby release and forever discharge generally the Franchisor and any affiliate, wholly owned or controlled corporation, subsidiary, successor or assign thereof and any shareholder, officer, director, employee, or agent of any of them, from any and all claims, demands, damages, injuries, agreements and contracts, indebtedness, accounts of every kind or nature, whether presently known or unknown, suspected or unsuspected, disclosed or undisclosed, actual or potential, which Releasor may now have, or may hereafter claim to have or to have acquired against them of whatever source or origin, arising out of or related to any and all transactions of any kind or character at any time prior to and including the date hereof, including generally any and all claims at law or in equity, those arising under the common law or state or federal statutes, rules or regulations such as, by way of example only, franchising, securities and anti-trust statutes, rules or regulations, in any way arising out of or connected with the Agreement, and further promises never from this day forward, directly or indirectly, to institute, prosecute, commence, join in, or generally attempt to assert or maintain any action thereon against the Franchisor, any affiliate, successor, assign, parent corporation, subsidiary, director, officer, shareholder, employee, agent, executor, administrator, estate, trustee or heir, in any court or tribunal of the United States of America, any state thereof, or any other jurisdiction for any matter or claim arising before execution of this Agreement.  In the event Releasor breaches any of the promises, covenants, or undertakings made herein by any act or omission, Releasor shall pay, by way of indemnification, all costs and expenses of the Franchisor caused by the act or omission, including reasonable attorneys' fees.

2.    Releasor hereto represents and warrants that no portion of any claim, right, demand, obligation, debt, guarantee, or cause of action released hereby has been assigned or transferred by Releasor party to any other party, firm or entity in any manner including, but not limited to, assignment or transfer by subrogation or by operation of law.  In the event that any claim, demand or suit shall be made or institute against any released party because of any such purported assignment, transfer or subrogation, the assigning or transferring party agrees to indemnify and hold such released party free and harmless from and against any such claim, demand or suit, including reasonable costs and attorneys' fees incurred in connection therewith.  It is further agreed that this indemnification and hold harmless agreement shall not require payment to such claimant as a condition precedent to recovery under this paragraph.

3.    Each party acknowledges and warrants that his, her or its execution of this Agreement is free and voluntary.

4.    Delaware law shall govern the validity and interpretation of this Agreement, as well as the performance due thereunder.  This Agreement is binding upon and inures to the benefit of the respective assigns, successors, heirs, and legal representatives of the parties hereto.

5.      In the event that any action is filed to interpret any provision of this Agreement, or to enforce any of the terms thereof, the prevailing party shall be entitled to its reasonable attorneys' fees and costs incurred therein, and said action must be filed in the State of Delaware.

6.      This Agreement may be signed in counterparts, each of which shall be binding against the party executing it and considered as the original.

The parties hereto, intending to be legally bound hereby, have executed this agreement effective as of the date first above.

RELEASOR:

_____
(Name)

CRAVE FRANCHISING, LLC:

By:_____
Name:_____
Title:_____

## State Effective Dates

The following states have franchise laws that require that the Franchise Disclosure Document be registered or filed with the states, or be exempt from registration: California, Hawaii, Illinois, Indiana, Maryland, Michigan, Minnesota, New York, North Dakota, Rhode Island, South Dakota, Virginia, Washington, and Wisconsin.

This document is effective and may be used in the following states, where the document is filed, registered, or exempt from registration, as of the Effective Date stated below:

| State | Effective Date |
|---|---|
| California | *Pending* |
| Illinois | *Pending* |
| Indiana | February 4, 2021 |
| Michigan | August 4, 2020 |
| New York | January 19, 2021, amended *Pending* |

Other states may require registration, filing, or exemption of a franchise under other laws, such as those that regulate the offer and sale of business opportunities or seller-assisted marketing plans.

CRAVE FDD 2021 A

**Exhibit I to the**
**Crave Franchise Disclosure Document**

**RECEIPTS**

This Franchise Disclosure Document summarizes certain provisions of the Franchise Agreement and other information in plain language.  Read this Franchise Disclosure Document and all exhibits carefully.

