## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

BDD GROUP, LLC.,

        Plaintiff,

v.

CRAVE FRANCHISING, LLC,
SAMANTHA RINCIONE, and
SALAVATORE RINCIONE

        Defendants.

Case No. 24-cv-10035

Hon. Judith E. Levy

_____/

| HAMMOUD, DAKHLALLAH & ASSOCIATES, PLLC | STARR, BUTLER, ALEXOPOULOS & STONER, PLLC |
|---|---|
| Kassem M. Dakhlallah (P70842) | Scott D. Stoner (P78037) |
| Kassem H. Amine (P86440) | Daniel C. Waslawski (P78037) |
| Basem M. Younis (P85962) | Zeth D. Hearld (P79725) |
| Attorneys for Plaintiff | Attorney for Defendants |
| 6050 Greenfield Rd., Ste 201 | 20700 Civic Center Dr., Ste. 290 |
| Dearborn, MI 48126 | Southfield, MI 48076 |
| Ph.: (313) 551-3038 | (248) 864-4935 |
| kd@hdalawgroup.com | sstoner@starrbutler.com |
| by@hdalawgroup.com | dwaslawski@starrbutler.com |
| ka@hdalawgroup.com | zhearld@starrbutler.com |

_____/

## PLAINTIFF'S FIRST AMENDED COMPLAINT AND JURY DEMAND

NOW COMES, Plaintiff, **BDD GROUP, LCC**, by and through its attorneys, HAMMOUD, DAKHLALLAH, & ASSOCIATES, and for its First Amended Complaint against Defendants, **CRAVE FRANCHISING, LLC**, **SAMANTHA RINCIONE**, and **SALVATORE RINCIONE**, hereby states as follows:

## **PARTIES & JURISDICTION**

1. Plaintiff BDD Group, LLC ("BDD Group") is a limited liability company organized in the state of Michigan. BDD Group's principal place of business is located at 5800 N Sheldon Road, Canton, Michigan 48187. BDD Group is owned by two members, Brad Fuchs and Darrell Olds. Brad Fuchs is domiciled in the state of Michigan at 7596 Wheaton Drive, Canton, MI 4817.  Darrell Olds is also domiciled in the state of Michigan at 7596 Andover Drive, Canton, MI 48187.

2. Defendant Crave Franchising, LLC ("Crave Franchising") is a limited liability company organized in the state of Wyoming. Crave Franchising's principal office is located in the state of New York at 10 Scholar Place, East Setauket, NY 11733. Upon information and belief, Crave Franchising is composed of one member, Rincione Investments, LLC. Rincione Investments, LLC is the parent company of Defendant Crave Franchising. Rincione Investments, LLC is a limited liability company also organized in the state of Wyoming. Rincione Investments, LLC's principal office is located at 10 Scholar Place, East Setauket, NY 11733. Upon information and belief, Rincione Investments, LLC is composed of two members, Defendant Samantha Rincione ("Samantha") and Salvatore Rincione ("Salvatore"). Samantha and Salvatore are husband and wife. Upon information and belief, both Samantha and Salvatore are domiciled in the state of New York.

3. Defendant Samantha Rincione is an individual who is domiciled in and is a citizen of the State of New York. Samantha is a founder and the Chief Executive Officer of Crave Franchising.

4. Defendant Salvatore Rincione is an individual who is domiciled in and is a citizen of the State of New York. Salvatore is a founder and the president of Crave Franchising.

5. This Court has personal jurisdiction over Defendant Crave Franchising and pursuant to the Federal Rules of Civil Procedure (FRCP) 4(k)(1)(A) and MCL 600.721 as Crave Franchising carries on a continuous and systematic part of its general business within the State of Michigan. This Court also has personal jurisdiction over Defendants Crave Franchising pursuant to the Federal Rules of Civil Procedure (FRCP) 4(k)(1)(A) and MCL 600.725 as Crave Franchising and transacts for business within the State of Michigan, has committed or caused an act to be done, or consequences to occur, resulting in an action for tort within the State of Michigan, and has entered into a contract for services to be performed or for material to be furnished in the State of Michigan, all of which give rise to the claims in this Complaint.

6. This Court has personal jurisdiction over Defendants Salvatore and Samantha pursuant to the Federal Rules of Civil Procedure (FRCP) 4(k)(1)(A) and MCL 600.705 as Salvatore and Samantha transacted for business within the State of

Michigan and have committed or caused an act to be done, or consequences to occur, resulting in an action for tort within the State of Michigan.

7.  This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C § 1331 as this case involves questions of federal law.

8.  This Court has supplemental jurisdiction over the related state law claims pursuant to 28 U.S.C § 1367(a) because those claims form part of the same case or controversy under Article III of the United States Constitution. Plaintiff's state law claims share the same operative facts with Plaintiff's federal law claims, and the parties are identical. Resoling Plaintiff's federal and state claims in a single action serves the interest of judicial economy, convenience, consistency, and fairness to the parties.

9.  This Court has diversity jurisdiction over this matter pursuant to 28 U.S.C §1332, as the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizen of different states, as alleged above. For purposes of diversity jurisdiction, Plaintiff is a citizen of Michigan, as both of its members are domiciled in Michigan. All Defendants are citizens of New York, as Crave Franchising's sole member is its parent company, Rincione Investments, LLC, whose members are Defendant Samantha Rincione and Salvatore Rincione, who are both domiciled in the State of New York.

Accordingly, no defendant in this matter is a citizen of Michigan, resulting in complete diversity between the parties, as Plaintiff is only a citizen of Michigan.