If CRAVE Franchising, LLC offers you a franchise, it must provide this Disclosure Document to you 14 calendar-days before you sign a binding agreement with, or make a payment to, the franchisor or an affiliate in connection with the proposed franchise sale.  New York requires you to receive this Franchise Disclosure Document at the earlier of the first personal meeting or 10 business days before the execution of the franchise or other agreement or the payment of any consideration that relates to the franchise relationship.  Michigan requires you to receive this disclosure document at least 10 business days before the execution of any binding franchise or other agreement or the payment of any consideration, whichever occurs first.

If CRAVE Franchising, LLC does not deliver this Disclosure Document on time or if it contains a false or misleading statement, or a material omission, a violation of federal and state law may have occurred and should be reported to the Federal Trade Commission, Washington, DC, 20580, and to your state authority listed on Exhibit G.

The name and principal business address and telephone number of each franchise seller offering the franchise is:

| | |
|---|---|
| Samantha Rincione<br>122 West 25th Street, Suite 101<br>Cheyenne, Wyoming 82002<br>516-316-7420 | Salvatore Rincione<br>122 West 25th Street, Suite 101<br>Cheyenne, Wyoming 82002<br>516-316-7420 |

Issuance Date: March 30, 2021

I received a Disclosure Document date March 30, 2021, that included the following Exhibits:

    EXHIBIT A:  Financial Statements
    EXHIBIT B-1:  Franchise Agreement with Attachments
    EXHIBIT B-2:  Food Truck Addendum
    EXHIBIT C:  Multi-Unit Development Agreement with Attachments
    EXHIBIT D:  List of Franchisees and Franchisees Who Have Left the System
    EXHIBIT E:  Table of Contents of the Operations Manual
    EXHIBIT F:  State Specific Addendum
    EXHIBIT G:  State Administrators/Agents for Service of Process
    EXHIBIT H:  Form of General Release
    EXHIBIT I:  Receipts

Date Received:_____          Date:_____
(If other than date signed)


                                                _____
                                                (Signature of recipient)

                                                Print Name:_____


                                                Print Address:_____
                                                _____

**KEEP FOR YOUR RECORDS**

**RECEIPT**

This Franchise Disclosure Document summarizes certain provisions of the Franchise Agreement and other information in plain language.  Read this Franchise Disclosure Document and all exhibits carefully.

If CRAVE Franchising, LLC offers you a franchise, it must provide this Disclosure Document to you 14 calendar-days before you sign a binding agreement with, or make a payment to, the franchisor or an affiliate in connection with the proposed franchise sale.  New York requires you to receive this Franchise Disclosure Document at the earlier of the first personal meeting or 10 business days before the execution of the franchise or other agreement or the payment of any consideration that relates to the franchise relationship.  Michigan requires you to receive this disclosure document at least 10 business days before the execution of any binding franchise or other agreement or the payment of any consideration, whichever occurs first.

If CRAVE Franchising, LLC does not deliver this Disclosure Document on time or if it contains a false or misleading statement, or a material omission, a violation of federal and state law may have occurred and should be reported to the Federal Trade Commission, Washington, DC, 20580, and to your state authority listed on Exhibit G.

The name and principal business address and telephone number of each franchise seller offering the franchise is:

| | |
|---|---|
| Samantha Rincione<br>122 West 25th Street, Suite 101<br>Cheyenne, Wyoming 82002<br>516-316-7420 | Salvatore Rincione<br>122 West 25th Street, Suite 101<br>Cheyenne, Wyoming 82002<br>516-316-7420 |

Issuance Date: March 30, 2021

I received a Disclosure Document dated March 30, 2021, that included the following Exhibits:

EXHIBIT A:  Financial Statements
EXHIBIT B-1:  Franchise Agreement with Attachments
EXHIBIT B-2:  Food Truck Addendum
EXHIBIT C:  Multi-Unit Development Agreement with Attachments
EXHIBIT D:  List of Franchisees and Franchisees Who Have Left the System
EXHIBIT E:  Table of Contents of the Operations Manual
EXHIBIT F:  State Specific Addendum
EXHIBIT G:  State Administrators/Agents for Service of Process
EXHIBIT H:  Form of General Release
EXHIBIT I:  Receipts

Date Received:_____          Date:_____
(If other than date signed)


_____
(Signature of recipient)
Print Name:_____


Print Address:_____
_____


**Please return signed Receipt to: CRAVE Franchising, LLC**
Herschler Building East, Suite 101
122 West 25th Street
Cheyenne, Wyoming 82202-0020

CRAVE FDD 2021 A