10. Venue is properly laid in this Court pursuant to 28 U.S.C §1391, as a substantial part of the events or omissions giving rise to the claims in this cased occurred in this judicial district, and the property that is the subject of the action is situated in this judicial district.

## FACTUAL ALLEGATIONS

11. Plaintiff restates and incorporates by reference the allegations in the preceding paragraphs as though fully set forth here.

12. Defendant Crave Franchising is a restaurant and food truck franchisor that sells hot dogs, grilled barbeque items, and other related foods and drinks.

13. According to Crave Franchising's website, "iwantcrave.com", Crave Franchising is the franchisor of over 25 locations nationwide.

14. In 2020, BDD, throughout its owners, Brad Fuchs ("Brad") and Darrell Olds ("Darrell") reached out to Crave Franchising to inquire about potentially opening a Crave restaurant in Michigan.

15. On September 7, 2020, the founder, president, and Chief Development Officer of Crave Franchising, Salvatore Rincione ("Salvatore"), responded to BDD's inquiry and provided BDD with a Franchise Disclosure Document, dated April 6, 2020 ("FDD"). **Ex. A – Email from Salvatore; Ex. B – FDD**.

16. Notably, in his email to BDD, Salvatore described the investment into a Crave restaurant as an "amazing low-cost opportunity." **Ex. A**

17. Moreover, in its FDD, Crave Franchising made several representations to BDD in order to induce BDD to enter into a franchise agreement.

18. Among several other representations, in its FDD, Crave Franchising represented that the "total investment necessary to begin operations of a Crave restaurant franchise is $220,400 to $582,000" ("Total Investment Representation"). **Ex. B**

19. The Total Investment Representation included the funds necessary "to cover ongoing expenses for the start-up phase of the business, which calculate to be three months." **Ex. B, pp. 17.**

20. To further induce BDD to enter into the franchise agreement, in its FDD, Crave Franchising also represented that the Total Investment Representation assumes "[t]hat you will purchase the required items" and that "**[y]our costs may be lower if you choose to lease some items**." *Ex. B, pp. 15.*

21. This representation was intentionally made to lead BDD to believe that the Total Investment Representation could be less than the amount stated.

22. In order to further induce BDD to rely on Total Investment Representation, in its FDD, Crave Franchising also represented that it "relied upon our (Crave Franchising) principals' experience in operating restaurants and food trucks when preparing these figures."

23. Moreover, as part of the Total Investment Representation, Crave Franchising also represented to BDD that the estimated costs of leasehold improvements would be "$50,000 to $275,000" ("Leasehold Improvements Representation"). **Ex. B, pp. 13**.

24. With regards to the Leasehold Improvement Representation, in its FDD, Crave Franchising represented that the "high end of our estimate ($275,000) assumes that you have leased a 'vanilla box' space and that more improvements are required." **Ex. B, pp. 15.**

25. In its FDD, Crave Franchising also represented that "the time from the signing of the Franchise Agreement to the opening of the Restaurant **will be approximately four to eight months**." **Ex. B, pp. 28**

26. Moreover, on December 7, 2020, Salvatore provided BDD with a personalized estimate of the total cost of investment in a Crave restaurant in the amount of $549,663.64 ("Personalized Total Investment Representation"). **Ex. C** – Personalized Total Investment Representation.

27. Notably, the Personalized Total Representation of $549,663.64, was significantly lower than the high-end of the Total Investment Representation provided in the FDD—further leading BDD to reasonably believe that the Total Investment Representation would be accurate.

28. Moreover, as part of the Personalized Total Investment Representation, Salvatore represented that BDD would need to obtain a loan in the amount of $509,663.64 to fund the investment. **Ex. C**

29. Salvatore also provided BDD with a pro forma, which included revenue projections for the first five years of operations. **Ex. D – Pro Forma**.

30. BDD reasonably believed and relied on the fact that the above representations would be correct.

31. In reliance on the above representation made, BDD executed and entered into a franchise agreement with Crave Franchising on December 7, 2020 ("Franchise Agreement"). **Ex. E - Franchise Agreement.**

32. Unfortunately, Defendants' various representations, including its Total Investment Representation, turned out to be fraudulent and intentionally inaccurate.

33. Specifically, BDD was forced to invest over $1,300,000.00 dollars to open the Crave restaurant—almost triple the amount Crave Franchising had represented.

34. Importantly, had the Total Investment Representation been higher than what Defendants stated that it would be, i.e., more than $582,000, BDD would not have entered into the Franchise Agreement as it would not have made economic sense to enter into a franchise agreement with a higher investment amount in light of Crave Franchising's revenue projections—Defendants knew this.

35. Nonetheless, after executing the Franchise Agreement and while still believing and relying on the Total Investment Representation, BDD selected a potential location for it crave restaurant, which is located a 5800 North Sheldon Road, Canton, Michigan 48187 ("Crave Canton Restaurant").

36. After BDD provided Defendants with full designs and layout plans for the Crave Canton Location, Crave Franchising approved the location.

37. Accordingly, on August 7, 2021, and pursuant to its reliance on Defendants' four-to-eight-month timeline until opening, BDD entered into a lease with the landlord of that location, HSQ, LLC ("HSQ").

38. Furthermore, in designing and planning the build out of the location, BDD fully complied with Defendants' requirements regarding, fixtures, furnishings, equipment, décor items, signs, and other related items.

39. BDD also sourced said items from vendors and suppliers expressly authorized and recommended by Defendants.

40. Given that BDD followed Crave Franchising's instructions and requirements to a tee, it reasonably and fully expected that the Total Investment Representation would be accurate.

41. In fact, Crave Franchising also required BDD to utilize one of Crave Franchising's permitted general contractors, Provost Construction ("Provost") for the required leasehold improvements.

42. However, in its FDD, Crave Franchising simply states that Crave Franchising "must approve the contractor you wish to use in the build-out of your restaurant."

**Ex. B – FDD, pp.15**

43. In other words, in its FDD, Crave Franchising did not state that Provost was a required contractor or services provider.

44. Nevertheless, given that given that Provost was a general contractor explicitly authorized and permitted by Crave Franchising, BDD justifiably relied on the fact that Leasehold Improvement Representation would be accurate.

45. However, to BDD's utter shock, the actual cost of the leasehold improvements in order to meet Defendants' specifications and requirements turned out to be almost triple the amount of Crave Franchising's Leasehold Improvement Representation.

46. Specifically, BDD was forced to pay Provost over $710,000.00 for leasehold improvements as opposed to the "$50,000 to $275,000" as provided in the Leasehold Improvement Representation.

47. Moreover, the construction timeline provided by Provost turned out to be wholly inaccurate.

48. According to Provost, the build out of the Crave Canton Restaurant was to be completed by October of 2022, in direct contradiction to Crave Franchising's four-to-eight-month timeline.

49. However, the actual completion date of construction was in February of 2023.

50. As such, not only was BDD forced to use the extremely over-priced Provost, but it was also forced to suffer significant delays in the opening of the Crave Canton Restaurant.

51. Upon information and belief, Defendants forced BDD to use Provost as the general contractor because Crave Franchising received kickbacks, commission and/or some form of material consideration from Provost for work that Defendants brought to or referred to Provost.

52. This becomes evidence since Provost is a construction company located and headquartered in the state of Connecticut.

53. As such, BDD was required to pay for the living expenses of Provost employees and agents, including over a year's worth of hotel fees, while Provost performed worked on BDD's Crave Canton Restaurant in Michigan.

54. This expense was needless and inappropriate, as there were many capable, competent, and available general contractors in the State of Michigan who could have performed the required work at a significantly lower price.

55. Despite having knowledge of these needless and added expenses, Defendants still forced BDD to utilize Provost.

56. Moreover, and as mentioned above, on December 7, 2020, Defendant Salvatore initially represented that BDD would need to take a loan of $509,663.64 (minus tenant improvements), in order to completely finance the investment. **Ex. C**

57. Again, BDD heavily relied on this loan estimate when deciding to enter into the Franchise Agreement.

58. Indeed, BDD was ultimately approved for a $575,000 Small Business Administration (SBA) loan from Meridian Bank, which it obtained.

59. However, after executing the Franchise Agreement, Defendants began to routinely increase the requested loan amount that BDD needed to obtain to fund the investment.

**60.** Namely, on August 19, 2021, Crave Franchising, through Salvatore, told BDD that it actually needed to obtain a loan in the amount of $725,320.60. **Ex. F – August 19, 2021, Loan Increase.**

61. On November 4, 2021, Salvatore again increased the needed loan amount to $1,043,568.44. **Ex. G – November 4, 2021 Loan Increase**

62. Incredibly, on August 3, 2022, Salvatore thereafter increased the loan amount once more to $1,210,658.55. **Ex. H – August 3, 2022 Loan Increase**

63. As a result, following execution the execution of the Franchise Agreement, BDD was forced to obtain a second SBA loan of $455,000.00, which it had not

anticipated due to its reliance on Crave Franchising's Total Investment Representation.

64. In order to secure the unanticipated loans, Brad, Brad's Wife (Pamela Fuchs), Darrell, and Darrell's wife (Shelby Olds) were all forced to execute personal guarantees.

65. Brad and Darrell were also forced to execute mortgages on each of their respective homes to use as collateral for unanticipated loans.

66. In addition to being compelled to use their homes as collateral in order to secure the unanticipated loans, Brad and Darrell were also forced to obtain two separate personal loans totaling $100,000.

67. Namely, Brad obtained a personal loan of $25,000 and Darrell obtained a personal of $75,000, in order to meet the actual total investment amount needed.

68. Unfortunately, the delays caused by Provost and the unanticipated process of having to obtain the unexpected loans caused significant delays in the timeline for the opening of the Crave Canton Restaurant.

69. Specifically, the Crave Canton Restaurant did not open its doors until February 2023, despite the fact that Crave Franchising represented that the "time from the signing of the Franchise Agreement to the opening of the Restaurant will be **approximately four to eight months**." **Ex. B, pp. 28**.

70. Because BDD executed the Franchise Agreement on December 7, 2020, it expected to open its doors sometime in September of 2021—at the latest—per the timeline representation made in the FDD.

71. As a direct result of the delays caused by Defendants fraudulent representations, BDD was forced to pay over $7,000 in monthly rent to HSQ for an inoperable location for almost two years while it waited for Meridian Bank to issue the unanticipated loans and for Provost to complete construction—again which were a direct result of Defendants' initial fraudulent investment representation and forced selection of Provost.

72. Unfortunately, after finally opening the Crave Canton Restaurant in February of 2023, BDD achieved little to no profits due to the suffocating debt it was forced to incur, as a significant amount of the revenue generated is being used to pay off the unexpected loans.

73. Moreover, as a result of the suffocating debt, BDD has been unable to make several required expenses, including required foods purchases and rent payments to HSQ.

74. In fact, BDD is currently in default on its lease with HSQ.

75. Crave Franchising is well aware of BDD's outstanding rent obligations, as BDD and Defendants have been in constant communications regarding the developing situation.

76. Unfortunately, instead of assisting BDD with resolving its issues with HSQ, Defendants intentionally worsened the situation.

77. Specifically, after extensive talks regarding the outstanding rent obligations, Crave Franchising, through its Chief Executive Officer, Samantha Rincione ("Samantha"), told BDD that it would directly reach out to the HSQ in hopes to negotiate a resolution on BDD's behalf.

78. Having no reason to believe that Defendants would not act in its best interest, BDD accepted and relied on Defendants' proposal.

79. Thereafter, on multiple occasions, BDD reached out to Crave Franchising, Samantha, and Salvatore, in order see whether any progress had been made regarding the rent.

80. For several weeks, Defendants told BDD that it had reached out to HSQ regarding the rent situation and provided BDD with "updates" regarding the same.

81. However, it was later discovered that Crave Franchising did not have any communications with the HSQ and that the "updates" provided to BDD were utter fabrications.

82. Indeed, HSQ confirmed that it did not receive any communications from Crave Franchising, Samantha, or Salvatore.

83. When BDD confronted Crave Franchising about their fabricated updates, Salvatore apologized to BDD for failing to communicate with HSQ but indicated that its failure to do so was simply a "mistake."

84. Unfortunately, because BDD relied on Defendants' promise to reach out to HSQ, it never reached out to HSQ itself.

85. As a direct result of BDD's reliance on Defendats' attention to the matter, and Crave Franchising's subsequent inaction, on November 30, 2023, HSQ issued a notice of default to BDD, wherein it requested that BDD pay $18,039.55 in overdue rent to HSQ within 10 days, in order to avoid eviction. **Ex. I – November 30, 2023 Landlord Notice**

86. Moreover, on December 27, 2023, HSQ served Plaintiff with a demand for possession for non-payment of rent. **Ex. J – December 27, 2023, Demand for Possession**

87. Again, due to the unanticipated debt that it was forced to incur, BDD is simply unable to make any payments to HSQ.

88. Additionally, in October of 2023, during communications regarding BDD's financial struggles due to the large loan payments, Crave Franchising offered to pause royalty payments for two months in order to financially assist BDD**. Ex. K – Email from Crave Franchising.**

89. The pause was supposed to encompass the months of November and December.

90. BDD accepted said offer.

91. However, thereafter Crave Franchising unjustifiably broke its promise of the two-month royalty payments pause, by charging BDD royalty fees for the month of December.

92. This incident merely underscores Crave Franchising's deceptive and untrustworthy business practices.

93. Defendants made several other fraudulent and deceptive representations to BDD.

94. Namely, while performing Crave Franchising's required training program, BDD were introduced to Crave Franchising's Director of Franchise Support & Training, Mona Jones.

95. During that training program, Mona Jones indicated to BDD that she previously bought an already existing Crave restaurant from a different franchisee but was forced to subsequently close it down because she didn't have enough time to dedicate to the store.

96. However, documents provided by Crave Franchising list Mona as an original franchisee of Crave Franchising, despite the fact that she never was, per her own admission.

97. Again, this incident further highlight's Crave Franchising's deceptive and untrustworthy business practices.

98. Additionally, it has been discovered that an unusually large number of Crave Franchising's franchisees have opened and subsequently closed down in a remarkably short period of time—the exact predicament BDD faces.

99. Upon information and belief, those other franchisees were similarly defrauded by Crave Franchising's deceptive and fraudulent representations.

100. Upon information and belief, a Crave restaurant in Charleston, South Carolina recently closed down after opening up only a few months prior:





101. Furthermore, on its website Crave Franchising currently deceptively represents that this Charleston, South Carolina Crave restaurant is "coming soon", instead of truthfully representing that the restaurant was recently closed, https://iwantcrave.com/locations/south-carolina/:



102. Similarly, a Crave restaurant in Ocala, Florida recently closed down after opening its doors in August of 2023, https://www.ocala-news.com/2023/12/19/ocala-hot-dog-spot-closed-less-than-4-months-after-opening/:





103. And again, instead of noting that the Ocala, Florida Restaurant was recently closed down, Crave Franchising represents that this the restaurant is "coming soon", https://iwantcrave.com/locations/florida/:

104. A Crave restaurant in Concord, North Carolina also recently closed down after only being open for a short while. On its website, Crave Franchising also inaccurately represents that this restaurant is "coming soon", https://iwantcrave.com/locations/northcarolina/:







105.   Astonishingly, a Crave restaurant in Raleigh, North Carolina also recently

closed its door after it was only open for only a short while. On its website, Crave

Franchising again inaccurately represents that this restaurant is "coming soon",

https://iwantcrave.com/locations/northcarolina/:





106.    Moreover, in a news article published in September of 2023, which includes

direct statements and comments made by Defendant Samantha Rincione, it is

stated that the total investment needed to open a Crave restaurant is "half a

million dollars", https://www.mashed.com/1402502/what-is-crave-hot-dogs-bbq/.

107. That same article also incorrectly states that there is "over 50 brick-and-mortar restaurants and around 20 food trucks currently in business", https://www.mashed.com/1402502/what-is-crave-hot-dogs-bbq/.

108. Upon information and belief, Defendant Samantha and Defendant Salvatore are directly responsible for the making of the fraudulent and inaccurate statements made in the "mashed.com" news article.

109. Similarly, in another news article published in March of 2023, which is linked to Crave Franchising's official website, it is represented that the total investment needed to open a Crave restaurant is "$190,400 - $512,500", https://www.profitableventure.com/franchise/hot-dog-opportunities/; https://iwantcrave.com/articles/.

110. Importantly, Defendants prohibit the disclosure of their fraudulent practices by prohibiting former franchisees from speaking about their experiences with Crave Franchising.

111. For example, pursuant to the Franchise Agreement, former franchisees are prevented from doing or performing, directly or indirectly, "any other act injurious or prejudicial to the goodwill associated with the Marks and the System." **Ex. D – Franchise Agreement, §10.3.2(a).**

112. Moreover, former franchisees of Crave Franchising are expressly prohibited from directly or indirectly representing to the public that they are former franchisees of Crave Franchising. **Ex. D – Franchise Agreement, §18.1.**

113. Indeed, in 2022, in response to a question from BDD regarding a former franchisee who had recently filed for bankruptcy, Mona Jones expressly told BDD that she was not allowed to speak on the matter.

114. Similarly, Crave Franchising sent out an email to its franchisees, including BDD, wherein it instructed their franchisees to ignore any message or communication from a disgruntled former franchisee and to not contact him. **Ex. L – Corporate Email Regarding Former Franchisee**

115. Moreover, as it does on their website, Crave Franchising also purposely misrepresents and decreases the number of franchisees who have closed down and/or transferred their stores on its FDD, in order to induce potential franchisees to enter into Franchise Agreements by making an investment in Crave Franchising to appear more appealing than it is.

116. Specifically, in the Franchise Disclosure Document provided to Plaintiff, dated April 6, 2020, Crave Franchising represented that were two franchisees who left the system:

**FRANCHISEES WHO HAVE LEFT THE SYSTEM**
(As of December 31, 2019)

| DISTRICT OF COLUMBIA | |
| --- | --- |
| **Franchisee** | **Location** |
| Floyd Bui<br>703-945-8467 | Washington, DC<br><br>**Terminated before lease signing** |

CRAVE FDD 2020 A6                    2

| GEORGIA | |
| --- | --- |
| **Franchisee** | **Location** |
| Blackrock Foodservice LLC<br>Robert Bibb<br>128 Headwaters Trail<br>Deloghgia, Georgia 30533<br>678-360-8844 | Dawson Crossroads<br>145 Forest Boulevard, Suite 465<br>Dawsonville, Georgia 30534<br><br>**Opened & transferred in 2019 to existing franchisee** |

**Ex. A – Franchise Disclosure Document, Exhibit D, pp. 2-3.**

117.   However, in a subsequent Franchise Disclosure Document, dated March 30, 2021, and in contradiction to its previous Franchise Disclosure Document, Crave Franchising misrepresented that were no franchisees who left the system as of March 30, 2021:

**FRANCHISEES WHO HAVE LEFT THE SYSTEM**
(As of December 31, 2020)

None

**Ex. M – March 30, 2021 Franchise Disclosure Document, Exhibit D, pp. 4.**

118.   Upon information, in their subsequent Franchise Disclosure Document, Crave Franchising continues to misrepresent the number of franchisees that have closed

down and/or transferred stored in order to fraudulent induce prospective franchisees.

119. In sum, and as shown above, Defendants employs several deceitful, fraudulent, and unlawful practices to induce franchisees, such as BDD, to enter into franchise agreements.

120. As a result of those deceitful, fraudulent, and unlawful practices, BDD has suffered immense damages.

## COUNT I — FRAUDULENT MISREPRESENTATION

121. Plaintiff hereby re-alleges and incorporates all previous paragraphs of this Complaint as if fully restated herein.

122. In order to have a claim for fraudulent misrepresentation the Plaintiff must prove: 1) the defendant made a material representation; 2) it was false; 3) the defendant either knew it was false or made it recklessly without knowledge of its truth; 4) the representation was made with the intent that the plaintiff would act upon it; and 5) the plaintiff did act, which caused the plaintiff to suffer damages. *Hi–Way Motor Co. v. Int'l Harvester Co.*, 398 Mich. 330, 336 (1976).

123. Defendants made many material representations to Plaintiff as an inducement to enter into the Franchise Agreement, including, but not limited to, representations relating the initial total investment amount, representations relating to the timeframe needed to open the restaurant, representations relating

to the costs of leasehold improvements, representations relating to the loan amount needed to fund the investment, representations regarding a required general contractor, and representations relating to the number of former franchisees.

124.   These material representations were false.

125.   Defendants either knew that these representations were false or made it recklessly without knowledge of its truth.

126.   Defendants made these representations with the intent that Plaintiff would rely upon it.

127.   Plaintiff did, in fact, act in reliance upon the Defendants' misrepresentations, by entering into the Franchise Agreement.

128.   Plaintiff, as a result, suffered damages.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment against Defendants, rescinding the Franchise Agreement, for damages in an amount greater than $75,000.00 plus 12% interest from the date of the entering of the Franchise Agreement, plus all costs and attorney fees so wrongfully incurred in having to bring this lawsuit.

## COUNT II — SILENT FRAUD

129.   Plaintiff hereby re-alleges and incorporates all previous paragraphs of this Complaint as if fully restated herein.

130. "Silent fraud is essentially the same as fraudulent misrepresentation except that it is based on a defendant suppressing a material fact that he or she was legally obligated to disclose, rather than making an affirmative misrepresentation." *Alfieri v. Bertorelli*, 813 N.W.2d 772 (Mich. Ct. App. 2012). To prove silent fraud therefore Plaintiff must show Defendant "suppressed the truth with intent to defraud" and that Defendant had a legal or equitable duty of disclosure." *Lucas v. Awaad*, 830 N.W.2d 141, 152 (Mich. Ct. App. 2013).

131. Defendants suppressed many material facts in order to induce Plaintiff to enter into the Franchise Agreement, including, but not limited to, suppressing the material fact that Provost Construction was a required general contractor that needed to be used to construct the restaurant and suppressing the facts regarding its relationship with Provost Construction.

132. Pursuant to MCL § 445.1508(2)(f), a franchisor's disclosure statement must contain:

> **A statement as to whether, by the terms of the franchise agreement or by other device or practice, the franchisee** or subfranchisor **is required to purchase from** the franchisor or **the franchisor's designee services**, supplies, products, fixtures, or other goods relating to the establishment or operation of the franchise business, together with a description**, and the terms and conditions thereof.**

28

133.  In other words, Defendants had a legal obligation to state whether Plaintiff was required to use Provost Construction as the general contractor and the terms and conditions of that relationship.

134.  Defendants failed to state the fact that Provost was the required general contractor its FDD, nor did it state the terms and conditions thereof.

135.  Defendants had an obligation to do so.

136.  As a result of Defendants' actions and omissions, Plaintiff suffered damages.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment against Defendants, rescinding the Franchise Agreement, for damages in an amount greater than $75,000.00 plus 12% interest from the date of the entering of the Franchise Agreement, plus all costs and attorney fees so wrongfully incurred in having to bring this lawsuit.

## COUNT III — INNOCENT MISREPRESENTATION

137.  Plaintiff hereby re-alleges and incorporates all previous paragraphs of this Complaint as if fully restated herein.

138.  The elements of innocent misrepresentation are: (1) a representation in a transaction between two parties; (2) that is false; (3) that actually deceives the other party; (4) that the other party relied on; (5) that the other party suffered damage from; and (6) the party making the misrepresentation benefited from it. *In re Moiles*, 840 NW2d 790 (Mich. Ct. App. 2013)

139. Defendants falsely represented the initial total investment amount, the timeframe needed to open the restaurant, the costs of leasehold improvements, the loan amount needed to fund the investment, that there is no required general contractor, the number of former franchisees.

140. Plaintiff was deceived by Defendants' representations.

141. Plaintiff relied upon these representations by the Defendants, by entering into the Franchise Agreement.

142. Plaintiff suffered damages as a result.

143. Defendants benefitted from their misrepresentation to Plaintiff.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment against Defendants, rescinding the Franchise Agreement, for damages in an amount greater than $75,000.00 plus 12% interest from the date of the entering of the Franchise Agreement, plus all costs and attorney fees so wrongfully incurred in having to bring this lawsuit.

## COUNT IV — VIOLATION OF MICHIGAN'S FRANCHISE INVESTOR LAW (MCL 445.1401 *et seq.*)

144. Plaintiff hereby re-alleges and incorporates all previous paragraphs of this Complaint as if fully restated herein.

145. Plaintiff is a "franchisee" within the meaning of MCL 445.1502(4).

146. Defendant Crave Franchising is a "franchisor" within the meaning of MCL 445.1502(5).

147.   Furthermore, pursuant to section 445.1532, the executives and officers of the franchisors who control the franchisor are also liable under Michigan's Franchise Investor Law:

> **A person who directly or indirectly controls a person liable under this act**, a partner in a firm so liable, **a principal executive officer or director of a corporation so liable**, a person occupying a similar status or performing similar functions, **an employee of a person so liable who materially aids in the act or transaction constituting the violation, is also liable jointly and severally with and to the same extent as the person...**

148.   Given that Defendants Salvatore Rincione and Samantha Rincione are principals and executive officers of Crave Franchising, and directly/indirectly controlled Crave Franchising, all Defendants are jointly and severally liable pursuant to the Michigan Franchise Investment Law, at *MCL 445.1501 et seq.*

149.   Pursuant to the explicit language of this statute, certain acts are prohibited by franchisors/persons with regard to the offering of any franchise as stated in *MCL 445.1505*, which states:

> 445.1505     Prohibited conduct in connection with offer, sale, or purchase of franchise.
>
> Sec. 5. A person shall not, in connection with the filing, offer, sale, or purchase of any franchise, directly or indirectly:
>
> (a) Employ any device, scheme, or artifice to defraud;
>
> (b) Make any untrue statement of a material fact or omit to state a material fact necessary in order to make the

statements made, in the light of the circumstances under which they are made, not misleading.

(c) Engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

150. As outline above, Defendants made various material misrepresentations, failed to make various required-disclosures, and made several misleading statements in violation of MCL 455.1505, including but not limited to, representations relating to the initial total investment amount, representations relating to the timeframe needed to open the restaurant, representations relating to the costs of leasehold improvements, representations relating to the loan amount needed to fund the investment, representations relating to whether there is any required general contractor, representations regarding Defendants' relationship with Provost Construction, and representations relating to the number of former franchisees.

151. Furthermore, in its Franchise Agreement, Defendants utilized various provisions to prohibit current and former franchisees from disclosing Defendants' wrongdoings, as outlined above.

152. Additionally, pursuant to MCL § 445.1508(2)(f), a franchisor's disclosure statement must contain:

> **A statement as to whether, by the terms of the franchise agreement or by other device or practice, the franchisee** or subfranchisor **is required to purchase from the franchisor or**

**the franchisor's designee services**, supplies, products, fixtures, or other goods relating to the establishment or operation of the franchise business, together with a description**, and the terms and conditions thereof.**

153.   In violation of MCL § 445.1508(2)(f), Defendants also failed to state the fact that Provost was the required general contractor in the Franchise Disclosure Statement, nor did it state the terms and conditions thereof.

154.   As a direct and proximate result of the Defendants' breaches of Michigan's Franchise Investment Law, Plaintiff has been damaged in a substantial and material respect.

155.   As it relates to damages under Michigan's Franchise Investor Law, MCL § 445.1531(1) provides that:

> **A person who offers or sells a franchise in violation of section 5 or 8 is liable to the person purchasing the franchise for damages or rescission**, with interest at 6% per year from the date of purchase until June 20, 1984 **and 12% per year thereafter** and reasonable attorney fees and court costs.

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court enter judgment against Defendants, rescinding the Franchise Agreement, for damages in an amount greater than $75,000.00 plus 12% interest from the date of the entering of the Franchise Agreement, plus all costs and attorney fees so wrongfully incurred in having to bring this lawsuit.

## COUNT V — VIOLATION OF THE FEDERAL TRADE COMMISSION' FRANCHISE RULE (*16 C.F.R. § 436.1 et seq.*)

156.   Plaintiff hereby re-alleges and incorporates all previous paragraphs of this Complaint as if fully restated herein.

157.   Plaintiff is a "franchisee" within the meaning of 16 C.F.R. § 436(1)(i)

158.   Defendant Crave Franchising is a "franchisor" within the meaning of 16 C.F.R. § 436(1)(k).

159.   Pursuant to 16 C.F.R. § 436.5(g) ("Subpart C"), in their franchise disclosure statement, franchisors must:

> (g) disclose, in the following tabular form, the franchisee's estimated initial investment.

160.   As outlined above, Defendants failed to disclose an accurate initial investment, as the total actual investment, turned out to be almost triple the amount initially estimated, in violation of 16 C.F.R. § 436.5(g).

161.   Pursuant to 16 C.F.R. § 436.5(h) ("Subpart C"), in their franchise disclosure statement, franchisors must:

> (h) **Disclose the franchisee's obligations to purchase or lease goods, services**, supplies, fixtures, equipment, inventory, computer hardware and software, real estate, or comparable items related to establishing or operating the franchised business either **from the franchisor, its designee, or suppliers approved by the franchisor**, or under the franchisor's specifications. Include obligations to purchase imposed by the franchisor's written agreement or by the franchisor's practice. For each applicable obligation, state:
>
> (1) The good or service required to be purchased or leased

(2) Whether the franchisor or its affiliates are approved suppliers or the only approved suppliers of that good or service.

(3) Any supplier in which an officer of the franchisor owns an interest.

(6) Whether the franchisor or its affiliates will or may derive revenue or other material consideration from required purchases or leases by franchisees. If so, describe the precise basis by which the franchisor or its affiliates will or may derive that consideration by stating:

> (i) The franchisor's total revenue.
> (ii) The franchisor's revenues from all required purchases and leases of products and services.
> (iii) The percentage of the franchisor's total revenues that are from required purchases or leases.
> (iv) If the franchisor's affiliates also sell or lease products or services to franchisees, the affiliates' revenues from those sales or leases.

(8) If a designated supplier will make payments to the franchisor from franchisee purchases, disclose the basis for the payment (for example, specify a percentage or a flat amount). For purposes of this disclosure, a "payment" includes the sale of similar goods or services to the franchisor at a lower price than to franchisees.

(9) The existence of purchasing or distribution cooperatives.

162.   As outlined above, Defendants failed to disclose that Plaintiff was required to utilize Provost Construction as the general contractor for construction of the restaurant, in violation of 16 C.F.R. § 436.5(h).

163.   Furthermore, Defendants failed to disclose any terms and conditions relating to the relationship between Provost Construction and Defendants, in violation of 16 C.F.R. § 436.5(h).

164.   Pursuant to 16 C.F.R. § 436.5(t) (Subpart C), in their franchise disclosure statement, franchisors also must also:

> (2) **Disclose, in the following tabular form, the number of franchised and company-owned outlets and changes in the number and ownership of outlets located in each state during each of the last three fiscal years**. Except as noted, each change in ownership shall be reported only once in the following tables. If multiple events occurred in the process of transferring ownership of an outlet, report the event that occurred last in time. **If a single outlet changed ownership two or more times during the same fiscal year, use footnotes to describe the types of changes involved and the order in which the changes occurred**.
>
> (i)   Disclose, in the following tabular form, **the total number of franchised outlets transferred in each state during each of the franchisor's last three fiscal years.** For purposes of this section, "transfer" means the acquisition of a controlling interest in a franchised outlet, during its term, by a person other than the franchisor or an affiliate.
>
> (ii)   Disclose in the following tabular form, the status of franchisee-owned outlets located in each state for each of the franchisor's last three fiscal years:
>
> > (A) In column 1, list each state with one or more franchised outlets.
> > (B) In column 2, state the last three fiscal years.
> > (C) In column 3, state the total number of franchised outlets in each state at the start of each fiscal year.

(D) In column 4, state the total number of franchised outlets opened in each state during each fiscal year. Include both new outlets and existing company-owned outlets that a franchisee purchased from the franchisor. (Also report the number of existing company-owned outlets that are sold to a franchisee in Column 7 of Table 4).

(E) In column 5, state the total number of franchised outlets that were terminated in each state during each fiscal year. For purposes of this section, "termination" means the franchisor's termination of a franchise agreement prior to the end of its term and without providing any consideration to the franchisee (whether by payment or forgiveness or assumption of debt).

(F) In column 6, state the total number of non-renewals in each state during each fiscal year. For purposes of this section, "non-renewal" occurs when the franchise agreement for a franchised outlet is not renewed at the end of its term.

(G) In column 7, state the total number of franchised outlets reacquired by the franchisor in each state during each fiscal year. For purposes of this section, a "reacquisition" means the franchisor's acquisition for consideration (whether by payment or forgiveness or assumption of debt) of a franchised outlet during its term. (Also report franchised outlets reacquired by the franchisor in column 5 of Table 4).

(H) In column 8, state the total number of outlets in each state not operating as one of the franchisor's outlets at the end of each fiscal year for reasons other than termination, non-renewal, or reacquisition by the franchisor.

(I) In column 9, state the total number of franchised outlets in each state at the end of the fiscal year.

165.   As outlined above, Defendants failed to state the accurate status of various current and former franchisees, in accordance with the requirements laid out under 16 C.F.R. § 436.5(t)(2)(i) and 16 C.F.R. § 436.5(t)(2)(ii)(A – I).

166.   Upon information and belief, there are various Crave restaurants that were transferred, terminated, or reacquired, that Defendants did not accurately disclose.

167.   Pursuant to 16 C.F.R. § 436.6(a), it is:

> (a) is an unfair or deceptive act or practice in violation of Section 5 of the FTC Act for any franchisor to fail to include the information and follow the instructions for preparing disclosure documents set forth in subpart C (basic disclosure requirements)

168.   Defendants engaged in unfair and deceptive acts, as they failed to make many required disclosures under Section 5 of the FTC Act and failed to follow all the instructions regarding the same pursuant to section 5 of the FTC Act, as outlined above.

169.   Moreover, pursuant to 16 C.F.R. § 436.9, it is an unfair or deceptive act or practice in violation of Section 5 of the Federal Trade Commission Act for any franchise seller covered by part 436 to:

> (a) Make any claim or representation, orally, visually, or in writing, that contradicts the information required to be disclosed by this part.

> (b) Misrepresent that any person:

      (1) Purchased a franchise from the franchisor or operated a franchise of the type offered by the franchisor.

2. As outlined above, made various claims and representations that contradicted information contained in the Franchise Disclosure Documents, including but not limited to, its representation that Provost Construction was a required general contractor, in violation of 16 C.F.R. § 436.9(a).

3. As outlined above, Defendants also misrepresented, among other things, that Mona Jones purchased a franchise from Defendants when she did not, and the number of franchisors that acquired their franchise from the Defendants or from a former franchisee, in violation of 16 C.F.R. § 436.9(b)(1)

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court enter judgment against Defendants, rescinding the Franchise Agreement, for damages in an amount greater than $75,000.00 plus 12% interest from the date of the entering of the Franchise Agreement, plus all costs and attorney fees so wrongfully incurred in having to bring this lawsuit.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectful requests that this Honorable Court grant the following relief:

    a) Compensatory damages in amount to be determined at trial, but in excess of $75,000;

    b) Punitive and/or exemplary damages in amount to be determined at trial;

c) Pre-Judgment and Post-Judgement interest to the extent permitted by law and MCL § 445.1531(1);

d) Cost of reasonable attorneys' fees and court costs to the extent permitted by law and MCL § 445.1531(1);

e) Recission of the Franchise Agreement;

f) An Order requiring Defendants to assume Plaintiff's lease with HSQ, LLC, and releasing all of Plaintiff's duties and obligation with respect to said lease;

g) An Order requiring Defendants to pay all outstanding rent payments owed to HSQ, LLC due under Plaintiff's lease with HSQ, LLC;

h) An Order requiring Defendants to pay off the remaining balance of Plaintiff's two SBA loans, including but not limited to, the interest on said SBA loans, and any pre-payment penalty charged;

i) An Order requiring Defendants to pay off the remaining balance of Brad Fuchs's personal loan of $25,000 and Darrell Old's personal loan of $75,000, including but not limited to, the interest on said personal loans, and any pre-payment penalty charged; and

j) An Order requiring Defendants to pay all costs incurred as a result of entering into the Franchise Agreement;

k) Any other relief this Court deems just and appropriate.

Respectfully Submitted:

HAMMOUD, DAKHLALLAH & ASSOCIATES, PLLC

/s/ *Kassem M. Dakhlallah*
Kassem M. Dakhlallah (P70842)
6050 Greenfield Rd., Ste. 201
Dearborn, MI 48126
(313) 551-3038

kd@hdalawgroup.com

Dated: January 24, 2024                    *Attorney for Plaintiff*

## <u>JURY DEMAND</u>

Plaintiff hereby demand a trial by jury of all triable issues, pursuant to Fed R.

Civ. P. 38(b) and Fed R. Civ. P. 38(c)

Respectfully Submitted:

HAMMOUD, DAKHLALLAH &
ASSOCIATES, PLLC

/s/ *Kassem M. Dakhlallah*
Kassem M. Dakhlallah (P70842)
6050 Greenfield Rd., Ste. 201
Dearborn, MI 48126
(313) 551-3038
kd@hdalawgroup.com
Dated: January 24, 2024                    *Attorney for Plaintiff*